IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                               No. CR 17-0965 JB

KIRBY CLEVELAND,

    Defendant.

**DEFENDANT KIRBY CLEVELAND'S MOTION TO DISMISS
AND/OR TO STRIKE THE NOTICE OF INTENT TO SEEK PENALTY OF DEATH
BECAUSE OF THE UNCONSTITUTIONALITY OF SELECTING A FAIR,
IMPARTIAL AND REPRESENTATIVE "DEATH QUALIFIED" JURY IN A STATE
<u>WHERE MOST CITIZENS OPPOSE THE DEATH PENALTY</u>**

The Defendant, Kirby Cleveland, by and through his attorneys, Theresa M. Duncan and Donald F. Kochersberger III, and for his Motion to Dismiss and/or to Strike the Notice of Intent to Seek Penalty of Death Because of the Unconstitutionality of Selecting a Fair, Impartial, and Representative, "Death Qualified" Jury in a State Where Most Citizens Oppose the Death Penalty, STATES:

**INTRODUCTION**

The government should be barred from seeking the death penalty in Mr. Cleveland's case because it would violate the Fifth, Sixth, and Eighth Amendments to seek a "death qualified" jury in a state where most citizens oppose that penalty. A "death qualified" jury could not truly serve as the conscience of the community in New Mexico[1], and would not be fair, impartial, or

---

[1] In addition to the State of New Mexico having repealed its death penalty, Mr. Cleveland is member of, and has resided for the overwhelming majority of his life in territory governed by, the Navajo Nation, a sovereign tribe that also opposes the death penalty. To the extent that any Navajo

representative of the community.

## PROCEDURAL HISTORY

Defendant Kirby Cleveland was charged in an April 12, 2017, Indictment with: murder of an officer or employee of the United States (Count 1), murder committed in the perpetration of an escape (Count 2), first degree murder (Count 3); Escape (Count 4) using and carrying firearms during and in relation to a crime of violence (Count 5, 6, and 7); and felon in possession of a firearm and ammunition (Count 8). [Doc. 20] The Indictment also includes Special Findings with respect to four counts in the Indictment. The Special Findings allege that, in addition to the gateway factors set forth in 18 U.S.C. § 3591(a)(2), two statutory aggravating factors apply: (1) Mr. Cleveland caused Officer Largo's death during the commission of or flight from another crime, specifically escape (18 U.S.C. § 3592(c)(1)); and (2) he committed the offense against a law enforcement officer engaged in his official duties (18 U.S.C. § 3592(c)(14)(D)(i)).  On January 26, 2018, the government filed its Notice of Intent to Seek the Death Penalty. [Doc. 39]

Mr. Cleveland now seeks to prohibit the government from seeking death based on the unconstitutionality of forcing a community in New Mexico to impose a punishment they have already rejected as cruel and unusual in violation of the Eighth Amendment.

## ARGUMENT

**I.      Under the Constitution and 18 U.S.C. Section 3593 (b), Only A Fair and Impartial Jury Selected From A Fair Cross Section Of The Community May Determine that Mr. Cleveland Should Receive a Death Sentence**

In the FDPA, Congress wisely chose to entrust to a jury of twelve (12) the ultimate decision of whether to impose the death penalty on a defendant convicted of capital murder. *See* 18 U.S.C.

---

people present themselves in the venire, they will nonetheless be disproportionately small compared to the ratio of Navajo people in *Mr. Cleveland's* community.

§ 3593(b). Because Mr. Cleveland is statutorily entitled to a jury trial on the issue of the appropriateness of the death penalty, it is a largely academic question of whether he is also entitled to a jury under the constitution. However, it is important to point out that the evolving view on this issue is that the Constitution requires the sentencing determination in a capital case to be made by a jury. There is indication from the high court, as found in several opinions, that previous and current justices have interpreted the Eighth Amendment to require that juries make capital sentencing determinations. "Of the 32 States[2] that currently authorize capital punishment, 31 require jury participation in the sentencing decision; only Montana leaves the jury with no sentencing role in capital cases." *Woodward v. Alabama*, 134 S. Ct. 405, 407 (2013) (Sotomayor, with whom Justice Breyer joins as to Parts I and II, dissenting from denial of certiorari.) After all, without adequate procedural safeguards, "the constitutional prohibition against 'cruel and unusual punishments' would forbid [the] use" of the death penalty. One such safeguard is that a "jury, and not a judge, should impose any sentence of death." *Id.* (quoting *Ring v. Arizona*, 536 U.S. 584, 612 (2002) (Breyer, J. concurring in judgment)).

The reason that the Eighth Amendment requires capital sentencing determinations to be made by a jury has been summarized by Justice Breyer:

> This Court has held that the Eighth Amendment requires States to apply special procedural safeguards when they seek the death penalty. Otherwise, the constitutional prohibition against "cruel and unusual punishments" would forbid its use. Justice Stevens has written that those safeguards include a requirement that a jury impose any sentence of death. Although I joined the majority in *Harris v. Alabama*, I have come to agree with the dissenting view, and with the related views of others upon which it in part relies. I therefore conclude that the Eighth Amendment requires that a jury, not a judge, make the decision to sentence a defendant to death.
> . . . .

---

[2] As of November 9, 2016, there were 31 States with the death penalty. https://deathpenaltyinfo.org/states-and-without-death-penalty.

> In respect to retribution, jurors possess an important comparative advantage over judges. In principle, they are more attuned to "the community's moral sensibility," Spaziano, 468 U.S., at 481, 104 S.Ct. 3154 (STEVENS, J., concurring in part and dissenting in part), because they "reflect more accurately the composition and experiences of the community as a whole," id., at 486, 104 S.Ct. 3154. Hence they are more likely to "express the conscience of the community on the ultimate question of life or death," Witherspoon v. Illinois, 391 U.S. 510, 519, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)…

*Ring*, 536 U.S. at 614-19 (Breyer, J., concurring in the judgment) (citations omitted).

Thus, the function of the jury in a capital case is to "express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968). And a capital jury, as Congress certainly knew when it conferred that right in capital cases, has certain other attributes as well.

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010), citing *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). "The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life….The FDPA enshrines this right. It requires that the jury be unanimous in concluding that the death penalty is justified". *See* 18 U.S.C. § 3593(d).  If even a single biased juror participates in the imposition of the death sentence, the sentence is infirm and cannot be executed." *Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013).

To satisfy the Sixth Amendment and the FDPA, jury "wheels", pools of names, panels, and venires must represent "a fair cross-section of the community." *Duren v. Missouri*, 439 U.S. 357, 363-64 (1979) (citing *Taylor v. Louisiana*, 419 U.S. at 538).  The jury itself need not represent a fair cross-section of the community, so long as the method by which a potential jury is drawn does not systematically exclude distinct groups. *Holland v. Illinois*, 493 U.S. 474, 477-84 (1990); *Taylor*, 419 U.S. at 538.  The objectives of the fair cross-section requirement include avoiding "the

possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common sense judgment of the community" and avoiding the "appearance of unfairness" that would result from excluding "large groups of individuals, not on the basis of their ability to serve as jurors, but on the basis of some immutable characteristic such as race, gender or ethnic background." *Lockhart v. McCree*, 476 U.S. 162, 175 (1986); *see also Taylor*, 419 U.S. at 530-31.

Extra precautions must be taken to protect the defendant's right to an impartial and representative jury in a capital case because of "the broad discretion given the jury at the death-penalty hearing" and "the special seriousness of the risk of improper sentencing." *Turner v. Murray*, 476 U.S. 28, 37 (1986); *Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013)("The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life.") *Gibson v. Zant*, 705 F. 2d 1543,1546 (11th Cir. 1983) ("The importance of non-discriminatory jury composition is magnified in capital cases, where juries are required to consider 'as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis of a sentence less than death.'"). In a death penalty case, "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007).

The Jury Service and Selection Act of 1968 (hereinafter "JSSA"), 28 U.S.C. §§ 1861-78 (the Act), "seeks to ensure that potential grand and petit jurors are selected at random from a representative cross section of the community and that all qualified citizens have the opportunity to be considered for service." *United States v. Calabrese*, 942 F.2d 218, 220 (3d Cir. 1991) (quoting *United States v. Bearden*, 659 F.2d 590, 593 (5th Cir. 1981). Specifically, 28 U.S.C. §

1861 grants litigants "the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." It further provides that "all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States[.]" 28 U.S.C. § 1861.

"If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title." 28 U.S.C. § 1867(d). The Act also provides that, although voter registration lists should be the primary source of prospective jurors, "the plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by §§ 1861 and 1862." 28 U.S.C. § 1863(b)(2). Those sections grant the right to a jury drawn from a fair cross-section of the community and provide that no citizen shall be excluded from service as a grand or petit juror "on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. §§ 1861, 1862.

II.     **A Death-Qualified Jury Cannot Be A Fair and Impartial Jury Selected from A Fair Cross Section of The Community, Or Serve as the Conscience of the Community, in a State in which a Majority of Citizens Oppose the Death Penalty**

There is a substantial question as to whether it is constitutional or statutorily permissible under the JSSA to subject a defendant to a retrial and potential capital sentencing hearing before a death-qualified jury in a state such as New Mexico, where citizens and legislators have rejected attempts to reinstate capital punishment, and where support for the death penalty has been steadily decreasing.[3]

Under the procedures generally followed in capital cases, a person "must be both 'death

---

[3] *New Mexico Bill to Restore Death Penalty Dies in Committee,* available at: https://deathpenaltyinfo.org/category/categories/states/new-mexico.

qualified' and 'life qualified'" to serve on the jury. *United States v. Wilson*, 493 F. Supp. 2d 406, 408 (E.D.N.Y. 2006). "A juror is not death qualified if the juror's views [against the death penalty] would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. A juror is not life qualified if he would automatically impose a death sentence after a guilty verdict, without considering mitigating factors." *Id.* (citations and internal quotation marks omitted) (alteration in original).

The overwhelming majority of capital cases in this country have been brought in states where most citizens support the death penalty. In that context, the exclusion from the jury of persons who would be unable to render a verdict of death, or find it very difficult to do so, has been regarded by the courts as acceptable. *See, e.g., Lockhart v. McCree*, 476 U.S. 162 (1986). In such places, because less than half of the pool of potential jurors opposes the death penalty, and because some persons who oppose the death penalty can still be "death qualified," there is an inherent limit to the impact of "death qualification" in jury selection.

In contrast, in jurisdictions where most citizens oppose the death penalty, "death qualification" is likely to result in a greater divergence between 1) the attitudes of the jury selected in a capital case and 2) the attitudes of the community at large. In a jurisdiction where a majority of potential jurors are more likely subject to exclusion based on their opposition to the death penalty, as in New Mexico, this divergence will necessarily be greater, leading to a greater likelihood that the so called "death-qualified" jury is actually a bias cross-section of the community rather than a jury of one's peers as required by the Sixth Amendment.

The Capital Jury Project ("CJP") was created in 1990 with the overall objective being to gather and present empirical data about how jurors in capital trials make decisions. In particular, the CJP sought to: 1) examine and systematically describe jurors' exercise of capital sentencing

discretion; 2) identify the sources of, and assess the extent of, arbitrariness in jurors' decision-making in capital cases, and 3) to determine whether there is a continuing influence of race in capital decision-making. Researchers for the CJP "interviewed some 1201 jurors who actually made the life or death sentencing decisions in 354 capital trials in 14 different states." William J. Bowers and Wanda D. Foglia, *Still Singularly Agonizing Law's Failure to Purge Arbitrariness from Capital Sentencing*, 30 Crim. L. Bull. 51, 51 (2003).[4] The states were Alabama, California, Florida, Georgia, Indiana, Kentucky, Louisiana, Missouri, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas and Virginia. *Id.* at 55. Data collected and analyzed by CJP has been cited by the Supreme Court and findings of the CJP have been published in scholarly journals.[5]

The CJP found that the percentages of jurors who thought the death penalty was the only appropriate punishment for various categories of murder far exceeded the percentages who thought the death penalty was unacceptable as punishment for these crimes. Bowers & Foglia, *supra*, at 62-63. For example, 57.1% of jurors believed death was the only acceptable punishment for a planned or premeditated murder, and 24.2% believed death was the only acceptable punishment for a killing committed during another crime. *Id.* at 62. Between 2.3% and 3.4% thought the death penalty was unacceptable for a planned or premeditated murder, and 6.9%, thought the death penalty was unacceptable for a killing committed during another crime. *Id.*

The CJP concluded that "jury selection over-exclude[s] and under-exclude[s], thus leaving a jury that is disproportionately pro-conviction and pro-punishment." *Id.* at 65 (emphasis added).

---

[4] Further review of the data evidently resulted in eliminating interviews with three jurors and one trial. *See What is the Capital Jury Project?* available online at:
    http://www.albany.edu/scj/13289.php.
[5] *See, e.g., Schiro v. Summerlin*, 542 U.S. 348, 356 (2004); *Simmons v. South Carolina*, 512 U.S. 154, 170 (1994); *People v. LaValle*, 817 N.E.2d 341, 357 (N.Y. 2004); *People v. Cahill*, 809 N.E.2d 561, 600-02 (N.Y. 2003).

As the authors explained:

> The death qualifying voir dire fails to eliminate jurors who believe death is the only appropriate punishment and who thus cannot give meaningful consideration to mitigating evidence. This problem is compounded by the tendency of the death qualification process to eliminate jurors who actually could impose death even though they have some reservations about capital punishment, and to leave *an especially conviction-prone and punishment prone* group of individuals to decide capital cases.

*Id.* at 84-85 (emphasis added).

Extrapolating this data and applying it to a non-death penalty state such as New Mexico, where most of the citizens oppose the death penalty, you would be left with a voir dire process that excluded all but the most pro-punishment and pro-conviction jurors. For example, in Massachusetts, where a majority of citizens oppose the death penalty, there appears to be a substantial question as to the constitutionality of Dzokhar's Tsarnaev capital sentence; the jury in Mr. Tsarnaev's trial consisted of the small percentage of the public who favored the death penalty. Because only about 15% of the public in Massachusetts favored the death penalty, it was impossible to weed out "death qualified" jurors.  This is truly not a representation of the "conscience of the community" and prevents one from having any confidence in the verdict - which is especially critical when that verdict is the penalty of death.  In sum, the "death-qualification" process in New Mexico would result in a pro-punishment and pro-conviction jury in violation of Mr. Cleveland's constitutional right to receive a fair trial.  Any verdict rendered by such a biased jury would be unconstitutional.

Whatever may be said of jury selection in capital cases in states where most citizens are in favor of the death penalty, one can have no reasonable assurance in a state like New Mexico where the carefully selected "death qualified" jury will most likely not share the values of the community with respect to retribution or other factors important in determined whether a defendant should be

sentenced to death. Under the Eighth Amendment; this is unacceptable, and the Court should not permit it.

### III.     The Problem of Under Representation of Cognizable Groups

In his Unopposed Motion for Disclosure of Grand and Petit Jury Data [Doc. 63], Mr. Cleveland discussed the underrepresentation of certain cognizable groups within this district, namely Native American and Hispanic people. [Doc. 63 at 4]. The underrepresentation problem that exists at the very outset of the jury selection process will also be greatly exacerbated by the death penalty qualification process. It is well understood that thanks to the death-qualification requirement, "capital juries are more likely to be white, older, predominantly male, Protestant, and less educated[6] than other criminal juries, and than the society from which they were picked." Richard Salgado, Note, *Tribunals Organized To Convict: Searching for a Lesser Evil in the Capital Juror Death-Qualification Process in United States v. Green*, 2005 B.Y.U. L. REV. 519, 520, 529-530 (2005) (discussing studies); *accord*, Kenneth E. Shirley and Andrew Gelman, *Hierarchical models for estimating state and demographic trends in US death penalty public opinions*. In addition, numerous studies have indicated that death-qualified guilt-phase juries are less favorable to defendants than more broadly constituted juries. *See e.g.*, Erik Lillquist, *Absolute Certainty and the Death Penalty*, 42 AM. CRIM. L. REV. 45, 88 (2005) (describing a "robust scholarly consensus that death-qualification of jurors lowers the effective standard of proof in criminal cases."). In particular, Professor Lillquist notes that death-qualified jurors are more likely to believe the testimony of government witnesses, find the facts presented by the government to be credible, and draw inferences favoring the prosecution. *Id.* at 86. Equally disturbing,

---

These are precisely the demographics of those most supportive of the death penalty. *See* Joseph Carroll, Gallup Poll: Who Supports the Death Penalty? (Nov. 16, 2004), available at:
  http://www.deathpenaltyinfo.org/article.php?scid=23&did=1266.

"[e]vidence suggests that white, male, death-qualified jurors were more likely to convict in sample cases than were African Americans or Hispanics and one and a half times more likely to sentence a defendant to death." Salgado, *Tribunals Organized To Convict* at 531 n.82. Justice Stevens put the matter bluntly in his concurring opinion in *Baze v. Rees*, 128 S. Ct. 1520, 1550 (2008):

> Of special concern to me are rules that deprive the defendant of a trial by jurors representing a fair cross section of the community. Litigation involving both challenges for cause and peremptory challenges has persuaded me that the process of obtaining a "death qualified jury" is really a procedure that has the purpose and effect of *obtaining a jury that is biased in favor of conviction*. (emphasis added).

In *Lockhart v. McCree*, 476 U.S. 162, 165 (1986), the Court concluded that death-qualification did not violate the fair cross-section requirement for a jury because the process of excluding a group defined exclusively by their death penalty attitudes did not involve the systematic exclusion of a distinctive group in the community. In the Court's opinion, "groups defined solely [by] shared attitudes that would prevent" them from performing their duties as jurors are not "distinctive groups." *Id.* at 174.

One year after *Lockhart*, in *State v. Ramseur*, 524 A.2d 188, 251 n.54 (N.J. 1987), the New Jersey Supreme Court found "no reason in state tradition or doctrine to depart from *Lockhart*." Nevertheless, the Court added an important qualification:

> We place one reservation on this decision. The reservation concerns the defendant's argument that, as one federal district court put it, all of the "evidence establishes that one consistent and inevitable result of the death qualification process is the disproportionate exclusion of blacks and women." *Grigsby v. Mabry*, 569 F.Supp. 1273, 1283 (E.D.Ark.1983), aff'd as mod., 758 F.2d 226 (8th Cir.1985), rev'd sub nom. *Lockhart v. McCree*, 476 U.S. ——, 106 S.Ct. 59, 90 L.Ed.2d 137 (1986). We have before us no evidence that in New Jersey there has been a resultant systematic exclusion of blacks and women in disproportionate numbers. In *State v. Gilmore*, supra, 103 N.J. 508, 511 A.2d 1150, we recently expressed our disdain for the systematic exclusion of distinctive groups because of our special commitment to the fair crosssection requirement. Therefore, if data relevant to the New Jersey practice are presented to us indicating such a result, we would be prepared to address this constitutional concern.

This issue was taken up on the federal level by District of Massachusetts Judge Nancy Gertner in the federal capital case of *United States v. Green*, 343 F. Supp. 2d 23, 33 (D. Mass. 2004), rev'd on other grounds, 407 F.3d 434 (1st Cir. 2005), where the question arose of whether a shared attitude about the death penalty was so polarized according to race and other factors that excluding that attitude also constituted the virtual exclusion of certain races and other demographics. Judge Gertner pointed out that while 48% of black people oppose the death penalty nationally, only 22% of whites oppose it. *Id.* Consequently, in an area such as the Eastern Division of Massachusetts, where just 7.8–9.1% of residents are black, death-qualifying a jury runs a high risk of "significantly deplet[ing] the already paltry number of minority jurors in the Eastern District." *Id.* (emphasis added).

Facing these concerns of fairness as well as judicial economy, Judge Gertner initially proposed two possible solutions to the death-qualification dilemma: 1) impaneling one unitary jury and the maximum number of alternates to hear the guilt phase without death-qualifying any of them, then death-qualifying that same jury and as many of the alternates as necessary after a guilty verdict, but before the punishment phase; or 2) initially impaneling a guilt jury that is not death-qualified, then, in the event of a conviction, discharging that jury and impaneling a new, death-qualified jury exclusively for the punishment phase. *United States v. Green*, 324 F. Supp.2d 311, 331 (D. Mass. 2004). The defendant in *Green* rejected the first option. Despite the prosecution's opposition to both of the alternatives that were presented, the court chose the latter option of impaneling, if necessary, two separate juries. *United States v. Green*, 343 F. Supp. 2d 23, 25 (D. Mass. 2004). The First Circuit held that the particular remedy chosen by Judge Gertner was not authorized by section 3593(b)(2)(c), but it did not disagree with Judge Gerner's assessment that a problem of constitutional dimension existed that needs some form of remedy. *See United States v.*

*Green*, 407 F.3d at 444 ("The government invites us to pass upon the validity of the district court's suggestion that it might defer death-qualification altogether until after it takes a verdict on the issue of guilt or innocence…We decline the invitation.").

The problem identified by Judge Gerther in *Green* will exist in this case. As indicated above, in the pre-death qualification pool, there are already indications of under-representation. These under-representations will increase in the post-death qualification pool, demonstrating that it is the death penalty qualification process itself, in combination with an already flawed jury selection system, that is producing constitutionally unrepresentative juries in the most serious criminal cases known in our law.

## CONCLUSION

For the foregoing reasons, Mr. Cleveland respectfully requests that this Court prohibit the government from seeking the death penalty in Mr. Cleveland's case because it would violate the Fifth, Sixth, and Eighth Amendments to seek a "death qualified" jury in a state where most citizens oppose that penalty. A "death qualified" jury could not truly serve as the conscience of the community in New Mexico, and would not be fair, impartial, or representative of the community.

Respectfully Submitted:

*/s/ Donald F. Kochersberger III*

---

Donald F. Kochersberger III
BUSINESS LAW SOUTHWEST LLC
320 Gold Ave. SW, Suite 610
Albuquerque, New Mexico 87102-3299
(505) 848-8581 (Voice)
(505) 848-8593 (Facsimile)
Donald@BusinessLawSW.com (E-Mail)

-and-

        Theresa M. Duncan
        Duncan Earnest LLC
        515 Granite Ave. NW
        Albuquerque, New Mexico 87102-2144
        (505) 842-5196 (Voice)
        (505) 750-9780 (Facsimile)
        Teri@DuncanEarnest.com (E-Mail)

*Attorneys for Defendant Kirby Cleveland*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of September, 2018, I filed the foregoing electronically through the CM/ECF system, which caused all counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

  Electronically Filed
  Donald F. Kochersberger III
  Attorney for Defendant Kirby Cleveland