**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


UNITED STATES OF AMERICA,

      Plaintiff,

v.                                              **No. CR 17-0965 JB**

KIRBY CLEVELAND,

      Defendant.


**DEFENDANT KIRBY CLEVELAND'S MOTION TO DISMISS AND/OR STRIKE**
**THE NOTICE OF INTENT TO SEEK PENALTY OF DEATH**
**BECAUSE 18 U.S.C. § 3596(a) FAILS TO PROVIDE COURTS IN NON-DEATH**
**PENALTY STATES LIKE NEW MEXICO GUIDANCE FOR CHOOSING**
**THE MANNER OR PROCEDURE OF EXECUTION AND**
**CANNOT CONSTITUTIONALLY BE IMPLEMENTED**


The Defendant, Kirby Cleveland, by and through his attorneys, Theresa M. Duncan and

Donald F. Kochersberger III, and for his Motion to Dismiss and/or Strike the Notice of Intent to

Seek Penalty of Death Because 18 U.S.C. § 3596(A) Fails to Provide Courts Guidance for

Choosing the Manner or Procedure of Execution in Non-Death Penalty States Like New Mexico

and Cannot Constitutionally Be Implemented, STATES:

**INTRODUCTION**

In addition to all of the other constitutional issues posed by the death penalty, the

government's attempt to put Mr. Cleveland to death should be barred on constitutional grounds

because of defects in the federal law and procedures governing implementation of a death sentence

imposed in a state such as New Mexico that does not have the death penalty.  The shocking

spectacles of botched 2015 executions in Oklahoma and Arizona highlight the significance of

problems relating to the method of execution.  *See Brief of Sixteen Professors of Pharmacology As Amici Curiae In Support Of Neither Party; Brief of The Innocence Project As Amicus Curiae In Support Of Petitioners, Glossip, et al., v. Gross, et al.*, No. 14-7955 (2015).[1]

      First, when a death sentence is imposed in a state such as New Mexico that does not have the death penalty, the FDPA contains *no standards or criteria* to guide the court in selecting, from among the 31 states that still have the death penalty, the one where the execution will occur and whose laws will govern implementation of the defendant's death sentence.  When Congress enacted the FDPA in 1994, it effectively restored a provision that it had first enacted in 1937 - when due process protections were much more rudimentary - and had repealed in 1984.  For prosecutions in states without the death penalty, the FDPA left it to the court to choose any other state that does have that penalty as the state whose laws will govern implementation of the defendant's death sentence (and as the place of execution).  *See* 18 U.S.C. § 3596(a).  Congress, however, neglected to bring the restored scheme into compliance with modern principles of due process and the Eighth Amendment by providing guidance for courts responsible for making such a selection. "Section 3596(a) does not set forth specific factors for a court to consider in designating a state for the implementation of a death sentence." *United States v. Hammer*, 121 F. Supp. 2d 794, 799 (M.D. Pa. 2000) ("It would be preferable to have uniformity in the implementation of federal death sentences. However, uniformity is contrary to the process which Congress devised."); George Kannar, *Federalizing Death*, 44 Buff. L. Rev. 325, 331 (1996) ("How the court is to select the alternate state…is not suggested, much less specified.").

      Whether or not such unfettered discretion complied with due process and the Eighth

---

[1]

http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/BriefsV5/14-7955_amicus_neither_pharm.authcheckdam.pdf

Amendment in 1937, it does not comply with those provisions today.  As the Supreme Court has repeatedly emphasized, the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death. In recognition of the uniquely solemn and severe duty involved in carrying out a sentence of execution, the Supreme Court "has been particularly sensitive to ensure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976); see also, *United States v. Fell*, 217 F. Supp. 2d 469, 475 (D. Vt. 2002) ("The need for more rigorous or scrupulous procedure when considering the imposition of a sentence of death has accompanied that recognition."), rev'd on other grounds, 360 F. 3d 135, 143 (2nd Cir. 2004).

In *Furman v. Georgia*, 408 U.S. 238, 287 (1972), the Court invalidated the capital sentencing schemes of thirty-nine states and the federal Government because they afforded untrammeled discretion to judges and juries in determining whether or not to impose a death sentence.  The primary concern arising out of such boundless discretion is that the imposition of death sentences was arbitrary and capricious.  "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189, 96 S. Ct. 2909. That same Eighth Amendment standard applies to the process by which the defendant is actually executed. *See United States v. Sampson*, 300 F. Supp. 2d 278, 283 (D. Mass. 2004) aff'd, 486 F.3d 13 (1st Cir. 2007) (recognizing the importance "of giving priority to fairness, rather than convenience or efficiency, in federal capital cases" at the implementation stage).

Since 1937, the Supreme Court has also established that subjecting a criminal defendant to a judge or jury's unlimited discretion is unconstitutional even when only money is at stake.  For example, in *Giaccio v. Pennsylvania*, 382 U.S. 399 (1966), the Court struck down a Pennsylvania

statute that subjected misdemeanor defendants to juries' unguided discretion in awarding costs. "[O]ne of the basic purposes of the Due Process Clause," the Court explained, "has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land.  Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce." *Id.* at 403 (emphasis added).  The Court held that the statute was unconstitutional "because of vagueness and the absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory imposition of costs." *Id.* at 402. Analogously, unchanneled discretion in awarding punitive damages is a denial of due process.  *See, e.g., Philip Morris v. Williams*, 549 U.S. 346, 353 (2007); *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 101 (4th Cir. 1991) ("The first principle of due process embraces a rule of law which contains standards that can be known in advance, conformed to, and applied rationally."). If the amount of money to be paid in costs in a criminal case or punitive damages in a civil case cannot be committed to a judge or jury's unguided discretion, surely the determination of the logistics involved in how a human being is to be put to death cannot be left to such discretion either.

Additionally, the federal government has failed to establish adequate procedures to ensure that, after the sentencing court chooses another state whose law will govern the defendant's execution, the execution will in fact conform to the law of that state.  Instead, the Department of Justice has left unchanged regulations (28 C.F.R. §§ 26.1–26.5) promulgated two years before the FDPA - when there was no obligation at all to follow state law in implementing a federal death sentence. In light of the Department's apparent failure to adopt and implement procedures to ensure that death sentences under the FDPA are carried out in conformity with the law of the state chosen by the court, a federal execution of Mr. Cleveland would inevitably involve numerous ad

hoc decisions.  The risk of another execution ending disastrously is clear.  This is intolerable under the Eighth Amendment.

For each of these reasons, the Government's Notice of Intent to Seek the Death Penalty should be stricken or, in the alternative, it is respectfully requested that an evidentiary hearing be granted so that expert testimony and evidence on this issue can be presented and made part of the record.

## BACKGROUND

With respect to federal offenses punishable by death, until 1937, federal law provided that "[t]he manner of inflicting the punishment of death shall be by hanging." Act of Mar. 4, 1909, ch. 321, § 323, 35 Stat. 1151 (codified as amended at 18 U.S.C. § 542 (1934)).

### A.       1937–1986:  Congress Turns to State Law.

In 1937, Congress replaced the provision for hanging with one directing attention to state law.  Act of June 19, 1937, ch. 367, 50 Stat. 304.  The 1937 law provided that "[t]he manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State in which the sentence is imposed." *Id.* It further provided that "[i]f the laws of the State within which the sentence is imposed make no provision for the infliction of the penalty of death, then the court shall designate some other State in which such sentence shall be executed in the manner prescribed by the laws thereof." *Id.* The court's designation thus dictated not only the state in which the execution would take place, but also which state's law that would govern the execution. When the Federal Criminal Code was recodified in 1948, the 1937 law was preserved without substantive change.  Act of June 25, 1948, ch. 645, 62 Stat. 837 (codified as amended at 18 U.S.C. § 3566 (Supp. IV 1948)).

**B.      1993: The Department of Justice Regulations.**

The provisions of the 1937 law remained in effect until they were repealed by the Sentencing Reform Act of 1984, effective November 1, 1986. Pub. L. No. 98-473, Tit. II, ch. II § 212(a)(2), 98 Stat. 1987.  The 1984 legislation did not include any new provisions addressing how federal executions were to be carried out, however.

The failure to enact any new law governing the method of execution created difficulty when Congress enacted the Anti-Drug Abuse Act of 1988.[2] In that Act, "Congress hastily established a new federal death penalty for drug 'king-pins' implicated in drug-related murders." *Kannar*, supra, 44 Buff. L. Rev. at 326. In its haste, however, Congress "neglected to include … anything at all about the actual, time, place, method, and manner for carrying out federal death sentences." *Id.* "The Congress delegated all that boring, non-symbolic work, in a manner so broad as to raise its own questions as to constitutionality, to someone else, to develop the real-world details through regulations, or Executive orders—or whatever." *Id.* at 326 n.11.

On the last day before President Clinton succeeded President Bush in office, the Department of Justice promulgated regulations in an attempt to fix the problem created by Congress's oversight.  *Implementation of Death Sentences in Federal Cases*, 58 Fed. Reg. 4,898, 4901–02 (Jan. 19, 1993) (promulgating 28 C.F.R. §§ 26.1–26.5).  The regulations, which remain unchanged to this day, "apply whenever a sentencing hearing conducted in United States District Court has resulted in a recommendation or determination that a criminal defendant be sentenced to death for commission of an offense described in any federal statute." 28 C.F.R. § 26.1.

Curiously, the regulations made no reference to state law.   Instead, they required

---

[2] Continuing Criminal Enterprise Act, Pub. L. No. 100-690, § 7001(a), 102 Stat. 4181, 4387 (codified at 21 U.S.C. § 848(e)-(r) (1988)).

government attorneys to file a proposed judgment and order providing that the death sentence shall be executed "by a United States Marshal designated by the Director of the United States Marshals Service [hereinafter 'a designated Marshal'] … by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death," and "on a date and time designated by the Director of the Federal Bureau of Prisons [hereafter 'BOP']," and that "[t]he prisoner under sentence of death shall be committed to the custody of the Attorney General or his authorized representative for appropriate detention pending execution of the sentence." 28 C.F.R. § 26.2(a)(1)–(4).

The regulations also contained directives to be followed unless the court orders otherwise. The "substance or substances" to be used in the lethal injection were "to be determined by the Director of [BOP]." § 26.3(a)(4).  The execution was to take place at a federal penal or correctional institution designated by the Director of BOP.  28 C.F.R. § 26.3(a)(2).  The sentence was to be executed by a designated Marshal, "assisted by additional personnel selected by the Marshal and the Warden of the designated institution and acting at the direction of the Marshal." 28 C.F.R. § 26.3(a)(3).

The regulations not only lacked any sort of provision for identifying factors or standards for the Director to consult in determining which substance or substances to use in the lethal injection(s), but, incredibly, they also failed to provide any procedure for judicial review of the Director's determination.   Indicative of the Department's policy priorities, however, the regulations did provide that "[i]f the date designated for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of [the BOP] when the stay is lifted." 28 C.F.R. § 26.3(a)(1).  Despite the constitutional basis of the President's power to grant clemency, the Department also specified that, "[u]nless the President interposes, the United

States Marshal shall not stay execution of the sentence on the basis that the prisoner has filed a petition for executive clemency." 28 C.F.R. § 26.2(b).

C.    **The Federal Death Penalty Act of 1994: Returning to State Law.**

When Congress enacted the FDPA in 1994, it chose to restore the old approach, originally enacted into law in 1937 and in effect until 1986, of carrying out executions in accordance with state law.  Under the FDPA, when a defendant is sentenced to death under the Act, he "shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence." 18 U.S.C. § 3596(a).  Thereafter, "the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." *Id.*  As was true under the 1937 legislation, "[i]f the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in that latter State in the manner prescribed by such law." *Id.* Thus, when a death sentence is imposed in a case brought in a state that does not have the death penalty, the court selects a death penalty state: (1) that will be the place of execution; and (2) whose laws will govern the manner of execution.

Under the FDPA, the Marshal is permitted, but not required, to use state or local facilities or personnel: "A United States marshal charged with supervising the implementation of a sentence of death may use appropriate State or local facilities for the purpose, may use the services of an appropriate State or local official or of a person such an official employs for the purpose, and shall pay the costs thereof in an amount approved by the Attorney General." 18 U.S.C. § 3597(a).

### D.     The Department of Justice's Unhappiness with 18 U.S.C. § 3596.

Soon after the FDPA became law, the Department of Justice made clear its unhappiness with Congress's decision that state law should again control the carrying out of federal death sentences.  In 1995, a year after the FDPA was enacted, the Department supported legislation to establish a uniform national system for putting federal prisoners to death. In its own words, the Department sought to "amend[]" the FDPA by "remov[ing] the current death penalty procedures which provide that State methods of execution are to be used in Federal executions."[3]  Although the FDPA in theory facilitated the use of state methods of execution in federal executions by allowing Marshals to use state or local facilities or personnel, *see* 18 U.S.C. § 3597(a), the Department recognized the practical obstacles to any such arrangement. "When the issue has come up during informal discussions with State officials," the Department told Congress, "the view of those officials has been that they are not interested in having any involvement with Federal executions."[4]  In the end, these proposed amendments to the FDPA were not enacted.  See *United States v. Hammer*, 121 F. Supp. 2d 794, 799–800 (M.D. Pa. 2000).

Despite its concerns and the unworkable nature of the scheme, the Department has simply left the matter there.  It has never modified its 1993 regulations, which were issued when there was no obligation to follow state law, and never even established procedures to ensure compliance with the state law chosen by the sentencing court to govern an execution.

On July 27, 2011, in *Roane v. Holder*, a federal challenge to the lethal injection protocol, the government informed the United States District Court for the District of Columbia that "the Federal Bureau of Prisons has decided to modify its lethal injection protocol but that the protocol

---

[3] *Hearing Before the Subcomm. on Crime of H. Judiciary Comm.*, 104th Cong., 1st Sess. 149 (1995) (letter from Assistant Attorney General Andrew Fois to Rep. Bill McCollum).
[4] *Id.* at 150.

revisions had not yet been finalized." *Roane v. Holder*, No. 05-2337 (D.D.C.), Doc. 288.

      **E.**    **State Law Concerning Executions.**

      "The states that still have death penalty statutes are not uniform in the implementation of death sentences, including the method of execution…." *Hammer*, 121 F. Supp. 2d at 799.  All states that have the death penalty authorize lethal injection as the primary method, but in many states, it is not the only authorized method of execution.[5]  Eight states authorize electrocution (in one, only if lethal injection drugs cannot be obtained); five states authorize the gas chamber; and three states authorize hanging.  In Oklahoma and Utah, death by firing squad is also an option.  *See* Richard Wolf and Kevin Johnson, *Courts, states put death penalty on life support*, USA Today, Sept. 14, 2015.[6]

      How lethal injection is done varies widely, and legal challenges and other problems have led to frequent changes in procedures and, in some states, to lengthy Eighth Amendment litigation. To what extent the method of execution is governed by state law, and to what extent it is left to the discretion of state officials, is often unclear.  For example, in 2011, a federal judge in Ohio noted that although a state correctional official had previously testified that the state's written execution protocol "carries the force of administrative law," the current warden of the Southern Ohio Correctional Facility "tells this Court that the written protocol is merely a set of guidelines." *Cooey v. Kasich*, 801 F. Supp. 2d 623, 624, 643 (S.D. Ohio 2011) ("It is the policy of the State of Ohio that the State follows its written execution protocol, except when it does not.  This is nonsense.").

      Sodium thiopental was used in the lethal injection procedure approved by the Supreme

---

[5] http://www.deathpenaltyinfo.org/methods-execution
[6] http://www.usatoday.com/story/news/nation/2015/09/14/death-penalty-execution-supreme-court-lethal-injection/32425015/

Court in 2008[7] and for a period was used in many states.  In January 2011, however, the only domestic manufacturer of sodium thiopental stopped producing it.  In late 2011, the European Union announced strict regulations on the export of sodium thiopental to countries that authorize the death penalty.  Press Release, European Commission, *Commission Extends Control over Goods Which Could Be Used for Capital Punishment or Torture* (Dec. 20, 2011).  The result has been great uncertainty regarding lethal injections, as states have scrambled to find a substitute - and often have fought tooth and nail to keep information about the substitute secret.  See, e.g., *Lockett v. Evans*, 2014 Ok. 33 (2014).  A substantial number of states have obtained drugs for lethal injection from compounding pharmacies (frequently, unidentified compounding pharmacies using unidentified drugs).  *See* Jeffrey E. Stern, *The Cruel and Unusual Execution of Clayton Lockett, The Atlantic,* June 2015.  Approximately 20 minutes after administering the first drug of the lethal injection protocol, Jeffrey Stern, a journalist for The Atlantic, provides an account of the execution chamber:

> Lockett lurched up against the restraints.  While the witnesses looked on, he started writhing as if trying to free himself, to get up off the gurney.  He struggled violently, twisting his whole body… [Lockett's] lawyer, began to cry.  Lockett got his whole head up off the gurney, as far as the restraints would let him go.  He kept trying to speak but couldn't form the words, and he rolled his head back and forth . . . [t]he doctor thought Lockett might be starting to seize.  But he still felt uncertain of his role, and hesitated to intervene.  Finally Lockett managed to speak: "*Man*."

*Id.*[8]  The 2014 execution of Joseph R. Wood III in Arizona lasted nearly two hours, and some observers reported that the prisoner was gasping and snorting for much of that time. The late Senator John McCain, who has some first-hand knowledge of these things, described Wood's

---

[7] See *Baze v. Rees*, 550 U.S. 35 (2008).
[8] http://www.theatlantic.com/magazine/archive/2015/06/execution-clayton-lockett/392069/

execution as "torture."  Burgess Everett, *John McCain: Arizona Execution 'Torture'*, Politico, July 24, 2014.[9]

F.     **Federal Executions Since the Reinstitution of Capital Punishment.**

In the years since capital punishment resumed in this country following the Supreme Court's decisions in 1976, there has never been an execution for a crime committed in a state that has abolished the death penalty.  Timothy McVeigh was convicted under the FDPA on the basis of his bombing of the Alfred P. Murrah Federal Building in Oklahoma City and executed on June 11, 2001.  Juan Raul Garza was convicted under the Anti-Drug Abuse Act of 1988 on the basis of three killings in Texas in 1990-91 in furtherance of a continuing criminal enterprise and executed on June 19, 2001.  *United States v. Flores*, 63 F.3d 1342, 1350–51 (5th Cir. 1995).  Louis Jones, Jr. was convicted under the FDPA on the basis of the kidnapping resulting in death of his ex-wife from the Goodfellow Air Force Base in San Angelo, Texas.  *United States v. Jones*, 132 F.3d 232, 237 (5th Cir. 1998), aff'd, 527 U.S. 373, 375–76 (1999).  He was executed on March 18, 2003.  The executions of Mr. McVeigh, Mr. Garza, and Mr. Jones all were carried out at the federal prison in Terre Haute, Indiana.

**ARGUMENT**

I.     **VESTING COURTS WITH UNBRIDLED DISCRETION TO DETERMINE THE METHOD OF EXECUTION DENIES DUE PROCESS AND VIOLATES THE EIGHTH AMENDMENT.**

Even assuming that the FDPA otherwise satisfies constitutional standards, it suffers from a critical constitutional defect as applied to a case such as this, which has been brought in a state that has abolished the death penalty.  For such cases, the FDPA contains no standard or criteria to guide the court in choosing the state where the execution will take place and whose laws will

---

[9] Available at http://www.politico.com/story/2014/07/john-mccain-arizona-execution-109350.html?hp=l18.

control the method of execution.  The court is free to choose, for any reason or no reason at all, any of the 31 states that authorize the death penalty.  Such absolute discretion is simply not compatible with due process of law or with the Eight Amendment.

> **A.  In a Capital Case, the Constitution Requires That Uniform and Objective Standards be Applied in Carrying Out the Execution of a Human Being.**

As indicated above, it is a fundamental tenet of Eighth Amendment jurisprudence that that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189, 96 S. Ct. 2909.

Perhaps what is not so well known is that the same process is due even in the non-capital context.  *Giaccio v. Pennsylvania*, 382 U.S. 399 (1966), involved an award of $230.95 in costs, assessed by a jury against a defendant indicted on misdemeanor charges of wantonly pointing or discharging a firearm at another person but acquitted at trial. In challenging the award before the Supreme Court, the defendant argued, inter alia, that "We might concede, *arguendo*, that situations can be conceived in which it would not be unfair to require acquitted defendants to pay costs.  But these situations must be precisely defined; the elements of this punitive liability must be adequately spelled out." *Giaccio v. Pennsylvania*, Juris. Stmt., No. 47, Oct. 1964 Term, Jan. 15, 1965, available at 1965 WL 130038, at *15–16.  The Supreme Court agreed.

Stressing that the statute "contain[ed] no standards at all," *Giaccio*, 382 U.S. at 403, the Court held that it was "invalid under the Due Process Clause because of vagueness and the absence of any standards sufficient to enable defendants to protect themselves against arbitrary and discriminatory imposition[] of costs." *Id*. at 402.  A basic goal of the constitutional guarantee of due process "has always been to protect a person against having the Government impose burdens

upon him except in accordance with the valid laws of the land," the Court observed. *Id.* at 403. "Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce." *Id*. at 403 (emphasis added).  Two Justices would have decided the case on a different ground, that the defendant had been acquitted[10], but the seven-Justice majority specifically rested its decision on the absence of standards in the statute.  *See id.*

The principle stated in *Giaccio* has broad application.  In *State in re Hunter*, 387 So.2d 1086 (La. 1980), the Supreme Court of Louisiana dealt with the absolute discretion of a juvenile court judge to transfer to adult court any 15-year-old whom there was probable cause to believe had committed a major violent felony.  *Id.*  "The statute no longer contains any standards that the juvenile judge must apply to individual cases to determine which fifteen-year olds accused of the designated crimes should be transferred or which ones should remain in the juvenile court system." *Id*. at 1087.  Citing *Giaccio*, the court held that the law "fails to meet the requirements of due process because of vagueness caused by its failure to set forth standards to enable juveniles to protect themselves against arbitrary and discriminatory forfeiture of the special rights and immunities of juvenile court jurisdiction." *Id.* at 1088.  Similarly, a three-judge district court in New York struck down, again on vagueness grounds, a statute permitting juveniles to be sentenced as adults if found to be "morally depraved" or "in danger of becoming morally depraved." *Gesicki v. Oswald*, 336 F. Supp. 371, 374 (S.D.N.Y. 1971) (internal quotation marks omitted).

The Third Circuit, sitting en banc, also relied on *Giaccio* in *United States ex rel. Matthews v. Johnson*, 503 F.2d 339 (3d Cir. 1974).  In that case, Pennsylvania case law permitted a jury to find a defendant charged with murder guilty of voluntary manslaughter, even without evidence

---

[10] *See Giaccio*, 382 U.S. at 405 (Stewart, J., concurring); *id*. (Fortas, J., concurring).

supporting the elements of voluntary manslaughter - and gave trial courts plenary discretion to

decide whether to instruct the jury on the definition of voluntary manslaughter.  Invoking "this

country's historic desire to minimize arbitrary judicial activity," *id*. at 344–45, the Third Circuit

concluded that conferring such discretion on judges violated the defendant's right to due process:

> Another trial judge, or the same judge on another day, could have permitted the
> jury to return a verdict of voluntary manslaughter, calling for a sentence of no more
> than twelve years. To deny appellee the possibility of a lesser verdict with a lesser
> restraint of liberty is permissible only if the denial comports with due process. . . .
>
> . . . [W]e conclude that the powerful rationale of *Giaccio* commands a similar result
> in this case.
>
> We believe that the safeguards of due process will be satisfied only when all
> defendants in Pennsylvania murder trials are given the same opportunity, upon
> request duly made, to have a jury return a verdict of voluntary manslaughter as well
> as first and second-degree murder.  To hold otherwise is to expose a defendant to
> the idiosyncrasies of the trial judge to whom the case has been assigned, or the
> whim or caprice of a given judge on a given day.

*Id.* at 345–46 (internal quotation marks and footnotes omitted).

Unfettered discretion is incompatible with due process even when only *quasi-criminal*

sanctions are at stake.  In *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1 (1991), the

Supreme Court highlighted the constitutional significance of providing guidance to a jury asked to

assess punitive damages (a "quasi-criminal" sanction)[11]:

> One must concede that unlimited jury discretion—or unlimited judicial discretion
> for that matter—in the fixing of punitive damages may invite extreme results that
> jar one's constitutional sensibilities. We need not, and indeed we can not, draw a
> mathematical bright line between the constitutionally acceptable and the
> constitutionally unacceptable that would fit every case. We can say, however, that
> general concerns of reasonableness and adequate guidance from the court when the
> case is tried to a jury properly enter into the constitutional calculus.

---

[11] *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc*., 532 U.S. 424, 432 (2001) (quoting *Pac. Mut.*, 499 U.S. at 19); see *Landgraf v. USI Film Prods*., 511 U.S. 244, 281 (1994) (punitive damages "share key characteristics of criminal sanctions").

*Id.* at 18 (emphasis added) (citation omitted).  More recently, the Court has emphasized "the need to avoid an arbitrary determination of a punitive award's amount." *Phillip Morris v. Williams*, 549 U.S. 346, 352 (2007).  "Unless a State insists upon proper standards that will cabin the jury's discretionary authority," the Court has explained, "its punitive damages system … may threaten 'arbitrary punishments,' *i.e.*, punishments that reflect not an 'application of law' but 'a decisionmaker's caprice…." *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 418 (2003), and *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 587 (1996)).

Lower court decisions confirm that unguided discretion to assess punitive damages is unconstitutional.  In *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir. 1991), the Fourth Circuit examined how punitive damages were then assessed under South Carolina law.  "The amount of penalty [was] committed to the discretion of the jury." *Id.* at 100.  The jury was told only that it should consider the goals of punishment and deterrence and the defendant's ability to pay.  *See id.* at 100–01.  The Fourth Circuit reversed the award of punitive damages.  "The first principle of due process," the court declared, "embraces a rule of law which contains standards that can be known in advance, conformed to, and applied rationally." *Id.* at 101 (emphasis added). Similarly, in *Baker v. General Motors Corp.*, 86 F.3d 811 (8th Cir. 1996), rev'd on other grounds, 522 U.S. 222 (1998), General Motors ("GM") was assessed "aggravating circumstances" damages, which the Eighth Circuit found were the equivalent of punitive damages.  *See id.* at 817.  The Eighth Circuit ruled that the failure to guide the jury in its determination of the amount of aggravating circumstances damages violated GM's right to due process:

> [T]here was neither any guidance for the jury nor any restraint on its discretion in awarding punitive damages. Instead, the jury was allowed to award aggravating circumstance damages without being given a definition of what those damages entailed. This lack of guidance rendered the jury instructions unconstitutionally vague and violated GM's right to due process.

*Id.* at 818.

Thus, due process forbids leaving matters such as how much, if anything, to award in costs in a criminal case, whether a criminal case against a juvenile will proceed in adult court or juvenile court, whether to instruct the jury on voluntary manslaughter, and how much to award in punitive damages to the unbridled discretion of a judge or jury.  It is therefore undeniable that, in a death penalty case, the Constitution equally requires objective and uniform standards when important decisions affecting how a human being is going to be executed are being made.

**B.   In Cases Brought in States without the Death Penalty, the FDPA Gives the Sentencing Court Unguided Discretion to Choose the Death Penalty State Whose Law Will Govern the Execution.**

Because the FDPA confers unbridled discretion on sentencing judges to choose the state whose laws will govern an execution, in capital cases brought in states without the death penalty, it denies due process and violates the Eighth Amendment.  In such cases, the FDPA leaves it to the sentencing court to choose, from among all the other states that do have the death penalty, the state - and thereby the manner - of execution.  Yet the FDPA provides absolutely no standards or criteria to guide the court's choice.  Under the current law, as written, a court has unfettered discretion to choose among the 31 states that authorize the death penalty.  And, of course, the court's choice has important consequences. *See* footnotes 4, 5, and 7, *supra*.

The tension between 18 U.S.C. § 3596 and due process is palpable. Where sanctions in criminal cases are at stake, laws must "carr[y] an understandable meaning with legal standards that courts must enforce." *Giaccio*, 382 U.S. at 403. Section 3596 contains no such standards, since it requires a court, which sits in a state that does not have the death penalty, like New Mexico, to choose among the 31 states that do have that penalty, and that have a variety of different procedures - and different track records of success - with respect to how to put a prisoner to death.

Even if the Government's bid for the death penalty in this case were otherwise constitutionally proper (which it is not), the unconstitutionality of 18 U.S.C. § 3596, as applied, alone forecloses the death penalty in this case.  If federal law is to provide for the death penalty in states that do not authorize that penalty, the Due Process Clause of the Fifth Amendment and the Eighth Amendment requires that Congress enact standards or criteria to guide selection of the state and manner of execution.  Failing that, the statute, and therefore the mandate of an execution, is unconstitutional.

## II.    THE DEPARTMENT OF JUSTICE HAS FAILED TO ESTABLISH ADEQUATE PROCEDURES TO ENSURE COMPLIANCE WITH THE SENTENCING COURT'S CHOICE OF STATE LAW UNDER SECTION 3596.

The death notice also should be stricken because DOJ apparently has failed to establish procedures to ensure compliance with the state law chosen by the sentencing court pursuant to § 3596.  This creates an impermissibly high risk of a botched execution, contrary to due process and the Eighth Amendment.

The 1993 DOJ regulations were issued before the enactment of the FDPA, when there was no obligation to follow state law.  More than 23 years have passed since the issuance of those regulations.  Yet, despite Congress's mandate that federal prisoners be executed in the manner provided by state law, DOJ has never modified its regulations to establish procedures designed to ensure compliance with state law.  To our knowledge, the DOJ has likewise failed to take other steps to adopt and implement procedures in a form other than regulations.

The record of botched executions in recent years shows that executions have often gone awry even when state officials are carrying out executions under the laws of their own states.  Surely, written procedures are necessary to guide federal officials in carrying out executions under laws with which they may have no experience.  Improvisation and ad hoc judgments are not

acceptable given the enormous potential for mental and physical suffering when something goes wrong during an execution.  Although, in theory, federal officials might involve state officials in the execution of a federal defendant, DOJ has itself informed Congress that, "[w]hen the issue has come up during informal discussions with State officials, the view of those officials has been that they are not interested in having any involvement with Federal executions." *See* p. 9, *supra*. Frequently, there may not even be any publicly available information about what procedures state officials actually follow, in light of the secrecy now surrounding lethal injection procedures in many states.  *See* footnote 5, *supra*.

## CONCLUSION

For the foregoing reasons, Mr. Cleveland respectfully requests that this Court strike the government's notice of intent to seek the death penalty in this case, or, in the alternative, grant an evidentiary hearing on this issue.

Respectfully Submitted:

*/s/ Donald F. Kochersberger III*
_____
Donald F. Kochersberger III
BUSINESS LAW SOUTHWEST LLC
320 Gold Ave. SW, Suite 610
Albuquerque, New Mexico 87102-3299
(505) 848-8581 (Voice)
(505) 848-8593 (Facsimile)
Donald@BusinessLawSW.com (E-Mail)

-and-

Theresa M. Duncan
Duncan Earnest LLC
515 Granite Ave. NW
Albuquerque, New Mexico 87102-2144
(505) 842-5196 (Voice)
Teri@DuncanEarnest.com (E-Mail)

*Attorneys for Defendant Kirby Cleveland*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of September, 2018, I filed the foregoing electronically through the CM/ECF system, which caused all counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

 Electronically Filed
Donald F. Kochersberger III
*Attorney for Defendant Kirby Cleveland*