IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                      No. CR 17-0965 JB

KIRBY CLEVELAND,

    Defendant.

**DEFENDANT KIRBY CLEVELAND'S MOTION TO DISMISS
AND/OR TO STRIKE THE NOTICE OF INTENT TO SEEK PENALTY OF DEATH
BECAUSE OF THE UNCONSTITUTIONALITY OF THE FDPA FOR
<u>FAILURE TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW</u>**

      The Defendant, Kirby Cleveland, by and through his attorneys, Theresa M. Duncan and Donald F. Kochersberger III, and for his Motion to Declare the Federal Death Penalty Act Unconstitutional for Failure to Require Comparative Proportionality Review, STATES:

**INTRODUCTION**

      The Federal Death Penalty Act ("FDPA") is unconstitutional in its failure to require a reviewing court to determine whether the punishment of death is excessive or disproportionate to the penalty imposed in similar cases, taking into consideration both the crime and the defendant. The absence of a provision for proportionality review renders the FDPA unconstitutional under the Eighth Amendment and a finding to that effect is necessary to avoid the arbitrary and capricious imposition of a death sentence. *See Furman v. Georgia*, 408 U.S. 238, 313-14 (1972)[1] (White, J., concurring) (recognizing the judiciary's obligation under the Eighth Amendment to review the

---

[1] *Furman* consisted of nine separate opinions, and one *per curiam* opinion that concluded "the imposition of and carrying out of the death penalty in [the cases before the Court] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 408 U.S. at 239 (*per curiam*).

constitutionality of punishment); *Gregg v. Georgia*, 428 U.S. 153, 174 (1976) (the "Eighth Amendment is a restraint upon the exercise of legislative power.").

The nascent national consensus compels the Court to recognize that comparative proportionality review is required under the Eighth Amendment. Of the thirty-one (31) states that still authorize the death penalty, the majority, eighteen (18), require comparative proportionality review.[2] Even the Uniform Code of Military Justice requires proportionality review.[3] Such requirements are based on the long-held and recognized "precept of justice that punishment for crime should be graduated and proportioned to offense." *Weems v. United States*, 217 U.S. 349, 367 (1910).

Comparative proportionality review is the judicial process through which a death sentence is compared with sentences imposed on similarly-situated defendants to guard against disproportionate sentences. *Gregg*, 428 U.S. at 206 (opinion of White, J.) (Burger, C.J., & Rehnquist, J., concurring) (finding that proportionality review "serves as a check against the random or arbitrary imposition of the death penalty."). Meaningful comparative proportionality review by the court is vital to ensure that the death penalty is being administered in a rational, non-arbitrary manner.

---

[2] Proportionality review is required by statute or case law in the following states: Alabama, Ala. Code §13A-5-53(b)(3) (enacted 1981); Delaware, Del. Code Ann. Title 11 §4209(g)(2)(a); Florida, by case law, see, e.g., Sinclair v. State, 657 So. 2d 1138 (Fla. 1995); Georgia, Ga. Code Ann. §17-10-35(c)(3) (enacted 1973); Kentucky, Ky. Rev. Stat. Ann. §532.075(3)(c) (enacted 1976); Louisiana, La. Code Crim. Proc. Ann. art. 905.9.1(1)(c) (enacted 1977); Mississippi, Miss. Code Ann. §99-1-105(3)(c) (enacted 1977); Missouri, Mo. Ann. Stat. §565.035(3)(3) (enacted 1983); Montana, Mont. Code Ann. §46-18-310(1)(c) (enacted 1977); New Hampshire, N.H. Rev. Stat. Ann. § 630:5(XI)(c) (enacted 1986); North Carolina, N.C. Gen. Stat. §15A-2000(d)(2) (enacted 1977); Ohio Rev. Code Ann. §2929.05(A) (enacted 1981); South Carolina, S.C. Code Ann. §16-3-25(C)(3) (enacted 1977); South Dakota, S.D. Codified Laws §23A-27A-12(3) (enacted 1979);Tennessee, Tenn. Code Ann. §39-13-206(c)(1)(D) (enacted 1992); Utah, by case law, see, e.g., *State v. Lafferty*, 20 P.3d 342 (Utah 2001); Virginia, Va. Code § 17.1-313(C)(2) (enacted 1998); Washington, Wash. Rev. Code Ann. §10.95.130(2)(b) (enacted 1981). *See* Brief for the Constitution Project as *Amicus Curiae* in Support of Grant of Certiorari at 8, *Holmes v. Louisiana*, No. 08-1358 (2009).

[3] Death sentences imposed under the Uniform Code of Military Justice must also be reviewed using a comparative proportionality analysis. *See United States v. Curtis*, 32 M.J. 252, 270-271 (C.M.A. 1991).

A court conducting proportionality review should analyze the similarities and differences between past death penalty decisions and the case before it.  To be truly effective, this comparison should include cases in which a death sentence was imposed, as well as cases in which the death penalty was sought but not imposed and cases in which the death penalty could have been but was not sought by the government.  See, e.g., *Walker v. Georgia*, 129 S. Ct. 453, 454-55 (2008) (Stevens, J., on the denial of certiorari) (noting that Georgia's approach to proportionality review, in which Georgia asserted that the state supreme court compared "'not only similar cases in which death was imposed, but similar cases in which death was not imposed'…seemed judicious because, quite obviously, a significant number of similar cases in which death was *not* imposed might well provide the most relevant evidence of arbitrariness in the sentence before the court") (citing *Zant v. Stephens*, 462 U.S. 862, 880 n.19 (1983) (emphasis added)).

The "arbitrary imposition of punishment is the antithesis of the rule of law." *Glossip v. Gross*, 135 S. Ct. 2726, 2759 (2015) (Breyer, Ginsburg, JJ., dissenting).  The Eighth Amendment is intended to protect against arbitrarily imposed and thus disproportionate sentences.  In 1972, the Supreme Court found that the death penalty in this country was being administered in a way that violated the constitution for this very reason.  *Furman*, 408 U.S. at 313 (Stewart, J., concurring) ("[T]he Eighth and Fourteenth [Fifth] Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.").  In reaction, many states enacted statutes providing for proportionality review in an effort to protect "against the evil identified in Furman." See *Pulley v. Harris*, 465 U.S. 37, 54 (1984).

Four years after *Furman*, in 1976, the Supreme Court allowed the death penalty to be reinstated but warned that it would be unconstitutional if it was inflicted in an arbitrary and

capricious manner. *Gregg*, 428 U.S. at 188-89 (joint opinion of Stewart, Powell, and Stevens, JJ.). Forty years after *Gregg*, however, numerous studies now "indicate that the factors that most clearly ought to affect application of the death penalty - namely, comparative egregiousness of the crime - often do not. Other studies show that circumstances that ought *not* to affect application of the death penalty, such as race, gender, or geography, often do." *Glossip*, 135 S. Ct. at 2760 (Breyer, Ginsburg, JJ., dissenting) (emphasis original).

The FDPA sentencing scheme is "so lacking in other checks on arbitrariness that it [does] not pass constitutional muster without comparative proportionality review…." *See Pulley*, 465 U.S. at 53. Enacted ten (10) years after *Pulley*, the FDPA was not mindful of the Supreme Court's warning that a failure to institute procedural safeguards such as comparative proportionality review would result in an arbitrary and capricious imposition of the death penalty in direct violation of its Eighth Amendment jurisprudence. For this reason, the FDPA should be declared unconstitutional for its failure to include or recognize the importance of comparative proportionality review in capital sentencing. For this reason, a federal death sentence imposed against Mr. Cleveland in this case would be unconstitutionally arbitrary and capricious in light of the prevailing precedent and available evidence.

## PROCEDURAL HISTORY

Defendant Kirby Cleveland was charged in an April 12, 2017 Indictment with: murder of an officer or employee of the United States (Count 1), murder committed in the perpetration of an escape (Count 2), first degree murder (Count 3); Escape (Count 4) using and carrying firearms during and in relation to a crime of violence (Count 5, 6, and 7); and felon in possession of a firearm and ammunition (Count 8). [Doc. 20] The Indictment also includes Special Findings with respect to four counts in the Indictment. The Special Findings allege that, in addition to the

gateway factors set forth in 18 U.S.C. § 3591(a)(2), two statutory aggravating factors apply: (1) Mr. Cleveland caused Officer Largo's death during the commission of or flight from another crime, specifically escape (18 U.S.C. § 3592(c)(1)); and (2) he committed the offense against a law enforcement officer engaged in his official duties (18 U.S.C. § 3592(c)(14)(D)(i)).  On January 26, 2018, the government filed its Notice of Intent to Seek the Death Penalty. [Doc. 39]

Mr. Cleveland now moves this Court to declare the FDPA unconstitutional on its face for its complete failure to provide anything even resembling comparative proportionality review, resulting in wholly arbitrary and capricious death sentences.

## ARGUMENT

I. **The Eighth Amendment Requires Proportionality Review to Safeguard Against Arbitrary and Capricious Death Sentences**

   A. **The FDPA Does Not Contain a Proportionality Review Provision**

There is no indication that, as currently drafted, the FDPA extends proportionality review to non-juvenile defendants charged with capital offenses.  To the contrary, different circuits have addressed the proportionality review issue, and none have interpreted the FDPA to require proportionality review.  *See United States v. Sampson*, 486 F.3d 13, 23-26 (1st Cir. 2007); *United States v. Barrett*, 496 F.3d 1079, 1108-09 (10th Cir. 2007); *United States v. Mitchell*, 502 F.3d 931, 980-81 (9th Cir. 2007); *United States v. Higgs*, 353 F.3d 281, 320-21 (4th Cir. 2003).

Many district courts have likewise found that the FDPA does not provide for proportionality review.  *See, e.g.*, *United States v. Williams*, 2004 WL 2980027, at *15 (S.D.N.Y. 2004); *United States v. Perez*, 2004 WL 935260, at *15-16 (D. Conn. 2004); *United States v. Frank*, 8 F. Supp. 2d 253, 272-73 (S.D.N.Y. 1998); *United States v. Briseno*, 2015 WL 163526, at *3 (N.D. Ind. Jan 12, 2015); *United States v. Williams*, 18 F. Supp. 3d 1065, 1072-76 (D. Haw.

2014); *United States v. Montgomery*, 2014 WL 1453527, at *15-16 (W.D. Tenn. 2014); *United States v. Hall*, 2014 WL 1356698, at *11-12 (W.D. Mo. 2014).

Moreover, the fact that the FDPA does not extend to juveniles indicates that applying proportionality review in the broader context was at least considered by our policymakers but rejected despite the Supreme Court's Eighth Amendment jurisprudence of the 1970's, which, as discussed above, specifically called for such safeguards in *any* death penalty scheme.  *See Roper v. Simmons*, 543 U.S. 551, 567 (2005) ("Congress considered [capital punishment for juveniles] when enacting the Federal Death Penalty Act in 1994 and determined that the death penalty should not extend to juveniles.").  The majority of States heeded and respected the Supreme Court's decisions which held that the death penalty violates the Eighth Amendment if it is arbitrarily imposed[4] and, in response, incorporated comparative proportionality review into their statutory schemes.  Yet the federal death penalty statutory scheme failed to institute such a safeguard, thereby rendering its imposition unconstitutionally arbitrary and capricious in violation of the Eighth Amendment.

> **B.    Because the FDPA Does Not Contain a Proportionality Review Provision, any Death Sentence Imposed under it Violates the Fifth and Eighth Amendments**

The Constitution forbids a capital-punishment scheme in which the sentence is being imposed arbitrarily and capriciously.  In *Furman*, Justice Stewart concluded:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of…murders…many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed….I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

---

[4] *See Gregg*, 428 U.S. at 187; *Proffitt v. Florida*, 428 U.S. 242, 247 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Jurek v. Texas*, 428 U.S. 262, 268 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)

*Furman*, 408 U.S. at 309-10 (Stewart, J., concurring) (citations and footnotes omitted).

In 1976, the Court approved Georgia's new statute, which was meant to cure the constitutional problems identified in *Furman*. *Gregg*, 428 U.S. at 195. In 1987, the Supreme Court once again considered whether Georgia's capital scheme had resulted in constitutionally disproportionate sentencing patterns. *McCleskey v. Kemp*, 481 U.S. 279 (1987). The Court noted that it had approved the "facial validity" of the state's statute in *Gregg*, based on several features, including one "important…safeguard" absent from the FDPA: proportionality review. That safeguard had been implemented in McKleskey's case, with the state supreme court finding that his death sentence "was not disproportionate to other death sentences imposed in the State," and "support[ing] this conclusion with an appendix containing citations to 13 cases involving generally similar murders." *Id*. at 303-06.

In *McKleskey*, the Supreme Court also independently considered whether the system was "arbitrary and capricious *in application*." *Id*. at 308. An empirical study of Georgia death sentences "in fact confirms that the Georgia system results in a *reasonable level of proportionality* among the class of murderers eligible for the death penalty….the system sorts out cases where the sentences of death is highly likely and highly unlikely, leaving a midrange of cases where the imposition of the death penalty in any particular case is less predictable." *Id*. at 313 n.36 (emphasis added). Thus, McKleskey's case was deemed a "far cry" from the disparities confronted in *Furman*. *Id*. at 313. This result originated, in no small part, due to the proportionality review "baked in" to the Georgia statutory scheme.

The lack of a comparative proportionality review provision creates a death penalty scheme with disparities strikingly similar to those found intolerable in *Furman* and which cannot satisfy the Eighth Amendment. *See generally* Sam Kamrin & Justin Marceau, *Waking the Furman Giant*,

48 U.C. Davis L. Rev. 981 (2015).  Federal death-sentencing patterns, as in *Furman*, reveal "no meaningful basis" for distinguishing the few defendants who are condemned to die from the vast majority who are spared, *Furman*, 408 U.S. at 313 (White, J., concurring).  Death sentences under the FDPA are no more predictable than "a lottery system." *Id*. at 293 (Brennan, J., concurring).  Receiving a federal death sentence remains comparable to being "struck by lightning," a rare and freakish event.  *Id*. at 309-10 (Stewart, J., concurring).

II. **The FDPA Operates in an Arbitrary and Capricious Manner**

Justice Brennan summarized the constitutional problem we examine thusly: "When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily….it is highly implausible that only the worse criminals or the criminals who commit the worst crimes are selected for this punishment." *Furman*, 408 U.S. at 293-94 (Brennan, J., concurring). When "[t]he death penalty is exacted with great infrequency even for the most atrocious crimes, and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not", there is no disagreement that it is "unusual" under the Eighth Amendment.  *Furman*, 408 U.S. at 313 (Opinion of White, J., concurring).

In fact, the marked infrequency of death sentences was noted by each of the five concurring Justices in the *Furman* majority.  *Id*. at 248 n. 11 (Douglas, J., concurring); *id*. at 291-95 (Brennan, J., concurring); *id*. at 309-10 (Stewart, J., concurring); *id*. at 312 (White, J., concurring); *id*. at 354 n. 124, 362-63 (Marshall, J., concurring).  Members of the *Furman* Court also took note that the death penalty was often sought selectively, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority…." *Id.* at 255 (Douglas, J., concurring).

Justice White cited the infrequent utilization of the death penalty as an important factor contributing to his vote to strike down capital punishment:

> "That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not."

408 U.S. at 313 (White, J., concurring); *see also Walton v. Arizona*, 497 U.S.639, 658 (1990) (Scalia, J., concurring), overruled on other grounds by, *Ring v. Arizona*, 536 U.S. 584 (2002) (noting the key opinions in Furman "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed.").

The Court rejected mandatory death penalty sentencing schemes from North Carolina and Louisiana, requiring "that there be taken into account the circumstances of the offense together with the character and propensities of the offender" to insure that "the system . . . function in a consistent and a rational manner." *Id.* at 153; *Proffitt v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 309 (1976); *Roberts v. Louisiana*, 428 U.S. 153 (1976). The Court approved, but did not require, a bifurcated trial procedure, but did nonetheless insist that a jury's discretion be channeled by "guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Gregg*, 428 U.S. at 189.

Four years after *Furman*, in 1976, the Supreme Court allowed the nationwide death penalty to be reinstated but warned that it would be unconstitutional if it was inflicted in an arbitrary and capricious manner. *Gregg,* 428 U.S. at 188-89 (joint opinion of Stewart, Powell, and Stevens, JJ.). This ruling began the process of various states crafting capital sentencing schemes that sought to operate in a constitutionally acceptable "consistent and rational manner." *Id.* at 190; *see also Glossip*, 135 S. Ct. at 2759.

Connecticut's Supreme Court recently analyzed this issue, finding that its death penalty was unconstitutional. *State v. Santiago*, 318 Conn. 1, 23-26 (Aug. 25, 2015). A punishment that is arbitrarily and discriminatorily imposed is unconstitutionally cruel: "[i]t goes without saying…. that the eighth amendment is offended not only by the random or arbitrary imposition of the death penalty, but also by the greater evils of racial discrimination and other forms of pernicious bias in the selection of who will be executed." *Id*. at 24-25 (citing *Tuilaepa v. California*, 512 U.S. 967, 973, 114 (1994) (guarding against bias or caprice in sentencing is the "controlling objective" of court's review)).

Justice Breyer joined by Justice Ginsburg also analyzed this seemingly inevitable feature of the death penalty in their dissenting opinion in *Glossip v. Gross*, noting that the Supreme Court "has consequently sought to make the application of the death penalty less arbitrary by restricting its use to those whom Justice Souter called 'the worst of the worst.'" *Glossip*, 135 S. Ct. at 2760 (citing *Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (Souter, J., dissenting)). Reiterating the precept of *Roper v. Simmons*, 543 U.S. at 568, that "[c]apital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." Despite this mandate, however, Justice Breyer and Justice Ginsburg concluded that:

> Despite the *Gregg* Court's hope for fair administration of the death penalty, 40 years of further experience make it increasingly clear that the death penalty is imposed arbitrarily, i.e., without "reasonable consistency" legally necessary to reconcile its use with the Constitution's commands.

*Id*. at 2760 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)).

In addition to its lack of adherence to the Supreme Court's Eighth Amendment jurisprudence, the FDPA's vague and ambiguous statutory language is unconstitutional under the Fifth Amendment. Recently, the Supreme Court emphasized this constitutional mandate, finding

that an arbitrarily drafted or vague statute would no doubt result in arbitrarily imposed sentencing. In *Johnson v. United States*, 135 S. Ct. 2551 (June 26, 2015), the Supreme Court held that a section of the Armed Career Criminal Act of 1984 was unconstitutional because it was vague, in violation of the Fifth Amendment. *Id*. at 2556. Justice Scalia explains:

> The Fifth Amendment provides that "no person shall…be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away *someone's life*, liberty, or property *under a criminal law so vague* that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites *arbitrary enforcement*. The prohibition of vagueness in criminal statutes "is a well- recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." These principles apply not only to statutes defining elements of crimes, but also *statutes fixing sentences*."

*Johnson*, 135 S. Ct. at 2556-57 (citations omitted) (emphasis added).

In sum, looking at the data, there is no reasonable doubt the FDPA has allowed the death penalty to be imposed arbitrarily and discriminatorily and, whether under this analytical rubric or simply through the lens of history, it must be seen as unconstitutionally cruel and declared as such.

### III.  The FDPA Has no Basis for Distinguishing the Few Cases in Which the Federal Death Penalty was Imposed from the Many Cases in Which it is Not, Thereby Rendering it Unconstitutional as Applied to Mr. Cleveland

Congress reinstated the federal death penalty through the 1988 Anti-Drug Abuse Amendments ("ADAA"), authorizing capital punishment for murders occurring in the context of drug trafficking. 21 U.S.C. § 848(e). The scope of the federal death penalty was expanded six (6) years later with the addition of numerous new capital crimes, including carjacking, in the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 et seq. The FDPA also set out procedures intended to provide the fairness and consistency required by the Supreme Court, including "gateway" criteria and statutory aggravators to narrow the pool of death eligible defendants, along with a separate sentencing trial before a jury. 18 U.S.C. § 3591(a)(2)(A)-(D); 18 U.S.C. §§ 3592, 3593(b).

However, in practice, the federal death penalty scheme consists of an extremely large "pool" of capital-eligible offenders that fall within its scope.

Between 1972, when *Furman* was decided, and 1988, Congress prescribed the death penalty for just a handful of narrowly-specified federal crimes. See *Jones v. United States*, 527 U.S. 373, 407 n.3 (1999) (Ginsburg, Breyer, Stevens & Souter, JJ., dissenting). The passage of the FDPA in 1994, however, created at least 60 different statutes making a myriad of federal crimes punishable by death.

The scheme applies to all 50 states and all U.S. territories, regardless of whether the state forbids the death penalty; tribal members charged with crimes in Indian Country, regardless of whether the sovereign tribe forbids the death penalty; crimes against U.S. nationals abroad, even in countries that abhor it; crimes against foreign nationals outside the U.S. jurisdiction; and crimes that do not even involve U.S. nationals or property but where the perpetrator was "found" within U.S. jurisdiction. *See* Congressional Research Service, *Capital Punishment: An overview of Federal Death Penalty Statutes* (Jan. 5, 2005). In other words, the federal capital sentencing scheme embraces a wide sweep of factual scenarios that subject a large pool of offenders to potential punishment by death. As one former federal prosecutor once responsible for administering the death penalty explained:

> When the generality of these statutory aggravating factors and [their] commonality in many murders are considered together with the added authority to invoke non-statutory aggravators, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense.

Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Ford. Urb. L.J. 347, 403 (1999). Not surprisingly, under this expansive capital scheme, a very large number of offenders prove eligible for federal death-penalty prosecutions. In the more than quarter century between 1988 (when the Anti-Drug Abuse Act was enacted) until

2015, at least 3,924 offenders had fallen into this category. Of that large group of offenders, the federal government authorized a capital prosecution in only 495 death-eligible cases (or about 13 percent). Of those cases authorized, the government withdrew its authorization in over half of them. Of the remaining 233 cases that proceeded to a capital sentencing hearing, the government obtained approximately 80 death verdicts (against 77 defendants, three of whom were sentenced to death twice). And, at least 16 of those have been judicially vacated. Another defendant had his death sentence commuted by the President. Therefore, though at least 3,924 offenders were statutorily eligible for the federal death penalty between 1988 and 2015, only 62 were actually on death row in 2015.

When considered as a proportion of the pool of 3,911 federal death-eligible cases that had been resolved up to 2015 (that is 3,924 total, less the 13 death-authorized cases that were still pending trial at the time these numbers were compiled), yielded a death-sentence rate of only about 2.0%, if all 80 death verdicts are used - and only 1.6%, if only the 63 non-invalidated death sentences are used. This is rate is far below the 15-20% rate found to be unconstitutional scant by the Supreme Court in *Furman*, and it is expected they have not significantly changed since these numbers were compiled[5].

"To pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Santiago*, 318 Conn. at 23-24 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988)). The federal death penalty system must be held to at least the standards required by states, i.e., "it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the

---

[5] Counsel is prepared to present evidence to support these numbers, as well as update the Court on their current values, at an evidentiary hearing.

death penalty…[it must] define the crimes for which death may be the sentence in a way that obviates standardless [sentencing] discretion…[i]t must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (citing *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (plurality opinion)).

### IV.     An Evidentiary Hearing is Warranted

The Second Circuit has recognized the importance of evidentiary hearings and the district court's "broad" discretion in determining whether to conduct one. *See Drake v. Portuondo*, 321 F.3d 338, 347 (2d Cir. 2003); *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000); *see also Lopez v. Miller*, 906 F. Supp. 2d 42, 52-54 (E.D.N.Y. 2013). An evidentiary hearing on this motion is particularly justified. *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (holding that an evidentiary hearing is required if a "material issue of fact were raised 'which if resolved in accordance with (appellant's) contentions would entitle him to relief', an evidentiary hearing would be required."); *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (a defendant seeking an evidentiary hearing must "allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."); *United States v. LaRouche Campaign*, 682 F. Supp. 610, 620 (D. Mass. 1987) (discussing factors to be considered by a court presented with a request for an evidentiary hearing, including: "Are the allegations before the court supported by a showing of factual circumstances in which there is at least a substantial likelihood that full exploration of the facts will show that the alleged violation of that cognizable right has caused some substantial (or 'not insubstantial') impairment of that right?").

The lack of a comparative proportionality review provision renders the FDPA unconstitutional because it results in the "lack of guided discretion" and consequently arbitrarily imposed sentences of death. *See United States v. Sampson*, 2015 WL 6511247, at *22 (finding that it is not the rarity of capital sentences under the FDPA but rather the lack of guided discretion that constitutes arbitrariness). Worse still, the data appear to demonstrate that the death penalty may have a history of being imposed based on factors that are impermissible to consider (i.e. race, gender, wealth, etc.)

The foregoing legal arguments and cited authority in conjunction with the statistical evidence briefly demonstrated herein, satisfies the standard for granting an evidentiary hearing on this issue and this Court has broad discretion to order one. Additionally, absent an evidentiary hearing, the Court will be insufficiently informed of the true historically arbitrary and/or prejudicial effects of the application of the FDPA without a mechanism for comparative proportionality review. Accordingly, the Defendant respectfully requests the Court to hold such a hearing.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court summarily hold that the FDPA is unconstitutional on its face and strike the notice of death filed by the government. [Doc. 39]. In the alternative, an evidentiary hearing should be held on this issue, allowing the Defendant to present data and expert testimony in support of his arguments herein.

Respectfully Submitted:

*/s/ Donald F. Kochersberger III*

_____
Donald F. Kochersberger III
BUSINESS LAW SOUTHWEST LLC
320 Gold Ave. SW, Suite 610
Albuquerque, New Mexico 87102-3299
(505) 848-8581 (Voice)
(505) 848-8593 (Facsimile)
Donald@BusinessLawSW.com (E-Mail)

-and-

Theresa M. Duncan
Duncan Earnest LLC
515 Granite Ave. NW
Albuquerque, New Mexico 87102-2144
(505) 842-5196 (Voice)
(505) 750-9780 (Facsimile)
Teri@DuncanEarnest.com (E-Mail)

*Attorneys for Defendant Kirby Cleveland*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of September, 2018, I filed the foregoing electronically through the CM/ECF system, which caused all counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

  Electronically Filed_____
 Donald F. Kochersberger III
 Attorney for Defendant Kirby Cleveland