## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

        **vs.**                         **No. 17-cr-00965-JB**

**KIRBY CLEVELAND,**

       **Defendant.**

### MOTION TO STRIKE THE NOTICE OF INTENTION TO SEEK THE DEATH PENALTY BECAUSE THE FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL BASED UPON THE SUPREME COURT'S DECISION IN *RING* AND THE FIFTH AND EIGHT AMENDMENTS TO THE CONSTITUTION

Defendant Kirby Cleveland, through his undersigned counsel, respectfully moves the Court to strike the Notice of Intention to Seek the Death Penalty filed in this case [Doc. 39] because the Federal Death Penalty Act (FDPA) is unconstitutional pursuant to the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002) and the Fifth and Eighth Amendments to the United States Constitution.

### FACTUAL BACKGROUND

On April 12, 2017, a federal grand jury charged Kirby Cleveland by indictment with murder of a federal officer, contrary to 18 U.S.C. §§ 1111 and 1114 (Count 1); felony murder, contrary to 18 U.S.C. § 1111 (Count 2); first-degree murder, contrary to 18 U.S.C. § 1111 (Count 3); escape, contrary to 18 U.S.C. § 751 (Count 4); three counts of using a firearm during and in relation to a crime of violence, contrary to 18 U.S.C. § 924(c)(1) (Counts 5-7); and felon in possession of a firearm, contrary to 18 U.S.C. § 922(g)(1) (Count 8). [Doc. 20.] All charges (except escape) stem from the shooting death of Houston Largo, an officer employed by the Navajo Police Department (NPD), on March 11, 2017.

The Indictment also contains "Special Findings" relating to Counts 1, 2, 5, and 6. These special findings track 18 U.S.C. §3591(a)(2) and 18 U.S.C. § 3592(c) and are as follows:

[That Kirby Cleveland]

a.     was 18 years of age or older at the time of the offenses charged. 18 U.S.C. § 3591(a);

b.     intentionally killed John Doe. 18 U.S.C. § 3591(a)(2)(A);

c.     intentionally inflicted serious bodily injury which resulted in the death of John Doe. 18 U.S.C. § 3591(a)(2)(B);

d.     intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and John Doe died as a direct result of the act. 18 U.S.C. § 3591(a)(2)(C);

e.     intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation constituted a reckless disregard for human life, and John Doe died as a direct result of the act. 18 U.S.C. § 3591(a)(2)(D);

f.     caused John Doe's death during commission of or attempted commission of, or during the immediate flight from the commission of another crime, specifically escape, in violation of 18 U.S.C. § 751. 18 U.S.C. § 3592(c);

g.     committed the offense against a law enforcement officer while John Does was engaged in the performance of his official duties. 18 U.S.C. § 3592(14)(D).

[Doc. 20 at 4-5.] On January 26, 2018, the United States filed a Notice of Intention to Seek the Death Penalty should Mr. Cleveland be convicted of Counts 2 and/or 6 of the Indictment. [Doc. 39.] The Notice includes the statutory aggravating factor alleged in paragraph (f) of the special findings, namely that the killing of Officer Largo was in furtherance of an escape. [*Id*. at 2.] The Notice also includes two non-statutory aggravating factors, victim impact and status of the victim. [*Id*. at 3.]

The Federal Death Penalty Act process for alleging aggravating factors, which was followed in this case, is unconstitutional and therefore, the Notice of Intention to Seek the Death Penalty [Doc. 39] must be struck.

I.   **THE SUPREME COURT'S *RING* DECISION HAS RENDERED THE FEDERAL DEATH PENALTY UNCONSTITUTIONAL AND THE ACT MAY NOT BE SAVED BY A JUDICIAL "CONSTRUCTION" THAT CREATES A NEW CRIMINAL OFFENSE WHOSE ELEMENTS AND INTERTWINED PROCEDURES HAVE NEITHER BEEN CONSIDERED, NOR ENACTED INTO LAW, BY CONGRESS.**

"It is the legislature, not the court, which is to define a crime and ordain its punishment."

*United States v. Wiltberger*, 18 U.S. 76, 93 (1820) (Marshall, C.J.).

A.   **Introduction and summary of the argument.**

In enacting the FDPA[1] in 1994, and the predecessor ADDA scheme in 1988, Congress granted exclusive statutory authority to allege aggravating factors to the prosecutor. If that aspect of the FDPA is not operative, the statute lacks any congressionally-approved method of alleging aggravating factors. But that is exactly the case. In the wake of *Ring v. Arizona,* 536 U.S. 584 (2002), the FDPA[1] lacks any legislatively-selected method of initiating a capital prosecution. While the Constitution requires that the elements of capital murder be presented to a grand jury and charged in an indictment, Congress, in passing the FDPA, chose another route. Now, only Congress can make the necessary corrections. Thus, the Federal Death Penalty is presently unconstitutional, and this court should resist and reject what the defense believes will be the government's efforts to invent a "*Ring* fix."

_____

[1] For the purposes of this argument, the abbreviation FDPA will be utilized to refer to both the 1988 and 1994 federal death-penalty schemes. Although the procedural provisions of the ADAA have been repealed, both statutes are relevant to demonstrate Congressional intent that the prosecution have exclusive authority concerning aggravating factors.

It is fundamental to our system of government that "[i]t is the legislature . . . which is to define a crime and ordain its punishment." *United States v. Wiltberger*, 18 U.S. 76, 93 (1820) (Marshall, C.J.). In *Ring*, the Court held that, with respect to the framework of Arizona's death penalty statute, the "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense[.]' " *Ring,* 536 U.S. at 585, quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000).[2] That holding, coupled with the Court's earlier holding in *Jones v. United States*, 526 U.S. 227, 251-52 (1999), that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt[,]"[3] in effect rendered the FDPA unconstitutional. This is because under *Ring* the statute's aggravating factors—like the factors at issue in the Arizona statute—that are necessary for a death sentence are elements of the capital offense and must be charged in the indictment and proved to a jury beyond a reasonable doubt. Under the FDPA, and for the purposes of this discussion only, therefore, the "elements" of capital murder are at least[4] murder + intent + one or more statutory aggravating factors.

---

[2] The FDPA and Arizona capital schemes are similar in that each establishes death as a possible sentence in the statute defining the offense, and then sets forth the further fact-finding and procedural steps necessary to establish a particular defendant's – and the set of relevant facts' – eligibility for a capital sentence. As in the Arizona system addressed and invalidated in *Ring*, under the FDPA the fact that a jury returns a guilty verdict in a case of capital murder does not, without more, allow for imposition of a death sentence. It is the further fact-finding, and intertwined procedures, that determine, in the post-*Ring* era, what constitute the new elements of "federal capital murder," a crime that presently exists only by judicial fiat.

[3] *Ring* did not discuss the grand jury issue since the case arose in the context of a state statute to which the Fifth Amendment's Indictment Clause does not apply. *Hurtado v. California,* 110 U.S. 516 (1884).

[4] In other motions the defense argues that the elements of capital murder include decisions reached by the jury right up to and including the point where it makes a fact-finding that the aggravating circumstances outweigh the mitigating circumstances. In truth, the final "selection" or ultimate sentencing decision is not made until the jury reaches the final

The FDPA, of course, nowhere provides for presentation of aggravating factors to a grand jury, however. But neither is the statute silent on the issue of how such factors are to be alleged. On that score, the FDPA explicitly reserves the selection and notice of aggravating factors to the exclusive discretion of the prosecutor. This court must not allow the government to re-write the FDPA to its own liking. Instead, the FDPA must be declared unconstitutional pending further congressional action.

In a closely analogous circumstance, the Supreme Court, in *United States v. Jackson*, 390 U.S. 570 (1968), condemned the very practice now at issue; that is, where a district court was asked to engage in the judicial amendment of a capital statute in order to preserve its constitutionality. In that case, the court declined to do so. The Supreme Court's admonition in *Jackson* is equally powerful and appropriate here:

> It is unnecessary to decide here whether this conclusion [the Government's proposed "fix" of the death-penalty aspects of the federal kidnapping statute] would follow from the statutory scheme the Government envisions, for it is not the scheme that Congress enacted.

*Id*. at 573.

The Vermont Supreme Court's identification of the "*Apprendi*" problem in Vermont's murder statute and its remedy is instructive. In 2005, 13 V.S.A. § 2303 provided that the punishment for first-degree murder was 35 years to life imprisonment

> unless the court finds that there are aggravating or mitigating factors which justify a different minimum term. If the court finds that the aggravating factors outweigh any mitigating factors, the minimum term may be longer than 35 years, up to and

---

decision-point of determining, factually, "whether all the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist to justify a sentence of death[.]" 18 U.S.C. § 3593(e). A simple "outweighing" is insufficient. Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors. That is precisely why the legislature needs to amend this statute, not the courts or the Department of Justice.

> including life without parole. If the court finds that the mitigating factors
> outweigh any aggravating factors the minimum term may be set at less than 35
> years but not less than 15 years.

*Id.* The statute went on to list aggravating and mitigating factors for use in increasing or

decreasing the minimum term. In *State v. Provost*, 179 Vt. 337, 896 A.2d 55 (2005), the Court

quickly found the statute unconstitutional in light of *Apprendi* and *Blakely*. The state made a

number of arguments to try to save the four consecutive sentences of life without parole that the

defendant received after the trial judge found five aggravating factors and no mitigating factors

at sentencing. The Court rejected all of the state's arguments. The Court also concluded that

remanding the case for resentencing would serve no purpose as the statute was unconstitutional.

The Court declined "to follow the example of those courts that have created their own sentencing

procedures to replace legislative schemes held unconstitutional in the wake of *Apprendi* and

*Blakely.*" *Id.* at ¶ 21. The Court vacated the sentences and imposed consecutive sentences of

imprisonment for life with minimum terms of 35 years.

The legislature responded and in 2006, 13 V.S.A. § 2303 was comprehensively amended

to comply with the federal constitution. The new procedure had the jury make the findings of

aggravating and mitigating factors. Additionally, the new procedures specified that, "[t]he

burden shall be on the state to prove beyond a reasonable doubt the presence of aggravating

factors or the absence of mitigating factors and to prove *beyond a reasonable doubt that the

aggravating factors outweigh the mitigating factors."* 13 V.S.A. § 2303(d)(1)(D) (emphasis

added). Vermont solved the constitutional problem with its statute.

The principles which flow logically and inexorably to the conclusion that the FDPA

cannot survive *Ring* will be presented below in the following order:

> (1)        in *Ring* and related cases such as *Jones* and *Harris*, the Supreme
> Court held that aggravating factors necessary to a capital verdict are essential

elements of the capital offense, and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt;

(2)      the FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests authority to identify aggravating factors exclusively with the prosecutor;

(3)      the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because, as the Supreme Court held in *Jackson,* and consistent with centuries of constitutional jurisprudence and statutory construction, it is for the legislature, not the courts or the prosecutor, to define crimes and punishment and the contours of a statute, and the presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA; and,

(4)      contrary decisions from Courts of Appeals have been wrongly decided because they have failed either to (a) address *Jackson* and the fundamental separation of powers principles incorporated therein; and/or (b) acknowledge, much less reconcile, the explicit allocation of authority to the prosecutor to determine the propriety of aggravating factors. Nor do severability analysis or the post-*Apprendi* drug cases, or the principle of "constitutional avoidance" save the FDPA; indeed, those doctrines and the cases, as well as post-*Ring* Supreme Court cases, including *United States v. Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, U.S. 542 U.S. 296 (2004), establish that a judicially imposed solution cannot redefine or reconfigure a federal criminal statute to do what Congress has not intended.

### B.      Aggravating Factors Necessary to a Capital Verdict are Essential Elements of the Capital Offense, and Must Be Pleaded in the Indictment and Proved to a Jury Beyond a Reasonable Doubt.

In *Ring,* in which the Supreme Court overruled *Walton v. Arizona,* 497 U.S. 639 (1990),

and in subsequent cases, the Court established beyond dispute that aggravating factors necessary

to imposition of the death penalty under the FDPA must be charged in the indictment and proved

to the satisfaction of a jury beyond a reasonable doubt. As noted earlier, the Supreme Court

explained in both *Ring* and *Harris* that facts which increase the maximum penalty faced by the

defendant create new, different, and "greater offense[s]." In *Harris,* 536 U.S. at 555-566, the

Court noted repeatedly that respect to any "fact" which increases the maximum possible penalty

beyond that authorized by the findings implicit in the jury's verdict of guilt is an element of an offense:

> [r]ead together, *McMillan [v. Pennsylvania*, 477 U.S. 79 (1986)] and *Apprendi* mean that those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis.

*Harris,* 536 U.S. at 567. Concurring in *Ring*, Justice Scalia famously observed:

> [All] facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring,* 436 U.S. at 610 (Scalia, J., concurring.)

Similarly, in *Apprendi,* the Court had observed that, "[t]he judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense." 530 U.S. at 483, n. 10; *see also Harris,* 536 U.S. at 560 (stating that the principle "by which history determined what facts were elements . . . defined elements as 'fact[s] legally essential to the punishment to be inflicted'") (quoting *United States v. Reese,* 92 U.S. 214, 232 (1876) (Clifford, J., dissenting)).

In *Jones*, the Court had presaged what has since occurred by holding that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." *Jones,* 526 U.S. at 227; *see also United States v. Cotton*, 535 U.S. 625 (2002) (in federal prosecutions, any fact increasing the maximum punishment "must also be charged in the indictment").[5]

---

[5] As stated earlier, *Ring* does not address the grand jury issue because the case arose in the context of a state statute, to which the Fifth Amendment's Grand Jury Clause does not apply. *Hurtado v. California*, 110 U.S. 516 (1884). However, *Jones* and *Cotton*, discussed above, make it plain that the Fifth Amendment requires the inclusion of such elements in the indictment.

Thus, *Ring* and *Harris* have established beyond dispute that the facts alleged in the "Special Findings" section of the indictment in this case constitute elements of an offense, since they "are facts that expose [this] defendant to a punishment greater than that otherwise legally prescribed[,]" *i.e.,* the death penalty. That conclusion is further confirmed by the Supreme Court's subsequent decisions in *Blakely* and *Booker,* in which the Court held (first in state and then federal, respectively) sentencing guideline factors constitute the functional equivalent of elements that required proof to a jury beyond a reasonable doubt. *Blakely*, 542 U.S. at 303; *Booker,* 543 U.S. at 244.

Capital cases since *Ring* have continued in the same vein. For example, in *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), the Court considered whether double jeopardy was a bar to the second prosecution of a capital case when the Commonwealth of Pennsylvania again sought (and received) a sentence of death after a divided jury at the first trial had spared the defendant's life and the defendant then succeeded in having the underlying conviction set aside on appeal. The Court ruled 5-4 that double jeopardy did not bar a second opportunity to seek a death sentence. Justice Scalia – joined by the Chief Justice and Justice Thomas – discussed the implications of the Court's decision in *Ring:*

> [i]n *Ring v. Arizona*, 536 U.S. 584 (2002), we held that aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a greater offense.'" *Id*., at      [609]      (emphasis added). That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances": Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death.

*Sattazahn,* 537 U.S. at 111.

The three justices who joined that portion (Part III) of the main opinion[6] concluded that there could be no principled reason to distinguish between what constitutes an offense for purposes of the Sixth Amendment and an "offence" for purposes of the Double Jeopardy Clause of the Fifth Amendment. *Id.*[7] Yet, even the four dissenting justices agreed with Justice Scalia's proposition with respect to capital murder constituting a greater offense based on the additional elements – the aggravating factors – needed to prove that offense:

> [t]his Court has determined . . . that for the purposes of the Double Jeopardy Clause, capital sentencing proceedings involving proof of one or more aggravating factors are to be treated as trials of separate *offenses,* not mere sentencing proceedings. *See*, *ante,* at [537 U.S. at 736-738, 739-740]; *Ring v. Arizona,* 536 U.S. 584 (2002); *Bullington v. Missouri*, 451 U.S. 430 (1981).

*Sattazahn*, 537 U.S. at 126 n. 6 (emphasis in original) (Ginsburg, J., dissenting).

Thus, at least seven justices agreed that, under the principles set forth in *Ring*, capital sentencing schemes that employ aggravating factors create, from a constitutional perspective, new offenses, greater than ordinary willful homicide, that are distinguished by the additional elements those aggravating factors represent. Pursuant to *Jones* and *Cotton*, when those greater offenses are prosecuted under federal law in federal court, it is equally beyond question that they must not only be proved to a jury beyond a reasonable doubt, but that they must first be presented to a grand jury and included within the indictment.

---

[6] There were three separate opinions in *Sattazahn*. The majority opinion, authored by Justice Scalia was joined in toto by the Chief Justice and Justices Thomas and, with the exception of Part III of the opinion, by Justices Kennedy and O'Connor. Justice O'Connor filed a separate concurrence. Justice Ginsburg filed a dissenting opinion joined by Justices Stevens, Souter, and Breyer.

[7] Justice Kennedy, without explaining his position, did not join Part III of the opinion. Justice O'Connor concurred, stating she did "not join Part III, which would further extend the reach of *Apprendi v. New Jersey,* 530 U.S. 466 (2000), because [she] continue[d] to believe that case was  wrongly decided[.]" 537 U.S. at 116-17, citing her dissent in *Ring*.

Certainly, the structure of the FDPA conforms to that conclusion. As with the Arizona scheme at issue in *Ring,* a jury's verdict finding a federal defendant guilty of murder cannot support a sentence of death without additional fact finding. For example, although a guilty verdict in a case of a federal prison murder carries with it an authorized potential death sentence, such a defendant is not actually exposed to a death sentence unless and until the jury (or the judge, but only where a jury has been waived) makes determinations, unanimously and beyond a reasonable doubt, that the crime was committed with one of the four "intent" factors listed at 18 U.S.C. § 3591(a)(2)(A-D) and that there exists at least one of the 16 statutory aggravating factors set forth at 18 U.S.C. § 3592(c)(1-16). In addition, arguably, a defendant may not be sentenced to death unless it is also established that the attorney for the Government believes that executing the defendant is justified, 18 U.S.C. § 3593(a), that the defendant was not less than 18 years old at the time of the offense, 18 U.S.C. § 3591(a), and that he is not intellectually disabled, *Atkins v. Virginia*, 536 U.S. 304 (2002).

It thus follows that the aggravating factors the government has alleged by indictment in this case are viewed by the government, and for purposes of statutory and constitutional analysis, as elements of a greater offense that requires the proof of those elements before a death sentence can be imposed.

### C.   The FDPA Does Not Provide for Presentation of Aggravating Factors to a Grand Jury (and Thereby Including Them in an Indictment), But Instead Vests Exclusive Authority to Identify Aggravating Factors Exclusively with the Prosecutor.

With respect to federal capital offenses prosecuted in federal court, *Ring* and the Fifth Amendment's indictment clause require that aggravating factors necessary to a death sentence

be presented to a grand jury and included in the indictment.[8] The FDPA neither permits, not contemplates affording, the grand jury any role in determining which aggravating factors are to be alleged in a federal capital prosecution. Pursuant to the FDPA scheme chosen by Congress, a sentence of death may not be sought unless, as set forth in the statute itself, "the attorney for the Government believes that the circumstances of the offense are such that a sentence of death is justified[.]" 18 U.S.C. § 3593(a). If the "attorney for the government" believes death is warranted, the next step in the legislatively-selected process is for that attorney to serve and file a notice, signed by the attorney for the Government, stating, *inter alia*, that "the Government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the Government will seek a sentence of death[.]" 18 U.S.C. § 3593(a)(1).

Although not in and of themselves aggravating factors, the pre-*Ring* FDPA also required proof – and allegation in the notice by government attorneys – of one or more of four "gateway" state-of-mind factors. 18 U.S.C. § 3591(2). The notice, in addition, is required to set forth the aggravating factors– statutory and non-statutory – the government proposes to prove if the defendant is convicted, which may include victim-impact evidence. 18 U.S.C. § 3593(a). The ADAA scheme was similar. *See* 21 U.S.C. § 848(h) (Repealed). Consequently, the unambiguous language of the FDPA statutes themselves establishes that Congress, rightly or wrongly, elected to enact a scheme where the decision to set the machinery of death in motion would be reserved to the government's attorneys and no one else, not grand juries, not the court, and not any other individual or entity. Nonetheless, the government seeks to establish in this

---

[8] The Fifth Amendment provides in pertinent part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury[,]" including those accused of felony offenses. *See Stirone v. United States*, 361 U.S. 212, 215 (1960) ("[t]he crime charged here is a felony and the Fifth Amendment requires that prosecution  be begun by indictment").

case a substitute method for introducing aggravating factors now that *Ring* rendered the exclusive statutorily prescribed mechanism selected by Congress constitutionally invalid. Fidelity to the fundamental principle of separation of powers, embedded deeply in the constitutional form of government our nation has adopted, and detailed below, is even more important when applied to the government's efforts to execute one of its citizens, thereby imposing "the most irremediable and unfathomable of penalties[.]" *Ford v. Wainwright*, 477 U.S. at 411.

D.    *Jackson* **And the Separation of Powers Doctrine Demonstrate That the FDPA Cannot Be Amended By the Prosecutor or the Courts to Permit Presentation of Aggravating Factors to a Grand Jury Because it is for the Legislature to Define Crimes and Punishment, and Presentation of Aggravating Factors to a Grand Jury is Contrary to the Unambiguous Intent of Congress as Expressed in the FDPA.**

This is not an instance in which Congressional silence permits flexibility in rescuing an otherwise unconstitutional statute from invalidation. Indeed, given the express and unambiguous language and structure of the FDPA, if, prior to *Ring,* a defendant had argued that the aggravating factors could not be applied unless they were presented to and charged by a grand jury in the indictment, the government's response undoubtedly, and correctly, would have been that the statute does not ascribe any such role to the grand jury, and that the statute plainly reserves that authority solely to the prosecutor.

1.    Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct.

Centuries of federal criminal jurisprudence support this position. Since at least as early as *United States v. Hudson*, 11 U.S. 32 (1812) (Marshall, C.J.), it has been clear that the Constitution affords Congress the sole power to define and create all offenses against the United States, and the punishment therefor. *See also United States v. Worrall*, 2 U.S. (2 Dall.)

384, 393-394 (1798); *United States v. Wiltberger*, 18 U.S. 76, 93 (1820) ("[i]t is the legislature, not the court, which is to define a crime and ordain its punishment"); *Hudson,* 11 U.S. at 34 ("[t]he legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense" and "[t]he power of punishment is vested in the legislative, not in the judicial department"). *See also Bousley v. United States,* 523 U.S. 614, 620-21 (1998) ("under our federal system it is only Congress, and not the courts, which can make conduct criminal"); *Staples v. United States*, 511 U.S. 600, 604 (1994) ("[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute") (citation omitted).

As a result, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress." *Viereck v. United States*, 318 U.S. 236, 241 (1943) (citations omitted). *See also United States v. Lanier,* 520 U.S. 259, 267-68 n. 6 (1997) ("[f]ederal crimes are defined by Congress, not the courts"); *Logan v. United States,* 144 U.S. 263, 283 (1982) ("[a]lthough the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, [with certain exceptions] . . . no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States").

The Supreme Court applied these principles in *Bouie v. City of Columbia*, 387 U.S. 347 (1964). The state courts of South Carolina, in an obvious effort to prosecute civil rights protesters, had construed an existing statute in a manner that created a new crime. The Supreme Court intervened and set aside the statute as interpreted, for conflicting with *Wiltberger*. *See*

*also Crandon v. United States*, 494 U.S. 152, 158 (1990) ("legislatures, not courts, define criminal liability").

2.     *Jackson* provides a direct and "all fours" analogy to the circumstances present herein and compels invalidation of the FDPA.

It is in that context that the Supreme Court's decision in *United States v. Jackson,* 390 U.S. 570 (1968), provides precedent directly and specifically applicable to capital statutes, and this is not the first time that the government has attempted to enlist the judiciary in an effort to rescue, through ersatz construction, a constitutionally flawed federal death penalty.

In *Jackson*, the Court held that when a particular federal sentencing statute is unconstitutional, a court lacks authority to devise its own procedure, unauthorized by statute or rule, simply because the procedure, if properly enacted by Congress, would pass constitutional muster. In *Jackson,* the Court considered the federal kidnapping statute, which contained a mandatory death penalty when a jury recommended it – thereby making the death penalty possible only for those defendants who exercised their right to trial by jury.

In an effort to salvage the death penalty provision, however, the government proposed a number of alternative "constructions" of the statute and cited *ad hoc* procedures developed by other district courts as "cures" for the constitutional problems. The court, after finding the statute unconstitutional, rejected the government's proposed remedy of directing the trial court to convene a special penalty phase jury after a guilty plea, as well as every other approach proposed by the government because those proposals represented judicial, rather than legislative action. *Id.* at 572–81.[9]

---

[9] For example, the government proposed a "construction" of the statute under which "even if the trial judge accepts a guilty plea or approves a jury waiver, the judge remains free . . . to convene a special jury for the limited purpose of deciding whether to recommend the death penalty." *Id.* at 572. The Government also suggested that the court might save the statute by reading it to

15

The *Jackson* Court, in analyzing and explicating the limits of judicial authority to construe legislation, even when such construction would "save" the legislation from a declaration of unconstitutionality, pointed out that the kidnapping statute "sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or one who pleads guilty." *Id.* at 571. The Court declined to read into the statute congressional authority for the courts to develop such a procedure. *Id.* The Court was concerned principally with overreaching its authority by imposing the alternate sentencing scheme. According to the Court, "it would hardly be the province of the courts to fashion [such] a remedy[,]" *Id.* at 579, absent "the slightest indication that Congress contemplated any such scheme." *Id.* at 578.

Applying *Jackson's* analysis to this case, it is manifest that once the provision allocating to the prosecutor the power to charge aggravating factors is declared unconstitutional, the FDPA "sets forth no procedure" for alleging aggravating factors. Indeed, as the *Jackson* opinion explained, "[t]o accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands." *Id.* at 576.

Here, as in *Jackson*, Congress has "deliberately placed in [the prosecution's] hands" the responsibility for alleging aggravating factors under the FDPA. Consequently, in this case, "construing" the FDPA to allow the grand jury to assume that responsibility would violate the FDPA and contravene Congressional intent without "the slightest indication that Congress contemplated" according the grand jury such a role in the federal capital decision-making process. Presented with the option, Congress, in light of the change of law from *Walton* to

---

make imposition of the death penalty discretionary on the part of the sentencing judge. *Id.* at 575. The court rejected these proposed reconstructions and adhered, instead, to the plain language of the statute as the best evidence of Congress' intent.

*Ring,* might very well enact a comprehensive death penalty scheme that allocated a role to the grand jury.  Congress might also choose to enact a wholly new and different scheme, one that fully defined the new offense of "capital murder," specified its elements, and set forth comprehensive procedures for trial of those offenses.[10]  Of course, first, it is incumbent upon the Court to tell them that the manner Congress has chosen in the FDPA is impermissible.

It is understandable that the courts, or prosecutors, would feel compelled to simply fix what Congress has broken.  *Jackson,* however, proscribes a court from implementing what Congress might do, or what the prosecutor proposes as a "fix" for a constitutionally deficient statute. Instead, *Jackson,* requires that courts, under such circumstances, invalidate, and not legislate:

> [i]t is unnecessary to decide here whether this conclusion would follow from the statutory scheme the Government envisions, *for it is not the scheme that Congress enacted.*

*Id.* at 573 (emphasis added).

Also, the Court in *Jackson* recognized that the government's particular proposal "would be fraught with the gravest difficulties." *Id.* at 579. As the Court explained, "it is one thing to fill a minor gap in a statute," but "quite another thing to create from whole cloth a complex and completely novel procedure and thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality." *Id.* at 580. *See also Blount v. Rizzi*, 400 U.S. 410, 419 (1971) (statute that permitted the Postmaster General to determine that material

---

[10] Indeed, the dangers of judicial legislation are patently evident from the divergent attempts, following *Ring*, to salvage the FDP despite the obvious defect in the method of alleging aggravating factors. For example, in *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003), the  court held that the presentation of but one statutory aggravating factor to the grand jury (and inclusion in the indictment) was sufficient to permit the government to seek death on the basis of several statutory aggravating factors not so included. 327 F.3d at 284-87.

was obscene struck down by the Court which, in the process of rejecting the government's suggestion that Congress's plain language could be "construed to allow a judge to make that determination instead of the Postmaster General, explained that "it is for Congress, not this Court, to rewrite the statute").

The very same type of judicial and prosecutorial restructuring of a statute to conform with constitutional imperatives was rejected by the Court in *United States v. Booker*, 543 U.S. 220 (2005). In the course of invalidating the mandatory nature of the federal sentencing guidelines because they permitted a judge to find, by a preponderance of the evidence, facts necessary to an enhanced punishment, the Court did not create a hybrid system, inconsistent with the Sentencing Reform Act (hereinafter "SRA"), under which those sentencing factors would be incorporated in indictments and presented to a jury. Rather, a separate majority in *Booker* (in what has generally been denominated the "remedy opinion," *Booker,* 543 U.S. at 245-46) severed the offending section – that which made the guidelines mandatory – but retained the essential character of the remainder of the SRA.[11]

Indeed, in *Blakely* v. *Washington*, *Booker's* predecessor, Justice Breyer, who wrote the remedial opinion in *Booker*, recognized quite clearly the practical and due process concerns attendant to simply charging sentencing enhancement facts and submitting them to a jury. *Blakely,* 542 U.S. at 334-5 (Breyer, J., dissenting). Justice Breyer's admonition about the practical implications of presenting sentencing factors to a jury absent any legislative or procedural framework is mirrored by the issues raised by the submission of aggravating factors to a grand jury in the similarly barren context of the FDPA – none of which the government

---

[11] Severance of the invalid section of the FDPA does not save the statute because it cannot function as a constitutionally-valid capital statute without a mechanism for alleging aggravating factors.

ever recognizes or addresses. For example, there are questions regarding which aggravating factors must be included in the indictment, whether the defendant must plead to those factors, whether the lessened evidentiary standard of the FDPA remains applicable to some or all aggravating factors, and, if so, to the presentation of mitigating evidence, and any procedural changes in the two phases of the trial.

Here, the government's typical position, by implication, is that prosecutors can fashion their own remedy independent of both Congress' intent and clear and limiting legislative language. This view, however, would mirror the position taken by the government, and rejected by the Supreme Court, in *Booker*:

> Severing the requirement that judges, not juries, apply the Guidelines would require courts to make the legal and policy decisions necessary to resolve all of those questions. There is no indication that Congress delegated that role to the courts. It is one thing to recharacterize a single factor that increases a statutory maximum and treat it as an element of the crime. It is quite another to take an entire system expressly designed to channel sentencing discretion and treat it as if Congress was attempting to rewrite the criminal code.

*Booker,* 543 U.S at 363.

Accordingly, *Jackson* is precisely on point and controls this case.  In enacting the FDPA, Congress, relying on *Walton,* created a scheme in which the prosecutor was granted the exclusive authority to make the threshold determination whether to seek the death penalty, and, once a decision was made to pursue death, which aggravating factors to allege.  Allowing the Government to seek indictment of what Congress unambiguously defined as sentencing factors would give "to the [grand jury] the ultimate duty that Congress deliberately placed in other

hands," i.e., those of the government attorney – precisely the kind of end-run that *Jackson* forbids.[12]

As a result, if the FDPA's treatment of aggravating factors is unconstitutional after *Ring*, then it is undeniable, under *Jackson* and the doctrine of Separation of Powers, that only Congress can cure the problem, and only by enacting – should it choose to do so in light of the changed constitutional landscape augured by *Ring* – a new death penalty scheme.

        3.    <u>The Non-Delegation Doctrine provides further compelling support for the conclusion that the FDPA's defects cannot be cured by judicial action.</u>

A corollary to the Separation of Powers problems posed by the prosecution's typical proposed unilateral *Ring* fix for the FDPA is the non-delegation doctrine's[13] preclusion of either Executive or Judiciary action, whether separately or in tandem, substituting either's judgment for that of Congress in relation to prescribing the elements and the procedures for application of the federal death penalty. As Justice Scalia stated in his dissent in *Mistretta v. United States,* 488 U.S. 361 (1989):

> It is difficult to imagine a principle more essential to democratic Government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature.
> * * *
> That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of Government ordained by the Constitution.

---

[12] Conversely, if aggravating factors (and other aspects of the FDP, such as the required "gateway" findings and the age of the defendant) are not elements of the offense, the grand jury has no business investigating or finding them, since the authority of the grand jury is limited to determining "if there is probable cause to believe that a crime has been committed[ . ]" *Branzburg v. Hayes,* 408 U.S. 665, 686 (1972) and "whether criminal proceedings should be instituted against any person." *United States v. Calandra,* 414 U.S. 338, 343-33 (1974).

[13] "The non-delegation doctrine originated in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989); U.S. CONST., ART. 1, § 1.

*Id*. at 415 (Scalia, J., dissenting). The majority in *Mistretta* ultimately found that the non-delegation doctrine had not been violated by creation of the United States Sentencing Commission and the guidelines it promulgated, because, in constituting the Commission, Congress had "[laid] down by legislative act an intelligible principle to which the [Sentencing Commission] is directed to conform, . . ." *Id*. at 372, quoting *N.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409 (1928). Nevertheless, the Court reaffirmed "'the integrity and maintenance of the system of Government ordained by the Constitution's mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta,* 488 U.S. at 371-72, quoting *Field v. Clark*, 143 U.S. 649, 692 (1892).

Thus, *Mistretta* involved the delegation only of authority to determine sentencing factors within the limits of a legislatively determined "intelligible principle." It did not include the authority to determine the very elements of an offense, as would be the case under a hypothetical post-*Ring* FDPA.[14] Plainly, Congress must have the opportunity to determine, in light of *Ring,* the precise elements of federal capital murder and how *Ring* has affected the legislative balancing which produced the FDPA in the first place.

Since Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch cannot simply assume that

---

[14] In *Touby v. United States*, 500 U.S. 160, 164 (1991), the Court upheld Congress' delegation to the Attorney General of the authority to temporarily classify a drug as a controlled substance in order to bring its use and/or distribution within reach of criminal prosecution. This delegation of authority was based on the advent of "designer drugs" which were only marginally different in chemical composition from drugs that were already controlled. The Court held that the intelligible Congressional principle at issue not only meaningfully constrained the Attorney General's discretion to define criminal conduct but that, in addition, "Congress ha[d] placed multiple specific restrictions on the Attorney General's discretion to define criminal conduct[.]" *Id*. at 167.

power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by the *Ring, Jones, Apprendi* trilogy.

4.       The grand jury lacks any authority to issue "special findings."

In this case, the indictment contains a section labeled, "Special Findings." [Doc. 20 at 4-5.] Grand juries are not, however, permitted to return anything denominated as "Special Findings." The Federal Rules of Criminal Procedure provide that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  In 1979, Rule 7 was amended specifically to allow notice of criminal forfeitures to be alleged by indictment.  Obviously, nothing in the text of the Rule, and nothing in the Indictment Clause of the Fifth Amendment, contemplates or permits a grand jury to make "Special Findings" that serve the function of the triggering requirements of the FDPA that are now invalid in light of *Ring*.

In addition, while the Supreme Court's decision in *Schriro v. Summerlin*, 542 U.S. 348 (2004), held that, for purposes of collateral review, *Ring* involved issues of procedure rather than substantive criminal law, 542 U.S. at 354-55, that does not place the method of alleging the FDPA's aggravating factors within the purview of the government's authority or role in a three-branch form of government. Rather, the principles established in *Jackson* continue to apply, and the express language of the statute remains controlling and dispositive. Consequently, the prosecutor's attempt to rescue the FDPA via the grand jury's "Special Findings" is void.

**E.**   **Courts of Appeals Decisions to the Contrary Have Been Wrongly Decided, and Neither Severability Analysis, nor the Post-*Apprendi* Drug Cases, nor the Doctrine of "Constitutional Avoidance" Can Save the FDPA.**

1.   The decisions by the courts of appeal have been wrongly decided.

While various Courts of Appeals have considered the issue herein and concluded that there is no constitutional or statutory impediment to presenting the FDPA's aggravating factors to a grand jury in order to avoid unconstitutionality under *Ring*, the cursory reasoning in each case has been fatally flawed for two principal reasons:

- the decisions all fail to address *Jackson*, and/or to distinguish its clearly applicable holding and principles; and,

- the decisions ignore the plain language of the FDPA with respect to whether the grand jury is authorized to allege aggravating factors.

For example, in *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the Eleventh Circuit not only failed to even mention *Jackson*, but also joined other circuits in claiming that while "'nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment … there is nothing in that law inhibiting such a charge.'" *Id.* at 1367, quoting *United States v. Robinson,* 367 F.3d 278, 290 (5th Cir. 2004).[15] *See also United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006) ("[t]he major flaw in LeCroy's argument is that nothing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking the additional step of including the statutory aggravating factors in the indictment and submitting same to the grand jury. Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury");

---

[15] In *Brown,* the Court also stated the defendant's argument in a manner different than what Mr. Cleveland presents here. In *Brown,* according to the Court, the defendant "argue[d] that the FDPA is  facially unconstitutional [] because it does not require [aggravating] factors to be alleged in the  indictment." 441 F.3d at 1367. Here, Mr. Cleveland states the converse: that the FDPA is unconstitutional because it requires that aggravating factors be alleged exclusively in a manner  that precludes presentation to the grand jury.

*United States v. Allen,* 406 F.3d 940, 949 (8th Cir. 2005) ("[w]hile it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment"); *United States v. Barnette*, 390 F.3d 775, 789 (4th Cir. 2004) ("[a] review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury. Neither does the legislative history indicate any such intent").[16] The First Circuit's attempt to distinguish *Jackson* is likewise flawed in that the reasoning requires ignoring the plain language of the statute which ordains a procedure completely at odds with presentment to a grand jury. *United States v. Sampso*n, 486 F.3d 13 (1st Cir. 2007); *see also United States v. McCluskey*, No. CR 10-2734 JCH, 2012 WL 13076173, at * 5 (D. NM. Sept. 14, 2012) (unpublished) (adopting reasoning of *Sampson*).

That contention is wrong on two counts: (1) the FDPA not only does not "require" prosecutors to present aggravating factors to the grand jury, it prescribes a precise and exclusive method for alleging aggravating factors: the prosecutor's exclusive discretion and judgment; and (2) the assertion that "nothing in the [FDPA] inhibit[s]" presentation of aggravating factors to the grand jury ignores the explicit and exclusive statutory delegation to the prosecutor, the rules of statutory construction and the clear and controlling precedent provided by *Jackson*.[17]

---

[16] In both *Allen* and *Barnette*, the defendant's principal (and unsuccessful) argument was that the indictment failed to allege an aggravating factor. 406 F.3d at 940; 390 F.3d at 775. In both cases, the Courts found any error to be harmless, and in *Barnette* the Court also held that the language of the indictment did, in fact, adequately allege an aggravating factor. *Id*.

[17] Significantly, neither *Allen*, nor *Robinson*, nor *Barnette*, nor *LeCroy*, nor *Brown* discuss or even cite *Jackson.* Thus, none of those decisions can be deemed to have considered the issue sufficiently, or comprehensively. *Contra, United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007).

Again, this is not an instance in which a statute simply does not "expressly provide for submitting elements of an offense to the grand jury;" rather, the FDPA expressly and comprehensively provides for another, exclusive method for alleging aggravating factors. Each of these prior decisions, seemingly by failing to recognize its existence in the first place, fails to appreciate the gravity of this important distinction. Thus, these decisions upholding the validity of the FDPA were wrongly decided, and this Court should, consistent with *Jackson* and the clear language of the FDPA, declare the statute unconstitutional as applied to Mr. Cleveland.

2. The post-*Apprendi* drug-quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury.

Nor can the FDPA find refuge in post-*Apprendi* cases that required drug quantity in federal prosecutions under 21 U.S.C. § 841, previously deemed a sentencing factor to be determined by a judge by a preponderance of evidence, to be pleaded in an indictment and proved to a jury beyond a reasonable doubt. *See, e.g., United States v. Thomas,* 274 F.3d 655 (2d Cir. 2001) (*en banc*). *See also United States v. Cotton*, 535 U.S. 625 (2002) (government concedes that it was error not to include drug quantity in all post-*Apprendi* federal drug indictments, but conviction affirmed because the defendant failed to object, and omission constituted harmless error).

In fact, the difference between Title 21's treatment of drug quantity and the FDPA's handling of aggravating factors is striking and dispositive. Regarding drug quantity, Congress enacted statutes in which the penalty ranges increase directly with the quantity of the specified

drug.[18]  For those statutes, though, Congress was silent on whether drug quantities were elements of the offense or sentencing factors. Thus, requiring drug quantities to be alleged by indictment did not alter the structure of the drug laws, or offend Congressional intent.[19]

In fundamental contrast, however, Congress clearly never intended the aggravating factors in the FDPA to constitute *elements of the offense*.  Rather, Congress, relying on *Walton*, which permitted such aggravating factors to be treated as *sentencing factors*, patently described them as such, and (impermissibly) directed that they be determined and identified in each case *not* by a grand jury (or any other body or institution), but by the prosecutor alone.

Moreover, when the Supreme Court has been required to determine whether a statute sets forth elements-of-an-offense, as distinct from sentencing factors, it has looked to Congressional intent.  Accordingly, in *Castillo v. United States*, 530 U.S. 120 (2000), the Court explained that "[t]he question before us is whether Congress intended the statutory references . . . to define a separate crime or simply to authorize an enhanced penalty." 530 U.S. at 123. *Accord, Jones,* 526 U.S. at 232–39. *See also Almendarez-Torres v. United States,* 523 U.S. 224, 228 (1998); *Harris*, 536 U.S. at 582.

In both *Harris* and *Almendarez-Torres,* the Court found the aspects at issue to be sentencing factors; in *Castillo* and *Jones*, they were found to be elements of the offense.  In both sets of cases, the Court proceeded by the same exhaustive statutory, not constitutional,

---

[18] *See, e.g.,* 21 U.S.C. § 841(b)(1)(A) (possession of one kilogram or more of heroin exposes a defendant to a sentence of 10 years to life; possession of less than 50 grams of heroin exposes a defendant to a sentence of 0 - 20 years, 21 U.S.C. § 841(b)(1)(c)).

[19] The same is true of the federal carjacking statute at issue in *Jones,* 526 U.S. at 239, 251-252. The statute, 18 U.S.C. § 2119, did not make any distinction with respect to whether serious bodily injury was an element or a sentencing factor. Thus, including that factor in an indictment did not involve the redrafting of a statute as is proposed by the government in this case with respect to the FDPA's aggravating factors.

analysis, because the Constitution, though it places limits upon Congress' ability to designate certain facts as sentencing factors, does not afford the courts authority to recast statutes so that they fit within those limits. For example, in *Harris,* the Court comprehensively considered "the distinction the law has drawn between the elements of a crime and factors that influence a criminal sentence." 536 U.S. at 549. The Court reaffirmed that the threshold question of statutory construction is whether Congress intended relevant facts to be offense elements or sentencing factors. 536 U.S. at 551. The Court further explained that the distinction is significant because *"[l]egislatures define crimes in terms of the facts that are their essential elements*, and constitutional guarantees attach to these facts." 536 U.S. at 549 (emphasis added).

Here, Congress's intent is plain and unmistakable. Consistent with the state of the law pre-*Ring* (and governed by *Walton*), Congress (again, wrongly) structured the FDPA so that aggravating factors were sentencing considerations that were within the exclusive province of the prosecutor.  As a result, the government is not empowered to subvert Congressional intent (even if ill-advised) and, in effect, create by prosecutorial fiat, a brand new criminal statute.

### 3.   Severability analysis cannot save the FDPA from unconstitutionality.

Additionally, the severability cases also undercut any analogy to the drug cases discussed earlier. Under those cases, the critical question is whether the statute at issue, upon removal of its unconstitutional portion, can function independently.[20] For example, in *Booker,* as noted, rather than cobble together a hybrid system that would permit presentation of sentencing factors to both grand and petit juries, the Supreme Court severed the sentencing guidelines' mandatory nature because that preserved the character of the SRA, and Congress's

---

[20] *See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Leavitt v. Jane,* 518 U.S. 137 (1990); *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678 (1987).

intent in enacting it, as opposed to creating a new system inconsistent with Congressional intent, and which raised more procedural issues and questions than it resolved.

The structure of the FDPA plainly requires that the government's notice of aggravating factors, and only that mechanism, trigger the entire operation of the FDPA. Absent that enabling act by the prosecutor, the statute cannot function as a capital statute, since without aggravating factors, the government cannot seek the death penalty. The same conclusion was reached in *Jackson*, in which the Court found that severing the unconstitutional death penalty provision of the Kidnapping Act left an otherwise fully functional criminal statute, albeit one that could not carry with it a potential sentence of death.

Here, deciding what Congress intended with regard to the FDPA is an easy task – it is obvious from the FDPA that Congress, relying on *Walton,* believed it was creating sentencing factors.  It is equally clear that after *Ring* these aggravating factors constitute, not sentencing factors, but elements of an offense. Accordingly, the statute may not be construed; it must be voided.

### 4.    The doctrine of "constitutional avoidance" is inapplicable.

The doctrine of constitutional avoidance applies when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Attorney General, v. Delaware & Hudson Co.,* 213 U.S. 366, 408 (1909). Here, since the FDPA is, for the reasons set forth supra, plainly not "susceptible of two constructions[,]" the simple conclusion is that the doctrine of constitutional avoidance simply does not apply here.

In *Harris,* for example, the Court found the doctrine of constitutional avoidance inapplicable because, at the time Congress enacted 18 U.S.C. § 924(c), Supreme Court precedent allowed Congress to label as sentencing factors certain facts which increased the minimum punishment for a crime. As the Court explained:

> The avoidance canon rests upon our "respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust v. Sullivan,* 500 U.S. 173, 191 (1991). The statute at issue in this case was passed when *McMillan [v. Pennsylvania*, 477 U.S. 79 (1986)] provided the controlling instruction, and Congress would have had no reason to believe that it was approaching the constitutional line by following that instruction. We would not further the canon's goal of eliminating friction with our coordinate branch, moreover, if we alleviated our doubt about a constitutional premise we had supplied by adopting a strained reading of a statute that Congress had enacted in reliance on the premise. And if we stretched the text to avoid the question of McMillan's continuing vitality, the canon would embrace a dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed. We decline to adopt that approach.

*Harris,* 536 U.S. at 556.

Thus, the doctrine of constitutional avoidance was irrelevant to the Court's analysis, and the Court, in accord with Congress' intent, concluded that "brandishing" was a sentencing factor. *See id.* Here, too, Congress relied on the state of the law existing at the time it enacted the FDPA—in *Walton v. Arizona*, 497 U.S. 639, 649 (1990), the Court had permitted a judge to decide sentencing factors in capital cases—and manifested that reliance in reserving for the prosecutor the exclusive authority to allege aggravating factors. Reconstructing the FDPA based on *Ring's* overruling of *Walton* would constitute the type of "dynamic" statutory interpretation that was precluded by *Harris* and would vitiate Congress's clear intent.

Consequently, the doctrine of constitutional avoidance is as inapplicable here as it was in *Harris*. As with § 924(c), with the FDPA there is no ambiguity about Congress's choice. As stated in *Miller v. French,* 530 U.S. 327, 341 (2000) (quotations omitted), "[w]here Congress

has made its intent clear, we must give effect to that intent." Similarly, in *Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833 (1986), the Court stated:

> Federal statutes are to be so construed as to avoid serious doubt of their constitutionality. Where such serious doubts arise, a court should determine whether a construction of the statute is fairly possible by which the constitutional question can be avoided. *It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it.*

478 U.S. at 841 (citations and internal quotations omitted) (emphasis added).

Here, Congress made its intent clear in the FDPA – the allegation of aggravating factors is the province solely of government attorneys. The *Jones-Apprendi-Ring* trilogy has now altered the status of the law, and aggravating factors (and other aspects of the FDPA) are now properly, and constitutionally, elements of an offense not yet enacted by Congress and beyond the authority of the courts (or the prosecutor) to create via "construction" that amounts to judicial and executive legislation. Accordingly, it is respectfully submitted that the FDPA cannot be rewritten to permit presentation of aggravating factors to the grand jury, and that, because those aggravating factors are elements of the crime pursuant to *Ring,* the FDPA is unconstitutional as applied to Mr. Cleveland. The capital aspects of this case should be dismissed.

II.    **EVEN IF THE FDPA CAN BE RENDERED CONSTITUTIONAL BY A FINDING BY THE GRAND JURY OF GATEWAY AND STATUTORY AGGRAVATING FACTORS, THE "SPECIAL FINDINGS" IN THE INDICTMENT SHOULD BE STRICKEN AND THE DEATH NOTICE SHOULD BE DISMISSED BECAUSE THE GOVERNMENT HAS NOT OBTAINED AN INDICTMENT CONSISTENT WITH THE REQUIREMENTS OF THE FIFTH AMENDMENT.**

   A.    **Introduction.**

   In this case, the Indictment contains seven "special findings." [Doc. 20 at 4-5.] Nowhere, however, does the indictment state that the "special findings" would subject Mr. Cleveland to the death penalty or otherwise reveal that the grand jury intended to return an indictment charging a capital offense. The indictment does not allege any non-statutory aggravating factors. Neither does the indictment allege that the aggravating factors present in this case outweigh the mitigating factors and do so to an extent that is sufficient to justify imposition of a sentence of death. Under these circumstances, the indictment does not comport with the Grand Jury Clause of the Fifth Amendment and does not charge a capital offense.

   B.    **The Grand Jury Was Not Given the Choice of Holding Mr. Cleveland to Answer for a Capital Crime Because it was (Presumably) Unaware of the Consequences of its "Special Findings."[21]**

   The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V. As the Supreme Court has explained:

> [T]he grand jury is a central component of the criminal justice process. The Fifth Amendment requires the Federal Government to use a grand jury to initiate a prosecution.... The grand jury, like the petit jury, 'acts as a vital check against the wrongful exercise of power by the State and its prosecutors.' It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision to charge a capital crime.

---

[21] This argument is based in part on a law review article on this topic: K. Bren and Tomer, "Ring Around the Grand Jury: Informing Grand Jurors of the Capital Consequences of Aggravating Factors", 17 CAP. DEF. J. 61 (2004).

*Campbell v. Louisiana*, 523 U.S. 392, 398 (1998) (emphasis supplied). *See also, Vasquez v. Hillary,* 474 U.S. 254, 263 (1986) (power to charge capital or noncapital offense lies in the hands of the grand jury); Fed. R. Crim. P. 7(a).

When Congress adopted the Bill of Rights, only the indicting grand jury, by choosing the offense to charge, could make an offense punishable by death. In 1789, Congress sought to ratify the Fifth Amendment and also passed the first federal criminal laws. Laws that authorized the death penalty mandated it; they left no other sentencing option. *See generally* R. Little, *supra,* 26 Fordham Urban L. J. at 361-63.[22] This practice was consistent with that of the states, which at the time the Bill of Rights was adopted in 1791, "followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses." *Woodson v. North Carolina,* 428 U.S. 280, 289 (1976). Thus, the intent of the framers of the Fifth Amendment was that the grand jury retain the power to choose which defendants would receive a sentence of death upon conviction, by allowing the power to decide which crimes to indict in the first instance.

The grand jury's historical role in choosing which defendant would receive a death sentence upon conviction is well documented. *See* LaFave, W.R., *et al.,* 1 *Criminal Procedure* 1.5(b) (2d Ed.) (noting that grand juries played a critical role in reducing the number of offenses for which capital punishment could be imposed by downgrading charges to non-capital offenses); Andrew Hirsch, *The Rise of the Penitentiary* (1992) ("[a]t the indictment stage, grand juries often refused to charge a person with capital crimes. They simply downgraded indictments to noncapital charges of their own devising . . ."). The Supreme Court has

_____

[22] An example of one such law provided that "such person or persons on being thereof convicted [of willful murder] shall suffer death." An Act for the Punishment of Certain Crimes Against the United States, ch.9, § 3, 1 Stat. 112, 113 (1790).

acknowledged this historical role of the grand jury, writing in *Vasquez,* 474 U.S. at 263, that "the Grand Jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of a grand jury lies the power to charge a greater or lesser offense; numerous counts or a single count; and perhaps the most significant of all, a capital offense or a noncapital offense." In this case, the Government presented to the grand jury some of the elements of capital murder so as to make Mr. Cleveland "death-eligible" for Eighth Amendment purposes – the intent requirements under 18 U.S.C. § 3591(a)(2) and the alleged statutory aggravating factors under 18 U.S.C. § 3592(c). On information and belief, however, the government did not inform the grand jury of the consequences of those special findings, *i.e.,* that by returning an indictment containing those findings (and only by doing so), Mr. Cleveland would be held to answer to an offense punishable by death. Certainly nothing on the face of the indictment shows that the grand jury was aware that it was being asked to determine if Mr. Cleveland should be held to answer for a capital offense. The model grand jury charge of the Administrative Office of the United States Courts indicates that the jury would not have been told that Mr. Cleveland would face the death penalty upon conviction. To the contrary, that charge expressly instructs the grand jury: "When deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment." *See* Tomer, *Ring Around the Grand Jury, supra.* Presumably, the grand jury that returned the indictment against Mr. Cleveland was given this instruction. And, by specifically not informing the jury that it was returning an indictment charging a capital offense, and misinforming the grand jury about who actually determines punishment in a federal capital case, the government turned the proceeding into one that gave only the appearance of

complying with the Fifth Amendment, but that instead deprived Mr. Cleveland of his constitutional and statutory rights.[23]

The Supreme Court, in a related context, has refused to countenance such disregard for the Fifth Amendment. In *Smith v. United States,* 360 U.S. 1, 9 (1959), the Court reversed a kidnapping conviction initiated by information even though it was a capital offense. The Court stated:

> [t]he Fifth Amendment made the [grand jury indictment] rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings. . . . [T]o permit the use of informations where . . . the charge states a capital offense, would . . . make vulnerable to summary treatment those accused of . . . our most serious crimes.

*Id*. (citations omitted). Similarly, to permit the government to obtain from a grand jury an indictment alleging the elements of a capital offense, but not informing the grand jury that by finding those elements it was holding the defendant to answer to a capital crime, makes vulnerable those accused of the most serious crimes. If the grand jury is not informed of the capital nature of the offense, it cannot express the conscience of the community or perform its constitutionally assigned role as a "barrier . . . between the liberties of the people and the prerogative of the [government])." *Harris v. United States,* 536 U.S. 545, 564 (2002) (grand and petit juries "form a 'strong and two-fold barrier'"). This concern weighs particularly heavily in the present case given the numerous witnesses who told law enforcement that Mr.

---

[23] *But See United States v. McCluskey*, No. CR 10-2734 JCH, 2012 WL 13076173, at * 5 (D. N.M. Sept. 24, 2012) ("The Court has already considered and rejected McCluskey's first argument with regard to the grand jury's lack of knowledge of the fact that he could be subject to the death penalty. In its Memorandum Opinion and Order entered July 26, 2012 [Doc. 590], the Court held that "because there is no requirement that an indictment charge the punishment sought there is no requirement that the grand jury be informed as to the ultimate punishment." *Id*. at 16. The Court reiterates that holding for all the reasons stated in its previous opinion.").

Cleveland was extremely intoxicated at the time of the events giving rise to the charges in this case.

The grand jury's constitutional and historical role in deciding whether, from the very institution of the charges, a defendant should face the death penalty is perhaps more critical now than ever. Few legitimate checks exist on the federal government's power to pursue the ultimate punishment against one of its citizens, and fewer opportunities exist for the local community to express its desires about the appropriateness of the death penalty in any given case. Prosecutorial decision-making in capital cases is centralized at the Department of Justice in Washington, D.C., nearly 2,000 miles away from the District of New Mexico. *See United States v. Navarro-Vargas*, 367 F.3d 896, 902 (9th Cir. 2004) (Kozinski, J., dissenting) ("[a]n independent grand jury – one that interposes the local community's values on prosecutorial decisions that are controlled by policies set in Washington as to the enforcement of laws passed in Washington – seems like an important safeguard that is entirely consistent with the grand jury's traditional function"), rehearing *en banc*, 408 F.3d 1184 (9th Cir. 2005).

Nor is the petit jury in a capital case a meaningful barrier between "the liberties of the people and the prerogative of the [government])." *Harris,* 536 U.S. at 564. This is because petit jurors, to-date, have been unanimously "death-qualified." Individuals with disqualifying scruples against the death penalty, no matter how many exist in a given community, have simply not been permitted to sit in judgment in a capital case. Instead, capital juries consist exclusively of those individuals in the community, no matter how rare they may be, who believe that the death penalty is an appropriate punishment and who express a willingness to impose it. Empirical evidence shows that such "death-qualified" jurors are more prone to believe government witnesses than others in a community, generally evaluate evidence

differently than other types of jurors, and give little meaning to the presumption of innocence. In other words, death qualified jurors are inescapably more conviction prone that the average group of community members from which they are drawn.[24] The death-qualifying process also tends to exclude women and African-Americans from jury service. *Id.* The net effect of death qualification is that capital jurors do not represent the conscience of the local community or its rich diversity; at best, they represent only those members of the community who share similar views on the death penalty as an appropriate punishment for modern crime. Jurors that represent such a small segment of the community are ill-equipped, and frankly ill-disposed, to act as a barrier between the "liberties of the people" and the power of a government, particularly a government so centralized that it can force local prosecutors to take a capital case to trial against their will.[25]

Thus, the Constitution and the Bill of Rights sets up a carefully crafted system of checks and balance. Under the Fifth Amendment, the grand jury, like the petit jury, is supposed to "act[] as a vital check against the wrongful exercise of power by the State and its prosecutors." *Campbell v. Louisiana*, 523 U.S. 392, 398 (1998) (citations omitted). Unless the grand jury is

---

[24] *See* Jesse Nason, "Mandatory Voir Dire Questions in Capital Cases: A Potential Solution to the Biases of Death Qualification," 10 ROGER WILLIAMS U. L. REV. 211, 219 (2004) (summarizing research on how death-qualified jurors may presume guilt, resolve ambiguities against the defendant, more readily accept the government's version of events, distrust defense witnesses, fill evidentiary gaps with their beliefs that defendant committed the crime; and were more likely to infer premeditation). *See also United States v. Green,* 324 F. Supp. 2d 311, 329 (D. Mass. 2004) (citing studies that note death-qualified juries are more conviction prone).

[25] Public opinion polls "consistently show that opposition to capital punishment runs around 45% to 55% for black Americans, while for whites it is much lower, ranging from 17% in 1992 to 24% in 2000. That is opposition to the death penalty is about twice as high among black Americans as among white, and a much larger majority of whites than blacks support the death penalty." Rory Little, "What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh," 53 DEPAUL L. REV. 1591, 1596 (2004).

aware of its capital charging power and the consequences of returning an indictment with "special findings" like those in this case, however, it cannot perform its constitutionally assigned function and make "the important decision to charge a capital crime." *Id.* Because the grand jury almost assuredly did not perform its constitutionally assigned role of deciding whether Mr. Cleveland should be held to answer for a capital crime (because it was not presented with adequate facts to do so), the death notice should be dismissed and the indictment's "special findings" stricken.

### C.   The Government Did Not Obtain an Indictment Alleging All Elements of a Capital Crime.

Even if the grand jury had been aware that it its "special findings" would hold Mr. Cleveland to answer for a capital crime, which appears unlikely, the notice should nonetheless be dismissed because the Government did not present further elements necessary for the grand jury to make the decision as to whether Mr. Cleveland should be subject to the death penalty. That is, whether (1) the aggravating factors outweigh the mitigating factors; and, (2) whether they outweighed the mitigating factors sufficiently to justify a sentence of death. The failure of the grand jury to examine all relevant factors to determine if the death penalty was justified conflicts with the framers' intent, discussed above, that the grand jury retain the power to decide which defendants should receive a sentence of death upon conviction. Moreover, as argued earlier, the process followed in this case violated Mr. Cleveland's Fifth and Sixth Amendment rights to have all elements of the crime submitted to the grand jury for its consideration. *See Jones v. United States*, 526 U.S. at 251-52.

The elements of capital murder include decisions reached by the jury right up to the point where it makes a fact-finding that the aggravating circumstances actually outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified. In truth,

then, the "selection" decision is not made until the jury reaches the final decision-point of determining "whether all the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist to justify a sentence of death [.]" 18 U.S.C. § 3593(e) (emphasis added). A simple "outweighing" is not enough. As a matter of human experience, one can imagine a conscientious juror reaching the conclusion that, although the aggravating circumstances do barely tip the balance *in favor of death*, the degree to which that balance tips is *not sufficient to justify imposition of a sentence of death*.  It is not until the moment that latter finding is made that the defendant's potential punishment increases to death. Recall Justice Scalia's point: "[All] facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt." *Ring,* 436 U.S. at 610 (Scalia, J., concurring).

Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors. That is precisely why, as argued in this motion, Congress needs to be body that amends this statute. It is not the role of courts and prosecutors to "fix" a statute that no longer reflects what Congress intended. The grand jury's failure to indict on all elements of capital murder – even assuming the viability of a "*Ring* fix" – means the notice must be dismissed.[26]

---

[26] *But see United States v. McCluskey*, No. CR 10-2734 JCH, 2012 WL 13076173, at * 6 (D. N.M. Sept. 24, 2012) (rejecting argument that grand jury was required to find aggravating circumstances outweighed mitigating circumstances) (citing *United States v. Barrett*, 496 F.3d 1079, 1108 (10th Cir. 2007)).

**D.      The Non-Statutory Aggravating Factors Alleged in the Death Notice Must Be Dismissed Because They are not Supported by the Indictment.**

In *United States v. Green*, 372 F. Supp. 2d 168 (D. Mass. 2005), Judge Gertner examined the issue of whether a non-statutory aggravating factor of unadjudicated criminal activity alleged in a death notice should be stricken under the Fifth Amendment because the factor had not been previously found by the grand jury. Holding that the factor must be stricken, she relied primarily on *Blakely's* mandate that "every defendant [has] … the right to insist that the prosecutor prove to a jury *all facts legally essential to the punishment*." *Id.* at 176 (quoting *Blakely*, 124 S. Ct. at 2543) (emphasis added). She reasoned that "any aggravating factor is 'legally essential to punishment' because, while not linearly triggering a higher sentence within the statutory maximum, as Federal Sentencing Guidelines factors do, it may effectively tip the scale from life to death in combination with the other factors at play." 372 F. Supp. 2d at 177-178. She continued:

> The FDPA makes the death penalty jury a sentencing jury, not only conducting fact-finding, as any jury does, but also weighing aggravating and mitigating facts for the purpose of determining punishment, as judges typically do. The penalty jury's unique role muddies the distinction between offense facts, traditionally screened by grand juries, and sentencing facts, which traditionally went unscreened.

> The trilogy of *Apprendi, Ring*, and *Blakely* further conflates the line between sentencing facts and offense facts. *Blakely* explicitly rejected methodical distinctions between formal offense elements and sentencing factors, holding that all facts "essential" to punishment must be treated to the formalities of grand jury presentment and a jury trial. The Supreme Court specifically deemed it an "absurd result" that "the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors – no matter how much they may increase the punishment – may be found by the judge." *Blakely,* 124 S.Ct. at 2539. Even the government agrees that certain "sentencing facts"– here the listed statutory aggravating factor – must be screened by a grand jury.

> Moreover, once a defendant is deemed death-eligible, the FDPA requires that the penalty jury impose the death penalty only if the aggravating factors "sufficiently outweigh" the mitigating factor or factors. 18 U.S.C. § 3593(e). This

> burden is not optional. Even if the defendant presents no mitigating factors, to
> return a sentence of death after the first two death-eligibility burdens have been
> met, the jury must find that the aggravating factors "alone are sufficient to justify
> a sentence of death." *Id.* Because we will never know exactly how each factor
> influences the jurors' ultimate punishment determination, logic dictates that all
> aggravating factors – together – be considered legally essential to the punishment.
> Indeed, the government's argument that non-statutory factors are not essential is
> disingenuous; if the government does not require additional evidence to convince
> the jury to vote for death, why is it invoking non-statutory factors at all?

*Id.* at 177.

Judge Gertner limited her holding to unadjudicated criminal activity, finding on the basis of

Supreme Court precedent that unadjudicated criminal activity, in particular, required the

procedural protection of grand jury screening. *Id.* at 180-182. However, the court's logic is

obviously applicable to all non-statutory aggravating factors, as is made clear in *United States*

*v. Mill*s, 446 F.Supp.2d 1115 (C.D. Ca. 2006).

In *Mills,* Judge Carter considered whether the Confrontation Clause was applicable to

evidence offered to prove non-statutory aggravating factors. He concluded that the

Confrontation Clause was applicable based on his analysis that non-statutory aggravating

factors were elements under *Apprendi, Ring*, and *Blakely*. He began by noting that "[w]hile the

Court finds the reasoning in *Green* persuasive, *Green* fails to consider *Booker's* lesson that

there are some facts – those which are not binding on the court – that do not rise to the level of

constitutional significance. From the Court's perspective, *Booker* and *Blakely* appear to present

three potential applications to the issue of confrontation during the selection portion of the

penalty phase: (1) pure fact-finding; (2) pure sentencing discretion; and (3) constitutionally

significant fact- finding*." Id.* at 1133.

Judge Carter acknowledged that if, as *Green* held, *Booker* and *Blakely,* applied to pure

fact-finding, then the implication was that non-statutory aggravating factors, as well as the

ultimate weighing decision on penalty, were elements under the *Ring* line of cases, as argued

above:

> In *Blakely,* the Court relied on *Apprendi* in striking down Washington's
> sentencing guideline scheme that permitted the judge to impose a sentence higher
> than the standard range if he found certain aggravating factors justifying a
> departure. 542 U.S. at 299, 304-05,124 S.Ct. 2531. The Court held: Our
> precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is
> the maximum sentence a judge may impose solely on the basis of the facts
> reflected in the jury verdict or admitted by the defendant. . . ." In other words, the
> relevant "statutory maximum" is not the maximum sentence a judge may impose
> after finding additional facts, but the maximum he may impose without any
> additional findings. When a judge inflicts punishment that the jury's verdict alone
> does not allow, the jury has not found all the facts "which the law makes essential
> to the punishment," . . . and the judge exceeds his proper authority. Id. at 303-04,
> 124 S.Ct. 531 (internal citations omitted). . . .
>
> As to pure fact finding, one could take *Blakely* literally, to mean that the
> judge may impose the death penalty "solely on the basis of the facts reflected in
> the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S.
> Ct. 2531; see 18 U.S.C. § 3594 (requiring court to impose sentence on
> recommendation of jury). Thus, the Sixth Amendment's protections would no
> longer stop once the jury has found a statutory aggravating factor and a statutory
> intent factor. Even if these facts have been found, the judge still cannot impose a
> death sentence under the FDPA until the jury has found that "all the aggravating
> factor or factors found to exist sufficiently outweigh all the mitigating factor or
> factors found to exist to justify a sentence of death, or, in the absence of a
> mitigating factor, whether the aggravating factor or factors alone are sufficient to
> justify a sentence of death." *See* 18 U.S.C. §§ 3593(e), 3594. Thus, if steps three
> through six are fact finding, placement of the weighing after the jury has already
> engaged in the eligibility determination is not dispositive.

*Id*. at 1131-33.

Instead of reaching this issue, he focused instead on non-statutory aggravating factors,

which he reasoned were elements because they involved "constitutionally significant fact

finding":

> Under the Act, the jury is required to find these facts unanimously and
> beyond a reasonable doubt. 18 U.S.C. § 3593(c). The jury may consider only the
> factors upon which it has rendered such a finding when it weighs the factors in
> aggravation and mitigation. 18 U.S.C. § 3593(d). Further, a jury renders these
> findings after a contested adversarial hearing that bears many of the features of a

trial. See 18 U.S.C. § 3593(b)-(e). The Court finds that these features of the Act render steps three and four significantly different than the judicially found facts that inform a court's calculation of the now non-binding Guidelines. In essence, the FDPA completely limits the jury's discretion until it has rendered its findings on the aggravating factors (whether statutory or non-statutory). Only upon finding these facts is the jury permitted to move on to the more discretionary task of finding the mitigating factors, and the broadly discretionary task of weighing aggravation against mitigation. 18 U.S.C. § 3593(c)-(e). Because of these fundamental structural differences, findings on the aggravating factors bear many of the hallmarks of constitutionally significant facts falling under the ambit of *Blakely*.

It is possible that the jury could return a verdict of death without finding any additional aggravating facts, provided the proven aggravator alone is sufficient to outweigh whatever mitigation has been found. *See* 18 U.S.C. § 3593(e). However, given the allocation of fact finding and discretionary tasks under the FDPA, the Court finds that this possibility alone is not sufficient to render these facts constitutionally insignificant for the purposes of confrontation.

*Id*. at 1134-1135.[27]

The reasoning of *Green* and *Mills* is persuasive and should be followed here.[28] Although *Green* only addressed one particular class of non-statutory aggravating factors and *Mills* addressed the Sixth Amendment Confrontation Clause, *Green* correctly points out that "The FDPA already complies with *Ring's* holding in the sense that it requires a jury to find both statutory and non-statutory aggravating factors. Although *Ring* does not address the Fifth Amendment, other Supreme Court and circuit court opinions have paired Fifth and Sixth Amendment protections. And, as *Ring* and some state courts following it have suggested, these procedural protections apply to more than one aggravating factor when the government presents

_____

[27] In a footnote, the court noted that "[s]everal state supreme courts have determined that 'weighing' is a factual determination" citing *State v. Whitfield*, 107 S.W.3d 253, 261 (Mo.2003); *Woldt v. People*, 64 P.3d 256, 265-66 (Colo.2003); *Johnson v. State*, 118 Nev. 787, 802-03, 59 P.3d 450 (2002).

[28] *But see United States v. McCluskey*, No. CR 10-2734 JCH , 2012 WL 13076173, at * 7 (D. N.M. Sept. 24, 2012) (rejecting argument that the nonstatutory aggravating factors alleged in the Notice of Intent should be dismissed because indictment did not enumerate them and the grand jury did not consider them).

multiple aggravating factors." *Green,* 372 F. Supp. 2d at 179. *See also, United States v. Barrett*, 496 F. 3d 1079, 1107 (10th Cir. 2007) ("The Court's *Apprendi* line of cases reveals that the reasonable doubt standard is appurtenant to the right to jury trial.").

In this case, as indicated above, the death notice alleges two non-statutory aggravating factors. Neither of them, however, is alleged in the indictment. Because Mr. Cleveland was entitled under the Fifth Amendment Indictment Clause to grand jury screening of these factors, the non-statutory aggravating factors alleged in the Notice of Intention to Seek the Death Penalty [Doc. 39] must be stricken.

## III.     CONCLUSION

For the reasons set forth above, the motions should be granted in all respects together with any and all such other relief as the court deems just and proper. A hearing is requested on all disputed facts and as further requested in this memorandum.

Respectfully submitted,

/s/ Theresa M. Duncan
Theresa M. Duncan
Duncan Earnest, LLC
515 Granite NW
Albuquerque, NM 87102
505-842-5196
teri@duncanearnest.com

Donald F. Kochersberger III
BUSINESS LAW SOUTHWEST LLC
320 Gold Ave. SW, Suite 610
Albuquerque, New Mexico 87102-3299
(505) 848-8581 (Voice)
(505) 848-8593 (Facsimile)
Donald@BusinessLawSW.com (E-Mail)

*Attorneys for Kirby Cleveland*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of October 2018, I filed the foregoing pleading electronically through the CM/ECF system, which caused counsel for Plaintiff and Defendants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ Theresa M. Duncan
Theresa M. Duncan