**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**vs.**                                 **No. 17-cr-00965-JB**

**KIRBY CLEVELAND,**

       **Defendant.**

**MOTION TO PRECLUDE THE DEATH PENALTY AS A PUNISHMENT
BECAUSE THE DEATH PENALTY, IN AND OF ITSELF, IS AN
<u>UNCONSTUTIONAL PUNISHMENT</u>**

Defendant Kirby Cleveland, through his undersigned counsel, respectfully moves the Court to dismiss and/or strike the Notice of Intention to Seek the Death Penalty filed in this case [Doc. 39] because administration of the federal death penalty violates the Fifth and Eighth Amendments to the United States Constitution.  The defense acknowledges that certain parts of these challenges have been negatively decided by Supreme Court or Tenth Circuit precedent,[1] but those decisions do not reflect "the evolving standards of decency that mark the progress of a maturing society."  *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

---

[1] *See United States v. McCluskey*, No. CR 10-2734 JCH, 2012 WL 13076173 (D.N.M. Sept. 24, 2012) (rejecting arguments that imposition of the federal death penalty is arbitrary, capricious, and therefore unconstitutional and collecting cases holding similarly).

**FACTUAL BACKGROUND**

On April 12, 2017, a federal grand jury charged Kirby Cleveland by indictment with murder of a federal officer, contrary to 18 U.S.C. §§ 1111 and 1114 (Count 1); felony murder, contrary to 18 U.S.C. § 1111 (Count 2); first-degree murder, contrary to 18 U.S.C. § 1111 (Count 3); escape, contrary to 18 U.S.C. § 751 (Count 4); three counts of using a firearm during and in relation to a crime of violence, contrary to 18 U.S.C. § 924(c)(1) (Counts 5-7); and felon in possession of a firearm, contrary to 18 U.S.C. § 922(g)(1) (Count 8). [Doc. 20.] All charges (except escape) stem from the shooting death of Houston Largo, an officer employed by the Navajo Police Department (NPD), on March 11, 2017.

The Indictment also contains "Special Findings" relating to Counts 1, 2, 5, and 6. These special findings include the intent elements set forth in 18 U.S.C. §3591(a)(2) and allege two statutory aggravating factors: that Mr. Cleveland caused Officer Largo's death during commission of or attempted commission of, or during the immediate flight from the commission of another crime, specifically escape, in violation of 18 U.S.C. § 751. 18 U.S.C. § 3592(c); and that he committed the offense against a law enforcement officer who was engaged in the performance of his official duties. 18 U.S.C. § 3592(c)(14)(D). [Doc. 20 at 4-5.]

On January 26, 2018, the United States filed a Notice of Intention to Seek the Death Penalty should Mr. Cleveland be convicted of Counts 2 and/or 6 of the Indictment. [Doc. 39.] The notice includes the statutory aggravating factor that the killing of Officer Largo was in furtherance of an escape, but not that he was a law enforcement officer engaged in the performance of his official duties. [*Id*. at 2.]  Instead, the notice alleges

2

Officer Largo's status as non-statutory aggravating factor along with victim impact. [*Id.* at 3.]

## DISCUSSION

**A.  More than 25 years of experience with the federal death penalty has demonstrated that it operates in an arbitrary, capricious, irrational and discriminatory manner.**

Over the past quarter of a century, in hundreds of federal capital trials around the country, the federal death penalty has revealed itself to be arbitrary, capricious, irrational, and discriminatory. There is little consistency or predictability in the manner in which federal juries (and in three cases, a federal judge) have imposed, or not, the federal death penalty. Hopelessly irremediable problems of arbitrariness and capriciousness mark the administration of the federal death penalty system. Descriptions of other federal life sentence verdict cases demonstrate that a death sentence for Kirby Cleveland is more than arbitrary and capricious.  It is unfair to sentence someone who witnesses describe as paranoid and highly intoxicated at the time of a shooting that took place in utter darkness to die in prison for a homicide precipitated by a life of struggle when terrorists, vicious gang members, and mass murderers are not sentenced to death.

In the final analysis, the federal death penalty is fundamentally incapable of answering in a rational and predictable way the profound question of who should live and who should die.  This Court should strike it down.

To summarize what is to follow:

- Only a tiny handful of those federal defendants who could face the federal death penalty ever do.

- The theoretically national federal death penalty is, in reality, a regional death penalty, heavily pursued in the South and virtually ignored in the rest of the nation.

- From its earliest days to the present, the federal death penalty has consistently and disproportionately targeted members of minority groups.

- Of the cases that proceed to trial, two-thirds of defendants are spared the death penalty by juries or judges.

- There has been a sharp drop in the number of cases authorized by the Attorney General for capital prosecution, a sharp drop in the number of capital trials, and an even sharper drop in the numbers of death verdicts returned by juries.

- Approximately one-third of federal death sentences have been set aside on direct appeal or in proceedings brought pursuant to 28 U.S.C. § 2255.

- Despite the fact that federal death-row inmates have only one round of direct appeal and one round of collateral review, there are federal death row inmates who have been there for more than 20 years.

- There has been a presidential clemency grant to one federal death row inmate because of concerns he was innocent.

- In the past 55 years there have been just three federal executions, the most recent of which took place more than 15 years ago, a circumstance stripping the federal death penalty of any valid penalogical purpose.

In 1972, the United States Supreme Court, citing the arbitrary and capricious imposition of capital punishment across the land, struck down all existing death-penalty schemes as incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution. *Furman v. Georgia*, 408 U.S. 238 (1972). The random and capricious imposition of the penalty was best captured in the comparison drawn in *Furman* by Justice Stewart between receiving a sentence of death and being struck by lightning:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders, . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection

4

> of these few to be sentenced to die, it is the constitutionally
> impermissible basis of race . . . I simply conclude that the Eighth and
> Fourteenth Amendments cannot tolerate the infliction of a sentence of
> death under legal systems that permit this unique penalty to be so
> wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and footnotes omitted).

Members of the *Furman* Court also found that the death penalty was fraught with invidious and irrational selectivity, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority . . . ." *Furman*, 408 U.S. at 255 (Douglas, J., concurring). Justice White, who concurred in the result, highlighted the infrequent utilization of the death penalty:

> That conclusion, as I have said, is that the death penalty is exacted with
> great infrequency even for the most atrocious crimes and that there is no
> meaningful basis for distinguishing the few cases in which it is imposed
> from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring). Justice White further concluded:

> [C]ommon sense and experience tell us that seldom-enforced laws
> become ineffective measures for controlling human conduct and that the
> death penalty, unless imposed with sufficient frequency, will make
> little contribution to deterring those crimes for which it may be
> exacted.

*Id.* at 312. In fact, the infrequency with which defendants were targeted for capital punishment was noted by each of the five concurring Justices in the *Furman* majority. *See Furman*, 408 U.S. at 248 n. 11 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J., concurring); *id.* at 309-10 (Stewart, J., concurring); *id.* at 312 (White, J., concurring); and, *id.* at 354 n. 124 and 362-63 (Marshall, J., concurring).

In 1972, Justice Brennan, positing a nation of 200 million people that carries out 50 executions per year, noted that "when government inflicts a severe punishment no

more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied," 408 U.S. at 294, and, "[w]hen the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system." *Id*.

We are now a nation of over three hundred twenty five (325) million people. Out of a universe of thousands of potential federal capital cases, there have been 85 federal death verdicts.  Federal Death Penalty Resource Counsel Project, Current Statistics re Use of Federal Death Penalty (July 30, 2018), available at https://fdprc.capdefnet.org/doj-activity/statistics/current-statistics-re-use-of-federal-death-penalty-february-2017.    Just three federal prisoners have been executed. *Id*.  The federal death penalty suffers from the same vice in that only a handful of federal defendants who are potentially eligible for capital punishment are ever targeted. And those who are targeted are rarely sentenced to death and even more rarely are they executed.

 In 2014, a federal court in California struck down the California death penalty on the basis, in part, that it was so rarely carried out.  *Jones v. Chappell*, 31 F.Supp.3d 1050 (C.D. Cal. 2014), *rev'd sub nom. Jones v. Davis*, 806 F.3d 538 (9th Cir. 2015). The court noted:

> In California, the execution of a death sentence is so infrequent, and the delays preceding it so extraordinary, that the death penalty is deprived of any deterrent or retributive effect it might once have had. Such an outcome is antithetical to any civilized notion of just punishment.

*Id*. at 1063.[2]  *See also United States v. Caro*, 597 F.3d 608, 636 (4th Cir. 2010) (Gregory, J., dissenting) ("When the government selects a few offenders from such a large pool for execution, it cannot further its legitimate penalogical interests; instead it merely inflicts gratuitous pain and suffering.).

The Connecticut Supreme Court in *Santiago* struck down that state's death penalty for the same reason, in language that has direct application to the unconstitutional operation of the federal death penalty in non-death penalty states like New Mexico:

> In addition, aside from the inevitable delays, the sheer rarity with which death sentences are imposed and carried out in Connecticut—and, indeed, the entire northeastern United States—suggests that any conceivable

---

[2]  As noted by the California Supreme Court in *People v. Seumanu,* 61 Cal. 4th 1293, 1368, 355 P.3d 384, 438 (2015), "[t]he state has appealed (*Jones*) to the Ninth Circuit Court of Appeals and, as of this writing, that appeal is pending. (*Jones v. Chappell* (9th Cir., Aug. 21, 2014, No. 14–56373).)." Despite the pendency of the appeal, the California Supreme Court, citing the *Glossip* dissent, invited further litigation of this claim in future habeas corpus proceedings, pointing out that "although we have consistently, and recently, rejected the Eighth Amendment/delay claim, doctrine can evolve" and "although this court has consistently rejected the Eighth Amendment/delay argument, defendant's reliance on the recently decided *Jones* ... provides an opportunity to reconsider whether our prior position on this issue remains valid and supportable." *Id.* See also State v. Santiago, 318 Conn. 1, 99-100, 122 A.3d 1 (2015) ("[Another] reason the death penalty has lost its retributive mooring in Connecticut is that the lengthy if not interminable delays in carrying out capital sentences do not just undermine the death penalty's deterrent effect; they also spoil its capacity for satisfying retribution.") (citing *Jones*).  On November 11, 2015, the Ninth Circuit decided the appeal in *Jones*, ruling that the merits of the issue could not be reached because of habeas corpus technicalities.  *Jones v. Davis*, 806 F.3d 538 (9th Cir. 2015).  The court did comment that "[m]any agree with Petitioner that California's capital punishment system is dysfunctional and that the delay between sentencing and execution in California is extraordinary."  *But see Andrews v. Davis*, 798 F.3d 759, 790 (9th Cir. 2015) (the state court's rejection of Andrews's *Lackey* delay claim was not an unreasonable application of *Furman* or *Gregg*, and reasonable jurists would not dispute the district court's conclusion to that effect), *pet. for rehg. granted*, 888 F.3d 1020 (9th Cir. 2018).

> deterrent value will be far less than in a state like Texas, for example, which
> carries out executions on a regular basis.[3]

*State v. Santiago*, 318 Conn. 1, 94, 122 A.3d 1 (2015) (holding that capital punishment, as currently applied, violates the constitution of Connecticut because of "Connecticut's long, troubled history with capital punishment: the steady replacement by more progressive forms of punishment; the increasing inability to achieve legitimate penological purposes; the freakishness with which the sentence of death is imposed; the rarity with which it is carried out; and the [influence of] racial, ethnic, and socioeconomic [factors].").

As Circuit Judge Calabresi persuasively argued in *United States v. Fell*:

> What is going on here is that the existence of certain local values makes the imposition of the federal death penalty in states that do not have the death penalty truly uncommon. It is in that sense significantly more "unusual" than was the execution of 16- and 17-year-olds or the execution of the mentally retarded, before the Supreme Court found those practices to be "cruel and unusual" in [*Roper*] and [*Atkins*]. In all of these categories, values that made a death sentence unusual were at work. In cases involving juvenile and mentally retarded defendants, the values were apparently related to the culpability of the offender. ... In cases from states without the death penalty, the constitutionally salient values are not just the "local" values, like the existence of substantial generalized opposition to capital punishment, but much more fundamentally the value and endurance of federalism itself-the recognition that we are part of a country, of a polity, that has to live with both Texan values and Northeastern values.

*United States v. Fell*, 571 F.3d 264, 289-290 (2d Cir. 2009) (Calabresi, J., dissenting from the denial of rehearing en banc).

---

[3] See also, Eric A. Tirschwell and Theodore Hertzberg, *Politics and Prosecution: a Historical Perspective on Shifting Federal Standards for Pursuing the Death Penalty in Non-Death Penalty States*, 12 U. PA. J. CONST. L. 57 (2009) ("Since the creation of the American republic more than two centuries ago, the federal government has executed 340 people, whereas the State of Texas has executed more than that many in the past fifteen years.").

This argument – that the federal death penalty should be struck down because it is so infrequently sought or imposed – should not be misunderstood as a call for more frequent use of the federal death penalty.  As Justice Brennan stated in *Furman*:

> The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity.  Informed selectivity, of course, is a value not to be denigrated. Yet, presumably the States could make precisely the same claim if there were 10 executions per year, or five, or even if there were but one. That there may be as many as 50 per year does not strengthen the claim. When the rate of infliction is at that low level, it is highly implausible that only the worst criminals who commit the worst crimes are selected for this punishment. No one has yet suggested a rational basis that could differentiate in these terms the few who die from the many who go to prison. Crimes and criminals simply do not admit of a distinction that can be drawn so finely as to explain, on that ground, the execution of such a tiny sample of those eligible. Certainly the laws that provide for this punishment do not attempt to draw that distinction; all cases to which the laws apply are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

**B.    The federal death penalty is a disproportionate sentence in this case because more aggravated cases have resulted in life sentences.**

The arbitrariness of the federal death penalty is further highlighted because no meaningful basis may be discerned for distinguishing those cases – even among the most extreme – where death is imposed from those cases in which it is not.  For instance, in the District of Colorado, Timothy McVeigh was sentenced to death and executed for utilizing a truck bomb to blow up a federal building in Oklahoma City, killing 168 people and injuring hundreds. Whereas, in the Southern District of New York, two men associated with Usama bin Laden and al-Qaeda were spared the death penalty after being convicted of simultaneous terrorist attacks, utilizing truck bombs, that destroyed two American embassies in East Africa, killing 224 – including 12 Americans – and injuring thousands.

Similarly, Zacharias Moussaoui was spared the death penalty in the Eastern District of Virginia despite a jury finding that he was responsible for the thousands of deaths that occurred as a result of the September 11, 2001 terrorist attacks. Eric Rudolph – the Olympics and abortion-clinic bomber – entered a guilty plea to a life sentence, as did Theodore Kaczynski, the Unabomber, as did Jared Loughner whose mass-shooting murder victims included a child and a federal judge. Yet, in Boston, in 2015, Dzhokhar Tsarnaev was sentenced to death for the bombing of the Boston Marathon where fewer people were killed than in other terrorism cases. Indeed, it is likely that in these and several hundred cases that resulted in life sentence, there is not one in which a prosecutor could not argue in summation, "If this case doesn't call for the death penalty, what case does?" And yet, in the overwhelming majority of such cases – juries (and in rare instances, judges) returned life verdicts and, to an even greater extent, plea agreements were offered and accepted.  *See* Death Penalty Information Center, *Struck by Lightning: The Continuing Arbitrariness of the Death Penalty Thirty-Five Years After Its Reinstatement in 1976* (Washington, DC 2011), available at https://deathpenaltyinfo.org/documents/StruckByLightning.pdf (examining the facts of several extremely aggravated federal death penalty cases in which the death penalty was not sought or imposed).

To be clear, all of these cases are by their own terms horrible, and all involved the infliction of agony on victims and survivors, and their loved ones. Yet, for indiscernible reasons, few were sentenced to death, while an overwhelming majority were not.  *See* Federal Death Penalty Resource Counsel Project, Current Statistics re Use of Federal Death Penalty (July 30, 2018), available at https://fdprc.capdefnet.org/doj-

activity/statistics/current-statistics-re-use-of-federal-death-penalty-february-2017 (of 516 cases in which the Attorney General authorized the government to seek the death penalty, only 85 resulted in death sentences). If any basis can be discerned, it is race, gender, and region. Because the defense can demonstrate that any death sentence here is arbitrary and disproportionate because life sentences have been imposed for more aggravated cases, the Court should allow testimony about a limited number of other cases and statistics regarding the race of the defendant and the victim and the outcome in other cases.

In *Walker v. Georgia*, 129 S. Ct. 453 (2008), Justice Stevens, dissenting from the denial of certiorari, noted that Georgia had sharply curtailed the scope of its statutory proportionality review of death sentences, and noted, "The likely result of such truncated review . . . is the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment." *Id*. at 457.

In their dissent in *Glossip v. Gross*, 135 S. Ct. 2726 (2015) ("*Glossip* dissent"), Justices Breyer and Ginsburg issued a call for reconsideration of the constitutionality of the death penalty, aligning themselves with several other justices who have expressed similar views in the four decades since the Court reversed its earlier decision that capital punishment violates the Eighth Amendment. *See* 135 S. Ct. at 2755-80 (2015). Again, Justice Breyer urged that the Court reconsider the constitutionality of the death penalty, in his dissent from the denial of certiorari in *Brooks v. Alabama*, 136 S. Ct. 708 (Mem.) (Jan. 21, 2016) ("The unfairness inherent in treating this case differently from others which used similarly unconstitutional procedures only underscores the need to reconsider the validity of capital punishment under the Eighth Amendment.  *See Glossip v. Gross*, 576 U.S. __ 135 S. Ct. 2726, 2755–56 (2015) (Breyer, J., dissenting)."). In support of

their conclusion that "the death penalty, in and of itself, now likely constitutes a legally prohibited 'cruel and unusual punishmen[t],'" Justice Breyer, who authored the joint dissent, wrote:

> In 1976, the Court thought that the constitutional infirmities in the death penalty could be healed; the Court in effect delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems. Almost 40 years of studies, surveys, and experience strongly indicate, however, that this effort has failed. Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose. Perhaps as a result, (4) most places within the United States have abandoned its use. I shall describe each of these considerations, emphasizing changes that have occurred during the past four decades. For it is those changes, taken together with my own 20 years of experience on this Court, that lead me to believe that the death penalty, in and of itself, now likely constitutes a legally prohibited "cruel and unusual punishmen[t]." U.S. Const., Amdt. 8.

*Id*. at 2755-56.

The Connecticut Supreme Court, relying heavily on Justices Breyer's analysis, held that "the death penalty . . . is so out of step with our contemporary standards of decency as to violate the state constitutional ban on excessive and disproportionate punishment." *State v. Santiago*, 318 Conn. 1, 45-46, 122 A.3d 1 (Conn. 2015). Although decided on state constitutional grounds, *Santiago* ruled that "when construing the state constitutional freedom from cruel and unusual punishment, we broadly adopt the framework that the federal courts have used to evaluate eighth amendment challenges." *Santiago*, 318 Conn. at 45-46. The Connecticut Supreme Court cited the *Glossip* dissent for a number of factual and legal propositions critical to the *Santiago* holding, including:

- "[n]otably, by 2012, less than 2 percent of the nation's counties accounted for all of the death sentences imposed nationwide" (318 Conn. at 80);

12

- "between 1973 and 1995, state and federal courts found errors in more than two thirds of the capital cases that they reviewed" (*id*. at 93 n. 96);

- "[s]tatistical analyses have demonstrated to a near certainty that innocent Americans have been and will continue to be executed in the post-Furman era" (*id*. at 104); and

- "court[s], not legislature[s] ultimately must determine whether capital punishment comports with evolving standards of decency because [these] are quintessentially judicial matters ... [that] concern the infliction—indeed the unfair, cruel, and unusual infliction—of a serious punishment [on] an individual. " (*id*. at 138-39).

The first Federal Death Penalty Act ("FDPA") case to address the realities of the modern death penalty as outlined in the *Glossip* dissent was *United States v. Sampson*, 2015 WL 7962394, at *20 (D. Mass. Dec. 2, 2015). There, although the court denied the defendant's challenges to the FDPA on the pre-*Glossip* record presented in that case, it nevertheless concluded, citing the *Glossip* dissent and its own prior ruling on the issue, that "[t]he court remains concerned … about the potential rate of error in federal capital cases generally and the risk of the execution of the innocent particularly." Since then, *Glossip*'s call for reconsideration of the constitutionality of the death penalty has been raised in other FDPA cases, including *United States v. Fell*, 5:01-cr-00012-GWC-1 (D. Vt.), where the court conducted a nine-day evidentiary hearing on the constitutionality of the Federal Death Penalty Act that concluded on July 21, 2016. In *Fell*, the court received testimony on all of the issues outlined in Justice Breyer's opinion, and so developed a comprehensive and up-to-date record of the FDPA's Fifth and Eighth Amendment deficiencies, including:

1. The rate of error, i.e., the high number mistakes by judges, prosecutors, police, or defense counsel, requiring new trials or sentencing hearings – and sometimes exonerations;

2. The arbitrariness in the FDPA's application, i.e., how the exercise of prosecutorial and juror discretion results in regional, racial, and gender disparities in which defendants receive the death penalty;

3. The unavoidable delay built into the process, intended to protect against that error, but which has failed to do so, and which undermines the purpose of capital punishment, often at the expense of victim family members; and

4. Abandonment of use of the death penalty in most states under evolving standards of decency.

Transcripts of *Fell* hearing attached as Exhibit 1. After hearing this evidence, the Court concluded that

the death penalty continues to be imposed in an arbitrary manner. The state in which a crime occurs is the strongest predictor of whether a death sentence will result. Whether the murder victim is white is also a significant predictor. These findings are as true of cases brought under the FDPA as they are for state death sentences. When large groups of cases which qualified for the FDPA but did not result in death sentences are compared with the much smaller groups which did, it is not possible to identify principled distinctions between the groups. The imposition of the death penalty through the FDPA remains arbitrary despite the efforts of the prosecution and the courts to impose legal standards to guide the decisions leading to a death sentence.

*United States v. Fell*, 224 F. Supp. 3d 327, 345 (D. Vt. 2016). Nonetheless, the court ultimately concluded that it was powerless to overturn precedent holding the FDPA constitutional. *Id*. at 359 ("The time has surely arrived to recognize that the reforms introduced by *Gregg* and subsequent decisions have largely failed to remedy the problems identified in *Furman*. Institutional authority to change this body of law is reserved to the Supreme Court. For this reason, the trial court is required to deny the defense motions related to the constitutionality of the death penalty.").

Because the federal death penalty is so infrequently sought, imposed, or carried out, it operates in an unconstitutionally arbitrary and capricious manner. Whether the most accurate analogy is being struck by lightning or participating in, and losing, a

deadly lottery, the federal death penalty does not operate in a rational manner. On this basis, the court should strike it down.

**C.      The federal death penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority and male defendants and a demonstrated race/gender-of-victim effect.**

From the earliest days of the government's efforts to enforce a nation-wide death penalty, patterns of uneven and apparently discriminatory application appeared. From the very outset, the federal death penalty was utilized almost exclusively by federal prosecutors in the South and, not surprisingly, federal death verdicts were returned almost exclusively in those traditional "death-belt" jurisdictions. Added to this arbitrary factor was the invidious circumstance of race, since the federal death penalty, as it was rolled out in the 1990's, targeted a disproportionately large number of minority groups, particularly African-Americans and Hispanics.

By 1994 – barely six years after the return of a "modern" federal death penalty – obvious racial disparities surfaced in the Justice Department's prosecution of federal death penalty cases. In response, the House Subcommittee on Civil and Constitutional Rights initiated an investigation and concluded as follows:

> Race continues to plague the application of the death penalty in the United States. On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims. On the federal level, cases selected have almost exclusively involved minority defendants.

*Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd

Congress, 2nd Session, March 1994.[4] That report found that as of 1994 there had been 37 defendants authorized for capital punishment under the § 848(e) (ADAA) scheme, of whom 33 (87 percent) were black or Hispanic. *Id.* Presently the figure is 73 percent, hardly an "improvement" to boast of. *See* Federal Death Penalty Resource Counsel Project, Current Statistics re Use of Federal Death Penalty (July 30, 2018), available at https://fdprc.capdefnet.org/doj-activity/statistics/current-statistics-re-use-of-federal-death-penalty-february-2017.

The disproportionate targeting of minorities for the federal death penalty has had what would be the expected effect on the population of death row. Thus, as of July 2018, 58 percent of those presently on federal death row are non-white. *Id.* This is an unacceptable state of affairs and, bluntly, one that should be a source of intense concern to the Justice Department.

Twenty-eight years ago, dissenting in *McCleskey v. Kemp*, 481 U.S. 279 (1987), Justices Brennan, Marshall, Blackmun and Stevens hypothesized an attorney-client conversation where an African-American defendant charged with capital murder asked his attorneys what the chances were that he would be sentenced to death and what would factor into that process. Based on the statistical analysis presented to the Court in *McCleskey*, it was the four dissenters' conclusion that, at some point in the dialogue, defense counsel would have to level with their client and tell him that his race would play an important role – perhaps a determinative one – in whether he lived or died:

---

[4] Available at https://www.ncjrs.gov/pdffiles1/153840.pdf.

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey*, 481 U.S. at 322 (Opinion of Brennan, Marshall, Blackmun and Stevens, J.J., dissenting).[5]

More than a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection. *Id.* at 373-74. The historical truth is that in the United States capital punishment and race have always been inextricably intertwined. That state-of-affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society. *See, e.g.*, C. J. Ogletree (Ed.) and A. Sarat, *From Lynch Mobs to the Killing State: Race and the Death Penalty in America* (New York University Press 2006); R. K. Little, *What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DEPAUL L. REV. 1591 (2004); K. McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 DEPAUL L. REV. 1615 (2004); C. J. Ogeltree, *Black Man's Burden: Race and the Death Penalty in America*, 81 OREGON L.REV. 15 (2002); G. L. Pierce, M. L. Radlet, *Race, Region, and Death Sentencing in Illinois*, 81 OREGON L.REV. 39 (2002); S. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty*, 35 SANTA CLARA L.REV. 433 (1995); D. Baldus,

---

[5]  After his retirement from the bench, Justice Powell wrote that he regretted both voting with the majority, and authoring the Court's 5-4 opinion upholding the death penalty in *McCleskey*.  *See,* Jeffries, *Justice Lewis F. Powell, Jr.* (1994) at pp. 451-52.

*Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection and Correction*, 51 WASH. & LEE L.REV. 359 (1994); Bienen, Weiner, Denno, Allison and Mills, *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion*, 41 RUTGERS L.REV. 27, 100-57 (1988).

In Connecticut's recent *Santiago* decision, the issue of race and the death penalty was examined with the following conclusion:

> [D]ata from three authoritative governmental sources . . . all suggest that the death penalty in Connecticut continues to be imposed disproportionately based on the race and ethnicity of the offender and the victim. The alleged disparities are significant and hold across hundreds of cases. We are not aware of any study or report to have reached a contrary conclusion.

*Santiago*, 318 Conn. at 151.

In *Furman*, Justice Douglas had explored the correlation between race and the death penalty and concluded:

> In a Nation committed to equal protection of the laws there is no permissible "caste" aspect of law enforcement. Yet we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position. In ancient Hindu law, a Brahman was exempt from capital punishment, and in those days, "[g]enerally, in the law books, punishment increased in severity as social status diminished." We have, I fear, taken in practice the same position . . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring; footnotes omitted.)

Mr. Cleveland's showing in this motion is sufficient to establish a case of arbitrariness and invidious discrimination in the enforcement of the federal death penalty. *See United States v. Sampson*, 275 F. Supp. 2d 49, 89 (D. Mass. 2003) (" If the

sentences of similarly situated defendants based on these three factors [the race of the defendant, the race of the victim, and the geographic location of the prosecution] were so great as to make the imposition of the death penalty arbitrary and capricious, the Eighth Amendment would be violated. The first two factors, the race of the defendant and the race of the victim, also implicate the Fifth Amendment's guarantee of equal protection of the law."). It is difficult to imagine how, other than racism, one can explain the arbitrary manner in which the federal death penalty has been administered in terms of the race of those who are targeted. *See Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986). To all appearances, there is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

The Supreme Court has repeatedly emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). This case, as a federal prosecution, is subject to the Due Process Clause of the Fifth Amendment, which has long been held to embody a guarantee of equal protection. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment."). In the area of criminal justice, where racial discrimination "strikes at the fundamental values of our judicial system and our society as a whole," *Rose v. Mitchell*, 443 U.S. 545, 556 (1979), the Supreme Court has "consistently" articulated a "strong policy . . . of combating racial discrimination." *Id.* at 558. That the federal death penalty operates with an impermissible racist effect is powerful evidence that it operates fundamentally unfairly

and with arbitrariness and caprice. Where a death penalty appears to operate so as to institutionalize racism, it offends the same constitutional values that yielded *Furman* and this nation's abandonment of capital punishment.

**D.      The FDPA is unconstitutional because it fails to provide a structure that permits a reasoned choice between a sentence of life without the possibility of release and execution.**

When the Supreme Court reinstated the death penalty in 1976, it did so subject to the requirement that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). That pronouncement followed from *Furman v. Georgia*, which had held that "as a result of giving the sentencer unguided discretion to impose or not to impose the death penalty for murder, the penalty was being imposed discriminatorily, wantonly and freakishly, and so infrequently that any given death sentence was cruel and unusual." *Id*. at 220–21 (footnote omitted).

The essential components of the new "guided discretion" scheme – under which the American death penalty system still operates – were that the pool of death eligible defendants would be narrowed in an objective way, and that every eligible defendant would then be entitled to individualized sentencing in which his or her character and background were put into evidence and the jury given unfettered discretion to exercise mercy. As more thoroughly discussed in Justice Breyer's dissent in *Glossip* and the Connecticut Supreme Court's decision in *Santiago*, and as demonstrated at the

evidentiary hearing in *Fell*, this delicate balance of discretion and objective reliability has proved unattainable.

Members of the Supreme Court identified the legal tension in this balancing act more than twenty years ago, and have struggled with it since. Arguing that *Furman* and *Lockett* "cannot be reconciled," Justice Scalia announced in 1990, that he would no longer enforce the requirement of individualized sentencing. *Walton v. Arizona*, 497 U.S. 639, 664 (1990). Justice Thomas took a similar position in 1993. *See Graham v. Collins*, 506 U.S. 461, 479 (1993). And Justice O'Connor also expressed concern with the difficulty of achieving consistency while allowing the consideration of individual characteristics. *See California v. Brown*, 479 U.S. 538 (1987).

Most famously, in 1994, Justice Blackmun announced that "[f]rom this day forward, I no longer shall tinker with the machinery of death." *Callins v. Collins*, 510 U.S. 1141 (1994) (Blackmun, J., dissenting from denial of certiorari). He explained:

> For more than 20 years I have endeavored-indeed, I have struggled-along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated to concede that the death penalty experiment has failed.

*Callins*, 510 U.S. at 1145. Justice Blackmun noted that "discretion could not be eliminated from capital sentencing without threatening the fundamental fairness due a defendant when life is at stake," because "evolving standards of decency required due consideration of the uniqueness of each individual defendant when imposing society's ultimate penalty." *Id*. at 1147-49. *See also Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (plurality opinion). Instead, "[e]xperience has shown that the consistency and

rationality promised in *Furman* are inversely related to the fairness owed the individual when considering a sentence of death. A step towards consistency is a step away from fairness." *Callins*, 510 U.S. at 1147–49. *See also Woodson*, 428 U.S. at 301 (plurality opinion).

If the inherently conflicting commands that the "sentencer's discretion to impose death must be closely confined, but the sentencer's discretion not to impose death (to extend mercy) must be unlimited," have confounded the Justices who developed them, it should not be surprising that they have proven impossible for jurors to follow. The most comprehensive study to date on the actual process by which death sentences are meted out is by the Capital Jury Project, a research program by a consortium of universities on how people who served on actual capital juries made the life and death decisions in those cases.  In June of 2007, New Mexico State District Judge Garcia found the State's death penalty unconstitutional, in part because of the findings of the CJP. *See State v. Dominguez*, D-0101-CR-200400521, *State v. Good*, D-0101-CR-00522, order entered June 8, 2007. Those findings demonstrate jurors' multiple difficulties with the guided discretion scheme, including:

- the jurors' propensity (more than 50% of the time) to decide the penalty issues before the penalty phase begins, thereby effectively excluding mitigation from the sentencing calculus;

- a lack of juror understanding of what constitutes mitigation, and how it relates to the jurors' sentencing function;

- a widespread lack of understanding of the instructions given by the judge; and

- evidence that the jury decision-making process in death penalty cases is so flawed as to violate constitutional principles.

The CJP specifically identified "seven deadly sins" of capital juries and jury selection procedure that unfairly increase the likelihood of a death verdict:

1.      premature decision-making;

2.      death bias;

3.      mitigation impairment;

4.      a widespread belief that death is mandatory in some cases;

5.      evasion of responsibility for sentencing decisions;

6.      the persistence of race as a factor in sentencing decisions; and

7.      the belief that life sentences will not result in lengthy incarcerations.

Worse, studies also show that jury instructions do little to ameliorate these concerns. *See* C. Haney, L. Sontag and S. Constanzo, *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 Journal of Social Issues 49 (1994). The authors of the Haney study interviewed 57 capital jurors from nineteen death penalty trials conducted under a California statute very similar to the FDPA. Contrary to the bromide that jurors are presumed to follow instructions, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), the authors found that – in this context – jurors either failed to apply or misapplied the instructions:

• one third of the jurors sampled focused on the nature of the crime in a way that essentially created a presumption for death;

• for many of the jurors, the absence of mitigation was the only reason given for the imposition of a death sentence, shifting the burden to the accused;

• the jurors misused the instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate them from the impact of their decision;

• many of the jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit into" the rubric contained in the

instructions, thereby indicating a failure to understand what constituted mitigating evidence;

• 80% of the jurors refused to consider mitigation evidence because it did not directly reduce the defendant's responsibility for the crime;

• 60% of the jurors rejected mitigation evidence because it did not completely account for the defendant's actions;

• less than one third of the jurors demonstrated a workable understanding of what constituted mitigation evidence; and

• 80% of the juries that returned death verdicts did so believing that life imprisonment without the possibility of parole did not mean life without parole.

Other research has demonstrated similarly widespread misunderstandings of the sentencing function in general, and of mitigation in particular, among jurors deciding death penalty cases. *See, e.g.*, C. Haney and M. Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions*, Law and Human Behavior, Vol. 18, No. 4, pp. 411–36 (1994); Peter M. Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, Utah Law Review 1, 10-43 (1995); J. Luginbuhl, *Comprehension of Judges' Instructions in the Penalty Phase of a Capital Trial: Focus on Mitigating Circumstances*, 16 Law and Human Behavior 203 (April 1992); M. Constanzo and S. Constanzo, *Jury Decision Making in the Capital Penalty Phase: Legal Assumptions, Empirical Findings and a Research Agenda*, 16 Law and Human Behavior 185 (1992). These and other studies show that jurors in death penalty cases misunderstand what they are permitted to consider much more often than not, and that instructions rarely cure these misunderstandings. *See* Bowers & Foglia, *Still Singularly Agonizing*, *supra*, at 68–69.

Because death is different from other forms of punishment, courts have long recognized the greater need for the reliability of the process by which the jury arrives at a

sentence. *See Woodson*, 428 U.S. at 303-05 (op. of Stewart, Powell & Stevens, JJ.). A death penalty sentencing scheme that presents an unreasonable likelihood that the jurors will misunderstand their role and their assignments violates the Eighth Amendment and the Due Process Clause. *Cf. Simmons v. South Carolina*, 512 U.S. 154 (1994) (establishing entitlement under Due Process Clause to instruction that "life" sentence means life without parole); *Godfrey*, 446 U.S. at 427 (holding that Eighth Amendment requires specificity and clarity in guiding juror discretion). Jurors must be provided an environment that permits a reasoned, informed decision about the appropriate sentence. *Cf. Boyde v. California*, 494 U.S. 370, 380 (1990) (holding that reversal is required when there is a "reasonable likelihood" that jury misunderstood instruction so as to improperly limit consideration of mitigating evidence).

The Capital Jury Project's findings demonstrate that although the FDPA may have been designed with as much care as possible under the circumstances, the capital sentencing process that the statute provides is constitutionally inadequate in practice. The results of jurors' good faith grappling with the law – arbitrary, biased, and erroneous death verdicts – are intolerable as a matter of due process and proportional punishment.

> **E.    The Federal Death Penalty Act is unconstitutional because it does not meaningfully narrow the class of offenders eligible for the death penalty as constitutionally required.**

As demonstrated above through case citations and the sentences imposed, the FDPA has also done a terrible job of limiting the death penalty to the "worst of the worst," because under the FDPA virtually every homicide can be punished by a sentence of death. That the multitude of FDPA aggravators meant the Act failed utterly to perform the narrowing function that the Eighth Amendment requires was noted by a

former federal prosecutor once responsible for administering the federal death penalty in

the Department of Justice:

> When the generality of these statutory aggravating factors and [their] commonality in many murders are considered together with the added authority to invoke non-statutory aggravating factors, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense.

Little, R.K., *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 403 (1999). This failure to narrow the class of crimes or the broad range of aggravating factors also leaves the FDPA open to its disproportionate application to people of color.

The arguments and evidence that will be presented before this Court at a hearing will show that sometimes it is just luck, good or bad, rather than culpability that explains why one defendant is convicted and sentenced to death while another similarly situated is sentenced to life.

**F.      The Supreme Court has recognized that renewed Constitutional challenges are properly adjudicated in District Courts.**

Experience over 40 years has shown that the *Gregg* approach has not tamed the arbitrariness problem identified in *Furman*. But, the question remains: In light of *Gregg*, what can this Court do about it?

Mr. Cleveland acknowledges the Court's obligation to apply the doctrine of *stare decisis*. But the protections afforded by the Eighth Amendment's prohibition of cruel and unusual punishment require reconsideration when necessary to ensure that its underlying values have not become moribund by later developments and knowledge. This Court can discount precedent when "special justifications" are present. *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984).

> Such justifications include the advent of "subsequent changes or development in the law" that undermine a decision's rationale, *Patterson v. McLean Credit Union, supra*, . . . the need "to bring [a decision] into agreement with experience and with facts newly ascertained," *Burnet v. Coronado Oil & Gas Co., supra* . . . ; and a showing that a particular precedent has become a "detriment to coherence and consistency in the law . . . " (citations omitted).

*Payne v. Tennessee*, 501 U.S. 808, 849 (1991) (Marshall, J. dissenting).

While the above relates to the Supreme Court reconsidering its own precedents, the doctrine of anticipatory overruling, which allows a lower court to reject precedent where circumstances have changed, applies to both courts of appeals, *see United States v. City of Philadelphia*, 644 F.2d 187, 191-92 (3rd Cir. 1980) (declining to follow *Wyandotte Transportation Co. v. United States*, finding it "merely one step in the development of current standards" and refusing to be "blind to subsequent developments"); *United States v. White*, 405 F.2d 838, 847-48 (7th Cir. 1969) (declining to follow *On Lee v. United States*, even though factually "directly on point" because of subsequent developments); and to lower courts, especially when called upon to reconsider issues of overriding constitutional importance. *See Barnette v. West Virginia Board of Education*, 47 F. Supp. 251 (S.D. West Virginia) (1942) (refusing to follow Supreme Court decision in *Minersville School District v. Gobitis*, 310 U.S. 586 (1940), holding that public schools could require students to salute the flag and recite the *Pledge of Allegiance* over their religious objections as Jehovah's Witnesses), *aff'd West Virginia State Board of Education v. Barnette*, 319 U.S. 643 (1943) (overruling *Minersville School District*); *Gebhart v. Belton*, 87 A.2d 862 (Del. Ch. 1952), *aff'd* 91 A.2d 137 (De. 1952) (Delaware Chancellor Collins Seitz (later Chief Judge of the Third Circuit) orders public schools integrated despite Supreme Court decision in *Plessy v.*

*Ferguson*, 163 U.S. 537 (1896)), *affirmed in Brown v. Board of Education*, 347 U.S. 483 (1954).[6]

The Supreme Court has often addressed challenges to the constitutionality of a statute first ruled upon by a district court; thus, the review of Supreme Court constitutional decisions in other contexts is instructive. Two areas where the Court has confronted constitutional challenges to laws where district courts have ruled after evidentiary hearings are the abortion and election law cases. In each of these areas, trial courts, based on records before them, make assessments whether a statute created an undue burden on constitutional rights. In each of these classes of cases, a previous holding that a statute is constitutional presented no bar to later assessment as to constitutionality based on new evidence at a hearing in the trial court. Thus, the question is not merely whether this Court is empowered to assess the constitutionality of the federal death penalty, it is whether it is this Court's duty. The answer to both questions is "yes." Indeed, this is emphatically the role of the judiciary. *See United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675, 2688 (2013).

For example, in *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, 136 S. Ct. 2292 (2016), the Supreme Court reviewed the Fifth Circuit decision overturning a district court's finding unconstitutional a Texas statute regulating abortion. The law at issue had previously survived a facial challenge to its constitutionality, where the Fifth Circuit had held that "holding the provisions unconstitutional on their face is improper because the

---

[6] Judge Seitz did not directly rule *Plessy* was no longer good law but instead held that the evidence did not support *Plessy*'s underlying assumption that the segregated schools in New Castle, Delaware were equal.  Similarly, there is no need for this Court to say *Gregg* is no longer applicable.  The Court need only rule that the now-available evidence does not support its underlying assumption that the death penalty can be imposed in a non-arbitrary and non- capricious manner.

plaintiffs had failed to show that either of the provisions 'imposes an undue burden on a large fraction of women.'" *Whole Woman's Health*, 136 S. Ct. at 2304. Within weeks of that decision a new suit was filed alleging a constitutional violation and, after an evidentiary hearing, the district court concluded that the law imposed an undue burden on constitutional rights. In reversing the lower court, the Court of Appeals declared that "the district court erred by substituting its own judgment for that of the legislature" when it conducted its "undue burden inquiry," in part because "medical uncertainty underlying a statute is for resolution by legislatures, not the courts." *Id.*, at 587 (citing *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)).

The Supreme Court reversed, and in so doing, endorsed the action of the district court, which "did not simply substitute its own judgment for that of the legislature. It considered the evidence in the record — including expert evidence, presented in stipulations, depositions, and testimony. It then weighed the asserted benefits against the burdens." *Whole Woman's Health*, 136 S. Ct. at 2310. Deciding that the as-applied review was not barred by the previous denial of a facial challenge, the Court turned to the Eighth Amendment for an example:

> We find this approach persuasive. Imagine a group of prisoners who claim that they are being forced to drink contaminated water. These prisoners file suit against the facility where they are incarcerated. If at first their suit is dismissed because a court does not believe that the harm would be severe enough to be unconstitutional, it would make no sense to prevent the same prisoners from bringing a later suit if time and experience eventually showed that prisoners were dying from contaminated water. Such circumstances would give rise to a new claim that the prisoners' treatment violates the Constitution. *Factual developments may show that constitutional harm, which seemed too remote or speculative to afford relief at the time of an earlier suit, was in fact indisputable. In our view, such changed circumstances will give rise to a new constitutional claim. This approach is sensible, and it is consistent with our precedent.*

*Whole Woman's Health*, 136 S. Ct. at 2305 (emphasis added).

Similarly, in *Crawford v. Marion County Election Board*, 533 U.S. 181 (2010), a divided Court upheld Indiana's voter identification law against a facial challenge, while expressly reserving the possibility that the requirement might be unconstitutional as applied in some later case. There, the Court held that the petitioners presented an inadequate record in the court below to make it "possible to quantify either the magnitude of the burden [on voting rights] on this narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id*. at 202. The possibility that an adequate record could be made in the future was clearly contemplated by the Court. Like the question whether a particular statute creates an "undue burden" on abortion rights or on the right to vote, the "evolving standard of decency" of Eighth Amendment jurisprudence requires a factual review of the effects of the challenged statute. Community standards change over time and the full impact of laws on constitutional rights may not be readily ascertained until a tipping point has been reached regarding the FDPA's constitutionality. It is submitted that the sole venue where that assessment can be made in the first instance is in the District Court. *Cf. United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007) (striking death penalty allegations made under the FDPA because government charging decisions were arbitrary and capricious).

**G.      There is a national consensus against the death penalty marking the maturing and evolving standards of decency in our society.**

There have been only three federal executions, less than one percent of cases reviewed and none since 2003. By any measure the use of the death penalty is declining. In the United States, there is steady movement away from the death penalty. Since 2006, eight states have abolished capital punishment: New York (2007), New Jersey (2007),

New Mexico (2009), Illinois (2011), Connecticut (2012), Maryland (2013), Nebraska (2015), and Delaware (2016). It is now entirely prohibited in 21 jurisdictions and several governors have declared moratoria. The four states with a moratorium on executions are: Oregon (2011), Colorado (2013), Washington (2014), and Pennsylvania (2015). *See* Death Penalty Information Center, States with and without the Death Penalty (Nov. 9, 2016), available at http://deathpenaltyinfo.org/statesand-without-death-penalty.

Most recently, the New Hampshire House and Senate both passed Senate Bill 593 repealing the use of the death penalty, although the governor vetoed the bill, which itself was almost overturned on September 13, 2018. See Paul Steinhouser, *N.H. death penalty remains on the books as legislature fails to override veto*, Concord Monitor (Sept. 13, 2018), available at https://www.concordmonitor.com/Veto-override-of-death-penalty-dies-in-NH-Senate-20151290. Although the United States is considered a death penalty country, executions are rare or non-existent in most of the nation: a majority of the states—31 out of 50—have either abolished the death penalty or have not carried out an execution in at least 10 years. As important to the analysis as legislative change is the fact that the states that retain the death penalty use it so infrequently that there is little need to pursue legislation barring it. As the Supreme Court noted in *Hall v. Florida*, Oregon "has suspended the death penalty and executed only two individuals in the past 40 years." 134 S. Ct. 1986, 1997 (2014). The governors in Washington, Colorado, and Pennsylvania have indefinitely suspended executions.

The trend in the federal system reflects the same national march away from capital punishment as the states. In the five years between 2003 and 2008, there were 32

federal death sentences. In comparison, between 2013 and 2018, there were only 10 federal death sentences. Death Penalty Information Center, *Federal Death Sentences By Year Since 1988*, available at https://deathpenaltyinfo.org/federal-death-penalty#SentencesByYear.

Public opinion polling has also shown a growing consensus against the death penalty, with public support for the death penalty also dropped by around twenty percentage points between the mid-1990s and 2016. *See* Jeffrey M. Jones, U.S. Death Penalty Support at 60%, Gallup (Oct. 25, 2016), available at http://www.gallup.com/poll/196676/death-penalty-support.aspx; Baxter Oliphant, *Support for the Death Penalty Lowest in Four Decades*, Pew Res. Ctr. (Sept. 29, 2016), available at http://www.pewresearch.org/fact-tank/2016/09/29/support-for-death-penalty-lowest-in-more-than-four-decades/. Professional organizations have taken similar position. The American Medical Association strictly prohibits physician participation in executions for ethical reasons. The American Pharmacological Association has declared that pharmacists should not compound chemicals to be used for lethal injection. This year, the Pope, the spiritual leader of more than 69 million Americans, called for abolition of capital punishment as a matter of Catholic doctrine.

**H.     There is an international consensus against the death penalty marking the maturing and evolving standards of decency in our society.**

While not dispositive, the Court cannot altogether ignore the views of the international community as they shed light on the "evolving standards of decency in a maturing society." There has been a tremendous shift towards abolition. At the time of *Gregg*, 16 countries had abolished the death penalty. Today, over 140 countries have achieved abolition. Death Penalty Information Center, Abolitionist and Retentionist

Countries (Dec. 31, 2017), available at https://deathpenaltyinfo.org/abolitionist-and-retentionist-countries. The United States is the only nation in the Western Hemisphere that continues to carry out executions.

## CONCLUSION

Rather than a slow burn, arbitrariness in the administration of capital punishment has metastasized into an out-of-control wildfire. No matter the direction one looks, capital punishment presents seemingly intractable problems. Decisions such as *Roper, Simmons* and *Kennedy*, show that the death penalty is now wobbling on its last Eighth Amendment leg. Mr. Cleveland therefore asks this Court to enter an order declaring that the federal death penalty, in and of itself, constitutes a legally prohibited cruel and unusual punishment prohibited by both the Fifth and Eighth Amendments, and striking the government's Notice of Intention to Seek Death.

Respectfully submitted,


/s/ Theresa M. Duncan_____
Theresa M. Duncan
Duncan Earnest, LLC
515 Granite NW
Albuquerque, NM 87102
505-842-5196
teri@duncanearnest.com

Donald F. Kochersberger III
BUSINESS LAW SOUTHWEST LLC
320 Gold Ave. SW, Suite 610
Albuquerque, New Mexico 87102-3299
(505) 848-8581 (Voice)
(505) 848-8593 (Facsimile)
Donald@BusinessLawSW.com (E-Mail)

*Attorneys for Kirby Cleveland*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of October 2018, I filed the

foregoing pleading electronically through the CM/ECF system, which caused

counsel for Plaintiff and Defendants to be served by electronic means, as more

fully reflected on the Notice of Electronic Filing.

/s/ Theresa M. Duncan
Theresa M. Duncan