# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                  No. CR 17-0965 JB

KIRBY CLEVELAND,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss Counts 1 and 5 of the Indictment, filed September 24, 2018 (Doc. 72)("Motion"). The primary issues are whether: (i) a Navajo Nation Department of Public Safety ("NDPS") officer, Houston Largo, was a federal officer for purposes of 18 U.S.C. § 1114 -- "Protection of Officers and Employees of the United States" -- when the Bureau of Indian Affairs ("BIA")[1] has, with the Navajo Nation, entered a Self-Determination Contract, filed September 24, 2018 (Doc. 72-2)("Self-Determination Contract"), also known as a 638 contract,[2] granting the Navajo Nation authority to enforce United

---

[1] The BIA, dating to 1824, is a department within the United States Department of the Interior; it reports to the Assistant Secretary -- Indian Affairs. See Assistant-Secretary -- Indian Affairs, United States Department of the Interior, Indian Affairs, https://www.bia.gov/as-ia (last visited Nov. 20, 2018). The BIA seeks "to enhance the quality of life, to promote economic opportunity, and to carry out the responsibility to protect and improve the trust assets of American Indians, Indian Tribes and Alaska Natives." Bureau of Indian Affairs, United States Department of the Interior, Indian Affairs, https://www.bia.gov/bia (last visited Nov. 20, 2018).

[2] Public-Law 93-638 contracts, also known as 638 contracts, are contracts between the United States and American Indian Tribes in which the United States contracts with Tribes for the provision of services and obligations that the BIA would otherwise provide. See 25 U.S.C. § 450f. "The Indian Self-Determination and Education Assistance Act of 1975 ('[ISDA]'), . . . , Public Law 93-638, authorizes federal agencies to contract with Indian Tribes to provide services on the

States and Tribal laws; and (ii) Largo, when responding to a domestic violence call in the Navajo Nation, was performing a federal employee's "official duties," 18 U.S.C. § 1114. Based on a plain meaning of the Indian Law Enforcement Reform Act, 25 U.S.C. §§ 2801-14 ("ILERA"), and United States Court of Appeals for the Tenth Circuit precedent, the Court concludes that, based on the record before the Court[3], unless additional evidence reveals that the Navajo Nation waived its inherent criminal jurisdiction or authorized the BIA to enforce Tribal law, officers without Special Law Enforcement Commissions ("SLEC") like Largo, are not federal employees for 18 U.S.C. § 1114's purposes. Because the Court does not have sufficient evidence to definitively make this determination at this time, the Court requests additional information regarding whether the Navajo Nation waived its inherent criminal jurisdiction or authorized the BIA to enforce its laws. If there is no more evidence regarding the Navajo Nation's authority to enforce Tribal laws, the Court will grant Cleveland's Motion.

---

reservation." Snyder v. Navajo Nation, 382 F.3d 892, 896 (9th Cir. 2004)(citing 25 U.S.C. §§ 450-450(n)). "The purpose of the [ISDA] is to increase Tribal participation in the management of programs and activities on the reservation." Snyder v. Navajo Nation, 382 F.3d at 896-97.

[3]The United States notes that it "is not yet aware as to whether" the Deputation Agreement is the current agreement between the United States and the Navajo Nation. Defendant Kirby Cleveland's Motion to Dismiss Counts 1 and 5 of the Indictment at 3 n.2, filed November 2, 2018 (Doc. 94). The Court is skeptical that an updated deputation agreement would contain language that differs significantly from that in the Deputation Agreement (executed March 13, 2013), filed September 24, 2018 (Doc. 72-5). The Court makes its decision on the record before it at this time, and the parties may, if they desire, submit additional evidence.

## FACTUAL BACKGROUND

In its Memorandum Opinion and Order, No. CR 17-0965 JB, 2018 WL 4759889, filed

October 2, 2018 (Doc. 82)("MOO"), the Court summarized the factual background and early

procedural history.  See MOO at 1-2; 2018 WL 4759889, at *1-2.

> The Court draws its facts about the offense at issue from the Indictment, filed April 12, 2017 (Doc. 20)("Indictment").  The Court recognizes that the Indictment largely represents Plaintiff United States of America's version of events and that Cleveland is presumed innocent.
>
> . . . .
>
> On July 18, 2013, Cleveland pled guilty to violations of 18 U.S.C. § 1153 and 18 U.S.C. § 113(a)(6), for an assault on Jane Doe resulting in serious bodily injury.  See United States v. Cleveland, No. CR. 12-2062 MCA, Judgment at 1, filed November 27, 2013 (Doc. 102)("Judgment").  The Honorable M. Christina Armijo, then-Chief United States District Judge for the District of New Mexico, sentenced Cleveland to 24 months in prison and three years of supervised release.  See Judgment at 1.  Cleveland entered supervision on April 7, 2014, but after absconding from supervision, he was remanded to custody on July 14, 2016, for lying to the probation officer, violating the probation officer's instructions, using alcohol and other intoxicants, and not completing a substance abuse treatment program.  See United States v. Cleveland, No. CR. 12-2062 MCA, Petition for Revocation of Supervised Release at 1, filed July 17, 2015 (Doc. 109); Judgment at 1-2, filed August 8, 2016 (Doc. 121); Second Petition for Revocation of Supervised Release at 1, filed February 27, 2017 (Doc. 122).  Cleveland returned to supervision on September 6, 2016, with the supervision set to end on September 5, 2018.  See United States v. Cleveland, No. CR. 12-2062 MCA, Second Petition for Revocation of Supervised Release at 1.  Before completing his supervised release, around February 26, 2017, to March 11, 2017, Cleveland escaped "from Diersen Residential Reentry Center in Albuquerque," New Mexico.  Indictment at 2. . . .

See MOO at 1-2; 2018 WL 4759889, at *1-2.  While responding to a domestic violence call and

in uniform, see United States' Response to Defendant Kirby Cleveland's Motion to Dismiss

Counts 1 and 5 of the Indictment at 2, filed November 2, 2018 (Doc. 94)("Response"); Motion at

2, Largo stopped Cleveland's vehicle within the Navajo Nation while Cleveland was driving under

the influence, <u>see</u> Motion at 2; Response at 1-2.  During the stop, Cleveland shot and killed Largo. <u>See</u> Indictment at 2; Response at 2.

The NDPS employed Largo.  <u>See</u> Response at 2-3.  The BIA did not employ Largo, and Largo did not have a BIA SLEC.  <u>See</u> Motion at 2; Response at 2.  The Navajo Nation has a Self-Determination Contract with the BIA; the Self-Determination Contract provides for "the provision of law enforcement" by the Navajo Nation, and incorporates the Annual Funding Agreement (executed December 28, 2016), filed September 24, 2018 (Doc. 72-3), and the Statement of Work, filed September 24, 2018 (Doc. 72-4), which conditions federal funds on the provision of law enforcement services pursuant to ILERA.  Motion at 5.  The Self-Determination Contract states:

> Each provision of the Indian Self-Determination and Education Assistance Act . . . and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities and programs (or portions thereof), that are otherwise contractible under Section 102(a) of such Act, including all related administrative functions, from the Federal Government to the Contractor: **Law Enforcement-Patrol Services**.

Self-Determination Contract ¶ 2, at 1 (emphasis in original).  The Funding Agreement states: "The Navajo Nation agrees to administer and perform those portions of the Bureau of Indian Affairs' . . . <u>Law Enforcement-Patrol Services</u> identified in the Scope of Work . . . ."  Annual Funding Agreement ¶ A(1), at 1 (emphasis in original).  The Statement of Work describes that the Navajo Nation will maintain "law enforcement and crime prevention services," Statement of Work ¶ 101(A), at 1, enforce "Navajo Nation and federal laws and ordinances," Statement of Work ¶ 101(B), at 1, protect "private, public and government property" within the Navajo Nation, Statement of Work ¶ 101(C), at 1, respond to "citizen's [sic] complaints or other request [sic] for law enforcement services," Statement of Work ¶ 101(F), at 1, patrol the roadways within the

Navajo Nation, see Statement of Work ¶ 101(G), at 1, and engage in other law enforcement activities, see Statement of Work ¶ 101(E), (H)-(M), at 1-2. The Statement of Work further provides: "The Bureau may commission any law enforcement officer as a Federal Law Officer as set out in Attachment A-B." Statement of Work ¶ 104, at 6. The Deputation Agreement (executed March 13, 2013), filed September 24, 2018 (Doc. 72-5), states its intent to

> provide for the deputation of law enforcement officers employed by the [NDPS] . . . so that the [NDPS] law enforcement officers will be authorized to assist the BIA in its duties to provide law enforcement services and to make lawful arrests in Indian country within the jurisdiction of the Tribe or as described in section 5.

Deputation Agreement at 1. The Deputation Agreement explains the purpose for deputizing NDPS officers:

> Both parties to this Agreement recognize that when law enforcement officers arrest a criminal suspect, the officers may not know whether the suspect or the victim is an Indian or a non-Indian, or whether the arrest or the suspected crime has occurred in Indian country . . . and that therefore there is great difficulty in determining immediately the proper jurisdiction for the filing of charges.

Deputation Agreement at 2. The Deputation Agreement provides for the BIA to issue SLECs to NDPS officers. See Deputation Agreement ¶ 2(A), at 3. NDPS officers with SLECs have authority to enforce "[a]ll Federal laws applicable within Indian country, and specifically the Navajo Nation's Indian country, including the General Crimes Act, 18 U.S.C. § 1152, and the Major Crimes Act, 18 U.S.C. § 1153 . . . ." Deputation Agreement ¶ 3(A), at 4. The Deputation Agreement does not change judicial jurisdictions. See Deputation Agreement ¶ 3(C), at 4. "Officers holding SLECs are treated as BIA police officers for enforcing Federal laws." Deputation Agreement ¶ 6(A), at 5. Under the Deputation Agreement:

> [A]ny Navajo Nation Division of Public Safety Law Enforcement Officer who is deputized by the Bureau of Indian Affairs Special Law Enforcement Commission

will only be deemed an employee of the Department of the Interior for the Purposes of the Federal Tort Claims Act[, 28 USCA §§ 1291, 1346, 1402, 2401, 2402, 2411, 2412, 2671 to 2680, ("FTCA"),] while carrying out those laws applicable in Indian country . . . . Therefore, such officer will not be deemed a federal employee under 25 U.S.C. § 2804(f), or for purposes of the Federal Tort Claims Act with respect to the enforcement of any other law except those applicable in Indian country . . . .

Deputation Agreement ¶ 8(b), at 7.

## PROCEDURAL BACKGROUND

"A federal Grand Jury indicted Cleveland in the current case on April 12, 2017. See Indictment at 1." MOO at 2; 2018 WL 4759889, at *2. The Grand Jury indicted Cleveland on eight counts: (i) killing a federal officer in violation of 18 U.S.C. § 1111 and 18 U.S.C. § 1114; (ii) felony murder in violation of 18 U.S.C. § 1111; (iii) killing Largo with a firearm in violation of 18 U.S.C. § 1153 and 18 U.S.C. § 1111; (iv) escape from Dierson Residential Reentry Center in violation of 18 U.S.C. § 751(a); (v) using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1) and (j)(1); (vi) using a firearm in relation to the felony murder of Largo and, during the felony murder, killing Largo with a firearm in violation of 18 U.S.C. § 924(c)(1) and (j)(1); (vii) using a firearm in relation to a crime of violence, the first degree murder of Largo, and, while committing this violation, killing Largo in violation of 18 U.S.C. § 924(c)(1) and (j)(1); and (viii) using a firearm while a felon in violation of 18 U.S.C. § 922(g)(1). In addition, the Grand Jury made the following special findings: (i) Cleveland was 18 years old or older at the time of the violations, see Indictment at 4; (ii) Cleveland "intentionally killed" Largo, Indictment at 4; (iii) Cleveland "intentionally inflicted serious bodily injury," resulting in Largo's death, Indictment at 4; (iv) Cleveland "intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense," and Largo died as a result of the act, Indictment

at 4; (v) Cleveland "intentionally specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life," and Largo died as a result of the act, Indictment at 5; (vi) Cleveland caused Largo's death during Cleveland's flight from another crime -- the other crime being escape from Dierson Residential Reentry Center, Indictment at 5; and (vii) Cleveland "committed the offense against a law enforcement officer while [Largo] was engaged in the performance of his official duties," Indictment at 5.

On January 26, 2018, the United States filed the Notice of Intent to Seek the Death Penalty, filed January 26, 2018 (Doc. 39)("Intent Notice"), stating that it would seek the death penalty for Count 2, "Committing Felony Murder while in Violation of 18 U.S.C. § 751(a)," escaping from Dierson Charities, "in violation of 18 U.S.C. § 1111 [("Murder")]," and Count 6, "Using and Carrying a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. §§ 924(c)(1) and (j)(1)." Intent Notice at 1. In support of the death penalty, the United States cites the special findings one through five, see Notice at 1-2, and it cites four "non-statutory aggravating factors," Intent Notice at 2: (i) "[t]he defendant caused the death of [Largo], a 27-year old son, brother, and decorated veteran law enforcement officer with [NDPS], who enjoyed a strong relationship with his family, friends, and colleagues," Intent Notice at 2; (ii) "[t]he victim's family suffered severe and irreparable harm including, but not limited to, emotional distress, grief, loss of companionship, and loss of emotional and financial support," Intent Notice at 2; (iii) "[t]he victim's employer, [NDPS], and the victim's colleagues within [NDPS] and adjoining law enforcement agencies have suffered substantial and irreparable harm, including, but not limited to,

emotional distress, grief, loss of companionship, and loss of service," Intent Notice at 2; and (iv) Largo was engaged in his official duties when killed, see Intent Notice at 2.

## 1.    **The Motion.**

Cleveland filed the Motion on September 24, 2018. See Motion at 1. Cleveland argues that Largo "was not a federal employee and was not engaged in the performance of official duties of a federal officer." Motion at 3. Cleveland contends that, because Largo was not a federal officer, the Court does not have jurisdiction over Counts 1 and 5 of the Indictment, and should dismiss those Counts. See Motion at 7.

Cleveland explains that the United States is relying on the ILERA to establish that Largo was a federal officer. See Motion at 3. According to Cleveland, the ILERA "clarifies that the BIA's responsibility is 'the enforcement of Federal law and, with the consent of the Indian Tribe, Tribal law.'" Motion at 3-4 (quoting 25 U.S.C. § 2802(c)(1)). Cleveland explains that § 2804(f)(1)(B) provides that persons who are not otherwise federal employees will be treated as federal employees when acting under the authority that the Secretary of the Interior ("DOI Secretary") grants under § 2804(a). See Motion at 3 (citing 25 U.S.C. §§ 2804(f)(1)(B)). Cleveland further explains that § 2804(a) establishes the methods by which the DOI Secretary grants law enforcement authority to Tribal law enforcement bodies. See Motion at 4 (citing U.S.C. § 2804(a)). Cleveland explains that the ILERA "authorizes the BIA to enter into 'self-determination [contracts]' with other law enforcement agencies -- including any 'Federal, Tribal, State, or other government agency.'" Motion at 4 (footnote omitted)(quoting § 2804(a)(1)). According to Cleveland, "[u]nder the ILERA, the enforcement of federal laws is the province of

the BIA, while the enforcement of Tribal laws is the province of the Tribes, and each of these entities can opt to enlist the assistance of the other." Motion at 4.

Cleveland cites 25 C.F.R. § 12.21(b) to argue that "[t]ribal law enforcement officers operating under a BIA contract or compact are not automatically commissioned as Federal officers," although, according to Cleveland, "they may be commissioned on a case-by-case basis." Motion at 4 (internal quotation marks omitted)(quoting 25 C.F.R. § 12.21(b)). Cleveland explains that the Navajo Nation entered the Self-Determination Contract pursuant to the ILERA. See Motion at 5. The Self-Determination Contract, Cleveland notes, provides for "the provision of law enforcement" by the Navajo Nation and incorporates the Annual Funding Agreement, and the Statement of Work, which conditions federal funds on the provision of law enforcement services pursuant to the ILERA. Motion at 5. According to Cleveland, the Self-Determination Contract also provides that the BIA can commission NDPS officers as federal officers pursuant to a SLEC agreement, the Deputation Agreement, and BIA -- Office of Justice Services SLEC policies.[4] See Motion at 5. Cleveland avers that the ILERA and related regulations govern the Deputation Agreement, which gives the BIA discretion in commissioning NDPS officers as federal officers.

---

[4]The ILERA established the Office of Justice Services, providing:

(b) **OFFICE OF JUSTICE SERVICES** There is established in the Bureau an office, to be known as the "Office of Justice Services", that, under the supervision of the Secretary, or an individual designated by the Secretary, shall be responsible for --

　　(1) carrying out the law enforcement functions of the Secretary in Indian country, and

　　(2) implementing the provisions of this section.

25 U.S.C. § 2802 (emphasis in original).

See Motion at 6. According to Cleveland, NDPS officers with SLECs "have the power to enforce 'all federal laws applicable within Indian country, including the General Crimes Act, 18 U.S.C. § 1152, and the Major Crimes Act, 18 U.S.C. § 1153.'" Motion at 6 (citing Deputation Agreement, ¶ 3(A), at 4). Arguing that a federally commissioned Tribal police officer is only a federal employee for the FTCA and 18 U.S.C. §§ 111 and 1114 when enforcing federal laws, Cleveland quotes from the Deputation Agreement:

> [A]ny Navajo Nation Division of Public Safety Law Enforcement Officer who is deputized by the Bureau of Indian Affairs Special Law Enforcement Commission will only be deemed an employee of the Department of the Interior for purposes of the Federal Tort Claims Act while carrying out those laws applicable in Indian Country as described in Section 3.A and Appendix A [which list only federal laws]. Therefore, such officer will not be deemed a federal employee under 25 U.S.C. § 2804(f)(1) [which in turn references §§ 111 & 1114], or for purposes of the FTCA with respect to enforcement of any other law except those enforceable in Indian country as described in Section 3.A and Appendix A.

Motion at 6 (citing Deputation Agreement ¶ 8(B), at 7).

Cleveland contends that, because NDPS, not the BIA, employed Largo, and the BIA had not given Largo a SLEC, he was not a federal officer. See Motion at 7 (citing United States v. Tauz Abner Henderson, 3:18-cr-08112-DJH, Order (filed June 11, 2018)(Humetewa, J.)(unpublished), filed September 24, 2018 (Doc. 50)("United States v. Tauz Abner Henderson Order")). Cleveland avers that, in United States v. Tauz Abner Henderson, the Honorable Diane J. Humetewa, United States District Judge for the District of Arizona, concluded that an officer, like Largo, who "was employed by the Navajo Nation and did not hold a[n]" SLEC, was not a federal officer. Motion at 7 (citing United States v. Tauz Abner Henderson Order at 3). Cleveland argues that, because 25 C.F.R. § 12.21(b) distinguishes between commissioned and non-commissioned Tribal police officers, only commissioned Tribal police officers are federal

officers. <u>See</u> Motion at 8 (citing <u>Boney v. Valline</u>, 597 F. Supp. 2d 1157, 1177 (D. Nev. 2009)(Jones, J.); <u>Trujillo v. United States</u>, 313 F. Supp. 2d 1146, 1150 (D.N.M. 2003)(Johnson, J.)). Cleveland argues that the Deputation Agreement specifies when NDPS officers are federal officers. <u>See</u> Motion at 9. Cleveland contends that "it cannot be the case that all Navajo Nation police officers are federal officers by virtue of the mere existence of a contractual delegation of federal authority when the contract itself specifies only a limited class of Tribal police officers who have federal status." Motion at 9. Cleveland avers likewise that 25 C.F.R. § 12.21(b) "undermines any notion that a contractual delegation of federal authority 'automatically' confers federal employee status." Motion at 10.

Finally, Cleveland argues that, even were Largo a federal officer, he was not "engaged in the 'official duties' of a federal employee" at the time Cleveland killed him. Motion at 10 (citing 18 U.S.C. § 1114). Cleveland contends that, although determining Largo's duties at the time requires factual findings, the Court can resolve the question, because the issue involves limited factual findings and is jurisdictional. <u>See</u> Motion at 10 (citing <u>United States v. Olivas-Perea</u>, 297 F. Supp. 3d 1191, 1204 (D.N.M. 2017)(Browning, J.)). According to Cleveland, because Largo was responding to a "domestic violence call," Largo was engaged in "quintessentially local, Tribal matters," not federal laws. Motion at 11. <u>See</u> Motion at 10-11.

2. **The Response.**

The United States replied on November 2, 2018. <u>See</u> Response at 1. The United States contends that the Court should not dismiss Counts 1 and 5. <u>See</u> Response at 9. The United States first notes in a footnote that it does not object to the introduction of the Self-Determination Contract, providing for NDPS authority over law enforcement within the Navajo Nation; the

Annual Funding Agreement, establishing BIA funding for NDPS law enforcement activities; the Statement of Work, stating the scope of NDPS authority; or the Deputation Agreement, providing for the BIA to give SLECs to NDPS officers, although it cannot determine if the Deputation Agreement is current. See Response at 3 n.2. Further, the United States responds that Largo was acting as a federal officer, because domestic violence implicates federal crimes -- including "[A]ssault resulting in serious bodily injury," 18 U.S.C. § 113(a)(6); "assault with a dangerous weapon," 18 U.S.C. § 113(a)(4); "[A]ssault resulting in serious bodily injury," 18 U.S.C. § 113(a)(3); "Domestic Assault by Strangulation," Response at 3 (citing 18 U.S.C. § 113(a)(8); "Domestic assault by an habitual offender," 18 U.S.C. § 117; federal stalking crimes, see 18 U.S.C. §§ 2261, 2262, and 2261A; and violations of protective orders, see 18 U.S.C. § 922(g)(8). See Response at 3-4.

Next, the United States argues that, as Largo "was acting within the scope of his duties as a law enforcement officer pursuant to a contract between the BIA and the Navajo Nation for law enforcement services," he was a federal officer. Response at 4 (citing United States v. Janis, 810 F.3d 595, 597 (8th Cir. 2016); Allender v. Scott, 379 F. Supp. 2d 1206, 1218 (D.N.M. 2005)(Black, J.)). The United States argues that Tribal police officers were considered federal law enforcement before the ILERA. See Response at 4-5. The United States contends that, twenty years before the ILERA's passage, see Response at 7, the Indian Self-Determination Education and Assistance Act, 25 U.S.C. §§ 13a, 5301-02, 5304-08, 5321-25, 5328-32, 5345-47, 5351-56, 5361-68, 5381-99, 5411-13, 5421-23 ("ISDA"), authorized the DOI Secretary to transfer authority for the provision of services, including law enforcement, from the United States to Tribal actors to ensure American Indian participation in servicing their communities. See Response at 4-5 (citing

Salazar v. Ramah Navajo Chapter, 567 U.S. 182, 185 (2012); 25 U.S.C. §§ 5302(a), 532l(a)(l)(B), 5329(c); 25 C.F.R. § 900.3(b)(4); S. Rep. No. 107-324, at 2 (2002); S. Rep. No. I07-324, at 2 (2002)(stating that the ISDA allows "Indian Tribes to 'step into the shoes' of the United States")). The United States explains that, in 1921, before the ISDA, the Snyder Act, 25 U.S.C. § 13[5], authorized the BIA "to employ Indian police to conduct law enforcement operations." Response at 5. The Snyder Act included pay for "Indian Police," which Congress had authorized since 1879, Response at 5 (citing 20 Stat. 295 (1880); 27 Stat. 120 (1893); 32 Stat. 245 (1903); 36 Stat. 269 (1911)), and authorization for "liquor suppression 'special officers'" to act as "United States Marshals" "on reservations," Response at 5 (citing 37 Stat. 518 (1913)). See Response at 5 (citing 25 U.S.C. § 13; Gilbert v. United States, 114 F.2d. 568, 570-71 (10th Cir. 1944)).

The United States argues that, "when a Tribe opts to assume the functions of law enforcement under ISDA, it must also assume BIA's legal authority to execute federal functions legally assigned to BIA officers." Response at 6 (citing United States v. Schrader, 10 F.3d 1345, 1350 (8th Cir. 1993)). According to the United States, the United States Court of Appeals for the Eighth Circuit has concluded that, in prosecutions of assaults on alleged federal officers, "the court

---

[5]The Snyder Act provides:

The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:

. . . .

For the employment of inspectors, supervisors, superintendents, clerks, field matrons, farmers, physicians, Indian police, Indian judges, and other employees.

25 U.S.C. § 13.

should decide as a matter of law whether the officers of the relevant Tribal law enforcement department, as a class, qualify as federal officers," and the jury should decide whether the particular Tribal officer was a federal officer. Response at 6 (citing United States v. Janis, 810 F.3d at 598). The United States argues that, because NDPS officers were charged with enforcing federal law, Largo and other NDPS officers were federal officers. See Response at 6 (citing Self-Determination Contract at 1; Annual Funding Agreement ¶ A(1), at 2; Statement of Work ¶ 101(b), at 1 (stating that the scope of work included "enforcing applicable Navajo Nation and federal laws and ordinances"); United States v. Roy, 408 F.3d 484, 490 (8th Cir. 2005)).

The United States continues, noting that the ILERA authorizes SLECs, but it does not replace Congress' grant of law enforcement authority through the ISDA. See Response at 7 (citing 25 U.S.C. §§ 13, 5301; H.R. Rep. No. 101-60, at 5-6 (1989)). The United States contends that the Honorable William H. Alsup, United States District Judge for the District of Northern California, in Hopland Band of Pomo Indians v. Norton, 324 F. Supp. 2d 1067 (N.D. Cal. 2004), explains that Tribal police officers were already federal law enforcement officials before Congress enacted the ILERA. See Response at 7 (citing Hopland Band of Pomo Indians v. Norton, 324 F. Supp. 2d at 1073). The United States avers that the ILERA provides additional authority, but it does not change when Tribal police officers would be considered federal officers under the ISDA. See Response at 7-8. The United States concludes that, given the Self-Determination Contract, Largo, who was acting as a NDPS officer when killed, should be treated as a federal officer. See Response at 8. Regarding whether Largo was engaged in official duties, the United States avers that the Supreme Court of the United States has concluded that, for the FTCA, "Congress intended [intentional-tort-coverage] determinations to depend on a federal officer's legal authority,

not on a particular exercise of that authority," Response at 8 (brackets in original)(citing <u>Millbrook v. United States</u>, 569 U.S. 50, 56 (2013)), and urges the Court to adopt a similar interpretation to determine whether Largo was a federal officer, <u>see</u> Response at 8-9.

**3.        The Reply.**

On November 19, 2018, Cleveland filed the Reply in Support of Defendant Kirby Cleveland's Motion to Dismiss Counts 1 and 5 of the Indictment [Doc. 72] (Doc. 104)("Reply"). <u>See</u> Reply at 11.  Cleveland cites <u>Dry v. United States</u>, 235 F.3d 1249, 1254 (10th Cir. 2000), to argue that "[t]he authority of Navajo police officers to enforce Navajo law cannot be delegated from the federal government to the tribes via a self-determination contract because it belongs, in the first instance, to the tribes."  Reply at 2.  Cleveland argues that the ILERA and BIA regulations make clear that BIA officers cannot enforce Tribal laws without the Tribe's permission.  <u>See</u> Reply at 3 (citing 25 U.S.C. § 2802(c)(1); 25 C.F.R. § 12.22).  In a footnote, Cleveland notes, in response to the United States' argument that the Self-Determination Contract specifies that the Navajo Nation will enforce United States and Tribal Laws, that: "It makes sense that the law enforcement activities to be funded would be specified in the contract.  But the provision of funds from the federal government to local law enforcement does not transform all local officers who benefit from such funds into federal officers."  Reply at 3.  Cleveland attacks the Eighth Circuit cases on which the United States relies, arguing that they are not binding or persuasive, and that the Court cannot ignore the specific contracts into which the BIA entered with the Navajo Nation.  <u>See</u> Reply at 3-4.  Cleveland emphasizes that the language in the particular contract at issue is what matters, and reiterates that the Deputation Contract specifies which Tribal officers "are federal officers under section 1114, and under what circumstances."  Reply at 4.

Cleveland cites again to 25 C.F.R. § 12.21(b), contending: "It would not be necessary to promulgate a regulation explaining that the BIA may obtain the assistance of tribal officers in enforcing federal law" -- as 25 C.F.R. § 12.21 addresses -- "'on a case-by-case basis' if tribal officers were all federal officers by virtue of the mere existence of a self-determination contract." Reply at 5 (citing 25 C.F.R. § 12.21(b)). According to Cleveland, 25 C.F.R. §§ 12.21(b) answers who are federal officers for § 2804(f), and Cleveland avers that the Court cannot "deny Mr. Cleveland's motion without finding that the Secretary of the Interior has reached an unreasonable interpretation of the ILERA in promulgating 25 C.F.R. § 12.21." Reply at 6.

Cleveland further notes that the United States "ignores the ILERA's implementing regulations . . . and the language of the relevant contract documents" when it argues that, because earlier statutes allowed the employment of American Indians, Tribal officers are federal employees under the ILERA are federal employees. Reply at 6. Cleveland indicates that, were the SLEC unnecessary, the Deputation Agreement would not explain that 25 U.S.C. § 2804(f), and consequently the FTCA and 18 U.S.C. §§ 111 and 1114, apply when "SLEC-bearing" Tribal officers enforce federal law, but not when they enforce Tribal law. Reply at 7.

Finally, according to Cleveland, Largo could not have been enforcing federal law, because he was not a federal officer. See Reply at 7-8. Further, Cleveland explains that Largo reported to a call "that Mr. Cleveland was drunk and disorderly, not that he had assaulted anyone," and, according to Cleveland, such facts "do not support a finding that Officer Largo was enforcing federal law," because the domestic violence had not escalated to a crime "of sufficient seriousness to be prosecutable under the Major Crimes Act." Reply at 8. Cleveland additionally contends that Largo could only have enforced federal law if he acted outside his authority's scope, because he

had no SLEC.  Reply at 8.  Cleveland notes that the United States has previously argued that Tribal

officers require SLECs to enforce federal law.  See Reply at 8-9 (citing Etsitty-Thompson v. United

States, No. 2:13-CV-159 TS, 2013 WL 4052621 (D. Utah Aug. 12, 2013)(Stewart, J.); Williams

v. Naswood, No. CV-10-8080-PCT-FJM, 2011 WL 867520 (D. Ariz. March 14,

2011)(Martone, J.)).

## LAW REGARDING THE INDIAN CANON

The Indian canon of construction requires that courts liberally construe treaties,

agreements, statutes, and executive orders in the American Indians' favor.  See Montana v.

Blackfeet Tribe, 471 U.S. 759, 766 (1985).  See generally Philip P. Frickey, Marshalling Past and

Present: Colonialism, Constitutionalism, and Interpretation in Federal Indian Law, 107 Harv. L.

Rev. 381 (1993)(offering a scholarly commentary on the Indian canon).  Courts are to construe

treaties and other agreements as the American Indians who entered into the treaties or agreements

would have understood them.  See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians, 526

U.S. 172, 196 (1999)("[W]e interpret Indian treaties to give effect to the terms as the Indians

themselves would have understood them.").  Any ambiguity in an agreement is to be resolved in

the American Indians' favor.  See, e.g., Carpenter v. Shaw, 280 U.S. 363, 367 (1930).[6]

The Indian canon sometimes can come into conflict with other canons of statutory

interpretation.  When canons clash, the Indian canon usually trumps competing canons.  See

Cohen's Handbook of Federal Indian Law § 2.02[3], at 119-123 (Nell Jessup Newton et al. eds.,

---

[6]This case is old, but two United States Courts of Appeals recently have held that this
principle still applies.  See Gila River Indian Cmty. v. United States, 729 F.3d 1139, 1148 (9th Cir.
2013)("Ambiguous statutes are to be construed in favor of Indians."); Cal. Valley Miwok Tribe v.
United States, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008)(stating that statutes are "to be construed
liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit").

2012).  See <u>Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell</u>, 220 F. Supp. 3d 1190,

1263-64 (D.N.M. 2016)(Browning, J.)(employing the Indian canon to override deference to the

HHS and supports its conclusion that Annual Funding Agreements under the ISDA "must be

negotiated, if a Tribe wishes for them to be negotiated"); <u>Navajo Health Found.-Sage Mem'l</u>

<u>Hosp., Inc. v. Burwell</u>, 263 F. Supp. 3d 1083, 1165-66 (D.N.M. 2016)(Browning, J.)(applying the

Indian canon to conclude that a hospital was a "Federal program" eligible for reimbursement under

the ISDA).

## LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

Under the APA,

[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (emphasis in original).  The APA states that district courts can:

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be --

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     contrary to constitutional right, power, privilege, or

immunity;

(C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)    without observance of procedure required by law;

(E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

Under Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the APA] must be processed *as appeals*.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  42 F.3d 1560, 1580 (10th Cir. 1994)(emphasis in original).  See WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d 1314, 1323 (D.N.M. 2009)(Browning, J.).  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant."  N. New Mexicans Protecting Land & Water Rights v. United States, No. CIV 15-0559, 2015 WL 8329509, at *9 (D.N.M. Dec. 4, 2015)(Browning, J.).

## 1.    **Reviewing Agency Factual Determinations.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).  The APA's two linguistic formulations amount to a single

substantive standard of review.  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984)(explaining that, as to factual findings, "there is no *substantive* difference between what [the arbitrary or capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness.  The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies." (emphasis in original)).  See also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d, 1123 1167-68 (D.N.M. 2015)(Browning, J.)(discussing this fact).

In reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record.  See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party . . . .");  Fed. R. App. P. 16(a) ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency.");  Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted . . . .").  See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here

Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most instances, no de novo proceedings may be had." (footnote omitted)). Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action. See N.M. ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683 702 n.21 (10th Cir. 2009)("We take judicial notice of this document, which is included in the record before us in [another case]." (citing Fed. R. Evid. 201(b))); N.M. ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.22 ("We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof."). In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits have held that taking judicial notice is inappropriate in APA reviews absent extraordinary circumstances or inadvertent omission from the administrative record. See Compassion Over Killing v. U.S. Food & Drug Admin., 849 F.3d 849, 852 n.1 (9th Cir. 2017); Nat'l Mining Ass'n v. Sec'y U.S. Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the record before it when determining whether an agency's decision survives arbitrary-or-capricious review. Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation and internal quotation marks omitted). The Tenth Circuit explains:

> "[I]n determining whether the agency acted in an 'arbitrary and capricious manner,' we must ensure that the agency 'decision was based on a consideration of the relevant factors' and examine 'whether there has been a clear error of judgment.'" We consider an agency decision arbitrary and capricious if "the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999)(quoting Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997)).  Arbitrary-or-capricious review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions,"  Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172.  The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings. See SEC v. Chenery Corp., 318 U.S. 80, 92-95 (1943).  While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(citation omitted).

## 2. **Reviewing Agency Legal Interpretations**.

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution of the United States of America, and Courts reviewing those interpretations apply three different deference standards, depending on the kind of law at issue. First, the federal judiciary accords considerable deference to an agency's interpretation of a statute that Congress has tasked it with enforcing.  See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994).  This is known as Chevron deference, named after the supposedly seminal case, Chevron, U.S.A., Inc. v. Natural

Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").[7]  Chevron deference is a two-step process[8] that first asks whether the statutory provision in question is clear and, if it is not, then asks whether the agency's interpretation of the unclear statute is reasonable; as the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative agency interpretations of their organic statutes laid down by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 . . . (1984).  Those directives require that we first determine whether Congress has directly spoken to the precise question at issue.  If the congressional intent is clear, we must give effect to that intent.  If the statute is silent or ambiguous on that specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at 238 (citing Chevron, 467 U.S. at 842-43).

---

[7]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all.  Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court of the United States, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years.  See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

[8]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all.  See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006).  Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000).  An affirmative answer to all three inquiries results in the agency's decision passing step zero.

*Chevron*'s second step is all but toothless, because if the agency's decision makes it to step two, it is upheld almost without exception.  See Jason J. Czarnezki, An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice."); Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L. Rev. 1253, 1261 (1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second *Chevron* step.").  Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

*Chevron*'s first step, in contrast, has bite, but there is substantial disagreement about what it means.  The Court has noted the varying approaches that different Supreme Court Justices have taken in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine.  Those Justices, such as Justice Scalia, who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step.  These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine.  Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for Chevron doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

Griffin v. Bryant, 30 F. Supp. 3d 1139, 1192 n.23 (D.N.M. 2014)(Browning, J.).  A number of policy considerations animate Chevron deference, among them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, grants discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies

are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the President of the United States of America, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but Circuit-fragmented federal judiciary can.

Second, when agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party complied with them -- courts accord agencies what is known as Auer or Seminole Rock deference. See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945)("Seminole Rock"). This deference is applied in the same manner as Chevron deference and is substantively identical. There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, more uncertain. The Honorable Antonin Scalia, Former Associate Justice of the Supreme Court of the United States, after years of applying the doctrine followed by years of questioning its soundness, finally denounced Auer deference in 2013 in his dissent in Decker v. Northwest Environmental Defense Center, 568 U.S. 597 (2013). The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice himself:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations." This is generally called *Seminole Rock* or *Auer* deference.
>
> . . . .

The canonical formulation of *Auer* deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation." But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation. Obviously, that is not enough, or there would be nothing for *Auer* to do. In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes. The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for *Auer* deference. The first case to apply it, *Seminole Rock,* offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Our later cases provide two principal explanations, neither of which has much to be said for it. First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it. The implied premise of this argument -- that what we are looking for is the agency's *intent* in adopting the rule -- is false. There is true of regulations what is true of statutes. As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." Whether governing rules are made by the national legislature or an administrative agency, we are bound *by what they say*, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "complex and highly technical regulatory program." That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of *rulemaking*, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is." Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation *will be given effect* if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for *Auer* deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that *Congress* enacted, as we do per *Chevron*, it is *a fortiori* reasonable to defer to them regarding the meaning of *regulations that they themselves crafted*. To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all. The theory of *Chevron* (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Congress cannot enlarge its *own* power through *Chevron* -- whatever it leaves vague in the statute will be worked out *by someone else*. *Chevron* represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.) So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it." And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation. *Auer* deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures." *Auer* is not a logical corollary to *Chevron* but a dangerous permission slip for the arrogation of power.

It is true enough that *Auer* deference has the same beneficial pragmatic effect as *Chevron* deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court. The agency's view can be relied upon, unless it is, so to speak, beyond the pale. But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute. For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear. The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing. It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here. And there is another respect in which a lack of *Chevron*-type deference has less severe pragmatic consequences for rules than for statutes. In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute. That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from *Auer* deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 568 U.S. at 616-21 (Scalia, J., dissenting)(alterations and emphasis in original)(citations omitted). Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution. See U.S. W., Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))). Courts have superior competence in

interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content. The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation. See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

### 3. Waiving Sovereign Immunity.

The APA waives sovereign immunity with respect to non-monetary claims. See 5 U.S.C. § 702. The statute provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . . .

5 U.S.C. § 702. Claims for money damages seek monetary relief "to *substitute* for a suffered loss." Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1298 (10th Cir. 2009)(emphasis in original). Claims that do not seek monetary relief or that seek "specific remedies that have the effect of compelling monetary relief" are not claims for monetary damages. Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1298. To determine whether a claim seeks monetary relief, a court must "look beyond the face of the complaint" and assess the plaintiff's prime objective or essential purpose; "[a] plaintiff's prime objective or

essential purpose is monetary unless the non-monetary relief sought has significant prospective effect or considerable value apart from the claim for monetary relief." Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (internal quotation marks omitted)(quoting Burkins v. United States, 112 F.3d 444, 449 (10th Cir. 1997)).

The APA's sovereign immunity waiver for claims "seeking relief other than money damages" does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act, 28 U.S.C. §§ 1346, 1491, permits district courts to hear some claims against the United States, but it also states that "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). It follows that the APA does not waive the United States' sovereign immunity as to contract claims even when those claims seek relief other than money damages, such as declaratory or injunctive relief. See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1295. Consequently, two questions determine whether the APA waives the United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,' such that the APA's general waiver of sovereign immunity is even implicated? Second, does the Tucker Act expressly or impliedly forbid the relief that [the plaintiff] seeks, such that the APA's waiver does not apply?" Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING THE ISDA

The ISDA authorizes American Indian Tribes and Tribal organizations to contract with either the Department of the Interior ("DOI") or the Health and Human Services ("HHS")

Secretary[9] to provide their members federally funded services that a federal agency would otherwise provide directly.  See 25 U.S.C. § 5302(b); S. Rep. No. 100-274, at 1 (1987), reprinted in 1988 U.S.C.C.A.N. at 2620 ("1987 Senate Report").  When Congress passed the ISDA in 1975, it recognized that "the prolonged Federal dominion of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities," and has "denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians."  25 U.S.C. § 5301(a)(1).  Congress thus enacted the ISDA to "permit an orderly transition of federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services."  25 U.S.C. § 5302(b).

An ISDA contract proposal typically consists of two parts: (i) a multi-year agreement that satisfies 25 U.S.C. § 5329(a); and (ii) an annual funding agreement ("AFA").  See 25 U.S.C. § 5324(c).  The AFA must contain: (i) "terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment"; and (ii) "such other provisions, including a brief description of the programs, services, functions, and activities to be performed (including those supported by financial resources other than those provided by the Secretary), to which the parties agree."  25 U.S.C. § 5329(c).

---

[9]The ISDA uses the term "the Secretary" throughout the statute, without specifying the specific department that the Secretary supervises.  25 U.S.C. § 5304(i).  In the ISDA's "definition" provision, it defines "the Secretary" as "either the Secretary of Health and Human Services or the Secretary of the Interior or both."  25 U.S.C. § 5304(i).  Accordingly, in this Law Regarding section, when the Court refers to "the Secretary" it means "either the DOI or the HHS Secretary."  25 U.S.C. § 5304(i).

1.     **The Declination Process.**

The ISDA contracting process begins when a Tribe or Tribal organization submits a contract proposal to the Secretary.  See 25 U.S.C. § 5301(a)(2).  Unless the Tribe or Tribal organization agrees to an extension, the Secretary must approve or decline the proposal within ninety days.  See 25 U.S.C. § 5321(a)(1), (a)(2); 25 C.F.R. §§ 900.16, 900.17.  Otherwise, the proposal is deemed approved.  See 25 U.S.C. § 5321(a)(2); 25 C.F.R. § 900.18.

Should the Secretary decide to decline the proposal in part or in its entirety, he or she must do so based on one of these five reasons:

**(A)**     the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

**(B)**     adequate protection of trust resources is not assured;

**(C)**     the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

**(D)**     the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or

**(E)**     the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities, . . . because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 5321(a)(2).  See 25 C.F.R. § 900.22 (setting forth the same declination criteria).

There are a number of limitations on the Secretary's authority to apply § 5321(a)(2)'s declination criteria.  The Secretary cannot decline a contract renewal proposal "where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian Tribe or Tribal organization."  25 C.F.R. § 900.33.  Similarly, the Secretary cannot decline a successor AFA proposal that is "substantially the same" as its

predecessor.  25 C.F.R. § 900.32.  The Secretary also cannot decline any proposal based on any objections "that will be overcome through the contract."  25 C.F.R. § 900.33.  Moreover, if the Secretary can decline only a portion of a contract proposal, he or she must approve all other severable portions of the proposal.  See 25 C.F.R. § 900.25.

After the Secretary declines a proposal, he or she must: (i) state any objections in writing to the Tribe or Tribal organization; (ii) provide assistance to the Tribe or Tribal organization to overcome the stated objections; and (iii) provide the Tribe or Tribal organization with a hearing on the record with the right to engage in full discovery on any issue raised in the matter and the opportunity to appeal the Secretary's objections.  See 25 U.S.C. § 5321(b).  The Tribe or Tribal organization may, in lieu of filing an appeal, initiate an action in federal district court.  See 25 U.S.C. §§ 5321(b)(3), 5331(a).  In any hearing, appeal, or action in federal court regarding a contract declination, the Secretary bears "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 5321(e)(1).  Courts faced with ISDA declination claims have thus required the Secretary to establish "by clear and convincing evidence" the validity of the grounds of his or her declination decision.  S. Ute Indian Tribe v. Leavitt, 497 F. Supp. 2d 1198, 1252 (10th Cir. 2009).  See Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007)(Kornmann, J.).

**2.    The Reassumption Process.**

The Secretary also has the authority to reassume ISDA contracts.  See 25 U.S.C. § 5330. Reassumption means "rescission, in whole or in part, of a contract and assuming or resuming control or operation of the contracted program . . . without consent of the Indian Tribe or Tribal

organization." 25 C.F.R. § 900.246. A federal agency within the DOI or the HHS may unilaterally reassume a contract either on an emergency or a non-emergency basis. See 25 C.F.R. § 900.246. An emergency reassumption is permitted when a Tribe or Tribal organization fails to fulfill the ISDA contract's requirements, and that failure poses: (i) an immediate threat of imminent harm to the safety of any person; or (ii) an imminent substantial and irreparable harm to trust funds, trust lands, or interest in such lands. See 25 C.F.R. § 900.247. A non-emergency reassumption is permitted when there has been: (i) a violation of the rights, or endangerment of the health, safety, or welfare, of any person; or (ii) gross negligence or mismanagement in the handling or use of contract funds, trust funds, trust lands, or interest in trust lands under the contract. See 25 C.F.R. § 900.247.

In an emergency reassumption, the Secretary must: (i) immediately rescind, in whole or in part, the contract; (ii) assume control or operation of all or part of the program; and (iii) give written notice of the rescission to the Tribe or Tribal organization, and to the community that the contract serves. See 25 C.F.R. § 900.252. The written notice must include: (i) a detailed statement of the findings that support the Secretary's decision; (ii) a statement explaining the Tribe or Tribal organization's right to a hearing on the record within ten days of the reassumption, or such later date as the Tribe or Tribal organization may approve; (iii) an explanation that the Tribe or Tribal organization may be reimbursed for actual and reasonable "wind up costs" incurred after the effective date of the reassumption; and (iv) a request for the return of property, if any. 25 C.F.R. § 900.253.

In a non-emergency reassumption, the Secretary must: (i) notify the Tribe or Tribal organization in writing of the deficiencies in contract performance; (ii) ask the Tribe or Tribal

organization to take specific corrective action within a reasonable period of time, which cannot be less than forty-five days; and (iii) offer and provide, if requested, the necessary technical assistance and advice to help the Tribe or Tribal organization overcome the deficiencies. <u>See</u> 25 C.F.R. § 900.248. If the Tribal organization fails to ameliorate the deficiencies, the Secretary shall provide a second written notice to the Tribe or Tribal organization that the Secretary will reassume the contract, in whole or in part. <u>See</u> 25 C.F.R. § 900.249. The second written notice shall include: (i) the intended effective date of the reassumption; (ii) the details and facts supporting the intended reassumption; and (iii) an explanation of the Tribe or Tribal organization's right to a formal hearing within thirty days of receiving the notice. <u>See</u> 25 C.F.R. § 900.250. The Secretary cannot reassume the contract before the issuance of a final decision in any administrative hearing or appeal. <u>See</u> 25 C.F.R. § 900.251.

### 3. <u>The ISDA and the FTCA.</u>

The United States has provided that it will assume liability under the FTCA for activities undertaken by Tribal agencies under 638 contracts. <u>See</u> 25 U.S.C. § 5321. First, in 1988, Congress enacted Pub. L. 93-638 to extend FTCA coverage to individuals engaged in health care services. <u>See</u> Jessie Huff Durham, Responsible Sovereignty: <u>How Tribes Can Use Protections Provided in P.L. 93-638 and P.L. 101-512 to Their Advantage Without Taking Advantage</u>, Tulsa L.J. 35, 55-56 (1999). Section 5321 now provides:

> For purposes of section 233 of Title 42, with respect to claims by any person, initially filed on or after December 22, 1987, whether or not such person is an Indian or Alaska Native or is served on a fee basis or under other circumstances as permitted by Federal law or regulations for personal injury, including death, resulting from the performance prior to, including, or after December 22, 1987, of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigations, or for purposes of section 2679, Title 28, [part of the FTCA] with respect to claims by any such person, on or after November 29, 1990,

for personal injury, including death, resulting from the operation of an emergency motor vehicle, an Indian Tribe, a Tribal organization or Indian contractor carrying out a contract, grant agreement, or cooperative agreement under sections 5321 or 5322 of this title is deemed to be part of the Public Health Service in the Department of Health and Human Services while carrying out any such contract or agreement and its employees (including those acting on behalf of the organization or contractor as provided in section 2671 of Title 28, and including an individual who provides health care services pursuant to a personal services contract with a Tribal organization for the provision of services in any facility owned, operated, or constructed under the jurisdiction of the Indian Health Service) are deemed employees of the Service while acting within the scope of their employment in carrying out the contract or agreement: *Provided*, That such employees shall be deemed to be acting within the scope of their employment in carrying out such contract or agreement when they are required, by reason of such employment, to perform medical, surgical, dental or related functions at a facility other than the facility operated pursuant to such contract or agreement, but only if such employees are not compensated for the performance of such functions by a person or entity other than such Indian Tribe, Tribal organization or Indian contractor.

25 U.S.C. § 5321. Then, in the Department of the Interior and Related Agencies Appropriation Act for 1991, Pub. L. 101-512, 104 Stat. 1915, Congress included a note to 25 U.S.C. § 5321, extending the FTCA applicability to all activities undertaken pursuant to 638 contracts:

With respect to claims resulting from the performance of functions during fiscal year 1991 and thereafter, or claims asserted after September 30, 1990, but resulting from the performance of functions prior to fiscal year 1991, under a contract, grant agreement, or any other agreement or compact authorized by the Indian Self-Determination and Education Assistance Act of 1975, as amended . . . , an Indian Tribe, Tribal organization or Indian contractor is deemed hereafter to be part of the Bureau of Indian Affairs in the Department of the Interior or the Indian Health Service in the Department of Health and Human Services while carrying out any such contract or agreement and its employees are deemed employees of the Bureau or Service while acting within the scope of their employment in carrying out the contract or agreement: Provided, That after September 30, 1990, any civil action or proceeding involving such claims brought hereafter against any Tribe, Tribal organization, Indian contractor or Tribal employee covered by this provision shall be deemed to be an action against the United States and will be defended by the Attorney General and be afforded the full protection and coverage of the FTCA; Provided further, That beginning with the fiscal year ending September 30, 1991, and thereafter, the appropriate Secretary shall request through annual appropriations funds sufficient to reimburse the Treasury for any claims paid in the

prior fiscal year pursuant to the foregoing provisions: Provided further, That nothing in this section shall in any way affect the provisions of [25 U.S.C. § 5301].

Pub. L. 101-512, 104 Stat. 1959 (1990), <u>as amended</u> Pub. L. 103-138, 107 Stat. 1416 (1993).

## 4. <u>Relief Available Under the ISDA</u>.

The ISDA provides a comprehensive range of remedies for a Tribe or Tribal organization whose contract the Secretary unlawfully terminates. <u>See</u> 25 U.S.C. § 5331(a). Section 5331(a) provides that, in an ISDA action, a federal district court "may order appropriate relief," including

money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 5331(a).

Applying § 5331(a) to the DOI Secretary's contract declination decision in <u>Crownpoint Institute of Technology v. Norton</u>, No. CIV 04-0531 JP/DJS, Findings of Fact and Conclusions of Law, filed September 16, 2005 (D.N.M.)(Parker, J.)(unpublished), the Honorable James A. Parker, United States Senior District Judge for the District of New Mexico, said that "[t]he specific mandamus relief authorized by the ISDA relieves [the plaintiff] of proving the usual equitable elements including irreparable injury and absence of an adequate remedy at law." <u>Crownpoint Inst. of Tech. v. Norton</u>, Findings of Fact and Conclusions of Law at 26 (citing <u>Atchison, Topeka & Santa Fe Ry. v. Lennen</u>, 644 F.2d 255, 260 (1981); <u>Star Fuel Marts, LLC v. Sam's East, Inc.</u>, 362 F.3d 639, 651-52 (10th Cir. 2004); <u>Shadid v. Fleming</u>, 160 F.2d 752, 753 (10th Cir. 1947)). Other federal district courts have similarly concluded that a Tribe or Tribal organization does not need to demonstrate the traditional grounds for equitable relief to obtain injunctive or mandamus

relief under the ISDA.  See, e.g., Pyramid Lake Paiute Tribe v. Burwell, No. CIV 13-1771 CRC, 2014 WL 5013206, at *7 (D.D.C. Oct. 7, 2014)(Cooper, J.)("Because the [ISDA] specifically provides for both injunctive and mandamus relief to remedy violations of the Act, 25 U.S.C. § 450m-1(a) [(now § 5331(a))], however, the Tribe need not demonstrate the traditional equitable grounds for obtaining the relief it seeks."); Red Lake Band of Chippewa Indians v. Dep't of the Interior, 624 F. Supp. 2d 1, 25 (D.D.C. 2009)(Kollar-Kotelly, J.)(granting specific performance on an ISDA contract without considering the ordinary grounds for such relief because injunctive relief is provided for in the statute); Susanville Indian Rancheria v. Leavitt, No. CIV 07-0259 GEB/DAD, 2008 WL 58951, at *10-11 (E.D. Cal. Jan. 3, 2008)(Burrell, J.)(holding that a plaintiff seeking injunctive relief under the ISDA need not satisfy the traditional equitable requirements); Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068 (ordering a writ of mandamus where the plaintiffs had not established the traditional equitable requirements, but had established that the Secretary's contract declination decision violated the ISDA).

## THE ISDA'S LEGISLATIVE HISTORY

If possible, the Court interprets statutes according to the statutory text's plain meaning and structure.  When the text's meaning and structure leave ambiguities, however, even the ardent textualist "routinely takes purpose into account, but in its concrete manifestations as deduced from close reading of the text."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 20 (2012).  The Court gives special interpretive weight to committee reports,[10]

---

[10]Congress defines Committee Reports as follows:

one set of documents among the variety of document types produced by the House and Senate committees that address legislative and other policy issues,

which congressional staffers consider the most reliable sources of congressional intent.  See Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside -- An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 977 fig.8 (2013).  Given the central role that the Executive Branch played in ISDA history, the Court also examines related presidential signing statements.[11]  Historical background is woven throughout the discussion as needed to knit a process that transpired over a quarter century into a coherent narrative.

1. **Indian Self-Determination and Education Assistance Act of 1975.**

---

investigations, and internal committee matters.  Committee reports usually are one of these types: (1) reports that accompany a legislative measure when it is reported for chamber action; (2) reports resulting from oversight or investigative activities; (3) reports of conference committees; and (4) committee activity reports, published at the conclusions of a Congress.

About Committee Reports of the U.S. Congress, U.S. Congress, https://www.congress.gov/congressional-reports/about (last visited Nov. 20, 2018).

[11]The Congressional Research Service defines presidential signing statements as follows:

official pronouncements issued by the President contemporaneously to the signing of a bill into law that, in addition to commenting on the law generally, have been used to forward the President's interpretation of the statutory language; to assert constitutional objections to the provisions contained therein; and, concordantly, to announce that the provisions of the law will be administered in a manner that comports with the administration's conception of the President's constitutional prerogatives.

Todd Garvey, Presidential Signing Statements: Constitutional and Institutional Implications, Congressional Research Service, http://fas.org/sgp/crs/natsec/RL33667.pdf (Nov. 20, 2018).

The ISDA became law in 1975.  See Pub. L. No. 93-638, 88 Stat. 2203 (1975).  In this section, the Court first examines the ISDA's historical background.  It then looks to the House and Senate Committee reports, and to President Ford's signing statement to uncover legislative intent.

### a.  Background.

The 1960s, a decade that unmoored so many other longstanding federal policies, barely left a ripple in federal policies related to American Indian self-determination.  Shortly after his Senate confirmation in 1961, Stewart Udall, President John F. Kennedy's Secretary, assembled a taskforce to study the issue of American Indian self-determination.  See Udall Tells of Plan for Reorganization, N.Y. Times, Jan. 29, 1961, at A32.  Yet the task force accomplished little of practical value, more replete with grandiloquence than grand strategy.  See Bureau of Indian Affairs, Report of Task Force on Indian Affairs at 2-7 (1961)("1961 Report of Task Force").  In a stunning rebuke of the very concept of self-determination even at the ideational stage, Udall paternalistically told task force members that "test[ing] our thinking against the thinking of the wisest Indians and their friends did not mean that we are going to let, as someone put it, the Indian people decide what the policy should be."  1961 Report of Task Force at 2.  For the remainder of the Kennedy and Lyndon B. Johnson Administrations, neither the White House nor Congress paid much attention to American Indians.  See generally Thomas Francis Clarkin, The New Trail and the Great Society: Federal Indian Policy During the Kennedy-Johnson Administrations (May 1998)(unpublished Ph.D. dissertation, University of Texas at Austin)(on file with ProQuest Dissertations & Theses Global).

Beginning in the 1960s, the Indian Health Service ("IHS ") also faced problems along many fronts, including congressional attempts to control its budget.  See Leah Kalm-Freeman, The

Community Health Representative Program: Early Voices and Program History 115-18 (June

2009)(unpublished Ph.D. dissertation, Johns Hopkins University)(on file with ProQuest

Dissertations & Theses Global)(providing an easily digestible summary of IHS finances and

budgetary concerns from the late 1950s until the passage of the ISDA). For their part, Tribal

leaders nationwide began to agitate for a greater say in healthcare services on their reservations.

See, e.g., Indians of North America, Declaration of Indian Purpose: The Voice of the American

Indian 9-10 (1961)(coauthored by leaders of sixty-seven American Indian Tribes). Tribes also

began to undertake small federally funded local projects through Indian Community Action

Programs established under President Johnson's War on Poverty, spurring greater American

Indian agitation for self-determination in general. See Sar Levitan & Barbara Hetrick, Big

Brother's Indian Programs, With Reservations 90 (1971).

    During his presidential campaign in 1968, Richard M. Nixon issued a statement to the

National Congress of American Indians in Omaha, Nebraska in which he seconded Tribes' calls

for greater self-determination. See Richard Nixon and the American Indian: The Movement to

Self-Determination (Smithsonian National Museum of the American Indian broadcast Nov. 15,

2012) at 20:14-:30, https://www.nixonfoundation.org/2012/11/nixon-and-the-american-indian-

the-movement-to-self-determination/ ("Smithsonian Video").

    Nixon did not forget this support for greater American Indian self-determination after the

election.[12] On October 8, 1969, Nixon sent Vice President Spiro Agnew to Albuquerque, New

---

[12]According to a White House domestic policy staffer who oversaw much of the push
behind the ISDA, the issue was extremely important to Nixon, in part because his former football
coach, an American Indian, had taught the teenage Nixon how to be confident and self-reliant. See
Smithsonian Video at 22:55-:59. Nixon believed that attitudes prevailing in the 1960s that

Mexico, to deliver a speech on the topic to lay the groundwork for American Indian legislation that Nixon's domestic policy advisers were drafting.  See Smithsonian Video at 24:15-25:21.  The legislative proposal was ready by the following summer, and Nixon proposed to Congress, at the start of July 1970, what eventually would become the ISDA.  See Richard Nixon, Special Message to the Congress on Indian Affairs (July 8, 1970), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency.ucsb.edu/documents/special-message-the-congress-indian-affairs (last visited Nov. 21, 2016)("Nixon's Special Message to Congress").[13]

Decrying the disorientation and excessive dependency that federal hegemony over American Indian healthcare had spawned as "morally and legally unacceptable," Nixon challenged Congress (i) to assure Tribes that the federal government would continue to perform its treaty and trusteeship obligations;[14] and (ii) to guarantee that, "whenever Indian groups decided to assume control or responsibility for government service programs, they could do so and still receive adequate Federal financial support."  Nixon's Special Message to Congress § 1.  The second

---

American Indians were less able to perform or manage projects than white Americans were benighted and bigoted, and that federal resistance to allowing American Indians to run IHS projects was "destructive, discriminatory, and debilitating."  Smithsonian Video at 2:05-:14.

[13]Nixon's Special Message to Congress, as available online, is not paginated.  Most of the message, however, is broken into enumerated sections.  To direct readers as precisely as possible to supporting text, citations to Nixon's Special Message to Congress will include the section number wherever applicable.

[14]The concept of a federal trust responsibility to the American Indians arose early in Supreme Court jurisprudence with Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831). The Supreme Court more recently recognized the concept in County of Oneida v. Oneida Indian Nation.  See Cty. of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247 (1985).

assurance, according to Nixon, is a very important rejection of suffocating paternalism and bureaucratic inefficiency in favor of American Indian self-determination. See Nixon's Special Message to Congress § 1.

Nixon told Congress that the assumption prevailing at the time was that American Indian programs could not exist without Federal administration. See Nixon's Special Message to Congress § 1. Nixon said that he believed this assumption is incorrect and that there is no reason that Congress should deprive American Indians of the privilege of self-determination merely because they receive monetary support from the federal government. See Nixon's Special Message to Congress § 2. In Nixon's opinion, it "should be up to the Indian Tribe to determine whether it is willing and able to assume administrative responsibility for a service program which is presently administered by a Federal agency." Nixon's Special Message to Congress § 3. He therefore proposed legislation that would:

> empower a Tribe or a group of Tribes or any other Indian community to take over the control or operation of Federally-funded and administered programs in the Department of the Interior and the Department of Health, Education and Welfare whenever the Tribal council or comparable community governing group voted to do so.

Nixon's Special Message to Congress § 3.[15]

Nixon proposed that discretion to take on a program or to not take on a program should lie completely with American Indians; it would not be necessary for the federal agency administering

---

[15]The Department of Education Organization Act, 93 Stat. 695, abolished the United States Department of Health, Education and Welfare ("HEW") on October 17, 1379. See General Records of the Dep't of Health, Educ. and Welfare, Nat'l Archives, https://www.archives.gov/research/guide-fed-records/groups/235.html (last visited Nov. 21, 2018). The United States Department of Health and Human Services is the successor to HEW for all Indian healthcare programs. See HHS Historical Highlights, U.S. Dep't of Health and Hum. Servs., http://www.hhs.gov/about/historical-highlights/index.html# (last visited Nov. 21, 2018).

a program to approve the transfer of responsibility to a Tribe or Tribal organization, nor could a Tribe or Tribal organization be compelled into a transfer it did not want. See Nixon's Special Message to Congress § 3. Tribes or Tribal organizations also would, under Nixon's proposal, retain the "right of retrocession," by which he meant that an American Indian group could elect to administer a program and then later decide to give it back to the federal government. Nixon's Special Message to Congress § 3. Nixon wanted appropriate technical assistance to help local organizations successfully operate programs they took over and for locally administered programs to be funded on equal terms with services that federal agencies continue to administer. See Nixon's Special Message to Congress § 3.

Nixon said that his proposed legislation would triply benefit American Indians. See Nixon's Special Message to Congress § 3. First, Nixon wrote, contracting out programs to Tribes or Tribal organizations would directly channel more money into American Indian communities, because American Indians -- not federal bureaucrats -- would be administering the programs and drawing salaries. See Nixon's Special Message to Congress § 3. Second, Nixon contended, contracting out programs to Tribes or Tribal organizations would "help build greater pride and resourcefulness within the Indian community." Nixon's Special Message to Congress § 3. Third, Nixon asserted, American Indians would get better and more efficacious programs if the people whom the programs most directly affected were responsible for creating them. See Nixon's Special Message to Congress § 9.

Nixon insisted that, "[a]s we move ahead in this important work, it is essential that the Indian people continue to lead the way by participating in policy development to the greatest possible degree." Nixon's Special Message to Congress § 9. According to Nixon, the federal

government has not always realized that it needs American Indian energy and leadership if its assistance is to be effective in improving the conditions of American Indian life.  See Nixon's Special Message to Congress § 9.  Nixon concluded that his proposed legislation would turn a new page, however, striking a "new and balanced relationship between the United States government and the first Americans . . . ."  Nixon's Special Message to Congress § 9.

During 1970 and 1971, Nixon Administration officials met with Tribal leaders at ten regional conferences and discussed the President's proposed legislation with them.  See generally Smithsonian Video.  The ISDA's first version was introduced in the Senate as 92 S. 3157 on February 9, 1972, and was reported to the Senate on July 27, 1972.  See Indian Self-Determination Act of 1972, S. 3157, 92d Cong. (1972)("1972 ISDA").  It was referred to the House Committee on Interior and Insular Affairs on August 3, 1972, see 1972 ISDA, but it died there as Washington became embroiled in the Watergate scandal and the related conviction of some of Nixon's White House aides, see Bob Woodward & Carl Bernstein, The Final Days 14-17 (2005)(providing a detailed chronology of the last two years of Nixon's presidency).

Undaunted, Nixon called for greater American Indian self-determination in his fourth State of the Union Address in 1973.[16]  In that Address, Nixon indicated that his Administration would

---

[16]Article II, Section 3 of the United States Constitution requires Presidents of the United States to deliver a "State of the Union Address" to Congress "from time to time."  U.S. Const. art. II, § 3.  Until 1973, every President of the United States except for George Washington had interpreted "from time to time" to mean at most once per calendar year.  George Washington, First Annual Message to Congress on the State of the Union (Jan. 8, 1790), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency.ucsb.edu/ws/index.php?pid=29431node/203158 (last visited Nov. 20, 2018); George Washington, Second Annual Message (Dec. 8, 1790), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency .ucsb.edu/ws/index.php?pid=29432.node/203719 (last visited Nov. 20, 2018).  In 1973, in a break

continue to advance opportunities for American Indian self-determination.  See Richard Nixon,

State of the Union Message to the Congress on Human Resources, 61 Public Papers of the

Presidents of the United States 143-44 (1973)(John Woolley & Gerhard Peters eds. 2005)("1973

Address").  Expounding in more depth on the same issue, Nixon said:

> Just as it is essential to put more decision-making in the hands of the State and local governments, I continue to believe that Indian Tribal governments should assume greater responsibility for programs of the Bureau of Indian Affairs and the Department of Health, Education, and Welfare which operate on their reservations. *As I first proposed in 1970, I recommend that the Congress enact the necessary legislation to facilitate this take-over of responsibility.*

1973 Address at 144 (emphasis in the original).  Nixon continued:

> Meanwhile the new statutory provisions for Indian Tribal governments under General Revenue Sharing will assist responsible Tribal governments in allocating extra resources with greater flexibility.  *I shall also propose new legislation to foster local Indian self-determination by developing an Interior Department program of bloc[k] grants to Federally recognized Tribes as a replacement for a number of existing economic and resource development programs.*  The primary purpose of these grants would be to provide Tribal governments with funds which they could use at their own discretion to promote development of their reservations.

1973 Address at 144 (emphasis in the original).  Nixon concluded his remarks on American Indians

with an expression of exasperation with Congress for having failed to pass the version of the ISDA

that he had proposed in his Nixon's Special Message and said that, "[t]o accelerate organizational

reform, I have directed the Secretary of the Interior to transfer day to day operational activities of

the Bureau of Indian Affairs out of Washington to its field offices."  1973 Address at 144.

---

from tradition, Nixon gave six State of the Union addresses -- the first an overview and the following five each focused on one specific policy theme.  See State of the Union Addresses and Messages, The American Presidency Project, http://www.presidency.ucsb.edu/sou.php#nixon1973 (last visited Nov. 20, 2018)(explaining that Nixon gave six addresses and linking to each)(last visited Oct. 27, 2016).

The bill languished in committee for nearly a year before Nixon drove home the pressing need for it in his 1974 State of the Union Address.  See Richard Nixon, Annual Message to the Congress on the State of the Union, 26 Public Papers of the Presidents of the United States 56 (1974)(John Woolley & Gerhard Peters eds. 2005)("1974 Address").  Perhaps sensing that this address would be his final opportunity to advocate for American Indian self-determination in a State of the Union Address, Nixon spoke passionately:

> For too many years the American Indians -- the first Americans -- have been the last Americans to receive the rights and opportunities to which they are entitled. This Administration has taken the initiative to change this picture.  For its part, the Federal Government must put behind it the role of autocratic manager of Indian reservations.  We shall continue to encourage Indians and their Tribal governments to play an increasing role in determining their own future.

1974 Address at 75.  Nixon noted that "[o]ne measure of our attempt to foster a better, more humane policy is the level of Federal funding benefitting American Indians -- over twice what it was five years ago or about $1.6 billion."  1974 Address at 76.  Nixon chided Congress for not having acted on his proposals "to permit turning over to Indian Tribal governments the management and control of Indian programs," and "to provide greater local control over federally assisted reservation programs through a program of Tribal grants."  1974 Address at 76.  Nixon then closed his discussion of American Indian self-determination with a final promise to American Indians that had first taken embryonic form in his 1968 campaign speech in Omaha: "I shall ask that the Bureau of Indian Affairs make specific plans to accelerate the transfer of significant portions of its programs to Indian Tribal management, although I repeat my assurance that, while accelerated, these transfers will not be forced on Indian Tribes not willing to accept them."  1974 Address at 76.

Even as the long shadows of possible impeachment over Watergate began to darken the Oval Office in the spring of 1974, Nixon pressed forward with his efforts to pressure the Senate into passing the ISDA. Resurrecting his strategy of sending out surrogates with speeches that he first had tried with Vice President Agnew's Albuquerque speech in 1969, Nixon dispatched his special counsel and the executive assistant to his special counsel to Albuquerque, New Mexico in March, 1974, to deliver two more speeches advocating for the ISDA and American Indian self-determination. See Leonard Garment, Speech to Indian Law Students Association, Albuquerque, New Mexico (March 14, 1974)(available for scan or photocopy at the Nixon Presidential Library); Bradley H. Patterson, Albuquerque Speech. After having sat on the bill for nearly a year, the Senate reported it out from the Committee on Interior and Insular Affairs two weeks later, on March 28, 1974. See S. Rep. No. 93-682.

### b.   <u>Senate Report No. 93-682.</u>

The section of the Senate Committee Report dedicated to congressional findings left no doubt that Congress had followed Nixon's lead in advocating for "a definitive break from the past." Smithsonian Video at 19:40. After careful review of the federal government's historical and special legal relationship with American Indians and of federal responsibilities that result from it, the Senate Committee found that:

> (1) the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities; and

> (2) the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons.

S. Rep. No. 93-682, at 1 (1974). The Senate Committee further recognized

> the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

S. Rep. No. 93-682, at 2. Furthermore, the Senate Committee declared that its

> commitment to the maintenance of the Federal Government's unique and continuing relationship with and responsibility to the Indian people through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from Federal domination of programs for and services to Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

S. Rep. No. 93-682, at 2. After diving into the bill's text, section by section, see S. Rep. No. 93-682, at 3-11, the Senate Committee wrote at length about the purpose behind and the need for the bill that it had just christened the "Indian Self-Determination and Educational Reform Act." S. Rep. No. 93-682, at 1, 12-14.

Priming fellow senators for the discussion about the ISDA's purpose, the Senate Committee chronicled the history of federal relations with American Indians. See S. Rep. No. 93-682, at 12-13. The Supreme Court, the Senate Committee said, first recognized Tribal sovereignty in 1832. See S. Rep. No. 93-682, at 12 (citing Worcester v. Georgia, 31 U.S (6 Pet.) 515, 519 (1832)). The Senate Committee declared that the extent to which the semi-independent Tribes are able to function depends on the degree to which Congress exercises its derived plenary power. See S. Rep. No. 93-682, at 12. The Senate Committee noted what it saw as a trend in both statutory and caselaw over the previous forty years to put greater emphasis on American Indian sovereignty and greater limitations on federal oversight of American Indians. See S. Rep. No. 93-682, at 12-

13 (referencing the Indian Reorganization Act of June 18, 1934, 48 Stat. 984; the Indian Bill of Rights Act of 1968, 82 Stat. 77, and <u>Begay v. Miller</u>, 222 P.2d 624, 627 (1950)).

The ISDA, the Senate Committee indicated, would be the next stage in this progression, being "in essence an effort to provide Tribes with the means to implement Tribal self-governing power by providing finances and procedures to achieve progressive development of Tribal resources and institutions." S. Rep. No. 93-682, at 13. Lest the bill's purpose not yet be clear enough, the Senate Committee continued: "The purpose of [the ISDA] is to implement a policy of self-determination whereby Indian Tribes are given a greater measure of control over the programs and services provided to them by the Federal government." S. Rep. No. 93-862, at 13.

Having discussed the ISDA's purpose, the Senate Committee then turned to discussing the need for the bill. See S. Rep. No. 93-682, at 13. In the recent past, the Senate Committee said, federal Indian policy had experienced a dramatic shift with respect to the delivery of programs and services that the BIA and the IHS formerly had administered. See S. Rep. No. 93-682, at 13 (citing four different statutes). The Senate Committee noted, however, that the policy changes had been made on very shaky authority, through a "mixture of broad interpretation and unrelated statutes . . . ." S. Rep. No. 93-682, at 13. Such policy potpourri, the Senate Committee said, had created "numerous administrative and management problems," such as "the inability of the Federal government to exempt Tribal contracts from Federal Procurement Regulations and to authorize payments in advance of Tribal performance on such contracts." S. Rep. No. 93-682, at 13, 14. The ISDA, according to the Senate Committee, was designed to alleviate such problems by providing direct statutory authority for American Indians' federal contracting. See S. Rep. No. 93-682, at 14.

c.    **House Report No. 93-1600.**

The House Committee on Interior and Insular Affairs ("1974 House Committee") reported S. 1017 to the House floor on December 16, 1974. H.R. Rep. No. 93-1600 (1974). In the preamble to its report, the 1974 House Committee indicated that one of the bill's goals was to "provide for the full participation of Indian Tribes in programs and services conducted by the Federal Government for Indians." 1974 U.S.C.C.A.N. 7775. The bill, according to the 1974 House Committee, therefore "authorizes and directs the Secretary of the Interior and the Secretary of Health, Education, and Welfare to contract with Indian Tribes or Tribal organizations for the operation of programs provided by the Bureau of Indian Affairs and the Indian Health Service under guidelines and criteria established by the bill . . . ." 1974 U.S.C.C.A.N. 7775.

Providing fellow House members with a quick rationale to support the bill, the 1974 House Committee indicated that S. 1017 provides "flexible authority to efficiently and realistically permit contracting of Bureau of Indian Affairs and Indian Health Service programs to the Indian Tribes while maintaining the integrity of the programs and services funded by Federal appropriations." 1974 U.S.C.C.A.N. 7782. According to the 1974 House Committee, S. 1017 simultaneously would expand the DOI Secretary's authority and the Department of Health, Education, and Welfare ("HEW ") Secretary's authority to enter into negotiated contracts with Indian Tribes and Tribal organizations under clear guidelines and contract requirements. See 1974 U.S.C.C.A.N. 7782.

The 1974 House Committee also explained, mostly at the DOI's and the General Accounting Office's recommendation, that it had adopted several major amendments to S. 1017 which the Senate passed. See 1974 U.S.C.C.A.N. 7782. First, the 1974 House Committee adopted

three new sections in S. 1017's preliminary provisions that it meant to tighten the ISDA's contract requirements in the areas of auditing and reporting, criminal penalties for the misuse of contract funds, applicability of the Davis-Bacon Act, 46 Stat. 1494, which regulated wages for laborers and mechanics under contracts to which the United States was a party, to contracts under the ISDA, and preferences for American Indians and American Indian subcontractors. See 1974 U.S.C.C.A.N. 7782. Second, the 1974 House Committee expanded the grant provisions to facilitate contracting by Tribes and Tribal organizations under the ISDA's terms. See 1974 U.S.C.C.A.N. 7782-83. Third, the 1974 House Committee adopted amendments which would:

> (1) permit Tribes and Tribal contractors to be eligible for grants from the Civil Service Commission under the Intergovernmental Personnel Act to strengthen personnel administration of the contractors; (2) permit Federal employees transferring to Tribal employment under such contracts to retain various fringe benefits of Federal employment; and (3) exempt such transferring employees from the conflict-of-interest provisions of section 205 and 207 of title 18 U.S.C., which would be inappropriate to the circumstances of such contracts.

1974 U.S.C.C.A.N. 7783. Just as important, the 1974 House Committee indicated that it had deleted four parts of the Senate bill authorizing new programs, based on the DOI's advice, because the DOI believed that such programs would be duplicative of existing programs. See 1974 U.S.C.C.A.N. 7783.

The Senate ISDA bill had made no explicit mention whether the HEW Secretary could reduce the amount of funding a Tribe or Tribal organization received if the Tribe or Tribal organization took control of administration of a program. The House Committee added subsection 106(h) that addressed this issue; it provided that

> the amount of any funds provided to a contractor under a contract shall not be less than the amount the Secretary would have expended had the United States

performed the service itself. It also provides that savings, if any, realized by the Tribal contractor would be available for additional services and benefits.

1974 U.S.C.C.A.N. 7779. This subsection that made it into the enacted ISDA retains the sense of the House Committee version but neither the House Committee version's sentence structure nor wording, reading as follows:

> The amount of funds provided under the terms of contracts entered into pursuant to sections 102 nad [sic] 103 shall not be less than the appropriate Secretary would have otherwise provided for his direct operation of the programs or portions thereof for the period covered by the contract: Provided, that any savings in operation under such contracts shall be utilized to provide additional services or benefits under the contract.

Pub. L. 638, 88 Stat 2204.

### d. President Ford's Signing Statement.

Nixon resigned the presidency approximately four months before Congress passed the ISDA. See Richard Nixon, Letter to Henry Kissinger Resigning the Office of President of the United States (dated Aug. 9, 1974), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency.ucsb.edu/documents/letter-resigning-the-office-president-the-united-states (last visited Nov. 21, 2016). Gerald Ford succeeded Nixon as President on August 9, 1974. See Gerald Ford, Remarks on Taking the Oath of Office (Aug. 9, 1974), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency.ucsb.edu/documents/remarks-taking-the-oath-office (last visited Nov. 21, 2018). On January 4, 1975, Ford signed the ISDA. See Gerald R. Ford, Statement on Signing the Indian Self-Determination and Education Assistance Act (Jan. 4, 1975), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.),

https://www.presidency.ucsb.edu/documents/signing-the-indian-self-determination-and-education-assistance-act (last visited Nov. 21, 2018)("1975 Signing Statement").

In his signing statement, Ford indicated that his Administration "is committed to furthering the self-determination of Indian communities without terminating the special relationships between the Federal government and the Indian people.  The Congress is to be congratulated for its passage of the legislation.  It will enhance our efforts to implement the policy of Indian self-determination."  1975 Signing Statement.  Ford continued

> Title I of this act gives the permanence and stature of law to the objective of my Administration of allowing -- indeed encouraging -- Indian Tribes to operate programs serving them under contract to the Federal Government.  Furthermore, with the passage of this act Indian communities and their leaders now share with the Federal Government the responsibility for the full realization of this objective.  It will be through the initiatives of Indian communities that the authorities provided in this act will be implemented.  I urge these communities to make the fullest possible use of them and pledge the support of this Administration.

1975 Signing Statement.  Ford concluded his discussion of American Indian self-determination on a practical note: "In addition to making this kind of contracting a right, the act does much to make it feasible and practical. . . . The granting authority in this act can also be used to strengthen Tribal governments and Tribally-funded programs."  1975 Signing Statement.

2.    **1988 Amendments to the ISDA.**

ISDA implementation did not go completely smoothly in the years after 1975.  See S. Rep. No. 100-274, at 6-7 (1988).   In the years after ISDA enactment, Tribes had encountered many problems in their contracts with the federal agencies.  See, e.g., Indian Self-Determination and Education Assistance Act, Public Law 93-638: Hearing Before the Select Comm. on Indian Affairs, 101st Cong. at 156-58 (prepared statement on behalf of Standing Rock Sioux Tribes, North and South Dakota; Assiniboine and Sioux Tribes, Fort Peck Reservation, Montana; Seneca Nation,

New York; Yukon-Kuskokwim Health Corporation; Kodiak Area Native Association; Aleutian/Fribilof Islands Association; Bristol Bay Native Association; and the Association of Regional Health Directors, Alaska ("Standing Rock"))("1987 Senate Committee Hearing"). Tribes complained that federal contracting requirements and bureaucratic regulations were too rigid and too burdensome, preventing the Tribes from being able to implement their own priorities and agenda for Tribal self-determination. See, e.g., Second 1987 Senate Hearing at 24 (Suzan Shown Harjo, Executive Director, National Congress of American Indians). Moreover, many Tribes contended that they were paying a financial penalty for the right to contract for the administration of federal programs, as federal agencies did not cover many costs associated with the contract's performance, and these costs therefore came from the Tribes' coffers. See, e.g., 1987 Senate Committee Hearing at 93-97 (Edward Loke Fight).

Federal agencies such as IHS recognized that many of these "contract support costs" ("CSC") -- first defined in the 1988 amendments, and including costs associated with audits, insurance, legal fees, and accounting fees -- are ones that the agencies would not have incurred themselves had they still been administering the same programs. See S. Rep. No. 100-393, at 4 (1987). In an effort to cover such costs for the Tribes, the BIA started to use a special line item in its Congressional Budget Requests that called for such CSC. See S. Rep. No. 100-393, at 4. The House and Senate Appropriation Committees, however, requested the BIA to merge CSC with other program funds. See H.R. Rep. No. 99-761, at 4 (1986). Starting in 1985, the BIA decided to cover CSC in another way, grandfathering the costs on a one-time basis in one lump sum in existing contracts at one hundred percent of the level of need in the previous year. See H.R. Rep. No. 99-761, at 4-5. The BIA never requested, however, that the additional CSC funding from

Congress and never received sufficient funds to fully cover CSC that Tribes were incurring. See S. Rep. No. 100-393, at 4. Because many Tribes lacked sufficient resources to continue operating programs without CSC, many threatened to invoke their right to retrocede contracts to federal agencies under the ISDA. See H.R. Rep. No. 99-761, at 5. Wishing to prevent a mass termination of Tribal contracts, the House of Representatives began to consider ISDA amendments in February 1987, that would (i) guarantee Tribes an adequate level of funding for CSC; and (ii) give Tribes a stronger voice in determining policies affecting the various federal programs for which they were contracting. See S. Rep. No. 100-393, at 4.

### a.      House Report No. 103-653.

On October 26, 1987, the House Committee on Interior and Insular Affairs reported proposed ISDA amendments out to the floor. See H.R. Rep. No. 100-393 (1987). The House Committee found:

> The Indian Self-Determination and Education Assistance Act . . . has furthered the development of local self-government and education opportunities for Indian Tribes, but its goal and progress have been impeded by lack of clarity and direction on the part of Federal agencies regarding their role in implementing the Federal policy of Indian self-determination.

H.R. Rep. No. 100-393, at 1. The House Committee further found that the "Federal responsibility for the welfare of Indian Tribes demands effective self-government by Indian Tribal communities," and that "additional legislation is necessary to assure that Indian Tribes have an effective voice in the planning and implementation of programs for the benefit of Indians." H.R. Rep. No. 100-393, at 1 (1987).

The House Committee therefore proposed multiple ISDA amendments. See H.R. Rep. No. 100-393, at 2-3. It recommended amending ISDA § 4 to define "contract support costs" as

the reasonable costs for activities which must be carried on by a Tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --

> (1) normally are not carried on by the respective Secretary in his direct operation of the program; or

> (2) are provided by the Secretary in support of the contracted program from resources other than those under contract

H.R. Rep. No. 100-393, at 2 (1987). The House Committee then tackled the issue of CSC funding levels, proposing that the ISDA § 106(h) be amended to read as follows:

> (1) The amount of funds provided under the terms of contracts entered into pursuant to this Act shall be no less than the appropriate Secretary would have otherwise provided for his operation of the programs or portion thereof for the period covered by the contract.

> (2) To the amount available under subsection (h)(1) of this section shall be added the negotiated contract support costs.

> . . . .

> (4) Costs incurred by the contracting agency in monitoring contracts shall not be subtracted from the amount of funds provided under subsection (h)(1).

> (5) Contract support costs shall be awarded for all programs for which a Tribal organization has contracted pursuant to sections 102 and 103 of this Act.

> (6) Except for general assistance grants, once contract and grant obligations are negotiated, the contract or grant amount may be decreased only with the consent of the contractor or grantee or to reflect a reduction in congressional appropriations from the previous fiscal year as reflected in the appropriation line item from which the contract or grant funds are derived.

> (7) Any savings realized by the contractor or grantee in the operation or administration of such contract or grant shall be used to provide additional services or benefits under the contract or grant and shall be carried over to the succeeding fiscal years without any reduction in the funding to which the contractor or grantee is otherwise entitled.

> (8) The appropriate Secretary shall provide supplemental reports to the Congress on or before March 15 of each year identifying any deficiency of funds needed to

provide required contract support costs and indirect costs to all contractors for that fiscal year.

(9) The appropriate Secretary shall advise the Congress in annual budget requests of the amount of funds which should have been appropriated in the preceding fiscal year in order to have funded at the full amount the indirect costs and contract support costs negotiated by Tribal organizations pursuant to this Act. The appropriate Secretary shall also provide the Congress with an estimate of the indirect costs and contract support costs that will be needed for new contracts in the fiscal year covered by the budget request.

(10) At the request of any Indian Tribe, the appropriate Secretary shall disclose to such Tribe the current amount of funds allocated, obligated, and expended for any program, or portion thereof, administered for the benefit of such Tribe.

H.R. Rep. No. 100-393, at 2-3. The House Committee recommended more than just amendments to existing ISDA sections; it also proposed that entirely new sections be added to the ISDA. See

H.R. Rep. No. 100-393, at 3. A new ISDA § 112 would read as follows:

(a) Whenever an indirect cost rate is negotiated annually between a Tribe or Tribal organization and the cognizant federal agency, that rate shall be applicable to all contracts and grants made with such Tribe or Tribal organization pursuant to Sections 102, 103, and 104 of this Act.

(b) Where a contractor's allowable indirect cost recoveries are below the level of indirect costs that the contractor should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, state, or other agency, such shortfall shall not form the basis for any theoretical under or over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such contractor, nor shall any agency seek to collect such short fall from the contractor.

(c) Indian Tribal governments shall not be held liable for amounts of indebtedness attributable to theoretical or actual under-recoveries or over-recoveries of indirect costs, as defined in Office of Management and Budget Circular A-87, incurred for fiscal years prior to fiscal year 1988.

H.R. Rep. No. 100-393, at 3.

### b.    Senate Report No. 100-274.

On April 22, 1987, in response to multiple complaints from American Indian Tribes about problems associated with ISDA implementation, the Senate Indian Affairs Committee conducted an oversight hearing. See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S. Comm. on Indian Affairs, 100th Cong. (1987)("1987 Senate Committee Hearing"). At that hearing, Tribal witnesses described the ISDA as a constructive public policy that had, among other things, resulted in American Indians using healthcare facilities more frequently. See, e.g., 1987 Senate Committee Hearing at 30 (Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington). At the same time, Tribal witnesses told the Senate Committee that inappropriate application of labyrinthine federal procurement law and federal acquisition regulations to self-determination contracts had resulted in excessive paperwork and unduly burdensome reporting requirements. See 1987 Senate Committee Hearing at 156-58 (Standing Rock).

Perhaps the single most serious problem with ISDA implementation, however, according to the Tribal witnesses at the hearing, was BIA's and IHS' failure to provide full funding for the indirect costs associated with self-determination contracts.

> It is very difficult not to believe that the BIA has been playing the budget cutting game largely at the expense of Tribes. For a number of years in its [budget] justification the Bureau under-estimated . . . Tribal administrative needs . . . and funded Tribes for only a percentage of the indirect costs that were due them.

1987 Senate Committee Hearing at 172 (United South & Eastern Tribes, Inc.). The Tribal witnesses said that the agencies' consistent failure to fully fund Tribal indirect costs had resulted in financial management problems for Tribes as they struggled to pay for federally mandated annual single-agency audits, liability insurance, financial management systems, personnel

systems, property management and procurement systems, and other administrative requirements. See, e.g., 1987 Senate Committee Hearing at 93-97 (Fight)(showing indirect CSC calculations and incomplete federal reimbursement for them). Tribal witnesses indicated that their Tribes had diverted trust resources needed for community and economic development to cover these CSC. See 1987 Senate Committee Hearing at 150 (Standing Rock).

The Senate Committee took note of these Tribal concerns and held another hearing featuring American Indian Tribal leaders on September 21, 1987 -- this one to discuss proposed ISDA amendments. See First Session on S. 1703 to Amend the Indian Self-Determination and Education Act: Hearing Before the S. Select Comm. on Indian Affairs, 100th Cong. (1987)("Second 1987 Senate Hearing").[17] After eight months of working together with Tribal leaders, according to Committee Chairman Daniel K. Inouye, then-United States Senator from Hawaii, the Committee produced a draft bill meant to address many Tribal concerns, including

> the need for the Bureau of Indian Affairs and the Indian Health Service to fully fund Tribal indirect costs for self-determination contracts; the need for year-to-year stability of contract funding levels in order to improve planning and management of programs; clarifying that Federal acquisition regulations do not apply to self-determination contracts; . . . reducing the paperwork and reporting requirements for mature contracts; alleviating problems associated with over-recovery and under-recovery of indirect costs from Federal agencies other than the BIA and IHS . . . .

Second 1987 Hearing at 1-2 (Sen. Daniel K. Inouye, Chairman, S. Select Comm. on Indian Affairs). Then-United States Senator Daniel Evans from Washington, the Vice Chairman of the Senate Committee, further shared with witnesses:

---

[17]The Senate Committee held four hearings from April 22, 1987, to February 18, 1988, confusingly giving the title of "First Session" to the first three of them. See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S. Comm. on Indian Affairs, 100th Cong. (1987). The Court modifies this naming convention in the short forms to help the reader distinguish the three hearings from each other.

It is certainly my hope -- and I know that of the chairman and the members of the committee -- to attempt to move strongly in this field during this congress to try to open up new opportunities to finally fulfill, as closely as we can, the real concepts of self-determination that have been the goal of so many years.

Second 1987 Hearing at 2 (Sen. Daniel Evans, Vice Chairman, S. Select Comm. on Indian Affairs).

Tribal leaders, for the most part, praised the Senate Committee for the progress it had made to address these concerns over the previous few months, but still insisted there were structural problems with the ISDA's approach to CSC that needed to be remedied.  See, e.g., Second 1987 Senate Hearing at 24 (Suzan Shown Harjo, Executive Director, National Congress of American Indians).  Most particularly, the Tribal leaders indicated that they preferred the language of the House bill amending the ISDA as it related to CSC recovery:

The second recommended change to accomplish is full recovery of costs and funding allocations.  The House bill language amending the P.L. 93-638 [the ISDA], defining contract support costs and requiring full allocation of contract support costs, provides a more complete description of what contract funding allocations should be based upon.  We would like to see that language given full consideration. . . .  By including this proposed language, Tribes would receive a fair allocation of funds, irrespective of their indirect cost rates.

Second 1987 Senate Hearing at 78 (Joseph B. DeLaCruz, President, Affiliated Tribes of Northwest Indians).  Unless Tribes could rely on such strong statutory protection for recovery of full CSC, Tribal leaders maintained that BIA and IHS would continue to fail to provide sufficient funds to cover CSC.  See Second 1987 Senate Hearing at 83 (Clarence W. Skye, Director, United Sioux Tribes of South Dakota Development Cooperation).

Taking such critiques to heart, the Senate Committee went to work on the amendments and scheduled a Third Hearing on them for the following month.  See First Session on S. 1703 to Amend the Indian Self-Determination and Education Assistance Act: Hearing Before the S. Select Comm. on Indian Affairs, 100th Cong. (1987)("Third 1987 Senate Hearing").  The Third Hearing,

unlike the first two, provided the BIA and IHS witnesses with significant time to present their view of the amendments. See Third 1987 Senate Hearing at 25-52. The Vice Chairman of the Senate Committee grilled then-United States Senator John McCain from Arizona, the Assistant Secretary for Indian Affairs, with the latter noting that the agency had veered very far from Nixon's clear intent in Nixon's Special Message to Congress, and had gotten "bound up in conflicting and probably unnecessary regulations." Third 1987 Senate Hearing at 34 (Evans). Responding to a question about CSC from McCain from Arizona indicated that Tribes which found themselves short of CSC to cover overhead could simply dip into their program costs to pay for it. See Third 1987 Senate Hearing at 37 (Ross Swimmer, Assistant Secretary for Indian Affairs, United States Department of the Interior). Responding to a question from then-Senator Daniel Evans, the IHS Director indicated that inadequate appropriations for CSC at the overall agency level meant that there was a chronic CSC shortfall spread around at the Tribal contractor level as well, but that there was no better solution, because funding excess CSC for one Tribe from a finite pot of money meant that IHS would need to shortchange other Tribes by the equivalent amount. See Third 1987 Senate Hearing at 47-48 (Everett Rhoades, Director, Indian Health Services).

Tribal leaders at the hearing took issue with the Assistant Secretary's and the IHS Director's statements about CSC. See Third 1978 Senate Hearing at 53-61 (William Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington). They rejected the suggestion that excess CSC should be funded out of the Secretarial amount. See, e.g., Third 1978 Senate Hearing at 53-54 (William Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington). Tribes also rejected any proposal that CSC should be funded using a flat fee or some other simplified approach, arguing that "any kind of approach of a flat rate is just not workable within the system

of addressing the true costs of the recovery of those costs by the Tribes administering BIA/IHS contracts and grants." Third 1978 Senate Hearing at 54 (Allen).

A little more than two months following the Third 1978 Senate Hearing, the Senate Committee had considered and marked up CSC amendments, reporting them to the full Senate on December 22, 1987. See S. Rep. No. 100-274, at 1 (1987). The Senate Committee called for a "comprehensive reexamination" of the ISDA "to increase Tribal participation in the management of Federal Indian programs," and to "remove many of the administrative and practical barriers that seem to persist" under the ISDA. S. Rep. No. 100-274, at 2.

The Senate Committee also commended ISDA's enactment twelve years earlier as the "the major reason for assumption by Indian Tribes of responsibility for Federal Indian programs." S. Rep. No. 100-274, at 2-3. The transfer of responsibility had been a boon to American Indians, the Senate Committee said:

> In addition to operating health services, human services, and basic governmental services such as law enforcement, water systems and community fire protection, Tribes have developed the expertise to manage natural resources and to engage in sophisticated economic and community development. All of these achievements have taken place during a time when Tribes have also developed sophisticated systems to manage and account for financial, personnel and physical resources. . . . Compared to state, county and municipal governments of similar demographic and geographic characteristics, the level of development attained by Tribal governments over the past twelve years is remarkable.

S. Rep. No. 100-274, at 4. The Senate Committee further found:

> Improvements in Tribal financial, personnel, property, and procurement systems have enabled Tribes to manage increasingly complex matters. In response to both federal and Tribal demands for accountability, most Indian Tribes that operate programs now have annual single-agency audits of Tribal finances. The Department of Interior Office of Inspector General has reported an increase in Tribal assumption of responsibility for Tribal financial management.

S. Rep. No. 100-274, at 4.  The Senate Committee noted many more of the improvements that the ISDA had induced in American Indian communities, including custodial care placements for children, outreach to isolated American Indian families through community health workers, increased health facility use, and the construction of safe water and sanitation systems.  See S. Rep. No. 100-274, at 5.  The common thread among all these successes, according to the Senate Committee, is that the ISDA has given Tribal communities an opportunity to "plan and deliver services appropriate to their diverse demographic, geographic, economic, and institutional needs. S. Rep. No. 100-274, at 5.

The Senate Committee also found that IHS' actions attempting to implement the ISDA largely had been praiseworthy.  See S. Rep. No. 100-274, at 6.  As of 1987, the Senate Committee said, IHS directly operated forty-five hospitals, seventy-one health centers, and several hundred smaller health stations and satellite clinics.  See S. Rep. No. 100-274, at 6 (citing Indian Health Service, Fiscal Year 1988 Budget Request).  Nevertheless, the Senate Committee noted with concern that many Tribes had reported that the IHS had refused to negotiate for the transfer of central office funds and had exhibited an overall resistance to Tribal efforts to redesign programs, and to reallocate resources and personnel in support of Tribal self-determination.  See S. Rep. No. 100-274, at 6.  The Senate Committee therefore provides:

> [T]he [HHS] Secretary shall negotiate annual funding agreements with each Indian Tribe.  These agreements authorize the Tribe to plan, conduct, consolidate, and administer programs, services, functions, and activities to Indian Tribes or Indians. Pursuant to the terms of the agreement and at the request of the Tribe, the Secretary shall provide funds to carry out the agreement in a [sic] amount equal to the amount that the Indian Tribe would have been eligible for under Self-Determination Act contracts and grants.  The bill also provides that the Secretary shall interpret each Federal low [sic] in a manner that will facilitate inclusion of programs or activities under the agreement.

S. Rep. No. 100-274, at 8.  The Senate Committee then adopted an amendment in the nature of a substitute that made several modifications to language in H.R 3508 as introduced.  See S. Rep. No. 100-274, at 8-13.  The Senate Committee stated that it was concerned that "if an Indian Tribe is participating as part of a consortium that Tribe should not be able to contract for any of the programs or activities which are already part of the consortium's self-governance agreement." S. Rep. No. 100-274, at 8.  The Senate Committee also adopted language which instructed the HHS Secretary to "interpret each Federal law and regulation in a manner that will facilitate the inclusion of programs and services and the implementation of agreements."  S. Rep. No. 100-274, at 15.

A more noticeable change to the ISDA that the Senate Committee proposed, however, was to add a sixth title to the statute focused squarely on Tribal self-governance.  See S. Rep. No. 100-274, at 14, 17-21.  Section 403(g)(3) within that proposed sixth title stated that, subject to exclusions for community colleges, public primary and secondary schools, the Flathead Agency Irrigation Division, and the Flathead Agency Power Division,

> the HHS Secretary shall provide funds to the Tribe for one or more programs, services, functions, or activities in an amount equal to the amount that the Tribe would have been eligible to receive under contracts and grants under this Act, including amounts for direct programs and contract support costs and amounts for those activities that are specifically or functionally related, but not part of the service delivery program, without regard to the organizational level within the Department where such functions are carried out.

S. Rep. No. 100-274, at 20.  Furthermore, the Senate Committee clarified in a proposed Section 406(a): "Nothing in this title shall be construed to limit or reduce in any way the services, contracts, or funds that any other Indian Tribe or Tribal organization is eligible to receive under section 102 or any other applicable Federal law."  S. Rep. No. 100-274, at 21.

The Senate Committee proposed to add section 106 to clarify provisions for funding self-determination contracts, including direct costs. See S. Rep. No. 100-274, at 30. The Senate Committee walked slowly through each subsection to explain its import. See S. Rep. No. 100-274, at 30-34. Starting off with its proposed subsection 106(a), the Senate Committee said:

> It is apparent from the wording of the new section 106(a) that the Committee is strongly committed to the principle of assisting Tribes to succeed in their efforts to plan, manage and operate programs and services under self-determination contracts. . . . The intent of these amendments is to protect and stabilize Tribal programs from inappropriate administrative reduction by Federal agencies.

S. Rep. No. 100-274, at 30. The Senate Committee alleged that the BIA had made many such reductions over the years in direct contravention of Tribal funding priorities, see S. Rep. No. 100-274, at 30-31, and threw up subsection 106(a)(5) as a barricade to prevent any such chicanery in the future:

> Section 106(a)(5) would prevent the [HHS] Secretary from reducing funds for a self-determination contract, except in response to a reduction in appropriations enacted by the Congress. Such a reduction should be a proportional, across-the-board reduction. . . . These amendments are intended to prevent Federal agencies from passing on the entire amount, or a disproportionate amount, of a reduction in Congressional appropriations, to Tribal contracts in order to protect the base for Federally-operated functions.

S. Rep. No. 100-274, at 31. The Senate Committee accused the BIA of cutting Tribal self-determination budgets to free up money for pay increases for BIA personnel, of financial mismanagement, and of over-aggressively reducing Tribal programmatic budgets under the guise of congressional-imposed sequestrations, see S. Rep. No. 100-274, at 31-32, adding with comparative sangfroid that "the intent of these amendments is to prevent such administrative reductions of Tribal contract funds," S. Rep. No. 100-274, at 31.

The Senate Committee briefly discussed its proposed subsections 106(b)-(f), before turning

to its proposed subsection 106(g).  See S. Rep. No. 100-274, at 33.  That subsection, according to

the Senate Committee, would "require the [HHS] Secretary to add indirect costs to the amount of

funds provided for direct program costs associated with self-determination contracts for the initial

year of Tribal program operation, upon the request of the Tribal contractor."  S. Rep. No. 100-274,

at 33.  The intent behind this provision, according to the Senate Committee, is

> to require the [HHS] Secretary to provide indirect costs for each contract year in
> addition to the program funding which would have been available to the Secretary
> to operate a contracted program and to prohibit the practice which requires Tribal
> contractors to absorb all or part of such indirect costs within the program level of
> funding, thus reducing the amount available to provide services to Indians as a
> direct consequence of contracting.

S. Rep. No. 100-274, at 33.  The Senate Committee then added:

> The combined amount of direct and indirect costs shall then be available for each
> subsequent year that the program remains continuously under contract.  While the
> Committee has concerns about the changes to the methods of budgeting for and
> allocating indirect costs funds, whether those methods be the so-called
> "grandfather" approach,[18] the single line-item indirect cost fund, or some other
> method, the Committee does not believe that it should determine the method of
> distribution.  The "grandfather" approach and the "single fund" approach both have
> advantages and disadvantages from the perspective of Federal agency budgets and
> from the perspective of individual Tribal contracts.  It is the Committee's hope that
> the Department of the Interior Office of Inspector General, the Bureau of Indian

_____

[18]On November 3, 1983, the DOI Inspector General wrote a letter to the Office of
Management and Budget ("OMB") in which he reported the BIA's decision to "grandfather"
indirect cost dollars into a Tribe's recurring secretarial amount, so that, after the first year of a self-
determination contract, indirect costs would be paid off of the top of the total contract amount.  S.
Bobo Dean & Joseph H. Webster, Contract Support Funding and the Federal Policy of Indian
Tribal Self-Determination, 36 Tulsa L.J. 349, 356 (quoting Letter from Richard Mulberry, DOI
Inspector General, to Deputy Director, OMB (Nov. 3, 1983)("1983 OMB Letter")).  The DOI
Inspector General expected that this "grandfather" approach would encourage Tribes to develop
more efficient administrative systems, but he also indicated that there was a risk that the heavy and
inconsistent requirements of the federal bureaucracy were jeopardizing Tribes' ability to handle
federal programs.  S. Bobo Dean & Joseph H. Webster, supra at 356 (quoting 1983 OMB Letter).

Affairs, and the Indian Health Service will coordinate their efforts with the Tribes to develop the most effective method of distributing indirect cost funds. The Committee amendment will insure that, whatever method is used, the Tribal contractor will realize the full amount of direct program costs and indirect costs to which the contractor is entitled.

S. Rep. No. 100-274, at 33-34. The Senate Committee then turned to its proposed subsection 106(h). See S. Rep. No. 100-274, at 34.

### c. President Reagan's Signing Statement.

In his first Statement on Indian Policy, issued January 24, 1983, Reagan extended his general philosophical preference for programmatic decentralization to American Indian Tribes. See Ronald Reagan, Statement on Indian Policy (Jan. 24, 1983), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency.ucsb.edu/documents/statement-indian-policy (last visited Nov. 21, 2018)("Reagan Statement on Indian Policy").[19] Reagan praised Nixon's policy of Tribal self-determination from Nixon's Special Message to Congress and noted how the 1975 ISDA had captured Nixon's vision. See Reagan Statement on Indian Policy at 1. Reagan believed, however, that the ISDA had not gone far enough, having been "more rhetoric than action." Reagan Statement on Indian Policy at 796. Instead of fostering and encouraging Tribal self-government, Reagan said, "Federal policies have by and large inhibited the political and economic development of the Tribes. Excessive regulation and self-perpetuating bureaucracy have stifled local decision-

---

[19]Reagan's published diary entry from September 20, 1982, indicates that he already held a Cabinet meeting on this topic on that day. See Ronald Reagan, 1 The Reagan Diaries 155 (Douglas Brinkley ed. 2009)("A Cabinet meeting -- main subject our relations with Am. Indians. We are going to put our relationship with Tribes on a govt. to govt. basis."). These early discussions notwithstanding, Reagan did not issue any public presidential statement about American Indians before his January 24, 1983, Statement on Indian Policy.

making, thwarted Indian control of Indian resources, and promoted dependency rather than self-sufficiency." Reagan Statement on Indian Policy at 796. Reagan established that his Administration intended to

> reverse this trend by removing the obstacles to self-government and by creating a more favorable environment for the development of healthy reservation economies. Tribal governments, the Federal Government, and the private sector will all have a role. This administration will take a flexible approach which recognizes the diversity among Tribes and the right of each Tribe to set its own priorities and goals.

Reagan Statement on Indian Policy at 796-97. Reagan acknowledged that "[c]hange will not happen overnight," but he was determined to "honor the commitment this nation made in 1970 and 1975 to strengthen Tribal governments and lessen Federal control over Tribal governmental affairs." Reagan Statement on Indian Policy at 797. Delving into specifics, Reagan noted:

> Tribal governments, like State and local governments, are more aware of the needs and desires of their citizens than is the Federal Government and should, therefore, have the primary responsibility for meeting those needs. The only effective way for Indian reservations to develop is through Tribal governments which are responsive and accountable to their members.

Reagan Statement on Indian Policy at 797. For generations, according to Reagan, federal employees had performed functions on American Indians' behalf. See Reagan Statement on Indian Policy at 797-98. Despite ISDA passage, Reagan continued, "major Tribal government functions -- enforcing Tribal laws, developing and managing Tribal resources, providing health and social services, educating children -- are frequently still carried on by Federal employees." Reagan Statement on Indian Policy at 797.

Reagan asked Tribes to reduce their dependence on Federal funds by contributing to a larger percentage of the cost for their self-government and pledged to "assist Tribes in strengthening their governments by removing the Federal impediments to Tribal self-government

and Tribal resource development." Reagan Statement on Indian Policy at 797. At the same time, Reagan would not simply make Tribes fly before they were fully fledged, ensuring that "[n]ecessary Federal funds" would remain available for all Tribes, and developing a Small Tribes Initiative to provide financial support smaller Tribes need to develop basic Tribal administrative and management capabilities. Reagan Statement on Indian Policy at 797.

Reagan's interest in American Indian issues seemed to wane during his second term, being expressed only in a trio of ceremonial proclamations in the three years leading up to the ISDA amendment of 1988.[20] In Reagan's 1986, and 1988, proclamations marking National American Indian Heritage Week, however, Reagan revisited his theme of increased Tribal self-sufficiency. See Ronald Reagan, Proclamation 5868 -- National American Indian Heritage Week, 1988, 102 Stat. 5068 (1988); Ronald Reagan, Proclamation 5577 -- American Indian Week, 1986, 101 Stat. 2041 (1986). In the 1986 proclamation, Reagan noted:

> Indians make contributions in every area of endeavor and American life, and our literature and all our arts draw upon Indian themes and wisdom. . . . We look to the future with the expectation of even stronger Tribal governments and lessened Federal control over Tribal government affairs. We look to a future of development of economic independence and self-sufficiency, and an enhanced government-to-government relationship that will allow greater Indian control of Indian resources.

101 Stat. 2041. Two years later and just one week before Congress sent him the ISDA amendments of 1988, Reagan repeated this self-determination theme in his 1988 proclamation:

> Despite past periods of conflict and changes in Indian affairs policies, the government-to-government relationship between the United States and Indian Tribes has endured. The Constitution, treaties, laws, and court decisions have consistently recognized a unique political relationship between Tribal elected governments and the United States. We look to a future of increasing economic

---

[20]American Indian issues did not make a single appearance in Reagan's personal diary during the period of time that Congress was considering the 1988 ISDA amendments. See Ronald Reagan, 1 The Reagan Diaries 692-819.

independence and self-sufficiency on Indian reservations, and we support efforts to foster greater Indian control of Indian resources.

102 Stat. 5068. Read in light of Reagan's refrain about Tribal self-sufficiency over the five years preceding the ISDA amendments of 1988, it is difficult to miss the same tones in his signing statement to the bill on October 5, 1988. See Ronald Reagan, Statement on Signing the Indian Self-Determination and Education Assistance Act Amendments of 1988 (Oct. 5, 1988), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency.ucsb.edu/documents/statement-signing-the-indian-self-determination-and-education-assistance-act-amendments (last visited Nov. 21, 2018)("Reagan Signing Statement").

Reagan started the signing statement on a general note: "This Act will assist in furthering Administration efforts to transfer the development and operation of programs from the Federal Government to Indian Tribes. Tribal self-governance allows Tribes more freedom to design programs to serve the specific needs of their members." Reagan Signing Statement at 1284. He immediately thereafter turned, however, to a rejection of one of the provisions in the bill added to the proposed new ISDA. See Reagan Signing Statement at 1284. Reagan writes: "A provision in . . . the Act stated that the Secretaries of the Interior and Health and Human Services shall reduce funding to Indian Tribes if so directed by a statement from a Member of Congress that accompanies a conference report." Reagan Signing Statement at 1284.[21] Reagan asserted that the provision

---

[21]The object of the rejection is not entirely clear from the signing statement's text. Subsection (a)'s relevant portion reads as follows: "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions

purported to authorize a process altering Executive branch officials' legal duties without both congressional houses and the President's participation, thus violating the requirements for presentment and bicameralism that the Supreme Court five years earlier had enunciated in Immigration and Naturalization Service v. Chadha, 462 U.S. 919 (1983). Aside from this objection and two others focused on reporting requirements, Reagan did not voice any objections to any provisions in the 1988 ISDA amendments. See Reagan Signing Statement at 1284.

### 3. **1994 Amendments.**

Under the 1988 ISDA amendments' terms, the DOI and the HHS were supposed to work with Tribes to reach agreement on draft regulations to cover self-determination contracts within ten months of bill enactment. See Indian Self-Determination Amendments of 1987, Pub. L. 100-472 § 207(b)(3)-(4), 102 Stat. 2285 (1988).[22] Approximately two years after the statutory deadline -- and without first consulting Tribes -- the IHS developed new policy guidelines governing the award of CSC. See Indian Self-Determination Memorandum No 92-2 (Feb. 27, 1992)("1994 IHS Memorandum"). The new guidelines provided for the use of CSC to pay for all negotiated indirect costs, and the IHS distributed available funds to contractors based on an annually negotiated rate.

---

thereof for the period covered by the contract." Indian Self-Determination Amendments of 1987, Pub. L. 100-472, § 106(a)(1), 102 Stat. 2292.

[22]Congress split this requirement across two statutory Subsections. The first Subsection reads as follows: "Within seven months from the date of enactment of the Indian Self-Determination and Education Assistance Act Amendments of 1988, the Secretary shall publish proposed regulations in the Federal Register for the purpose of receiving comments from Tribes and other interested parties." Indian Self-Determination Amendments of 1987 § 207(b)(3). The second Subsection reads as follows: "Within ten months from the date of enactment of the Indian Self-Determination and Education Assistance Act Amendments of 1988, the Secretary shall promulgate regulations to implement the provisions of such Act." Indian Self-Determination Amendments of 1987 § 207(b)(4).

1994 IHS Memorandum at 1. The guidelines, however, also authorized the IHS to use CSC to pay for direct costs under ISDA § 106(a)(2). See 1994 IHS Memorandum at 1.

Oftentimes such payments never materialized, at least not in full. See United States General Accounting Office, GAO/RCED 99-150, Indian Self Determination Act: Shortfalls in Indian Contract Support Costs Need to be Addressed at 6 (June 1999), http://www.gao.gov/assets/230/227485.pdf)(last visited Nov. 21, 2018)("GAO Report"). Although CSC funding had been incommensurate with Tribal needs since the ISDA's enactment in 1975, the shortfalls started to become acute at the end of the 1980s and the beginning of the 1990s, because of Congress' failure to anticipate the increased Tribal demand for self-determination contracts that arose after the 1988 ISDA amendments. See GAO Report at 25-28. From 1989 to 1994, these CSC shortfalls ranged from seventy million dollars to over one hundred million dollars per year. See GAO Report at 32 fig.2.5.

Nearly five years after the statutory deadline and still without having meaningfully consulted with Tribes, the DOI and the HHS published eighty pages of proposed regulations conforming to the 1988 ISDA amendments in the Federal Register.[23]  See Indian Self-

---

[23]The DOI and the HHS admitted in the notice of proposed rulemaking:

[A] major area of concern for the current Administration relates to the adequacy of outreach to, and participation in the drafting process by, Tribes and Tribal organizations during the post-August 1990 period. The DOI's concern is heightened by the fact that the September 1990 draft (which did reflect Tribal input) was significantly modified during the more than two-year period in which the two Departments worked on the draft without Tribal participation.

59 Fed. Reg. 3166.

Determination and Education Act Amendments; Proposed Rule, 59 Fed. Reg. 3166 (January 20, 1994)(codified at 25 CFR § 900). Tribal reaction to the proposed regulations was overwhelmingly negative, because of both their content and their length. See First Session on Oversight Hearing to Establish a Detailed Timeframe for the Swift Development of New Implementing Regulations with Close Tribal Participation: Hearing Before the S. Comm. on Indian Affairs, 103d Cong., at 1-2 (1993)("1993 Senate Hearing")(Inouye). In response, the DOI and the HHS began to hold regional meetings with Tribal leaders in a de facto inversion of usual notice and comment rulemaking.[24] See 1993 Senate Hearing at 34 (Eddie F. Brown, Assistant Secretary for Indian Affairs, United States Department of the Interior).

### a. **House Report 103-653.**

On August 3, 1994, the House Committee on Natural Resources reported to the full House on another set of ISDA amendments. See H.R. Rep. No. 103-653 (1994). In its report's preamble, the House Committee indicated that the bill's purpose was "to amend the Indian Self-Determination and Education Assistance [A]ct to permanently establish Tribal Self-Governance in the Department of the Interior." H.R. Rep. No. 103-653, at 5. The House Committee commended the IHS for having entered into self-determination contracts with fourteen American

---

[24]In notice and comment rulemaking, also known as "informal rulemaking," the Administrative Procedure Act, 5 U.S.C. § 551-84, generally requires that agencies publish a notice of proposed rulemaking in the Federal Register. See Maeve P. Carey, Congressional Research Service, The Federal Rulemaking Process: An Overview 5-6 (June 17, 2013)("Federal Rulemaking Process"). The notice must contain (i) a statement of the public rulemaking proceedings' time, place, and nature; (ii) reference to the legal authority under which the rule is proposed; and (iii) either the proposed rule's terms or substance, or a description of the subjects and of the issues involved. See Federal Rulemaking Process at 6. After considering public comments, the agency may then publish the final rule, incorporating a general statement of its basis and purpose. See Federal Rulemaking Process at 6. Agencies commonly allow at least thirty days for public comment. See Federal Rulemaking Process at 6.

Indian Tribes during the previous two-and-a-half years, see H.R. Rep. No. 103-653, at 6, but it also revealed that it was

> very concerned about reports from many of the Self-Governance Tribes that officials of the Indian Health Service have refused to negotiate for the transfer of central office funds and have exhibited an overall resistance to Tribal efforts to redesign programs and reallocate resources and personnel under the authority of Tribal Self-Governance.

H.R. Rep. No. 103-653, at 6. The House Committee diagnosed the cause of such resistance within the IHS to be "a misapprehension that Tribal Self-Governance is a temporary project." H.R. Rep. No. 103-653, at 6. To the contrary, the House Committee said, Tribal self-determination is to be a permanent policy, and IHS must take steps to "begin to plan for and implement changes that will result in reductions in the Federal bureaucracy which correspond to the transfer of program funds, resources, and responsibilities to Self-Governance Tribes." H.R. Rep. No. 103-653, at 6.

The House Committee proposed adding an entire ISDA section dedicated exclusively to AFAs; in one subsection, it packed a punch far above its weight, instructing the HHS to interpret not just the ISDA, but rather "each Federal law and regulation," except where otherwise provided by law, in a manner that would facilitate "the inclusion of programs, service, functions, and activities in the agreements entered into under" Tribal self-determination contracts. H.R. Rep. No. 103-653, at 20.

### b.      Senate Committee Report.

On April 20, 1994, McCain and Inouye introduced a Senate version of the 1994 ISDA amendments, and the bill was referred to the Senate Committee on Indian Affairs. See S. Rep. No. 103-374, at 4 (1994). On August 10, 1994, the Senate Committee reported the bill to the full Senate. See S. Rep. No. 103-374, at 1. According to the Senate Committee, the major impetus

for the bill was the HHS and the DOI's incorrigibility; Congress mandated in 1988 to quickly promulgate simple regulations to govern Tribal self-determination contracts, but the agencies had done the opposite for six years.[25]  See S. Rep. No. 103-374, at 14.  The Senate Committee keelhauled the agencies:

> This action is a direct result of the failure of the Secretaries to respond promptly and appropriately to the comprehensive amendments developed by this Committee six years ago.  The recently promulgated proposed regulations severely undercut Congress' intent in the original Act and those [1988] amendments to liberalize the contracting process and to put these programs firmly in the hands of the Tribes.  The proposed regulations erect a myriad of new barriers and restrictions upon contractors rather than simplifying the contracting process and freeing Tribes from the yoke of excessive federal oversight and control.

S. Rep. No. 103-374, at 14.  The Senate Committee explained that, because of the agencies' recalcitrance, its proposed 1994 ISDA amendments would cabin their rulemaking authority even more than the original ISDA and the 1988 ISDA amendments had.  See S. Rep. No. 103-374, at 14:

> Section 5(1) delegates to the Secretary the authority only to promulgate implementing regulations in certain limited subject matter areas. . . .  A second key limitation on the delegation of rulemaking authority is provided in the twelve month limitation on the Secretaries' authority to promulgate the regulations.  This limit is necessary to prevent another regulation drafting process that goes on for years without satisfactory or final resolution.

---

[25]Such caustic congressional condemnation of the BIA was common during the 1980s and early 1990s.  See George Pierre Castile, Taking Charge: Native American Self-Determination and Federal Indian Policy, 1975-1993, at 49-110 (2006).  The Senate Special Committee on Investigations found massive failure of the BIA to serve American Indians in 1989 and noted "at least 42 congressional investigations have recommended federal reorganization, restructuring, retinkering.  And in one nine -year period alone, the BIA was actually reorganized ten times."  United States Senate, A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs 15, 101st Cong., 1st Sess. (Nov. 20, 1989).

S. Rep. No. 103-374, at 14.  Because of the agencies' obduracy in refusing to follow congressional instructions to consult Tribes before proposing regulations,[26] the Senate Committee explained, its proposed 1994 ISDA amendments also would require the DOI and the HHS to employ the negotiated rulemaking process, publishing a proposed rule within six months of the amendments' enactment.  See S. Rep. No. 103-374, at 14.

Having ground its ax, the Senate Committee also delved deeply into amendments that it proposed for ISDA § 106, which Congress had added to the ISDA in 1988.  See S. Rep. No. 103-374, at 8-14.  The Senate Committee proposed to amend §§ 106(a)(2) and (3) to more fully define the meaning of the term "contract support costs," to "include both funds required for administrative and other overhead expenses and 'direct' type expenses of program operation."  S. Rep. No. 103-374, at 8-9.  The Senate Committee said that, in the event that the secretarial amount for a particular function proves to be insufficient in light of a contractor's needs for prudent management, "contract support costs are to be available to supplement such sums."  S. Rep. No. 103-374, at 9. The Senate Committee proposed retaining the ISDA's process for negotiations between the agencies and Tribes for indirect cost agreements, see S. Rep. No. 103-374, at 9, but still smarting

---

[26]It appears that the Senate Committee may have been somewhat hyperbolic when haranguing the DOI and the HHS for completely "disregarding" American Indian input.  S. Rep. No. 103-374, at 14.  On at least one occasion, on September 29, 1990, President George Bush's DOI Secretary, Manuel Lujan, met with nearly seven hundred Tribal leaders.  See Seth Mydans, Old Angers Still Fresh As Indians Meet Lujan, N.Y. Times, Sept. 30, 1990, http://www.nytimes.com/1990/09/30/us/old-angers-still-fresh-as-indians-meet-lujan.html (last visited Nov. 21, 2018)("Old Angers").  Even at this meeting, however, the DOI effectively presented the Tribal leaders with a regulatory fait accompli, eliciting strong resentment from the Tribal leaders present.  See Old Angers at 1 (quoting, among others, Wayne Ducheneaux, president of the National Congress of American Indians, as challenging Lujan: "You say you want consultation with the Indian Tribes, but I don't think you truly want it.").

from the agencies' impenitent disregard for its earlier instructions, the Senate Committee drew a line in the sand even on these negotiations:

> Throughout this section the Committee's objective has been to assure that there is no diminution in program resources when programs, services, functions or activities are transferred to Tribal operation. . . . [If] a Tribe would be compelled to divert program funds to prudently manage the contract, [it is] a result Congress has consistently sought to avoid.

S. Rep. No. 103-374, at 9. The Senate Committee micromanaged even further, sidestepping the DOI and the HHS and directing the Office of Management and Budget ("OMB") to develop new cost principles unique to Tribal organizations for the DOI and the HHS to apply to self-determination contracts. See S. Rep. No. 103-374, at 10.

The Senate Committee also proposed new ISDA subsections that would codify existing practice and policy, and two new subsections that would reverse existing practice. See S. Rep. No. 103-374, at 10-12. The first new subsection would codify "the current policy and practice regarding program income earned by a Tribal organization during the course of administering a contract (such as third party income paid by insurance companies insuring persons served by a Tribal organization's health program)." S. Rep. No. 103-374, at 10. The second new subsection would

> Incorporate . . . the longstanding canon of statutory interpretation that laws enacted for the benefit of Indians are to be liberally construed in their favor, and further to clarify that all functions, services, activities or programs or portions thereof, as well as all administrative functions, are contractible, as clearly provided in the Act.

S. Rep. No. 103-374, at 11. The third new subsection would make it clear that Tribal contractors operating under self-determination contracts are "not subject to [the HHS or the DOI] manuals, guidelines, regulations or unpublished requirements unless expressly authorized under the [ISDA] or agreed to by the Contractor." S. Rep. No. 103-374, at 12. The fourth new subsection would

permit "a unilateral modification of [a self-determination] contract when that modification only adds supplemental funding for programs or other functions that are already included in the annual funding agreement." S. Rep. No. 103-374, at 13.

### c. President Clinton's American Indian Policy.

President William J. Clinton issued more than fifty percent more signing statements than any other President in history. See Congressional Research Service, Presidential Signing Statements: Constitutional and Institutional Implications 5-7 (Jan. 4, 2012), http://fas.org/sgp/crs/natsec/RL33667.pdf (last visited Nov. 20, 2018). His choice not to issue one on the ISDA amendments is therefore as notable as a dog that does not bark,[27] especially given that he wrote four other signing statements on other bills the same day that he signed the ISDA amendments of 1994. See Presidential Signing Statements -- 1994, The American Presidency Project, https://www.presidency.ucsb.edu/documents/presidential-documents-archive-guidebook/presidential-signing-statements-hoover-1929-obama (last visited Nov. 20, 2018)(providing a chronological listing of every presidential signing statement from 1994).

Clinton had not been silent about American Indian self-determination, however, during the months when the 1994 ISDA amendments were coursing through Congress; six months before the ISDA amendments reached his desk, Clinton had summoned the leaders of all 547 federally recognized Tribes to the meeting on the White House lawn. See Douglas Jehl, Clinton Meets

---

[27]The "dog didn't bark" canon derives from a short story from Sir Arthur Conan Doyle, in which Sherlock Holmes deduces the identity of the villain after realizing that the dog of the house did not bark when the individual came to the house. See Sir Arthur Conan Doyle, The Adventure of Silver Blaze, in The Complete Sherlock Holmes 347 (A.C. Doyle Memorial ed. 1960). The Supreme Court repeatedly has invoked this unofficial canon of statutory construction. See, e.g., Zuni Pub. Sch. Dist. No. 89 v. Dep't of Ed., 550 U.S. 81, 88 (2007); Scheidler v. Nat'l Org of Women, 547 U.S. 9, 20 (2006).

Indians, Citing a New Respect, N.Y. Times, April 30, 1994.  In his welcoming remarks to the Tribal leaders, Clinton said:

> All governments must work better.  We must simply be more responsive to the people we serve and to each other.  It's the only way we'll be able to do good things with the resources we have.  I know that you agree with that.  More and more of you are moving to assume fuller control of your governments.  Many are moving to take responsibility for operating your own programs.  Each year the Bureau of Indian Affairs is providing more technical services and fewer direct services.

> One avenue for greater Tribal control is through self-governance contracts.  There are about 30 self-compacting Tribes today.  We're working with Congress to raise that number by 20 Tribes every year.  We'd like self-governance to become a permanent program.  But we must ensure services will still be provided to the smaller Tribes that do not choose to participate

William J. Clinton, Remarks to Native American and Native Alaskan Tribal Leaders, (April 29, 1994), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency.ucsb.edu/documents/remarks-native-american-and-native-alaskan-tribal-leaders (last visited Nov. 21, 2018).  In the memorandum that Clinton ceremoniously signed immediately after his welcoming remarks, Clinton went further: "Each executive department and agency shall take appropriate steps to remove any procedural impediments to working directly and effectively with Tribal governments on activities that affect the trust property and/or governmental rights of the Tribes."  William J. Clinton, Memorandum on Government-to-Government Relations with Native American Tribal Governments (April 29, 1994), reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), https://www.presidency.ucsb.edu/documents/memorandum-government-government-relations-with-native-american-tribal-governments (last visited Nov. 21, 2018).

At Clinton's instruction, the Departments of Justice, Interior, and Housing and Urban Development followed up on the White House meeting with a joint "National American Indian

Listening Conference" in Albuquerque.  Louis Sahagun, <u>Tribal Leaders Meet, Voice Sovereignty Concerns</u>, L.A. Times, May 6, 1994, at 12 ("Tribal Leaders Meet").  At that meeting, ninety federal officials, including Attorney General Janet Reno, and DOI Secretary Bruce Babbitt and United States Secretary of Housing and Urban Development Henry Cisneros, fielded questions from more than 200 Tribal leaders to discuss how Tribes could develop their economies and social services free of the interference of federal agencies.  Tribal Leaders Meet at 12.  Reno indicated that the goal of the conference was to make a first "step toward doing away with the old, closed way of doing business."  <u>See</u> Tribal Leaders Meet at 12.

## LAW REGARDING THE ILERA

Congress enacted the ILERA in 1990 "to clarify and strengthen the authority for certain Department of the Interior law enforcement services, activities, and officers in Indian country." Indian Law Enforcement Reform Act, Pub. L. No. 101-379 104 Stat. 473 (1990).  The ILERA gives the DOI Secretary responsibility "for providing, or for assisting in the provision of, law enforcement services in Indian country."  25 U.S.C. § 2802(a).  <u>See</u> 25 U.S.C. § 2801(8).  As part of this responsibility, the ILERA grants the DOI Secretary authority to "charge" BIA employees with law enforcement tasks within "Indian country" and grant BIA employees "authority" to engage in such tasks.[28]  25 U.S.C. § 2803.  The ILERA also establishes an "Office of Justice

---

[28]Section 2803 states:

The Secretary may charge employees of the Bureau with law enforcement responsibilities and may authorize those employees to --

    (1) carry firearms;

    (2) execute or serve warrants, summonses, or other orders relating to a crime

committed in Indian country and issued under the laws of --

(A) the United States (including those issued by a Court of Indian Offenses under regulations prescribed by the Secretary or offenses processed by the Central Violations Bureau); or

(B) an Indian Tribe if authorized by the Indian Tribe;

(3) make an arrest without a warrant for an offense committed in Indian country if --

(A) the offense is committed in the presence of the employee,

(B) the offense is a felony and the employee has probable cause to believe that the person to be arrested has committed, or is committing, the felony;

(C) the offense is a misdemeanor crime of domestic violence, dating violence, stalking, or violation of a protection order and has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent or guardian of the victim, and the employee has probable cause to believe that the person to be arrested has committed, or is committing the crime; or

(D)

(i) the offense involves --

(I) a misdemeanor controlled substance offense in violation of --

(aa) the Controlled Substances Act (21 U.S.C. 801 et seq.);

(bb) title IX of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (21 U.S.C. 862a et seq.); or

(cc) section 865 of Title 21;

Services" in the BIA, responsible for, "(1) carrying out the law enforcement functions of the DOI Secretary in Indian country, and (2) implementing the provisions of this section." 25 U.S.C. § 2802(b).

Section 2804 of the ILERA provides for the DOI Secretary to enter agreements, similar to 638 contracts, with Tribal authorities allowing the United States to use Tribal personnel for law

---

(II) a misdemeanor firearms offense in violation of chapter 44 of Title 18;

(III) a misdemeanor assault in violation of chapter 7 of Title 18; or

(IV) a misdemeanor liquor trafficking offense in violation of chapter 59 of Title 18; and

(ii) the employee has probable cause to believe that the individual to be arrested has committed, or is committing, the crime;

(4) offer and pay a reward for services or information, or purchase evidence, assisting in the detection or investigation of the commission of an offense committed in Indian country or in the arrest of an offender against the United States;

(5) make inquiries of any person, and administer to, or take from, any person an oath, affirmation, or affidavit, concerning any matter relevant to the enforcement or carrying out in Indian country of a law of either the United States or an Indian Tribe that has authorized the employee to enforce or carry out Tribal laws;

(6) wear a prescribed uniform and badge or carry prescribed credentials;

(7) perform any other law enforcement related duty; and

(8) when requested, assist (with or without reimbursement) any Federal, Tribal, State, or local law enforcement agency in the enforcement or carrying out of the laws or regulations the agency enforces or administers.

25 U.S.C. § 2803.

enforcement functions.  <u>See</u> 25 U.S.C. § 2804(a).  The ILEA mandates that the DOI Secretary must develop training procedures for such personnel, <u>see</u> 25 U.S.C. § 2804(a)(3)(A), and "minimum requirements" for Tribal law enforcement functions, 25 U.S.C. § 2804(B)(i).  If the DOI Secretary desires to use an agency other than the Tribe or a federal agency for law enforcement in "Indian country," the DOI Secretary must obtain a Tribe's consent before entering an agreement with the third party.  25 U.S.C. § 2804 (c).  The BIA, nevertheless, may accept assistance and funding from "federal, Tribal, State or other government" agencies.  25 U.S.C. § 2804(g)(1).

Employees of Tribal law enforcement programs are deemed federal employees only for the FTCA's purposes, and for the federal prohibition on killing federal employees and officers:

> While acting under authority granted by the Secretary under subsection (a), a person who is not otherwise a Federal employee shall be considered to be --
>
>> (1) an employee of the Department of the Interior only for purposes of --
>>
>>> (A) the provisions of law described in section 3374(c)(2) of Title 5, and
>>>
>>> (B) sections 111 and 1114 of Title 18, and
>>
>> (2) an eligible officer under subchapter III of chapter 81 of Title 5.

25 U.S.C. § 2804(f).

The ILERA does not change preexisting jurisdictional and law enforcement divisions between governmental entities; the statute clarifies:

> The authority provided by this chapter is in addition to, and not in derogation of, any authority that existed before August 18, 1990.  The provisions of this chapter alter neither the civil or criminal jurisdiction of the United States, Indian Tribes, States, or other political subdivisions or agencies, nor the law enforcement, investigative, or judicial authority of any Indian Tribe, State, or political subdivision or agency thereof, or of any department, agency, court, or official of the United States other than the Secretary.

25 U.S.C. § 2806(d).

Subsequent ILERA sections allow the DOI Secretary to enact regulations relating to enforcing criminal laws and entering self-determination contracts, see 25 U.S.C. § 2805, tie funding for law enforcement activities on Tribal lands to the BIA's funds, see 25 U.S.C. § 2808; 25 U.S.C. § 13, grant an "uniform allowance" to BIA employees, 25 U.S.C. § 2807, and place jurisdiction over investigating criminal laws in "Indian country" in the DOI Secretary, subject to cooperation with the agency with "primary investigative jurisdiction over the offense," 25 U.S.C. § 2806. The ILERA also coordinates information and data collection between Tribal authorities and federal agencies, including coordination of information transferals for prosecution in Tribal courts, see 25 U.S.C. § 2809; establishes an Assistant United States Attorney to serve as a "Tribal liaison" for each district, see 25 U.S.C. § 2810, a "Native American Issues Coordinator" in the Department of Justice ("DOJ"), 25 U.S.C. § 2811, and an "Indian Law and Order Commission" to study and make recommendations on "law enforcement and criminal justice in Tribal communities," 25 U.S.C. § 2812; places authority for approving requests for testimony from Office of Justice Services or Indian Health Services' employees in the respective department's Directors, see 25 U.S.C. § 2813; and provides for the "Director of the Indian Health Service," "Director of the Office of Justice Services," and "Director of the Office on Violence Against Women" in the DOJ, to work with Tribal authorities to "develop standardized sexual assault policies," 25 U.S.C. § 2814. Finally, the ILERA provides that the Attorney General "may provide technical and other assistance to State, Tribal, and local governments that enter into cooperative agreements." 25 U.S.C. § 2815.

Regulations promulgated pursuant to the ILERA establish rules for the BIA, and for "Tribal law enforcement program[s] receiving Federal funding or operating under a BIA law enforcement commission." 25 C.F.R. § 12.11. The regulations clarify that the rules should not discourage self-determination agreements. See 25 C.F.R. § 12.12. Rather, the regulations reflect concerns about the United States' liability for law enforcement activities: "The Deputy Commissioner of Indian Affairs will ensure minimum standards are maintained in high risk activities where the Federal government retains liability and the responsibility for settling tort claims arising from contracted law enforcement programs." 25 C.F.R. § 12.12. The BIA opines in the regulations: "It is not fair to law abiding citizens of Indian country to have anything less than a professional law enforcement program in their community." 25 C.F.R. § 12.12. The regulations clarify that, if the rules are not followed, "[a] BIA law enforcement commission may be revoked, [a] law enforcement contract may be canceled," and" "Tribal shares allocated from the law enforcement budget" may no longer be accessible. 25 C.F.R. § 12.13.

The BIA can commission Tribal law enforcement officers to assist with enforcing federal criminal laws, but the BIA clarifies that not all Tribal law enforcement "officers operating under a BIA contract or compact are . . . automatically commissioned as Federal officers." 25 C.F.R. § 12.21. Tribal law enforcement officers "may be commissioned on a case-by-case basis." 25 C.F.R. § 12.21. The BIA will give only full-time Tribal law enforcement officers commissions. See 25 C.F.R. § 12.63. Regarding BIA employees' authority to enforce Tribal law, the regulations specify that "BIA officers will enforce Tribal laws only with the permission of the Tribe." 25 C.F.R. § 12.22.

Additionally, in operating law enforcement programs, "Tribal [law enforcement programs] are encouraged to develop" employment standards similar to those enforced by the BIA. 25 C.F.R. § 12.31. The programs' employees must undergo background checks equivalent to a federal officer's. See 25 C.F.R. § 12.32. The regulations dictate payment and training for officers performing law enforcement services under BIA contract: "Any contract or compact with the BIA to provide law enforcement services for an Indian Tribe must require a law enforcement officer to be paid at least the same salary as a BIA officer performing the same duties," 25 C.F.R. § 12.34, and "[l]aw enforcement personnel of any program funded by the Bureau of Indian Affairs must not perform law enforcement duties until they have successfully completed a basic law enforcement training course prescribed by the Director," 25 C.F.R. § 12.35. Further, the programs must meet specified reporting requirements for a "criminal justice information system for Indian country." 25 C.F.R. § 12.41. Investigative programs under the BIA or funded by the BIA are also encouraged to consult with local programs about detention and investigation programs. See 25 C.F.R. § 12.42. Although the BIA develops "use of force" policies "for all BIA law enforcement personnel, and for programs receiving BIA funding or authority," 25 C.F.R. § 12.55, the regulations require that Tribal law enforcement programs establish codes of conduct: "All law enforcement programs receiving Bureau of Indian Affairs funding or commissioning must establish a law enforcement code of conduct which establishes specific guidelines for conduct on and off duty, impartiality, and professional conduct in the performance of duty, and acceptance of gifts or favors," 25 C.F.R. § 12.51. The BIA oversees misconduct complaints about "any officer receiving funding and/or authority from the BIA." 25 C.F.R. § 12.53.

## LAW REGARDING TRIBAL POLICE OFFICERS AND 18 U.S.C. §§ 111 AND 1114

The ILERA's section 2804(f) makes officers employed by Tribal law enforcement programs with authority from the DOI Secretary federal employees for purposes of 18 U.S.C. § 111 and § 1114. 18 U.S.C. § 1114 makes killing a federal officer or employee a federal crime, stating:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished --
>
> **(1)** in the case of murder, as provided under section 1111;[29]

---

[29]Congress enacted the federal prohibition on murder in 18 U.S.C. § 1111:

**(a)** Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

**(b)** Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

**(c)** For purposes of this section --

**(2)** in the case of manslaughter, as provided under section 1112;[30] or

---

**(1)** the term "assault" has the same meaning as given that term in section 113;

**(2)** the term "child" means a person who has not attained the age of 18 years and is --

> **(A)** under the perpetrator's care or control; or

> **(B)** at least six years younger than the perpetrator;

**(3)** the term "child abuse" means intentionally or knowingly causing death or serious bodily injury to a child;

**(4)** the term "pattern or practice of assault or torture" means assault or torture engaged in on at least two occasions;

**(5)** the term "serious bodily injury" has the meaning set forth in section 1365; and

**(6)** the term "torture" means conduct, whether or not committed under the color of law, that otherwise satisfies the definition set forth in section 2340(1).

18 U.S.C. § 111.

[30]Section 1112 prohibits manslaughter:

**(a)** Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary -- Upon a sudden quarrel or heat of passion.

Involuntary -- In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

**(b)** Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of voluntary manslaughter, shall be fined under this title or imprisoned not more than 15 years, or both;

> **(3)** in the case of attempted murder or manslaughter, as provided in section 1113.[31]

18 U.S.C. § 1114 (bold in original).  Section 111 prohibits "assaulting, resisting, or impeding" federal employees to whom § 1114 applies:

> **(a) In general.** -- Whoever --

>> **(1)** forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or

>> **(2)** forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,

18 U.S.C. § 111 (bold in original).  The Tenth Circuit has determined that "the type of individual encompassed by § 1114 is a legal question for the court" and that the jury decides whether the individual assaulted was engaged in "federal duties."  See United States v. Martin, 163 F.3d 1212, 1214 (10th Cir. 1998)(citing United States v. Bettelyoun, 16 F.3d 850, 853 (8th Cir. 1994)).

According to the Eighth Circuit case cited in United States v. Martin -- United States v. Bettelyoun,

---

> Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than 8 years, or both.

18 U.S.C. § 1112 (bold in original).

> [31]Section 1113 criminalizes attempted murder or manslaughter:

> Except as provided in section 113 of this title, whoever, within the special maritime and territorial jurisdiction of the United States, attempts to commit murder or manslaughter, shall, for an attempt to commit murder be imprisoned not more than twenty years or fined under this title, or both, and for an attempt to commit manslaughter be imprisoned not more than seven years or fined under this title, or both.

18 U.S.C. § 1113.

"the court must determine threshold legal questions -- whether the Tribal contract, and the manner in which BIA has designated particular Tribal officers to perform under that contract, qualify under 25 U.S.C. § 2804(a)."  United States v. Bettelyoun, 16 F.3d at 853.  The Criminal Pattern Jury Instructions for the Tenth Circuit describe, as § 111's second element, the status of the individual assaulted or otherwise suffered interference: "*Second*: the person [assaulted] [resisted] [opposed] [impeded] [intimidated] or [interfered with] was a federal officer who was then engaged in the performance of his official duty, as charged."  10th Cir. Crim. Pattern Jury Instr. § 2.09, at 84 (2018)(emphasis in original).  The Criminal Pattern Jury Instructions do not include instructions for § 1114, but § 111 references § 1114's language about "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)," and § 111 includes the same "while such officer or employee is engaged in or on account of the performance of official duties" language as § 1114.  18 U.S.C. §§ 111 and 1114.  The jury's responsibility for § 1114, thus, should be similar to that for § 111.

The Tenth Circuit has seldom considered the legal inquiry that is a court's responsibility -- whether the class of individuals are federal employees -- in the context of Tribal police officers.  The Tenth Circuit has addressed whether Tribal police officers are federal employees under 25 U.S.C. § 2804(f) in two cases.  See Dry v. United States, 235 F.3d 1249 (10th Cir. 2000); United States v. Smith, 194 F.3d 1321, 1999 WL 770217 (10th Cir. 1999)(unpublished table opinion).[32]

---

[32]United States v. Smith is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . [a]nd we

In <u>Dry v. United States</u>, the Tenth Circuit explained that § 2804(f) does not apply when Tribal police officers operate under a Tribe's criminal jurisdiction, <u>see</u> 235 F.3d at 1258, and, in <u>United States v. Smith</u>, the Tenth Circuit concluded that, under § 2804(f), the 638 contract made a Tribal police officer a federal employee, <u>see</u> 1999 WL 770217, at *1. Neither <u>United States v. Smith</u> nor <u>Dry v. United States</u> addresses 18 U.S.C. § 1114, but the same language governing whether Tribal police officers are federal employees for 18 U.S.C. § 1114 controls whether Tribal police officers are federal employees for 18 U.S.C. § 111[33] and the FTCA. In <u>Dry v. United States</u>, the Tenth

---

have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that <u>United States v. Smith</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[33] 18 U.S.C. § 111 prohibits "assaulting, resisting, or impeding certain officers or employees," and provides:

**(a) In general.** -- Whoever --

**(1)** forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or

**(2)** forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

Circuit considered, on an appeal from a summary judgment motion, whether Choctaw Nation Tribal police officers who arrested the plaintiffs while they were distributing literature were acting as federal law enforcement officers for the FTCA exception for such officers in § 2680(h). See 235 F.3d at 1251. The Tenth Circuit does not address the initial question whether the Tribal police officers were federal employees to whom the FTCA applied. The Tenth Circuit first concludes that the officers were acting under the Choctaw Nation's inherent criminal jurisdiction. See 235 F.3d at 1255. The Tenth Circuit interpreted the silence of the Choctaw Nation's Constitution on whether it retained criminal jurisdiction as effecting no waiver of the jurisdiction. See 235 F.3d at 1254 ("The Choctaw Nation's failure to explicitly describe the Nation's inherent criminal jurisdiction in its constitution did not (and, per Merrion[ v. Jicarilla Apache Tribe, 455 U.S. 130 (1982)], could not) effect a waiver of that power.") Having reached this conclusion, the Tenth Circuit rejects the plaintiffs' argument that 25 U.S.C. § 2804(f) made the Tribal police officers "federal law enforcement officers" for the FTCA exception in § 2680(h). 235 F.3d at 1258. The Tenth Circuit reasons that, under § 2804(f), Tribal police officers are only federal officers when "acting under authority granted by the Secretary," and, under § 2806(d), the ILERA does not alter "civil or criminal jurisdiction of the United States" or of American Indian Tribes. 235 F.3d at 1258. Because the Tenth Circuit concluded that the officers were acting under the "authority

---

**(b) Enhanced penalty.** -- Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111 (bold in original).

inherent in the Choctaw Nation's sovereignty," the Tenth Circuit determined that § 2804(f) does not bring their actions under the FTCA exception. 235 F.3d at 1258.

In United States v. Smith, the Tenth Circuit concluded that a Tribal officer assaulted while arresting an individual for "disorderly conduct" was a federal officer for 18 U.S.C. § 111, because the Tribal officer "was enforcing federal law on Tribal lands, as authorized by a [self-determination] contract between the [BIA] and the Osage Tribe." 1999 WL 770217, at *1. See Garcia v. United States, No. CIV 08-0295 JB/WDS, 2010 WL 2977611, at *4, *18 (D.N.M. June 15, 2010)(Browning, J.)(explaining that Isleta Police Department officers acting within the 638 contract would be federal employees covered by the FTCA); Allender v. Scott, 379 F. Supp. 2d at 1217-18 (treating Tribal police officers as federal employees when the Tribe had a 638 contract with the BIA and the Tribal police officers were enforcing state law).

In United States v. Smith, the Tenth Circuit cites the Eighth Circuit's decision in United States v. Young, 85 F.3d 334 (8th Cir. 1996). See United States v. Smith, 1999 WL 770217, at *1. In that case, the Eighth Circuit confronted whether a Rosebud Sioux Tribe police officer who was assaulted in an altercation was a federal officer for 18 U.S.C. § 111. See 85 F.3d at 335. The Rosebud Sioux Tribe had a self-determination contract with the DOI Secretary and, the Eighth Circuit reasons that, "under 25 U.S.C. § 2804(f), [persons with 638 contracts], though not otherwise federal employees, are employees of the Department of the Interior for purposes of § 111 of Title 18 when acting under authority granted by the Secretary under 25 U.S.C. § 2804(a)." 85 F.3d at 335. The Eighth Circuit notes that, while not every person employed by a Tribe with a self-determination agreement is a federal officer, the agreement in question included a provision allowing the Rosebud Sioux Tribe "to perform law-enforcement functions that would otherwise

be performed by BIA officers." 85 F.3d at 335. For the Eighth Circuit, because the officer was acting pursuant to the contract, he was a federal officer. See 85 F.3d at 335. The Eighth Circuit relies on United States v. Schrader, in reaching its decision. See 85 F.3d at 335.

In United States v. Schrader, the Eighth Circuit concluded that, where Tribal police officers "encountered defendants because they were engaged in law enforcement activities and were acting pursuant to a 638 contract," the officers were federal officers. 10 F.3d at 1350. The Eighth Circuit explains:

> When a 638 contract meets the definition of a § 2804(a) agreement, and when Tribal police officers designated under that contract enforce laws that BIA officers would otherwise enforce, § 2804(f) expressly provides that those Tribal police officers are afforded the same protection under 18 U.S.C. § 111 that Congress has afforded BIA employees. This is so regardless of whether the officer is enforcing a Tribal, state, or federal law, so long as he is engaged in the performance of his official duties rather than "a personal frolic of his own."

United States v. Schrader, 10 F.3d at 1350-51 (quoting United States v. Heliczer, 373 F.2d 241, 245 (2d Cir. 1967)).

More recently, in United States v. Janis, the Eighth Circuit rejected an argument that, because the Oglala Sioux Tribe retained inherent authority over Tribal law, it did not receive a delegation of law enforcement authority over such laws from the BIA, and a Tribal officer assaulted when he responded to individuals "consuming alcohol" in violation of Tribal law was not a federal officer for 18 U.S.C. § 111. 810 F.3d at 596. The Eighth Circuit rejected the defendant's argument that, "because no evidence showed that the OST [Oglala Sioux Tribe] ever authorized the BIA to enforce Tribal law, OST public safety officers like Mousseau enforce Tribal law pursuant to the Tribe's inherent authority rather than any delegation of enforcement authority from the BIA." 810 F.3d at 597. Quoting the 638 contract, the Eighth Circuit notes:

> [T]he Department of Public Safety "agree[d] to provide for the protection of lives and property for persons visiting or residing within the . . . Pine Ridge Indian Reservation." The contract required the department to "assist the [BIA], and other federal, Tribal and state law enforcement officials in the investigation of Tribal, state or federal offenses."

810 F.3d at 597-98. Because the Tribal law enforcement program operated under the contract, the Eighth Circuit concludes that the officers were federal employees for 18 U.S.C. § 111. 810 F.3d at 598. The Eighth Circuit reserves for the jury the question whether the officer was employed by the Tribal law enforcement program and engaged in official duties at the time of the assault. See 810 F.3d at 598 (citing United States v. Roy, 408 F.3d 484, 489 (8th Cir. 2005)).

In United States v. Roy, the Eighth Circuit clarified when a 638 contract grants authority to Tribal law enforcement programs sufficient to bring Tribal police officers under § 2804(f). The Eighth Circuit explains:

> [T]o constitute a proper delegation, the contract need only be "an agreement for the use . . . of the personnel or facilities of a Federal, Tribal, State, or other government agency" to aid in law enforcement in Indian Country and authorize that agency to perform some law enforcement activity that the Secretary could authorize the Bureau to perform under section 2803.

408 F.3d at 490. In determining whether the Tribal police officer in question was a federal employee, the Eighth Circuit relied on the jury's determination that he was. 408 F.3d at 491. But cf., Cabazon Band of Mission Indians v. Smith, 388 F.3d 691, 695-96 (9th Cir. 2004)(stating that "commissioned Tribal police officers are treated as federal employees under the Federal Tort Claims Act" without addressing non-commissioned Tribal police officers or 638 contracts); Boney v. Valline, 597 F. Supp. 2d at 1177 (noting, while discussing whether Tribal police officers acted under color of federal law, "[a]dditionally, nothing in the ISDA, or in relevant case law, suggests that the mere existence of a 638 contract between the BIA and a Tribe for the provision of law

enforcement services automatically confers federal law enforcement authority upon the officers in Tribal police departments"); Trujillo v. United States, 313 F. Supp. 2d at 1150 (stating, after noting that the parties agreed that the Tribal police officer was a federal employee for the FTCA's purposes, "[n]othing in the ISDA, or in relevant case law, suggests that the mere existence of a Public Law 93-638 contract between BIA and a Tribe for the provision of law enforcement services automatically confers federal law enforcement authority upon the officers in Tribal police departments").

In United States v. Tauz Abner Henderson, Judge Humetewa reached a conclusion different from the Eighth Circuit's and declined to find jurisdiction over a Tribal law enforcement officer without a SLEC under 18 U.S.C. § 111 and 1114. United States v. Tauz Abner Henderson Order at 10. Following the statutory language closely, she explains that the DOI Secretary confers authority on Tribal law enforcement officers, as necessary for § 2804(f) to apply, through SLECs, because 2804(a)(2) enables the DOI Secretary to grant individuals law enforcement authority; the subsections following 2804(a)(2) establish a SLEC plan, which includes training for SLEC candidates, creating SLEC agreements between federal and Tribal law enforcement agencies, and including language in each agreement to "reflect the status of the applicable certified individual as a Federal law enforcement officer under subsection (f)." United States v. Tauz Abner Henderson Order at 3-4 (quoting 25 U.S.C. § 2804(a)(3)(B)(iii), and citing 25 U.S.C.§ 2804(2)-(3)). Judge Humetewa secondarily focuses on the BIA regulations, citing 25 C.F.R. § 12.21, which distinguishes commissioned from non-commissioned Tribal law enforcement officers and states that "Tribal law enforcement officers operating under a BIA contract or compact are not automatically commissioned as Federal officers." United States v. Tauz Abner Henderson Order

at 5 (quoting 25 U.S.C. § 12.21(b), and citing 25 U.S.C. § 12.21(a)). Finally, Judge Humetewa considers the contracts between the BIA and the Navajo Nation. See <u>United States v. Tauz Abner Henderson</u> Order at 6. In explaining the contracts, she notes that the 638 contract provides that the Navajo Nation may engage in law enforcement activities and that the BIA may commission Tribal law enforcement officers. See <u>United States v. Tauz Abner Henderson</u> Order at 6. Further, as Judge Humetewa describes, the Deputation Agreement states that the BIA may commission Tribal law enforcement officers to assist the BIA, that such officers will have the authority to enforce federal law, and that such officers will be treated as federal employees for the FTCA's purposes when acting under the SLEC. See <u>United States v. Tauz Abner Henderson</u> Order at 6-7. According to Judge Humetewa, a later deputation agreement limits the Tribal law enforcement officers to whom 2804(f) applies, explaining that the subsection applies only to those officers acting under SLECs. See <u>United States v. Tauz Abner Henderson</u> Order at 7. As determining that all Tribal law enforcement officers are federal employees would ignore 25 C.F.R. § 12.21 and the deputation agreement, Judge Humetewa declined the United States' invitation to reach such a conclusion. See <u>United States v. Tauz Abner Henderson</u> Order at 8. Further, Judge Humetewa rejects the proposition that law enforcement in the Navajo Nation is a federal function, because the Navajo Nation has inherent criminal jurisdiction over its territory. See <u>United States v. Tauz Abner Henderson</u> Order at 9. Accordingly, Judge Humetewa determines that the Tribal law enforcement officer in question, who did not have an SLEC, is not a federal employee for § 2804(f)'s purposes, and that her court lacked jurisdiction over the charge. See <u>United States v. Tauz Abner Henderson</u> Order at 9-10.

## THE ILERA'S LEGISLATIVE HISTORY

As mentioned in the ISDA's Legislative History Section, if possible, the Court interprets statutes according to the statutory text's plain meaning and structure. While the Court would, if writing on a clean slate, stop there, see Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell, 263 F. Supp. 3d at 1119, the Court is a district court, and many members of the Supreme Court still look at legislative history. The Court, thus, looks to legislators' purpose when ambiguities remain in the statutory text. See Lane v. Page, 272 F.R.D. 581, 593 (D.N.M. 2011)(Browning, J.)("In determining the proper interpretation of a statute, this court will look first to the plain language a statute and interpret it by its ordinary, common meaning. If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words." (quoting Holster v. Gatco, Inc., 559 U.S. 1060, 1060 (2010))); Scalia & Garner, supra, at 20. The Court grants committee reports special weight when determining this purpose. See Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside -- An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 977 fig.8 (2013). To understand the committee reports' context, the Court here also examines relevant hearing testimony and debate statements.

Before the ILERA's passage, no statute explicitly granted the BIA authority to engage in law enforcement activities on Tribal property. See, e.g., S. Rep. No. 101-167, at 5 (1989). The BIA based its authority on implicit authorizations contained, frequently, in appropriation statutes with language such as "[f]or maintaining law and order on Indian reservations." H.R. Rep. No.

101-60, at 5 (1989). The BIA also relied on the Snyder Act, 25 U.S.C. § 13,[34] which provides

funds for multiple purposes, including for "the employment of inspectors, supervisors,

superintendents, clerks, field matrons, farmers, physicians, Indian police, Indian judges, and other

employees"; 18 U.S.C. § 3055,[35] which grants officers law enforcement powers for controlling

liquor sales, and 25 U.S.C. § 200,[36] which provides for reporting an American Indian's

[34]The Snyder Act provides:

> The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:
>
> . . . .
>
> For the employment of inspectors, supervisors, superintendents, clerks, field matrons, farmers, physicians, Indian police, Indian judges, and other employees.

25 U.S.C. § 13.

[35]The statute's text states:

> The chief special officer for the suppression of the liquor traffic among Indians and duly authorized officers working under his supervision whose appointments are made or affirmed by the Commissioner of Indian Affairs or the Secretary of the Interior may execute all warrants of arrest and other lawful precepts issued under the authority of the United States and in the execution of his duty he may command all necessary assistance.

18 U.S.C. § 3055.

[36]Section 200 provides:

> Whenever an Indian shall be incarcerated in an agency jail, or any other place of confinement, on an Indian reservation or at an Indian school, a report or record of the offense or case shall be immediately submitted to the superintendent of the reservation or such official or officials as he may designate, and such report

incarceration on a reservation or in an "Indian school" to Tribal officials.  See, e.g., H.R. Rep. No. 101-60, at 5.

The BIA was commissioning Tribal police officers and contracting with Tribal law enforcement programs before Congress enacted the ILERA.  See, e.g., S. Rep. No. 101-167, at 5. At the Law Enforcement Reform Act: Hearing Before the Senate Select Committee on Indian Affairs, 101st Cong. (1989)("Senate ILERA Hearing"), the Senate Select Committee on Indian Affairs determined that, at the time -- 1989, the BIA employed around 503 officers, for 163 Tribal areas, in twenty-three states.  See S. Rep. No. 101-167, at 5; Senate ILERA Hearing at 23 (Walter R. Mills, Acting Deputy to the Assistant Secretary of Indian Affairs, United States Department of the Interior).  American Indian Tribes employed around 900 officers, around 700 of whom the BIA had specially commissioned.  See S. Rep. No. 101-167, at 5; Senate ILERA Hearing at 23 (Walter R. Mills, Acting Deputy to the Assistant Secretary of Indian Affairs, United States Department of the Interior).  The ISDA provided grounds for Tribal authorities to contract with the BIA for law enforcement authority.  H.R. Rep. No. 101-60, at 11; Senate ILERA Hearing at 20 (Philip N. Hogen, United States Attorney, District of South Dakota, Sioux Falls, South Dakota)(explaining that the BIA contracted for Tribal law enforcement after ISDA's passage); Senate ILERA Hearing at 35 (Ed Reina, Jr., Chief, Law Enforcement Program, Salt River Indian Community, Phoenix, Arizona)(describing over twenty years of 638 contracts for law enforcement authority).  At the Senate ILERA Hearing, for instance, testifiers assumed the 638 contract's authorizations for the

---

shall be made a part of the records of the agency office.

25 U.S.C. § 200.

Tribal law enforcement agencies; people debated the relationships between Tribal and federal law enforcement agencies, rather than the Tribal law enforcement agencies' authority. See Senate ILERA Hearing at 21, 24 (Stephen M. McNamee, United States Attorney, District of Arizona, Phoenix, Arizona)(stating that, after the ISDA's passage, Arizona encouraged 638 contracts for law enforcement and describing 638 contracts as a means to extend Tribal sovereignty); Senate ILERA Hearing at 13 (Hogen)(describing that his office prosecutes crimes brought to it by BIA officers and Tribal officers); Senate ILERA Hearing at 23 (Mills)(stating that Tribal law enforcement agencies with 638 contracts have "done an excellent job").

Legislators stressed that the ILERA would clarify the BIA's law enforcement authority, not that it would grant such authority. See, e.g., H.R. Rep. No. 101-60, at 5; S. Rep. No. 101-167, at 6. The House Committee on Interior and Insular Affairs wrote: "The bill, which was submitted by executive communication to the Congress during the 100th Congress, addresses the authority question by authorizing the Secretary to charge an officer or employee of the Department of the Interior with law enforcement responsibilities and by delineating specific authorities of such personnel." H.R. Rep. No. 101-60, at 5. The Senate Select Committee on Indian Affairs copied the language. See S. Rep. No. 101-167, at 6. Likewise, in the House Floor Debates, Representative George Miller of California argued: "The bill is needed because the existing law enforcement authorities under which the Bureau of Indian Affairs operates are not sufficiently clear, explicit, or comprehensive." 135 Cong. Rec. 10,031 (1989)(Miller). See 135 Cong. Rec. 10,031 (Rhodes)("H.R. 498 would clarify and strengthen the Interior/Bureau of Indian Affairs to engage in law enforcement activities in Indian country."); Senate ILERA Hearing at 1 (Sen. Daniel Inouye, Chairman, S. Select Committee on Indian Affairs)("The intent of this bill is to provide greater

clarity with respect to the authority of BIA police officers, or programs operated by the Tribes under contracts with the Bureau; better protection and benefits to those serving as Indian police officers; and enhancement of training programs for the Indian Police Service.").

Legislators worried that, without explicit authority to undertake law enforcement activities, individuals acting under the BIA's purported authority would face jurisdictional problems and individual liability for their actions. See S. Rep. No. 101-167, at 5. According to the Senate Select Committee on Indian Affairs, "many of the problems of law enforcement programs in Indian country resulted from the lack of clear statutory authority for the law enforcement functions of the Bureau of Indian Affairs on Indian reservations and in Indian country." S. Rep. No. 101-167, at 5. The House Committee on Interior and Insular Affairs stated: "Without explicit statutory authority for the BIA to carry out these law enforcement functions, a court could decide that BIA officers lack the authority to carry firearms and make arrests. Thus, these officers could be exposed to lawsuits alleging they are personally liable for unauthorized law enforcement actions." H.R. Rep. No. 101-60, at 5. See S. Rep. No. 101-167, at 5 ("Without express statutory authority to carry out these functions, BIA law enforcement authority could be challenged in the courts and BIA officers could be subject to suit and held personally liable for their actions."); 135 Cong. Rec. 10,031 (1989)(Rhodes)("[B]ecause these laws do not provide clearly stated and comprehensive statutory authorities, the BIA law enforcement officers run the risk of having their authority successfully challenged in court and of being found liable for unauthorized law enforcement actions."). The BIA's implicit authority contrasted with similar law enforcement agencies' explicit authorizations, and the difference highlighted the potential for liability. See S. Rep. No. 101-167, at 5 ("In comparison, other federal agencies charged with performing law enforcement functions

have explicit statutory authority which delineates their powers and duties. For example, title 8 of the United States Code provides explicit authority for Federal Bureau of Investigation officers to carry firearms and to make arrests . . . ."); H.R. Rep. No. 101-60, at 5 ("A successful challenge of such authority might be possible because the statutes codified in title 8 of the United States Code that delineate the powers of other Federal law enforcement officers . . . all provide explicit authority for those officers to carry arms and to make arrests.").

The ILERA purportedly did not change the BIA's or Tribal law enforcements agencies' authority for law enforcement; rather than change existing BIA and Tribal roles, the ILERA clarified the authority that legislators understood the BIA to possess. See, e.g., H.R. Rep. No. 101-60, at 6. The House Committee on Interior and Insular Affairs clarified that the ILERA did not change existing jurisdictional lines: the ILERA "also contains a section clarifying that the bill does not alter the civil or criminal jurisdiction of an Indian Tribe, State or political subdivision or agency." H.R. Rep. No. 101-60, at 6. Similarly, the Senate Select Committee on Indian Affairs Report acknowledged Tribal criminal jurisdiction. See S. Rep. No. 101-167, at 6 ("Intrinsic to the sovereignty of Indian Tribes is the power of a Tribe to create and administer a criminal justice system. Indian Tribal police forces have long been an integral part of such systems."). The bill's title, "Clarifying and Strengthening the Authority for Certain Departments of Inferior Law Enforcement Services, Activities, and Officers in Indian Country . . . ," reflects the goal to specify, rather than to alter, the BIA's authority. Indian Law Enforcement Reform Act, H.R. 498, 101st Cong. (1st Sess., 1989). The Congressional Budget Office emphasized the status quo's maintenance when it wrote: "H.R. 498 would provide a statutory foundation for the ongoing law enforcement activities of the Bureau of Indian Affairs (BIA) on Indian reservations and in Indian

country.  The functions authorized in the bill are already undertaken by the BIA under various less comprehensive authorities."  H.R. Rep. No. 101-60, at 10.

The legislative history contains little language directly addressing § 2804(f).  The House Committee on Interior and Insular Affairs and Senate Select Committee on Indian Affairs Reports paraphrase the section using the same language:

> Subsection (f) provides that non-Federal personnel under any agreement under  this section shall be considered an employee of the Department of Interior only for purposes of section 3374(c)(2) of title 15, U.S.C., relating to assignments of employees from State, Tribal, or local governments; sections 111 and 1114 of title 18, U.S.C., relating to assaulting or killing Federal officials or employees, and subchapter III of chapter 81 to title 5, U.S.C., relating to work  injury compensation for law enforcement officers not employed by the United States.

H.R. Rep. No. 101-60, at 8; S. Rep. No. 101-167, at 11.  The legislative history is similarly quiet about authorizing the Secretary to enter agreements for law enforcement authority with Tribes, likely because the legislators understood such contracts to already exist.  The Committee Reports summarized the subsection briefly:

> Subsection (a) authorizes the Secretary to enter into agreements for the use of personnel or facilities of a Federal, Tribal, state or other governmental agency to aid in the enforcement of Federal criminal law, and Tribal law where the Tribe has consented, within Indian country.  The Secretary may authorize such personnel to perform those functions set out in section 4.

H.R. Rep. No. 101-60, at 8; S. Rep. No. 101-167, at 10.  The House Committee on Interior and Insular Affairs paraphrased the section in similar terms early in its report:

> The bill also authorizes the Secretary to enter into agreements for the use of the personnel and facilities of a Federal, Tribal, State or other government agency to assist in the enforcement of Federal laws or Tribal laws, if requested by the Tribe, in Indian country.  Under these agreements, law enforcement officers of such agencies could be authorized to take any action otherwise authorized for BIA law enforcement officers.  Agreements would have to meet guidelines established by the Secretary and the Attorney General.

H.R. Rep. No. 101-60, at 5. Rationalizing criminal investigation work's exemption from 638 contracting, the House Committee on Interior and Insular Affairs suggested that those working under 638 contracts were not federal employees when it commented on the relationship between 638 contracts and federal official status, worrying that contract criminal investigators would lose that status: "Investigative personnel operating under Tribal supervision under a '638 contract' might well lose their status as Federal Law enforcement officials . . . ." H.R. Rep. No. 101-60, at 6.

In the House Committee on Interior and Insular Affairs and Senate Select Committee on Indian Affairs reports, professionalizing the BIA and Tribal law enforcement agencies receives more attention than how the BIA granted authority to Tribal law enforcement agencies, or such authority's relationship to the FTCA, worker's compensation, or 18 U.S.C. §§ 111 and 1114. The House Committee on Interior and Insular Affairs argues for centralizing investigation authority in the BIA in Washington, D.C. to "professionalize" the service. H.R. Rep. No. 101-60, at 6. The report also emphasizes requiring standards and pay for BIA personnel equivalent to that other law enforcement agency personnel earned, see H.R. Rep. No. 101-60, at 6, and ensuring communication between federal and Tribal law enforcement agencies to ensure prosecution of those criminal cases that the federal agencies decline to prosecute, see H.R. Rep. No. 101-60, at 7. The Senate Committee on Indian Affairs Report similarly expresses a desire to make training and pay for BIA law enforcement officials equivalent to that of other law enforcement officials:

> Section 3(e)(1) directs the Secretary to establish appropriate standards of education, experience, training and other relevant qualifications for law enforcement personnel of the Division of Law Enforcement Services who are charged with law enforcement responsibilities pursuant to Section 4. The Committee is concerned that the standards established by the Secretary should be comparable to the standards of other Federal law enforcement officers, and believes that the training

and educational standards of the United States Marshals Office would provide an appropriate guide to establishment of standards for BIA law enforcement officers.

S. Rep. No. 101-167, at 7-8.

The Investigation and Prosecution of Federal Crimes on Indian Reservations Hearing before the House Committee on Interior and Insular Affairs, 101st Congress (1989)("House ILERA Hearing"), similarly focused on personnel, professionalism, budgetary concerns, and practical relationships between various agencies. See, e.g., House ILERA Hearing at 124 (William Rhodes, Lieutenant Governor, Gila River Indian Community Council)(discussing training and budgetary concerns); House ILERA Hearing at 126 (Carlton Giff, Tribal Councilman, Sixth District of Gila River Indian Community)(describing problems with the Federal Bureau of Investigation ("FBI") declining to investigate major crimes on Tribal lands); House ILERA Hearing at 153 (Jerry W. Doyle, Jr., Supervisory Special Agent and Program Coordinator for Crimes on Indian Reservations)(expressing reservations about the quality of Tribal law enforcement agencies' investigation work); House ILERA Hearing at 163 (Daniel J. Eddy, Jr., Chairman, Colorado River Tribal Council William Rhodes, Lieutenant Governor, Gila River Indian Community Council)(identifying problems with funding and communication for investigations); House ILERA Hearing at 173 (Gilbert Jones, Tribal Council Member and Executive Director of the Tribal Housing Authority, Fort Mcdowell Reservation of the Mahave-Apache Community)(identifying lack of FBI and BIA personnel as a problem facing Tribes); House ILERA Hearing at 180 (Buck Kitcheyan, Chairman, San Carlos Tribal Council)(complaining about inadequate law enforcement resources). Ivan Sidney, the Chairman for the Hopi Tribal Council, spoke to concerns about the statutory authority for BIA law enforcement before the ILERA's passage and the desire for Tribal authority over law enforcement

matters.  House ILERA Hearing 82 (Sidney).  <u>See</u> House ILERA Hearing at 94 (Wilbur Kellogg, Jr. Chief of Police, Navajo Nation)(emphasizing similarly the need to contract for criminal investigations for Tribal sovereignty).  McNamee described that his office changed guidelines for investigations "due in large measure to the Navajo Tribal Police Department taking over the law enforcement responsibilities from the B.I.A."  House ILERA Hearing at 14 (McNamee).  Edward Reina, the Chief of Police for the Salt River Pima-Maricopa Indian Community, speaking on the Intertribal Council of Arizona's behalf, discussed the need for knowledgeable individuals in law enforcement positions.  <u>See</u> House ILERA Hearing at 11 (Reina).  For Senate ILERA Hearing discussions about professionalism, <u>see</u> Senate ILERA Hearing at 18-19 (Hogen)(describing decentralized law enforcement authority under the BIA); Senate ILERA Hearing at 21 (McNamee)(requesting increased standards for law enforcement under 638 contracts); Senate ILERA at Hearing 27 (Hogen)(encouraging law enforcement line authority, with authority centered in Washington, D.C., because the BIA should be "a professional law enforcement organization").

Concerns about the ILERA and changes to the ILERA after referral to the Senate centered around whether Congress would except criminal investigative functions from those activities contractible under the ISDA and whether the ILERA infringed on Tribes' inherent, sovereign criminal jurisdiction.  <u>See, e.g.</u>, S. Rep. No. 101-167, at 6.  Several Tribes expressed opposition to exempting criminal investigation from 638 contracting, and federal officers offered mixed experiences with working with Tribal criminal investigators.  <u>See, e.g.</u>, Senate ILERA Hearing at 13 (Sen. John McCain, Member, S. Select Comm. on Indian Affairs)(explaining that several Tribes expressed concerns about exempting criminal investigations from 638 contracts); Senate ILERA

Hearing at 32 (Hon. Manuel, Chief Judge, Tohono O'Odham Judiciary, Sells, Arizona)(objecting to eliminating criminal investigation contracting); Senate ILERA Hearing at 35 (Herb Yazzi, Attorney General, Navajo Nation Department of Justice, Window Rock, Arizona)(same); Senate ILERA Hearing at 42 (Major George John, Acting Chief of Police, Navajo Nation, Window Rock, Arizona)(same); Senate ILERA Hearing at 23 (Walter R. Mills, Acting Deputy to the Assistant Secretary of Indian Affairs, Department of the Interior)(admitting no problem with contracting with Tribal law enforcement agencies for criminal investigation if the investigation work is of sufficient quality); Senate ILERA Hearing at 20 (Hogen)(describing problems with criminal investigations undertaken under 638 contracts); Senate ILERA Hearing 35 (Reina)(same); Senate ILERA Hearing at 43-44 (Don Bleakney, Administrator, Law and Justice Committee, Colville Confederated Tribes)(same).  At the Senate ILERA Hearing, several people testified that they did not understand the proposed ILERA to undermine Tribal sovereignty.  See, e.g., Senate ILERA Hearing at 42 (John)(opining that the ILERA would not reduce the Navajo Nation's law enforcement authority); Senate ILERA Hearing at 45 (Gene Joseph, Chairman, Colville Legislative Comm., Colville Environmental Quality Commission, Colville Confederated Tribes, Nespelem, Washington)(describing the BIA as an adjunct to Tribal law enforcement).  Multiple Tribes opposed, however, centralizing authority over the BIA and contracting Tribal law enforcement agencies in Washington, D.C. and enabling the BIA to contract with authorities' other than the Tribes for law enforcement activities on Tribal lands.  See, e.g., Senate ILERA Hearing at 35 (Yazzi)(opining that establishing a line of authority to Washington, D.C. would be ineffective); Senate ILERA Hearing at 46 (Alvino Lucero, President, Isleta Pueblos Tribal Council, Isleta Pueblos, New Mexico)(objecting to centering authority in Washington, D.C. and

allowing the BIA to contract with third parties for law enforcement on Tribal lands); Senate ILERA Hearing at 46 (R. Bruce Haley, United States Deputy Special Officer, Bureau of Indian Affairs, Bellingham, Washington)(same). The Senate Select Committee on Indian Affairs responded to these concerns by removing the sections of the House bill exempting criminal investigations from 638 contracts, eliminating the language establishing line authority, and disallowing the BIA from contracting with law enforcement agencies other than the Tribe's on Tribal lands without Tribal permission. See S. Rep. No. 101-167, at 6.

## LAW REGARDING TRIBAL LAW ENEFORCEMENT JURISDICTION

25 U.S.C. § 1301(2) provides:

> [P]owers of self-government" means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians.

25 U.S.C. § 1301. "It is undisputed that Indian tribes have power to enforce their criminal laws against tribe members." Dry v. United States, 235 F.3d at 1254 (internal quotation marks omitted)(quoting United States v. Wheeler, 435 U.S. 313, 322 (1978), and citing Montana v. United States, 450 U.S. 544, 563 (1981)). The power to enforce Tribal law is "inherent in tribal sovereignty." Dry v. United States, 235 F.3d at 1254 (citing 25 U.S.C. § 1301(2); United States v. Wheeler, 435 U.S. at 322–23). "Indian tribes continue to possess all aspects of sovereignty not withdrawn by treaty or statute, or 'by implication as a necessary result of their dependent status.'" Dry v. United States, 235 F.3d at 1254 (quoting United States v. Wheeler, 435 U.S. at 323). A Tribal constitution's silence about criminal jurisdiction does not waive the Tribe's inherent criminal jurisdiction. See Dry v. United States, 235 F.3d at 1255-56. Tribal law enforcement

officers enforcing Tribal laws against Tribal members are acting within inherent criminal jurisdiction. See Dry v. United States, 235 F.3d at 1255.

## ANALYSIS

Based upon the record presented to the Court, the Court concludes that, under the Self-Determination Contract, a Tribal officer without an SLEC does not have authority from the Secretary to enforce federal laws, and so is not a federal employee for § 2804(f)'s purposes. As § 2804(f) allows § 1114 -- which criminalizes killing federal officers -- to apply, if a Tribal officer without a SLEC is not a federal employee for § 2804(f), the Court must dismiss Counts 1 and 5 against Cleveland. The Court does not, however, have sufficient information to determine definitively whether the Navajo Nation allowed the BIA to enforce Tribal law, which would enable the Secretary to authorize both federal and Navajo Nation law enforcement activity, and bring Tribal officers enforcing Tribal law under § 2804(f) and, consequently, criminalize killing such Tribal officers under § 1114. Accordingly, the Court will allow the parties to submit additional information on this topic. If, as is most likely the case, the Navajo Nation did not authorize the BIA to undertake Tribal law enforcement activities, a Tribal officer without an SLEC, like Largo, is not a federal employee for § 2804(f)'s purposes, and through § 2804(f), for § 1114's purposes, and the Court will dismiss Counts 1 and 5.

Contrary to the parties' suggestions, see Motion at 3; Response at 8-9, the Court need not and should not decide whether Largo was engaged in federal, official duties. Whether Largo was engaged in federal, official duties for § 1114's purposes is a question of fact for the jury. See United States v. Martin, 163 F.3d at 1214. The Court need only answer whether the class of

individuals to which Largo belonged are federal employees.  See United States v. Martin, 163 F.3d at 1214.

As an initial matter, the question turns on how the Secretary grants authority under § 2804(a).  As Judge Humetewa notes, § 2804(a)(2) provides: "the Secretary may authorize a law enforcement officer of such an agency to perform any activity the Secretary may authorize under section 2803 . . . ."  25 U.S.C. § 2804(a)(2).  See United States v. Tauz Abner Henderson Order at 3-4.  Nothing in the statute clarifies, however, how the Secretary confers authority.  See United States v. Tauz Abner Henderson Order at 3.  Taking together the Eighth and Tenth Circuit cases and Judge Humetewa's opinion in United States v. Tauz Abner Henderson, in determining whether the Secretary has "authorized" Tribal officers, the Court should begin its analysis in one of two places -- the SLECs or the 638 contract.

The Court treats the Tenth Circuit's unpublished decision in United States v. Smith as highly persuasive in determining the Court should begin its inquiry.  In United States v. Smith, the Tenth Circuit suggested that "the authority granted in 25 U.S.C. § 2804(a)" resulted from a 638 contract.  1999 WL 770217, at *1.  The Tenth Circuit described that the officer "was acting under the authority granted in 25 U.S.C. § 2804(a)," and that he "was enforcing federal law on tribal lands, as authorized by a contract between the Bureau of Indian Affairs and the Osage tribe pursuant to 25 U.S.C. § 450(h) (638 contract) and 25 U.S.C. § 2804(a)."  1999 WL 770217, at *1.  The Tenth Circuit does not mention SLECs.  The Court reads this analysis to tie the authority provided by § 2804(a)(2) to the agreement between the BIA and the Tribe under § 2804(a)(1), which parallels 638 contracts in authorizing Tribes to undertake traditionally BIA activities.  The Tenth Circuit's citation in United States v. Smith to United States v. Young supports this reading.

The Eighth Circuit in <u>United States v. Young</u> uses broad language grouping the personnel for whose aid the BIA enters into an agreement with the persons that § 2804(f) designates as federal employees. 85 F.3d at 335. <u>United States v. Young</u>, in turn, relies on <u>United States v. Schrader</u>'s statement that all employees under 638 contracts are deemed federal employees under § 2804(f). See <u>United States v. Young</u>, 85 F.3d at 335; <u>United States v. Schrader</u>, 10 F.3d at 1350-51.

As the Court follows the Tenth Circuit's opinion in <u>United States v. Smith</u>, the Court declines to read the statute as establishing SLECs as the means by which the Secretary authorizes Tribal officers, as Judge Humetewa did.[37] See <u>United States v. Tauz Abner Henderson</u> Order at 10. Further, the Court disagrees with Judge Humetewa's interpretation. Judge Humetewa relies on § 2804(a)(3), which follows § 2804(a)(2)'s authorization to the Secretary, to conclude that "the authority granted by the Secretary under subsection (a) is tied to the establishment of special law enforcement commissions, as well as the special law enforcement commission agreements referred to in § 2804(a)(3)(b)." <u>United States v. Tauz Abner Henderson</u> Order at 4. Nothing in § 2804(a)(3) indicates that the Secretary transfers authority through SLECs. Rather, § 2803(a)(3)'s title, "Program Enhancements," reflects that the provisions are addenda to the Secretary's authorization to enter agreements and confer authority rather than the recipe for conveying such authority. 25 U.S.C. § 2803(a)(3). Additionally, the Court is unconvinced by Judge Humetewa's citation to

---

[37]The Court believes that the Tenth Circuit's interpretation is better; the agreement entered by the BIA and a Tribe pursuant to § 2804(a) should be the starting point in inquiring what authority the Secretary has conferred and to whom the Secretary has conferred that authority. As the Court explains below in the Analysis section starting at page 115, starting with the contract does not mean that any Tribal officer acting under the 638 contract is a "federal employee" for § 2804(f). That § 2804(a) contemplates that the Secretary might authorize federal and Tribal law enforcement suggests that the 638 contract, which might authorize federal and Tribal law enforcement activities, rather than the SLEC, which authorizes United States law enforcement activities, see 25 C.F.R. § 12.21, defines the authority that the Secretary grants to a Tribe.

§ 2804(a)(3)(B)(ii), which states: "Each agreement entered into pursuant to this section shall reflect the status of the applicable certified individual as a Federal law enforcement officer under subsection (f)." 25 U.S.C. § 2804(a)(3)(B)(ii).  See United States v. Tauz Abner Henderson Order at 4.  Although the provision appears to link § 2804(f) with SLECs, as the word "certified" references the "certification" process for SLECs that (A)(i) and (ii) mention, 25 U.S.C. § § 2804(a)(3)(A)(i)-(ii), the provision states only a requirement that agreements identify § 2804(f)'s applicability, and not that § 2804(f) applies only to "certified individuals."  25 U.S.C. § 2804(a)(3)(B)(ii).  The regulation that the Plaintiffs and Judge Humetewa cite -- 25 C.F.R. § 12.21(B) -- although it focuses on commissions, likewise does not identify commissions as the method by which the Secretary conveys authority to Tribal officers.  See Motion at 8; United States v. Tauz Abner Henderson Order at 4.  The regulation also does not speak directly to § 2804(f); it uses the term "federal officer" rather than § 2804(f)'s "federal employee."  25 C.F.R. § 12.21(b).[38]

Legislative history and analogous ISDA provisions support the Court's conclusion. See, e.g., H. Rep. No. 101-60, at 8; S. Rep. No. 101-167, at 11.  The language summarizing § 2804(f) in the Senate Committee on Indian Affairs and House Committee on Internal and Insular Affairs Reports supports this conclusion.  See H.R. Rep. No. 101-60, at 8; S. Rep. No. 101-167, at 11.  The language references "non-Federal personnel under any agreement under this section." H.R. Rep. No. 101-60, at 8; S. Rep. No. 101-167, at 11.  "[A]ny agreement" denotes agreements between the United States and other governmental entities -- state, local, and Tribal -- because § 2804's crux is the BIA's ability to enter aid agreements with other law enforcement agencies.

---

[38]Because the Court concludes that 25 C.F.R. § 12.21(b) does not directly speak to § 2804(f), the Court need not, as Cleveland argues, conclude that the BIA, in issuing 25 C.F.R. § 12.21(b), reached an unreasonable interpretation of the ILERA.  See Reply at 6.

H.R. Rep. No. 101-60, at 8; S. Rep. No. 101-167, at 11. Further, that Congress -- in 1990 and 1991 -- extended FTCA coverage to all activities undertaken according to 638 contracts, indicates a Congressional tendency toward providing federal coverage for activities that Tribes undertake in lieu of the federal government. Pub. L. 101-512, 104 Stat. 1959 (1990), as amended Pub. L. 103-138, 107 Stat. 1416 (1993). Reading 25 U.S.C. § 2804(f), which also brings the authorized persons under the FTCA, to tie potential FTCA coverage to 638 contracts aligns liability coverage for the activities undertaken pursuant to § 2804 with that for activities undertaken pursuant to other 638 contracts.

That the Court begins its inquiry about the authority granted Tribal officers with the Self-Determination Contract, however, does not mean that all employees under the NDPS, which operates under the Self-Determination Contract, are federal employees for § 2804(f)'s purposes. See United States v. Young, 85 F.3d at 335 ("It is doubtless true . . . that not every person employed to carry out a 'Public Law 638 contract' fits this definition.") See also United States v. Bettelyoun, 16 F.3d at 853 (asking "whether the Tribal contract, and the manner in which BIA has designated particular Tribal officers to perform under that contract, qualify under 25 U.S.C. § 2804(a)"); Trujillo v. United States, 313 F. Supp. 2d at 1150-51 (inquiring whether the "particular contract under which the services are carried out" to determine whether Tribal officers are United States "law enforcement officers" under § 2680(h) of the FTCA). Contrary to the United States' assertions that, before the ILERA, the United States employed Tribal officers, does not mean that all Tribal officers acting for an agency with a 638 contract are federal employees. See Response at 5. The United States' references to the Snyder Act and liquor suppression officers fail to note that both Acts provided for granting Tribal officers authority -- the Snyder Act provides funds for

"employing" Tribal officers, 25 U.S.C. § 13, and the liquor suppression statute provides for conferring authority to "special officers," 25 U.S.C. § 200.  <u>See</u> Response at 5.  The Court likewise is unconvinced by the United States' citation to <u>Hopland Band of Pomo Indians v. Norton</u>, 324 F. Supp. 2d at 1073.  That the Senate removed the exemption of criminal investigative functions from 638 contracts does not mean that Tribal officers before the ILERA were federal employees; in choosing to remove the provision, the Senate could have weighted factors such as the "exemplary fashion" in which Tribal criminal investigative agencies "had been run," <u>Hopland Band of Pomo Indians v. Norton</u>, 324 F. Supp. 2d at 1073 (quoting S. Rep. No. 101-167, at 6), more heavily than investigative officers' "federal law enforcement," <u>Hopland Band of Pomo Indians v. Norton</u>, 324 F. Supp. 2d at 1073 (quoting H.R. Rep. No. 101-60, at 6).  The Court declines to read the United States' argument into the Senate's silence on the Tribal officers' federal employee status.

More importantly, while <u>United States v. Smith</u> does not directly address what authority the Secretary can grant Tribes -- the Tenth Circuit in <u>United States v. Smith</u> specifies that the officer in the case "was enforcing federal law on tribal lands" and does not address whether the officer was, in fact, enforcing a federal statutes or whether the Secretary could authorize Tribes to enforce Tribal law -- in <u>Dry v. United States</u>, decided one year after <u>United States v. Smith</u>, the Tenth Circuit recognized that, when a Tribal law enforcement officer acts under a tribe's inherent criminal jurisdiction, the officer is not considered a federal employee under § 2804(f).  <u>See</u> 235 F.3d at 1258.  Although the Tenth Circuit makes this statement when analyzing whether Tribal officers were "law enforcement officers" for § 2680(h)'s exception to the FTCA, the statement clarifies when § 2804(f) applies.  <u>See</u> 235 F.3d at 1258.  Here, the Tenth Circuit deviates from the

Eighth Circuit, which declares that 638 contracts authorized all law enforcement activity -- federal, state, local, or tribal. See United States v. Schrader, 10 F.3d at 1350-51. The Tenth Circuit's position, however, aligns with § 2804(a)(1), which differentiates between authorizing Tribal law enforcement agencies to enforce United States laws and authorizing Tribal law enforcement agencies to enforce Tribal laws, noting that the Secretary may authorize a Tribal law enforcement agency to enforce Tribal laws if the Tribe "has authorized the Secretary to enforce tribal laws." 25 U.S.C. § 2804(a)(1). BIA regulations, which the Court finds persuasive, similarly provide that: "BIA officers will enforce tribal laws only with the permission of the tribe." See 25 C.F.R. § 12.22. Other district courts have differentiated between Tribal officers' authority to enforce United States laws and Tribal officers' authority to enforce Tribal laws in determining whether the officers are "law enforcement officers" for the FTCA. 28 U.S.C. § 2680(h). In Boney v. Valline, the Honorable Robert C. Jones, United States District Judge for the District of Nevada, notes:

> A tribal officer is only considered to be a federal employee for FTCA purposes "[w]hile acting under authority granted by the Secretary [of the Interior]" (see 25 U.S.C. § 2804(f)) and a tribal officer is not acting in such capacity when he is enforcing tribal (not federal) law and is doing so without having received a SLEC from the BIA.

Boney v. Valline, 597 F. Supp. 2d at 1181 See Trujillo v. United States, 313 F. Supp. 2d at 1150 ("Nothing in the [ISDA], or in relevant case law, suggests that the mere existence of a Public Law 93-638 contract between BIA and a tribe for the provision of law enforcement services automatically confers federal law enforcement authority upon the officers in tribal police departments.").

Looking to the relevant contracts between the BIA and the Navajo Nation, the Court notes that the agreements contemplate authority to enforce both United States and Tribal laws. See Self-

Determination Contract ¶ A(2), at 1; Annual Funding Agreement ¶A(1), at 1; Statement of Work ¶ 101(B), at 1. The Self-Determination Contract, the Navajo Nation's 638 contract, transfers "law enforcement-patrol services" from the BIA to the Navajo Nation. Self-Determination Contract ¶ A(2), at 1. The Self-Determination Contract also incorporates the annual funding agreement, <u>see</u> Self-Determination Contract ¶ B(4), at 2, which defines the scope of the Navajo Nation's law enforcement-patrol services according to the Statement of Work, <u>see</u> Annual Funding Agreement ¶A(1), at 1. The Statement of Work describes a variety of work within the Navajo Nation's Scope of Work, including "enforcing applicable Navajo Nation and federal laws and ordinances." Statement of Work ¶ 101(B), at 1.

As neither party has submitted evidence demonstrating whether the Navajo Nation waived its inherent criminal jurisdiction -- through treaty or statute -- or whether the Navajo Nation authorized the BIA to enforce its laws, the Court lacks sufficient evidence to definitively determine whether the Navajo Nation has retained its inherent criminal jurisdiction, and thus whether the Secretary could authorize a Tribal Law Enforcement Officer to enforce Tribal law. Neither the United States nor Cleveland suggest that the Secretary authorizes the Navajo Nation to enforce Tribal law; rather, both assume that only by connecting a Tribal officer's actions to enforcing federal law, does § 2804(f)'s hook apply. <u>See</u> Motion at 2-6; Response at 7-8. The Court suspects, however, that neither party contemplated the question; the Court, therefore, will allow the parties, if they desire, to submit additional information on the question.[39]

_____

[39]Admittedly, at least one district court seems to have assumed that authority from the Secretary means the authority to enforce United States laws. <u>See</u> <u>Boney v. Valline</u>, 597 F. Supp. 2d at 1181. Because § 2804(a) states that the Secretary may authorize the carrying out of a law of "an Indian tribe that has authorized the Secretary to enforce tribal laws," the Court concludes that

If the Navajo Nation does not retain inherent criminal jurisdiction or authorized the BIA to enforce Tribal law, the 638 contract authorizes all law enforcement activities in the Navajo Nation, and Tribal officers without SLECs are persons authorized by the Secretary for the § 2804(f)'s purposes. If, as is more likely the case, the Navajo Nation retains inherent authority to enforce Tribal law, the Court must determine whether a NDPS officer acting without an SLEC has authority from the Secretary to enforce federal law. The Statement of Work provides that the BIA may, according to the Deputation Agreement, commission NDPS officers as "Federal Law Officer[s]." Statement of Work ¶ 104, at 6. Aside from the general statement defining the scope of work for which the NDPS contracts, see Statement of Work ¶ 1, at 1, the Statement of Work does not otherwise specify who has authority to enforce federal laws. According to BIA regulations, however, that: "BIA may issue law enforcement commissions to other Federal, State, local and tribal full-time certified law enforcement officers to obtain active assistance in enforcing applicable Federal criminal statutes, including Federal hunting and fishing regulations, in Indian country." 25 C.F.R. § 12.21. The Deputation Agreement further states:

> **Navajo Nation Division of Public Safety** law enforcement officers carrying SLECs issued by the BIA pursuant to this Agreement are given the power to enforce:
>
>> All Federal laws applicable within Indian country, and specifically the Navajo Nation's Indian country, including the General Crimes Act, 18 U.S.C. § 1152, and the Major Crimes Act, 18 U.S.C. § 1153, consistent with the authority conveyed pursuant to Federal law through the issuance of commissions or other delegations of authority.

---

it cannot assume that the Secretary would only be authorizing the enforcement of United States laws. See 25 U.S.C. § 2804(a).

Deputation Agreement ¶ 3(A), at 4 (bold in original).[40]  Because 25 C.F.R. § 12.21 and the Deputation Agreement specify that Tribal officers with SLECs have authority to enforce federal laws, logic dictates that those Tribal officers without SLECs do not have such authority.  Cf. Navajo Nation v. Dalley, 896 F.3d 1196, 1213 (10th Cir. 2018)("[E]xpressi[on] [of] one item of [an] associated group or series excludes another left unmentioned." (citing N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 940 (2017)); Navajo Nation v. Dalley, 896 F.3d at 1213-14 ("[T]the enumeration of certain things in a statute suggests that the legislature had no intent of including things not listed or embraced." (internal quotation marks omitted)(quoting Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n, 327 F.3d 1019, 1034 & n.24 (10th Cir. 2003), and citing Scalia & Gardner, supra, at 107)).  Other district courts have reached similar conclusions.  Cf. Etsitty-Thompson v. United States, 2013 WL 4052621, at *4)(Stewart, J.)("[O]nly officers holding SLECs and enforcing federal law would be deemed an employee of the Department of the Interior for purposes of the Federal Tort Claims Act."); Williams v. Naswood, 2011 WL 867520, at *1 (concluding that, because a Tribal officer did not hold a SLEC, "he was not a federal law enforcement officer within the meaning of the FTCA").  That the Deputation Agreement specifies that Tribal officers "holding SLECs are treated as BIA police officers for enforcing Federal laws,"

---

[40]As the Court noted in footnote 3, the United States states that it "is not yet aware as to whether" the Deputation Agreement is the current agreement between the United States and the Navajo Nation.  Response at 3 n.2.  The Court is skeptical that an updated deputation agreement would contain significantly different language than the Deputation Agreement, or, given 25 C.F.R. § 12.21's specification that "commission[s]" enable Tribal officers to assist in enforcing federal laws, that an updated deputation agreement would change the Court's analysis.  The Court is, however, working with the record before it, and it acknowledges that a deputation agreement containing different language might change its opinion.

and specifies that, under 25 U.S.C. § 2804(f)(1), a Tribal officer holding an SLEC is "deemed an employee of the Department of the Interior" when enforcing federal law supports the interpretation that only those Tribal officers with SLECs are granted authority to enforce federal law and that, under § 2804(f), § 1114 applies only to such officers.[41]  Accordingly, if the Navajo Nation has inherent jurisdiction to enforce its Tribal laws -- which the Court believes it probably has but cannot definitively determine, based on the record before the Court, Tribal officers without SLECs are not federal employees for § 2804(f).  Section 1114 does not, therefore, apply, and the Court will dismiss Counts 1 and 5.

**IT IS ORDERED** that: (i) the parties shall submit evidence, if any, within fourteen calendar days of the date of this Memorandum Opinion and Order, regarding the status of the Navajo Nation's Tribal law enforcement authority; and (ii) if there is no more evidence, based upon the record before the Court, the Defendant's Motion to Dismiss Counts 1 and 5 of the Indictment, filed September 24, 2018 (Doc. 72), is granted.

_____
UNITED STATES DISTRICT JUDGE

---

[41]As the Court cannot definitively determine whether the Navajo Nation retains its criminal jurisdiction, the Court cannot say whether this provision in the Deputation Agreement contradicts § 2804(f).  The Court notes, however, the possibility that, if the Navajo Nation authorized the Secretary to enforce Tribal law or waived its criminal jurisdiction, § 2804(f) dictates that Tribal officers be treated as federal employees in more situations than this provision of the Deputation Agreement contemplates.

*Counsel:*

John C. Anderson
  United States Attorney
Novaline D. Wilson
Jennifer M. Rozzoni
Niki Tapia-Brito
Letitia Carroll Simms
Michael D. Murphy
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Donald F. Kochersberger, III
Business Law Southwest, L.L.C.
Albuquerque, New Mexico

--and--

Theresa M. Duncan
Duncan Earnest Attorneys at Law
Albuquerque, New Mexico

     *Attorneys for the Defendant*