# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                    No. CR 17-0965 JB

KIRBY CLEVELAND,

    Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Kirby K. Cleveland's Objections to the Amended Presentence Report [DKT. 178-1], filed July 28, 2020 (Doc. 181)("Objection")(brackets in the original title). The primary issue is whether the Court can apply a 6-level sentencing enhancement under United States Sentencing Guidelines ("U.S.S.G") § 3A1.2(a), which applies when a defendant commits an offense "motivated by" the victim's status as a government officer, because although Defendant Kirby Cleveland was drunk and was worried that he would be attacked by a group of men that night, he knew that he shot at a police officer, because the uniformed officer approached with flashing lights in marked vehicle. The Court concludes that K. Cleveland knew that he was shooting at a police officer, because: (i) the officer approached in a marked police vehicle with his emergency lights on before stopping K. Cleveland and his uncle; (ii) the officer was in uniform; and (iii) K. Cleveland had two opportunities to see the vehicle with its flashing lights, first when the officer stopped him, and, second when he turned around to shoot at the officer. Accordingly, the Court overrules the Objection. Although not an Objection, the Court also concludes by the preponderance of that the evidence the video evidence shows that K. Cleveland was not involved in attacking another inmate on May 2, 2019, because

the video shows that K. Cleveland was in another part of the building while the attack occurred.

## FACTUAL BACKGROUND

The Court's factual background is based on the facts that the Court finds by a preponderance of the evidence. See United States v. Williams, No. CR. 17-2556 JB, 2020 WL 4016108, at *6 (D.N.M. July 16, 2020)(Browning, J.)(citing United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)). Accord United States v. Zapata, 546 F.3d 1179, 1192 (10th Cir. 2008)("The district court's district court's determination of drug quantity is a factual finding that must be supported by a preponderance of the evidence and is reviewed for clear error."). The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Banda, 168 F. App'x 284, 289 (10th Cir. 2006)(unpublished)(stating that "there is no prohibition on considering hearsay testimony at sentencing, provided it bears indicia of reliability"). The evidence and information upon which the Court relies must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). The Court takes its facts from the Second PSR, the Plea Agreement, filed December 2019 (Doc. 165), and the Objection.[1]

1.   **K. Cleveland, While Absconding From Supervised Release, Is Attacked and Beaten Up by Men Driving a White Van.**

1.      On September 6, 2016, K. Cleveland was released from custody after serving a

---

[1]K. Cleveland only disputes paragraphs 25-26 and 71 of the Second PSR, which summarize that facts and offer conclusions to support the USPO's upward adjustment and, unrelated to the instant offense, allege that he committed aggravated battery on May 2, 2019 while in custody. See Objection at 3, 7-8.

three-month revocation sentence, and he was placed on supervised release.  See Second PSR ¶ 11, at 4; Plea Agreement ¶ 9(a).

2.  On February 26, 2017, K. Cleveland absconded, after he left and failed to return to the residential reentry center in which he was ordered he reside at as part of conditions of supervision.  See Second PSR ¶ 11, at 4; Plea Agreement ¶ 9(b).

3.  A warrant was issued for his arrest.  See Second PSR ¶ 11, at 4.

4.  On either March 9 or 10, 2017,[2] a group of men in a white van stopped K. Cleveland, his brother, and his father while they were traveling together, and dragged them from their truck.  See Second PSR ¶ 28, 31, at 7, 8; Objection at 3-4; Transcript of Interview of Nathaniel Cleveland at 19:4-16 (taken 17, 2017), filed May 11, 2021 (Doc. 195-20)("Tr. N. Cleveland").

5.  The attackers pulled K. Cleveland's father out of the truck and began to beat him.  See Second PSR ¶ 79, at 16; Tr. N. Cleveland at 21:4-17.

6.  K. Cleveland attempted to protect his father, but the attackers hit K. Cleveland with baseball bats and pipe, knocked out several of his front teeth, and caused other injuries, including an open wound on K. Cleveland's forehead, which a cousin later closed with homemade stitches.  See Second PSR ¶¶ 31, 79, at 8, 16; Objection at 3-4.

7.  K. Cleveland's father later went to the hospital, but K. Cleveland did not seek medical treatment, instead, he treated his pain by drinking.  See Second PSR ¶¶ 79-80, at 16.

---

[2]The Second PSR gives conflicting reports of the exact date of the incident.  See Second PSR ¶¶ 18, 32, 33, 80, at 7, 8, 16.



Images 1-3: Photographs of K. Cleveland's stitched head injury, bruises on his shoulder and back, and missing front teeth.[3]

**2.    The March 11, 2017 Incident.**

8.      On the evening of March 11, 2017, K. Cleveland; Katie Todachine , K. Cleveland's long-term partner; and their children, were at home watching movies.  See Second PSR ¶ 21, at 6.

9.      Over the course of the evening, K. Cleveland drank alcohol and became intoxicated. See Second PSR ¶ 21, at 6.

10.      K. Cleveland was fearful that the attackers would show up at the residence.  See Second PSR ¶ 21, at 6.

11.      K. Cleveland thought that vehicles driving by the house might be the attackers, and he told Todachine to call the police.  See Second PSR ¶ 21, at 6.

12.      K. Cleveland became increasingly agitated, and at some point obtained a gun, fired

---

[3]Cleveland provided the images as exhibits to his Objections.  See Photographs of Cleveland, filed July 28, 2020 (Doc. 181-5).  Neither the Plaintiff the United States of America, nor USPO objected to the images.

shots outside, and took his daughter outside and showed her how to shoot the gun.  See Second PSR ¶ 21, at 6.

13.     While K. Cleveland was outside with his daughter, Todachine called the police and notified them that there was an intoxicated individual causing a disturbance.  See Second PSR ¶¶ 12, 21, at 5, 6.

14.     Todachine told the police that K. Cleveland is "being stupid over here, we have kids here."  Second PSR ¶ 24, at 7.

15.     She did not provide the police with any information about threatening men driving by the residence.  See Second PSR ¶ 24, at 7.

16.     K. Cleveland then came back inside and asked Todachine to drop him off at Elton Cleveland's house, which she did.  See Second PSR ¶ 21, at 6.

17.     Later that evening, K. Cleveland asked E. Cleveland for a ride home.  See Second PSR ¶ 17, at 5; Transcript of Interview of Elton Cleveland at 5:9-11 (taken March 13, 2017), filed May 11, 2021 (Doc. 195-26)("Tr. E. Cleveland").

18.     At 11:29 p.m. that evening, a Crownpoint police officer, Houston Largo, was dispatched in response to Todachine 's call.  See Second PSR ¶ 12, at 5.

19.     E. Cleveland was driving K. Cleveland home and they were almost back to K. Cleveland's house when E. Cleveland saw police lights in front of them.  See Second PSR ¶¶ 17, 19, at 5, 6; Tr. E. Cleveland at 5:13-22.

20.     E. Cleveland stopped his truck when he saw the lights.  Tr. E. Cleveland at 5:17-22.

21.     The vehicles were facing each other head on.  See Second PSR ¶ 17, at 5.



Image 4: Photograph of E. Cleveland's truck facing Largo's police vehicle.



Image 5: Photograph taken after the incident of Largo's police vehicle in front of E. Cleveland's truck.



Image 6: Photograph of the driver's side of Largo's police vehicle.



Image 6: Photograph of the front of Largo's police vehicle.

22.     Largo exited his vehicle.  See Second PSR ¶ 19, at 6; Tr. E. Cleveland at 5:24-6:2.

23.     At some point, either before Largo exited his vehicle or after, K. Cleveland fled

from scene with a .22 caliber rifle.  <u>See</u> Second PSR ¶ 19, at 6; Objections at 2.[4]

24.     Largo approached E. Cleveland's truck, handcuffed E. Cleveland to the truck's door, removed the keys from the truck's ignition, and at some point secured his own vehicle before pursuing K. Cleveland.[5]  <u>See</u> Second PSR ¶ 19, at 6; Tr. E. Cleveland at 5:24-6:14.

25.     Largo pursued K. Cleveland.  <u>See</u> Second PSR ¶¶ 19, 20, at 6.

26.     Largo and K. Cleveland exchanged gunfire, with K. Cleveland standing about 232 feet from the where the vehicles were parked.  <u>See</u> Second PSR ¶¶ 19, 20, at 6.

27.     Largo fired two shots, neither of which hit K. Cleveland.  <u>See</u> Second PSR ¶ 20, at 6.

28.     K. Cleveland fired approximately nine shots, two of which struck Largo, and one of which fatally wounded Largo.  <u>See</u> Second PSR ¶ 20, at 6.

29.     From her home, Todachine she saw a police vehicle arrive and turn its lights on, and she saw E. Cleveland's truck.  <u>See</u> Second PSR ¶ 22, at 6; Transcript of Interview of Katie Todachine at 5:22-24 (taken March 12, 2017), filed May 11, 2021 (Doc. 195-25)("Tr. Todachine ").

30.     Within about two minutes, she heard gun shots.  <u>See</u> Second PSR ¶ 22, at 6; Tr. Todachine at 6:1-3.

31.     Approximately ten minutes later, K. Cleveland knocked on the window, then went

---

[4]E. Cleveland does not remember when K. Cleveland exited the vehicle and fled the scene and the record does not otherwise show when K. Cleveland fled.  <u>See</u> Tr. E. Cleveland at 7:6-16; <u>id.</u> at 11:7-12:19.

[5]K. Cleveland disputes that "Officer Largo secured his own vehicle *after* handcuffing" E. Cleveland.  Objection at 2 (emphasis in the original).  The Court agrees with K. Cleveland that it cannot conclude by the preponderance of the evidence that Largo returned to his vehicle after handcuffing E. Cleveland.

to the front door and told Todachine : "Go help the cop. I shot the cop." Tr. Todachine at 6:15-18. See Second PSR ¶ 22, at 6.

32. K. Cleveland told Todachine : "I thought it was that white van" with "those guys [I] got into a fight with." Tr. Todachine at 6:20-25. See Second PSR ¶ 22, at 6.

33. K. Cleveland returned to the scene. See Second PSR ¶ 23 at 6; Tr. Todachine at 7:1-3.

34. Todachine also went to the scene. See Second PSR ¶ 23 at 6.

35. K. Cleveland argued with Todachine , and then he left the scene, while Todachine stayed at the scene until other officers arrived. See Second PSR ¶ 23 at 6.

36. Around 9:00 a.m. the next morning, police found K. Cleveland hiding near his residence. See Second PSR ¶ 18 at 6.

37. K. Cleveland was still intoxicated. See Second PSR ¶ 18 at 6.

38. That afternoon, on March 12, 2017, at 2:30 p.m., Largo was declared deceased from a gunshot wound to the head. See Second PSR ¶ 15 at 6.

39. At his plea hearing on December 12, 2019, K. Cleveland stated:

> "I was on supervised release and I got a weekend pass to go home to be with my family, and I did not return. While I was on my pass, me and my dad were traveling and we were cut off by a group of men who beat us and beat me with a baseball ball [bat], and I was afraid they would come back.
>
> A few day later, me and my uncle were drinking, and when he was taking me back home, another vehicle cut us off. And I thought it was them again, so I shot at them, shot at that group of men, but it wasn't them. It was a police officer."

Second PSR ¶ 28, at 7 (quoting Transcript of Plea Hearing, taken December 12, 2019).

### 3. The Neuropsychological Reports.

40. Dr. Lynette M. Abrams-Silva, a clinical neuropsychologist, evaluated K. Cleveland on April 16, 2019, at K. Cleveland's request. See Neuropsychological Evaluation, filed July 28,

2020 (Doc. 181-2)("Dr. Abrams-Silva Report").

41.     Dr. Abrams-Silva asked K. Cleveland to recall the events that led up to the shooting:

> When asked for his understanding of the reason for his current incarceration, Mr. Cleveland was generally able to provide a narrative of the events leading up to the incident in question, with a few notable exceptions. At first, when asked to relate why he is currently incarcerated, he stated he was arrested in March for "drinking, fighting," and getting his ''teeth knocked out." When redirected to the night in question, he corrected himself and agreed that he was not currently incarcerated for fighting or drunkenness. He stated that four or five days prior to the incident, he and his father and brother were assaulted by a group of men who approached them in a white van. He stated his memory for the assault is "hazy," but he recalled getting kicked and hit with a baseball bat in the head and face, resulting in face and head lacerations and lost teeth. He stated he is uncertain whether he lost consciousness or experienced post-traumatic amnesia, as all details of the event are reportedly "hazy." He stated his nephew stitched his head wound and he began to drink beer and whiskey to address the head and face pain. He stated he continued to drink alcohol for several days while staying at his uncle's house. He stated that his last relatively clear memory prior to the incident was Saturday, when his wife and children went to a birthday party while he remained at his uncle's house, drinking beer and whiskey. He stated he recalls his wife calling the police. After dark, he reported a white van approached his uncle's house and he heard the driver yell, "I'm gonna run you over!" He stated .he fired a weapon into the ground, stating several times, "I fired to the floor, I was aiming at the floor." He stated his next memory is of the arrest, when he was kicked in the head, opening up one of the lacerations from the assault.

> Overall, his account of the events leading up to the incident, as well as details of the incident itself, was disjointed and remarkable for somewhat inaccurate details. A mental health assessment performed 03/31/2017 noted "anxiety" under "current/previous diagnoses," but did not elaborate. A psychiatric evaluation performed 07/12/2018 noted a diagnosis of PTSD, with a history of childhood abuse, death of two brothers, physical assault as an adult, and witnessing violence. Symptoms noted included panic attacks, nightmares, intrusive thoughts, depressed mood, poor appetite, and sleeping less than usual. Planned medications noted at that time included Abilify, prazosin, and Remeron.

Dr. Abrams-Silva Report at 1-2

42.     Dr. Abrams-Silva concluded:

[O]n the night of the incident, Mr. Cleveland reported seeing a white van, a stimulus

associated with two prior traumatic experiences, hearing someone threaten to "run you over," associated with one prior trauma, and responding by, to his recollection, shooting into the ground. As his account of the events is somewhat inaccurate, but consistent with prior traumatic experiences, it is likely that he was experiencing a flashback associated with PTSD, while also impaired due to recent head injury and several subsequent days of intoxication.

Dr. Abrams-Silva Report at 6.

43.     Dr. Abrams-Silva answered several questions that K. Cleveland's attorneys asked her to consider:

1.     Based on your evaluation, to a reasonable degree of neuropsychological certainty, during the events of the night in question, have you concluded that Mr. Cleveland believed he was in imminent danger of death or great bodily harm? Why or why not?

Answer: Yes, based on his report and the factors contributing to his mental and physical state on the night in question (i.e., acute head injury, several days of continuous intoxication, and untreated PTSD), Mr. Cleveland believed he was in imminent danger of death or great bodily harm. The combination of these factors and his report of seeing a white van and hearing the driver shout a threat of running Mr. Cleveland over are consistent with details associated with prior traumas (i.e., the death of his brother by white van and the recent assault by perpetrators driving a white van). This suggests Mr. Cleveland, in addition to the cognitive sequelae of acute head injury and intoxication, experienced a PTSD "flashback," a hallmark symptom of the disorder. Flashbacks are vivid sensory experiences that interfere with the ability to distinguish between the events of prior trauma(s) and reality. In the moment, Mr. Cleveland was likely responding to threats associated with prior traumas, which had caused death and great bodily harm.

2.     Based on your evaluation, to a reasonable degree of neuropsychological certainty, during the events of the night in question, have you concluded that Mr. Cleveland accurately perceived the situation prior to the shots being fired? Why or why not?

Answer: No, based on the factors discussed above, Mr. Cleveland was likely experiencing a PTSD flashback, with cognitive abilities further clouded by acute head injury and intoxication. Based on his report of events, he was likely responding as if the threats of past traumatic events were currently occurring. PTSD flashbacks have been likened to nightmares experienced while awake, with an inability to distinguish the reality of the event. This inability to discriminate real threat from perceived threat was further exacerbated by the combination of acute head injury and intoxication.

3.     Based on your evaluation, to a reasonable degree of neuropsychological

certainty, during the events of the night in question, have you concluded that Mr. Cleveland was unaware that Officer Largo was a police officer? Why or why not?

Answer: No. Mr. Cleveland described seeing a white van, not a police vehicle. He described hearing a male voice shouting threats that he would be run over, not identifying information regarding the officer. What Mr. Cleveland reported perceiving was not consistent with the actual events of the night in question, due to the factors described above. He reported seeing and hearing stimuli associated with prior traumas, with impaired abilities to accurately perceive that a police officer was present at the scene.

Dr. Abrams-Silva Report at 6-7.

44. On March 4, 2020, Dr. Galit Askenazi, conducted a neuropsychological examination on K. Cleveland at the request of the United States. <u>See</u> Independent Neuropsychological Examination Report at 1, filed May 24, 2021 (Doc. 198)("Dr. Askenazi Report").

45. Dr. Askenazi responded Dr. Abrams-Silva's conclusions:

In response to specific questions provided to her, Dr. Abrams-Silva opined that on the night of his arrest, Mr. Cleveland believed that he was in "imminent danger of death or great bodily harm." She again suggested that he was suffering a flashback in addition to cognitive impact from an acute head injury and intoxication, although there is no evidence he had a flashback, and a head injury does not equal brain injury. What there is documentation of is the feud and back and forth actions between the Cleveland and Willeto families, which she did not mention. She then wrote that he was "likely responding to threats associated with prior traumas," even though he in fact had told her that he had fired his gun after thinking he heard someone yell at him, "I'm going to run you over," suggesting he was responding in the moment and not due to any flashback of previous events. This is relevant given that he and his family members had been assaulted several days earlier, and had purchased a weapon after the assault because of fear of future assault.

Dr. Abrams-Silva then opined that on the night in question, Mr. Cleveland was unable to discriminate real threat from perceived threat, again due to him having a flashback, for which there is no evidence, having a head injury, which was not documented as causing brain injury, and the well-documented intoxication. She also opined that he was unaware that the man he shot was a police officer, as he saw a white van, not a police vehicle. However, if she had reviewed relevant police records, it would have been clear that Mr. Cleveland at least knew immediately afterwards that he shot a cop, because he stated it to multiple people. She identified

him inaccurately perceiving what occurred due to prior traumas, rather than the much more likely reason of any inaccurate perception being due to intoxication.

Regarding whether or not Mr. Cleveland was able to control his response to the situation, Dr. Abrams-Silva opined that his ability to control himself was impaired due to "cognitive sequelae of traumatic brain injury, chronic alcohol abuse, and PTSD." The only true condition at that time, however, was active intoxication. She then stated that he demonstrated all those difficulties during her assessment when he was not having a response to an acute head injury, was not intoxicated, and was not having a flashback. She opined that based on such, he would be unable to control his responses, even though she did not thoroughly document asking him questions related to his thought processes at the time, or how he had shown her he could not control his responses. She in fact had described him as redirectable when he went off topic during her evaluation, and not exhibiting any inappropriate behaviors. Most importantly, her assessment included incorrect administer and scoring on at least one measure. This opinion is thus not supported by her own evaluation.

In response to whether or not Mr. Cleveland believed he was firing his gun towards the ground, she stated that Mr. Cleveland was very adamant that that was what he was doing, admitting that he had a gun and that he had fired the gun. In this regard, she cited that his "several days of alcohol intoxication" likely impacted his perception and proprioception. She further concluded that Mr. Cleveland did not intend to fire the weapon at a police officer, and did not intend to injure a police officer, again based on impaired executive functioning, PTSD flashback, and intoxication. What she did not address was the fact that he had shot his gun because he thought someone was threatening to harm him, even if he claimed he did not know who it was, which within his framework, was a reasonable response for Mr. Cleveland to being threatened. She also made no mention that he previously had absconded from the law and had a reason to attempt to flee from police.

Dr. Askenazi Report at 26-27.

46.     Dr. Askenazi diagnosed the K. Cleveland with "Alcohol Use Disorder, Moderate,

In a Controlled Environment" under the Fifth Edition of the Diagnostic and Statistical Manual of

Mental Disorders ("DSM-5").  Dr. Askenazi Report at 37.

47.     Dr. Askenazi  concluded:

Although Mr. Cleveland was assaulted sometime in the week leading up to the events on March 11, 2017, and the assault included head injury leading to surface injuries, loss of teeth, and headaches, there is no evidence that he suffered a concussion, which is considered a mild traumatic brain injury.  A concussion is specifically identified by loss of consciousness, change in mental status, amnesia around the time of events (not due to substance use), and/or neurological deficit.

Neither Mr. Cleveland nor anyone who provided a statement for the events around March 11, 2017 reported any symptoms consistent with concussion, or cognitive changes. He stated that if it was not for physical pain, he would have been functioning normally at the time.

Furthermore, at the time of his arrest on March 12, 2017, he was taken to the hospital, with no unusual mental status, and no report of symptoms associated concussion or brain injury. When seen, Mr. Cleveland complained of shoulder and neck pain, and missing teeth. From review of all provided records and interview of Mr. Cleveland, there is no evidence of him ever having any notable cognitive compromise, at any point in his life, aside from some extra academic assistance offered while a youth, via school. Although Mr. Cleveland reported having many heads hits and loss of consciousness, he denied any notable cognitive changes after these injuries. He specifically denied cognitive change after the assault that occurred approximately one week before the events on March 11, 2017.

. . . .

There is no evidence that Mr. Cleveland was suffering from any significant mental health condition on or around March 11, 2017, including posttraumatic stress disorder (PTSD). As he well explained, and is supported by collateral sources and documents, his family and that of the Willetos were in a feud, and assaulting each other or damaging each other's property in a back and forth, escalating manner in early March 2017. As Mr. Cleveland made clear, he was not suffering from a flashback on March 11, 2017, and has never suffered a flashback. Although Mr. Cleveland described having experienced traumas throughout his life, his actions on the date of March 11, 2017 were not trauma induced. As he described, on that date, he was anxious as to what may be the next action taken by the Willeto family in their feud. Being in this feud, combined with inebriation, is what led to him assuming that when stopped by Officer Houston Largo, it was this other family. The fact that he stated that he thought he was shooting into the ground, but he could not be sure of such because of inebriation, is what led to the death of Officer Largo. However, when he immediately returned to the scene, he very quickly was able to assess what had occurred, and expressed such to others. He explicitly informed Katie Todachine , and the others that were there, that he had shot a cop, and instructed her to get help for the cop. There also is the question how it would not have been clear to Mr. Cleveland that the other person was a police officer, given the flashing police car lights, once he was out of the vehicle and at a distance, especially when other people could see the flashing lights at a much greater distance. Furthermore, one police report noted that Mr. Cleveland was chased by Officer Largo because he had run, and he was in probation violation at the time, so he had reason to run.

Mr. Cleveland then running away, hiding, and continuing to drink support that by this time, he was fully knowledgeable what he had done. No mental health symptoms contributed to his perceptions or actions at the time. His perceptions and actions were based on the feud with the other family and his inebriation. Multiple

people, including Mr. Cleveland, confirmed that he was intoxicated immediately prior to the events on March 11, 2017, leading to his arrest.

. . . .

In summary, evidence does not support that Kirby Cleveland was suffering from any cognitive or mental impairment, disease, or reduced capacity at the time of the events on March 11, 2017, either in general or causally related to his actions. The feud his family was in, and his voluntary inebriation, are what led to him possibly misperceiving the situation, and him shooting. Why he claims he would be shooting at the ground when, as Nathaniel stated, they would have shot into the air to scare off others, is not clear. Mr. Cleveland's drinking problem has been related to his previous criminal issues. Although particularly physically aggressive while drinking, there are instances of Mr. Cleveland being in many fights when not drinking.

Dr. Askenazi Report at 37-39.

48.    Dr. Askenazi concluded that the recent attack and his intoxication meant the K.

Cleveland assumed that Largo was not a police officer, but his recent attackers:

Being in this feud [with the attackers], combined with inebriation, is what led to him assuming that when stopped by Officer Houston Largo, it was this other family. . . . As he described, on that date, he was anxious as to what may be the next action taken by the . . . family in their feud.

Dr. Askenazi Report at 38-39.

## PROCEDURAL HISTORY

On March 14, 2017, Plaintiff United States of America filed a Criminal Complaint,

charging K. Cleveland with second degree murder in violation of 18 U.S.C. §§ 1111 and 1153.

See Criminal Complaint , filed March 14, 2017 (Doc. 1).  K. Cleveland pled guilty to committing

second degree murder in violation of 18 U.S.C. §§ 1111 and 1153.  See Plea Agreement ¶¶ 7-10,

at 3-5.  In his Plea Agreement, K. Cleveland "specifically admit[s] the following facts related to

the charges against me, and declare under penalty of perjury that all of these facts are true and

correct:"

a.    On September 6, 2016, I, Kirby Cleveland, was placed on supervised release for a period of twenty-four months. As conditions of supervised release, the

federal district court for the District of New Mexico instructed me not to consume alcohol or violate the law, and I was required to reside and complete a program at a residential reentry center for a period of six months.

b.      On February 26,2017, without justification, and knowing it was a violation of the terms of my supervised release, I absconded from a residential reentry center.

c.      On March 11,2017, within the external boundaries of the Navajo Nation, District of New Mexico, I, Kirby Cleveland, an enrolled member of the Navajo Nation, after consuming alcohol and acting with callous and wanton disregard for human life, shot John Doe with a .22 caliber rifle, causing John Doe's death.

Plea Agreement ¶ 9, at 5.

### 1.    <u>The Second PSR.</u>

The United States Probation Office ("USPO") filed a Presentence Report, filed March 27, 2020 (Doc. 174)("PSR"), and the Second PSR. In the Second PSR, the USPO (i) calculates K. Cleveland's base offense level as 38; (ii) adds 6 points for "Victim Related Adjustment," "[b]ecause USSG § 3A1.2(a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), six levels are added" under "USSG § 3A1.2(b)"; and (iii) subtracts 3 points for acceptance of responsibility, and therefore calculates K. Cleveland's total offense level as 41. <u>See</u> Second PSR ¶¶ 45-55, at 10-11. Under other arrests, the USPO contends that on May 2, 2018, K. Cleveland committed aggravated battery, and notes, under the charge's disposition, nolle prosequi. <u>See</u> Second PSR ¶ 71, at 15. The USPO contends:

> While in custody for the instant offense, the defendant and two others were observed entering the cell of the victim. Minutes later the group exited the cell and shortly after, the victim exits the cell carrying his belongings. It was found the victim had been "jumped" in his cell and was bleeding. He was sent to the hospital for medical intervention, where the victim was found to have a nose injury.

Second PSR ¶ 71, at 15 (not citation for quotation).

### 2.    <u>The Objection.</u>

K. Cleveland objects to the Second PSR's conclusion that "he was motivated by the

officer's status as a government employee."  Objection at 1.  K. Cleveland argues that he was not motivated by Largo's status as a police officer, because "[h]e did not know that the person chasing him was a police officer; he wrongly believed it was the men who had attacked him returning to finish him off.  When he learned that he had shot a police officer, Kirby immediately sought help for the officer from his wife and brother."  Objection at 1.  K. Cleveland contends that he was not aware of Largo's status, because he "was suffering from severe physical injuries (including head trauma) and Post-Traumatic Stress Disorder (PTSD) as a result of a brutal beating a group of men inflicted on him and his father two days earlier," and he "was also extremely intoxicated, having self-medicated through the excessive use of alcohol for several days."  Objection at 1.

K. Cleveland argues that "suggestion Kirby lay in wait for the officer after running from the truck is pure speculation," because the "PSR relies on this artificial extension of time to speculate that Kirby 'waited nearby for the officer' rather than 'fleeing the area.'"  Objection at 2-3 (quoting Second PSR ¶¶ 25-26, at 7).  Next, K. Cleveland argues that "[i]t is unclear how Officer Largo's vehicle appeared to Kirby on the night of the shooting," because K. Cleveland was intoxicated, had a head injury, was traumatized from the attack, the stop occurred at night, and Largo's police vehicle was the same color as van driven by the men who had attacked him and his father.  Objection at 3.  Accordingly, K. Cleveland objects to the 6-point upward adjustment under U.S.S.G. § 3A1.2(a), because although he does not dispute that Largo was a government officer, or that he "pleaded guilty to an offense against a person governed by Chapter Two, Part A of the Sentencing Guidelines," K. Cleveland argues that was not motivated by Largo's status as a government officer.  Objection at 5.  K. Cleveland argues that

> it is not enough that the victim of the offense is a government officer or even that the defendant knew or had reasonable cause to believe the victim was a government officer; for the adjustment to apply, the offense must be motivated by the victim's status as a government officer.  See United States v. Akendeu, No. CR 18-0223 JB,

2019 WL 1002362, at *2 (D.N.M. Mar. 1, 2019)[(Browning, J.)]("United States Courts of Appeals have upheld enhancements under § 3A1.2 when the defendant knew that the victim was a government officer or employee, and the motivation for the action arose from the tasks that the government officer performed because of his or her status as a government officer.").

Objection at 6. K. Cleveland argues that the Second PSR makes all inferences in favor of the United States and "ignores substantial contradictory evidence," such as that the shooting occurred late at night, in area with no streetlamps or other lighting, and that "although the car was marked as a police vehicle, Officer Largo pulled up to the driver's side of [the] pickup truck, which was away from where Kirby was sitting." Objection at 6-7. K. Cleveland argues that the Second PSR also ignores his "intoxication, head injury, and his PTSD from the earlier beating," evidence which "supports a Kirby's assertions that he did not know Officer Largo was a law enforcement officer and that he fired the gun because he believed he was under attack from the men who had brutally beat him and his father days earlier." Objection at 7 (citing Neuropsychological Evaluation at 6-7).

K. Cleveland takes issue with the Second PSR's reliance on Dr. Askenazi's neuropsychological report from March 2020. See Objection at 8. K. Cleveland argues that although Dr. Askenazi's report concluded that K. Cleveland was not suffering from any significant mental health condition at the time of the shooting, "that was the conclusion of the government's expert," and "contrary evidence exists showing that Kirby did suffer from Post-Traumatic Stress Disorder (PTSD), an acute head injury, and alcohol intoxication at the time of the shooting, which impacted his ability to accurately perceive the events as they unfolded." Objection at 8 (citing Dr. Abrams-Silva Report at 1-8). K. Cleveland argues therefore that evidence supports that he was not aware he was shooting at a police office because he "was suffering from a significant mental health condition on March 11, 2017. The defense intends to call Dr. Abrams-Silva as a witness at sentencing to explain her findings further." Objection at 9.

Last, although not related to the K. Cleveland's offense level, K. Cleveland challenges the Second PSR's conclusion that he was involved in an assault on May 29. See Objection at 7 (citing Second PSR ¶ 71). K. Cleveland argues that video evidence shows that he was not involved: "it shows men other than Kirby entering and exiting the cell in which the alleged attack occurred." Objection at 7-8.

### 3. The Addendum to the PSR.

The USPO responded to the Objection. See Addendum to the Presentence Report, filed August 4, 2020 (Doc. 184)("PSR Addendum"). The USPO argues that K. Cleveland's was "motivated by the officer's status as a government employee," because he

> knew he had a warrant and would most likely be arrested; the officer's vehicle was a clearly marked police unit; his attire was consistent with that of a uniformed officer; the vehicles emergency lights were engaged and the defendant waited nearby for the officer after he fled from the scene.

PSR Addendum at 1-2. Next, the USPO does not address the video documenting the allegations in ¶ 71 of the Second PSR, instead the USPO argues that the "information provided in paragraph 71 was derived from law enforcement and court records. The information on court documents does not reflect the defendant was not a part of the group involved in the fight." PSR Addendum at 2.

### RELEVANT LAW REGARDING THE GUIDELINES

Section 2K2.1(b)(6)(B) provides for a 4-level enhancement "[i]f the defendant . . . used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). "[A]nother felony offense" "means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one

year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1 cmt. 14(C). See United States v. Gross, No. CR 16-0454 JB, 2016 WL 9021829, at *15 (D.N.M. Dec. 16, 2016)(Browning, J.)("An enhancement under § 2K2.1(b)(6) may be applied even though the felony in connection with which the firearm is possessed was not an offense for which the defendant was convicted." (citing United States v. Gambino-Zavala, 539 F.3d 1221, 1230 n.3 (10th Cir. 2008))). Application note 14(A) to U.S.S.G. § 2K2.1 specifies that the use or possession is "in connection with" another felony offense "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." U.S.S.G. § 2K2.1 cmt. 14(A). The Tenth Circuit has explained: "The plain and commonly understood meaning of 'facilitate' is to make easier." United States v. Marrufo, 661 F.3d 1204, 1207 (10th Cir. 2011). See United States v. Serna, 405 F. Supp. 3d 1107, 1110 (D.N.M. 2019)(Browning, J.).

An enhancement under U.S.S.G. § 2K2.1(b)(6) may be applied even though the felony in connection with which the firearm is possessed was not an offense for which the defendant was convicted. See United States v. Gambino-Zavala, 539 F.3d at 1230 n. 3. In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that, even after United States v. Booker, 543 U.S. 220 (2005), as long as the guidelines are considered advisory, facts relevant to sentencing still need be proved only by a preponderance of the evidence. See United States v. Magallanez, 408 F.3d at 684-85. See also United States v. Dalton, 409 F.3d 1247, 1252 (10th Cir. 2005)("[United States v.]Booker therefore does not render judicial factfinding by a preponderance of the evidence per se unconstitutional.").

The 4-level enhancement has four distinct elements, and "[t]he United States must prove that the defendant: (i) used or possessed; (ii) any firearm or ammunition; (iii) in connection with; (iv) another felony offense." United States v. Kepler, No. CR. 11-1946 JB, 2012 WL 592422, at

*5 (D.N.M. Feb. 14, 2012)(Browning, J.)(citing U.S.S.G. § 2K2.1(b)(6)). In <u>United States v.</u> <u>Kepler</u>, the United States and the defendant stipulated that § 2K2.1(b)(6)'s 4-level enhancement did not apply, and the Court accepted the stipulation, because there was a lack of evidence regarding whether the defendant or some other occupant in the house owned the locked box that contained methamphetamine and a handgun. See <u>United States v. Kepler</u>, 2012 WL 592422, at *6. The Court explained:

> Given that the Court has no ability to gather or present evidence to support a sentencing enhancement, the Court is dependent in many ways on the United States to assess the strength of its arguments and evaluate whether it can prove that a particular enhancement applies. While it is possible that the methamphetamine is attributable to Kepler, the evidence before the Court does not support a factual finding to that effect by a preponderance of the evidence. Without proof that Kepler committed another felony offense, the United States cannot establish that an enhancement under U.S.S.G. § 2K2.1(b)(6) applies.

<u>United States v. Kepler</u>, 2012 WL 592422, at *6. See <u>United States v Pacheco</u>, No. CR 13-2643 JB, 2014 WL 3421063, at *7 (D.N.M. July 8, 2014)(Browning, J.).

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court of the United States reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and its Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi v. New Jersey</u>, 530 U.S. at 490. In <u>Blakely v.</u> <u>Washington</u>, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in <u>Apprendi v.</u>

New Jersey, stating that the "'statutory maximum' for Apprendi[v. New Jersey] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. at 303 (emphasis and citations omitted). Apprendi v. New Jersey does not, however, "apply to the present advisory-Guidelines regime," because the sentencing guidelines are no longer mandatory. United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. 220, 259 (2005)). More recently, the Supreme Court held that Apprendi v. New Jersey's requirements apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. 99 (2013).

In United States v. Magallanez, 408 F.3d at 672, the Tenth Circuit held that Blakely v. Washington and United States v. Booker do not change the district court's enhancement findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute, and to distribute, methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines. See 408 F.3d at 682. The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months up to 121 to 151 months. See 408 F.3d at 682-83. On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551-86, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a

court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made the Guidelines ranges "effectively advisory," the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)). "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, 2012 WL 2574810, at *3 (D.N.M. 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x. 699, 705 (10th Cir. 2014)(unpublished)(holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").[6]

---

[6]United States v. Brown is an unpublished opinion, but the Court can rely on an

The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v. United States, 133 S. Ct. 2151 (2013), expands the rule from Apprendi v. New Jersey, 530 U.S. 466 (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.

United States v. Cervantes-Chavez, 2014 WL 6065657, at *14 (D.N.M. 2014)(Browning, J.)(citing

United States v. Sangiovanni, 2014 WL 4347131, at *22-26 (D.N.M. 2014)(Browning, J.)).

In United States v. Ulibarri, 115 F. Supp. 3d 1308 (D.N.M. 2015)(Browning, J.), the Court

considered the United States' assertion that the defendant deserved 8 additional offense levels for

threatening to cause physical injury to a person to obstruct justice. See 115 F. Supp. 3d 1336-37

(citing U.S.S.G. § 2J1.2(b)(1)(B)). The Court stated that, for the offense levels to apply:

> The United States must prove two elements by a preponderance of the evidence. First, [the defendant's] offense must involve "threatening to cause physical injury to a person." U.S.S.G. § 2J1.2(b)(1)(B). This element requires that the defendant] "communicate[d an] intent to inflict [physical injury] on another[.]" Black's Law Dictionary 1618. . . . Second, the defendant] must have made that threat "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B).

---

unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent. . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Schmidt, United States v. Banda, and United States v. Hendrickson have persuasive value with respect to a material issue and will assist the Court in its disposition of this Memorandum Opinion and Order.

United States v. Ulibarri, 115 F. Supp. 3d at 1336 (first two alterations in United States v. Ulibarriu; third alteration added). The Court determined that, although the United States showed that the defendant "communicated an intent to inflict physical injury" on someone, the United States failed to prove, by a preponderance of the evidence, that the defendant "did so to obstruct the administration of justice." 115 F. Supp. 3d at 1336. The Court concluded that, because the United States did not meet its burden on this second element, it would not impose the additional 8 offense levels under U.S.S.G. § 2J1.2(b)(1)(B). See United States v. Ulibarri, 115 F. Supp. 3d at 1336.

### LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, n.1(H). In United States v. Booker, the Supreme Court notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

> (1)
> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to U.S.S.G. § 6A1.3's commentary, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.), aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x. 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: <u>Witte v. United States</u>, 515 U.S. 389 (1995), and <u>United States v. Watts</u>, 519 U.S. 148 (1997).  In <u>Witte v. United States</u>, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  <u>See</u> 515 U.S. at 404-06.  The defendant in <u>Witte v. United States</u> had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991.  <u>See</u> 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  <u>See</u> 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and thus calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  <u>See</u> 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990.  <u>See</u> 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  <u>See</u> 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  <u>See</u> 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  <u>United States v. Witte</u>, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was

contrary to other United States Courts of Appeals opinions, including a Tenth Circuit opinion, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  See United States v. Watts, 519 U.S. at 149. The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149

(citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661).  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause).  In United States v. Banda, 168 F. App'x. 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x. at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'" 168 F. App'x. at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant appealed the district court's sentence enhancement for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute but was acquitted of using or carrying

a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth

Circuit acknowledged that courts had taken various positions on whether a sentence may be

enhanced for firearms possession despite a defendant's acquittal on firearms charges.  See 947

F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal

on a firearms carrying charge leaves ample room for a district court to find by the preponderance

of the evidence that the weapon was possessed during the drug offense."); United States v.

Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for

firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the

defendant was found not guilty violates the constitutional principle of due process and the ban

against double jeopardy")).

　　　　Without discussion related to the standard of proof a sentencing court should use to make

factual findings, the Tenth Circuit held that the district court did not err in enhancing the

defendant's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.

The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled

the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house;

and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics

involved.  See 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing relevant federal

case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial

evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at

1429.

　　　　In United States v. Washington, 11 F.3d at 1510, the defendant argued that the United

States needed to prove drug quantities used as relevant conduct to establish a defendant's offense

level by clear-and-convincing evidence, rather than by a preponderance of the evidence.  See 11

F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison. See 11 F.3d at 1515. The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)). See United States v. Sangiovanni, 2014 WL 4347131, at *22-26 (concluding that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 2014 WL 6065657, at *14-15 (D.N.M. 2014)(Browning, J.)(cross-referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court previously has held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal. See United States v. Goree, 2012 WL 592869, at *11 (D.N.M. 2012)(Browning, J.). The Court has also held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence. See United States v. Chapman, 2012 WL 257814, at *13 n.5 (D.N.M. 2012)(Browning, J.).

Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, 2012 WL 6632493, at *23 (D.N.M. 2012)(Browning, J.). See United States v. Tapia, No. CR 12-3012 JB, 2017 WL 6417610, at *10–15 (D.N.M. Dec. 14, 2017).

## ANALYSIS

K. Cleveland objects to the Second PSR's application of 6-level sentencing enhancement under U.S.S.G § 3A1.2(a). See Objection at 1. K. Cleveland argues that he "did not know that the person chasing him was a police officer; he wrongly believed it was the men who had attacked him returning to finish him off." Objection at 1. The Court concludes that the United States has shown by the preponderance of the evidence that K. Cleveland knew he was shooting at a police officer. Because K. Cleveland knew he was shooting at an officer who had stopped him and his uncle, K. Cleveland was motivated by the officer's status and the enhancement applies. Although the conclusion that K. Cleveland knew he was shooting at an officer is not clear-cut, K. Cleveland, even taking into account the state of his severe inebriation and his fear that he would be attacked by men in a white van, cannot show that he did not know, because: (i) Largo approached in a marked police vehicle with his emergency lights on before stopping K. Cleveland and his uncle; (ii) Largo was in uniform; and (iii) K. Cleveland had two opportunities to see the police vehicle with its flashing lights, first when Largo stopped him and second when he turned around to shoot at Largo. Next, although it is not an Objection to the PSR's offense level computation, K. Cleveland also disputes the PSR's allegation that he assaulted another inmate on May 2, 2019. The Court concludes the preponderance of the evidence shows that K. Cleveland was not physically involved in the attack on the other inmate.

U.S.S.G. § 3A1.2 provides:

>    (a)    If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by 3 levels.

>    (b)    If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by 6 levels.

U.S.S.G. § 3A1.2(a)-(b). Should U.S.S.G. § 3A1.2 apply, K. Cleveland base offense level will be increased by 6 points. See U.S.S.G. § 3A1.2(b). K. Cleveland concedes that Largo was a government officer performing an official duty and that subsection (b) applies. See Objection at 5. The issue, then, is whether K. Cleveland was "motivated by" Largo's status as a government officer. U.S.S.G. § 3A1.2(a). Application Note 3 to U.S.S.G. § 3A1.2 says that "motivated by such status . . . means that the offense of conviction was motivated by the fact that the victim was a government officer or employee, or a member of the immediate family thereof." U.S.S.G. § 3A1.2 application note 3. The Application Note explains:

> This adjustment would not apply, for example, where both the defendant and victim were employed by the same government agency and the offense was motivated by a personal dispute. This adjustment also would not apply in the case of a robbery of a postal employee because the offense guideline for robbery contains an enhancement (§ 2B3.1(b)(1)) that takes such conduct into account.

U.S.S.G. § 3A1.2 application note 3. See United States v. Williams, 520 F.3d 414, 424 (5th Cir. 2008)("The commentary further provides for a 'personal dispute' exception, noting that the adjustment would not apply 'where both the defendant and victim were employed by the same government agency and the offense was motivated by a personal dispute.'")(quoting U.S.S.G. § 3A1.2 application note 3).

United States Courts of Appeals have upheld enhancements under § 3A1.2 when the defendant knew that the victim was a government officer or employee, and the motivation for the

action arose from the tasks that the government officer performed because of his or her status as a government officer. See, e.g., United States v. Williams, 520 F.3d 414, 424 (5th Cir. 2008); United States v. Talley, 164 F.3d 989, 1003-04 (6th Cir. 1999). In United States v. Williams, the United States Court of Appeals for the Fifth Circuit held that a defendant was motivated by a corrections officer's status as a corrections officer when the defendant assaulted the corrections officer allegedly for his inappropriate touching during a pat-down. See 520 F.3d at 424. The Fifth Circuit concluded that "the sole reason [the defendant's] allegation of improper touching by Officer Bordelon arose was because Officer Bordelon was employed as a corrections officer . . . ." 520 F.3d at 424. Similarly, in United States v. Talley, the United States Court of Appeals for the Sixth Circuit concluded that an agent's official status motivated a defendant seeking to eliminate witnesses before his trial, when the defendant solicited someone to kill the federal agent. See 164 F.3d at 1004. The Sixth Circuit noted that the "very reason" that the agent acted as a witness was "because of his official status" and that the defendant wanted to kill the agent, because the agent "in performing his duties as a government official, had obtained incriminating information and would therefore be able to testify against" the defendant. 164 F.3d at 1004. See United States v. Kwaja, 691 F. App'x 214, 214 (5th Cir. 2017)(unpublished)(concluding that "[t]he sole reason [the defendant's] altercation with the officer arose was because the officer was acting in his official capacity as a federal policeman"), cert. denied, 138 S. Ct. 414 (2017); United States v. Rue, 988 F.2d 94, 95, 97 (10th Cir. 1993)(upholding § 3A1.2's application when a prisoner attacked a prison guard attempting to take a "homemade hypodermic syringe" from the prisoner). The Court has applied § 3A1.2 where one officer "identified himself with his Drug Enforcement Administration badge," another officer "issued several commands," the defendant attempted to avoid arrest, and the defendant "was convicted of assaulting, resisting, impeding, intimidating, and interfering with

a federal law enforcement officer." United States v. Akendeu, No. CR 18-0223 JB, 2019 WL 1002362, at *2 (D.N.M. Mar. 1, 2019)(Browning, J.).

Section 3A1.2 does not apply where the crime at issue does not relate to an officer's status, even if the officer was harmed. See United States v. Blackwell, 323 F.3d 1256, 1262 (10th Cir. 2003)(explaining that "[t]he offense of conviction in this case was possession of a firearm by a felon. Nothing about the status of the officers in any way motivated the commission of that offense, nor were the officers victims of that offense," and comparing the facts to convictions for drug possession, which are also not motivated by the officers' status); United States v. Ansberry, 976 F.3d 1108, 1123 (10th Cir. 2020)(reversing the district court's imposition of the official-victim enhancement, because the district court considered more than the "facts immediately related to the offense of conviction support the enhancement"). See also United States v. Goolsby, 209 F.3d 1079, 1081-82 (8th Cir. 2000)(holding where offenses of conviction were conspiracy to distribute cocaine base and possession with intent to distribute, defendant's assault of officer during escape from custody not subject to official victim enhancement under § 3A1.2); United States v. Drapeau, 121 F.3d 344, 349 (8th Cir. 1997)(noting § 3A1.2(a) provides that its enhancement is only proper where government official is victim of defendant's offense of conviction; hence district court erred in considering other relevant conduct); United States v. Ortiz-Granados, 12 F.3d 39, 42 n 4 (5th Cir. 1994)(recognizing that § 3A1.2(a) is inapplicable, because defendant's "offense conviction-possessing, importing, and conspiring to possess and import marijuana-was not motivated by the Border Patrol agents' status as government officers or employees"); United States v. Powell, 6 F.3d 611, 613 (9th Cir. 1993)(holding that § 3A1.2(a) is inapplicable to defendant's guilty plea to charge of felon in possession of firearm because offense of conviction not motivated by official status of law enforcement officer); United States v. Morrow, 925 F.2d 779, 782 (4th Cir.

1991)(same).  Here, L. Cleveland's offense -- second degree murder -- relates directly to the harm of the officer.

Section 3A1.2(a) also does not apply if the defendant did not know of the victim's official status, "because the guidelines' language explicitly requires knowledge."  United States v. Solorzano, 832 F. App'x 276, 282 (5th Cir. 2020).  See United States v. Rivera-Alonzo, 584 F.3d 829, 836 (9th Cir. 2009)("The key factors are knowledge of the victim's official status and assaultive conduct motivated by that knowledge.").  For instance, in United States v. Solorzano, the Fifth Circuit concluded that the defendant "was not motivated by" the officer's "official status," because "[h]e did not know" that the officers "were federal officers when he shot at them":

> Throughout this encounter [the officers] drove unmarked vehicles, wore plain clothes, and never informed [the defendant] that they were law enforcement. [A co-defendant] testified at trial that he and [the defendant] did not know they were firing at law enforcement officers. [One of the officers] himself recognized on cross-examination that [the defendant] had no reason to believe they were officers.

United States v. Solorzano, 832 F. App'x at 282.  And in United States v. Rivera-Alonzo, the Ninth Circuit held that a district court enhanced properly a sentence under U.S.S.G. § 3A1.2 where the defendant saw a Border Patrol agent in uniform, attempted to run away, eventually dove at the agent's feet, tackled him, and took the agent's gun before being subdued by another agent.  See 584 F.3d at 837 ("The 'Official Victim' enhancement does not require that a defendant harbor any particular ill-will towards federal agents.  It is enough that a defendant knows that the victim is a federal officer and then assaults the officer in an attempt to get away or evade capture.")(no citation for quotation).

Here, the Court concludes that § 3A1.2 applies, because K. Cleveland knowingly shot at a police officer.  The parties largely do not dispute the sequence of events leading up the shooting, instead they dispute whether the Court can, by the preponderance of the evidence, infer that K.

Cleveland knew he was shooting at a police officer, and they offer dueling neuropsychological reports to support their inferences. See Second PSR at 1-24; Objections at 1-10; Dr. Askenazi Report; Dr. Abrams Silva Report.[7] The neuropsychologists dispute the impact of K. Cleveland's wounds and his mental state at the time of the shooting: Dr. Abrams-Silva concludes that K. Cleveland "likely . . . was experiencing a flashback associated with PTSD, while also impaired due to recent head injury and several subsequent days of intoxication," Dr. Abrams-Silva Report at 6; whereas Dr. Askenazi concludes that although K. Cleveland was intoxicated at the time of the attack, he did not have a brain injury and that he was not experiencing a PTSD flashback, see Dr. Askenazi Report at 37-39. Both neuropsychological reports agree that K. Cleveland was drunk when he shot and killed Largo. See Dr. Askenazi Report at 1-8; Dr. Abrams Silva Report at 18, 37-40. The United States' expert, Dr. Askenazi, diagnosis K. Cleveland with moderate Alcohol Use Disorder, and even admits that K. Cleveland's "feud . . . and his voluntary inebriation, are what led to him possibly misperceiving the situation, and him shooting." Dr. Askenazi Report at 37-40. The reports, however, disagree whether K. Cleveland had a PTSD flashback and had a concussion. Compare Dr. Abrams-Silva at 1-8, with Dr. Askenazi Report at 24-28. The Court concludes by the preponderance of the evidence that K. Cleveland was not suffering from a PTSD flashback on the night he shot Largo or a concussion, because none of his descriptions of that night or the events leading up to it reflect a PTSD flashback or a concussion from his head wound days earlier and K. Cleveland knew within minutes after shooting Largo that he had shot an officer. See

---

[7]Although not disputed, the record does not reflect: (i) when Largo turned on his lights -- Largo turned on his shortly before he stopped E. Cleveland and K. Cleveland, but the exact timeframe is not evident from the record before the Court; (ii) whether K. Cleveland exited the truck before Largo stepped out of his vehicle or after; and (iii) whether Largo gave K. Cleveland any verbal orders or verbally identified himself as an officer.

PSR ¶¶ 22-23, at 6-7 ("Approximately 10 minutes [after the shooting], Kirby knocked on the window, then went to the front door and said, 'I shot the cop,' 'go help the cop.'").  The Court agrees with Dr. Askenazi that Dr. Abrams-Silva's assessment is not credible, because Dr. Abrams-Silva made several errors in her evaluation, did not take all the evidence into consideration, and the evidence she did consider does not reflect a trauma-induced flashback.  See Dr. Askenazi Report at 24-39.[8]  Because K. Cleveland was not suffering from a trauma-induced flashback or

---

[8]Dr. Askenazi explains why Dr. Abrams-Silva's passement is not credible:

Quite notable is that shortly after his arrest on March 12, 2017, Mr. Cleveland was taken in by police for medical evaluation for clearance, at which time there were absolutely no complaints that would be consistent with a concussion or brain injury, and there were no noted mental status abnormalities due to alcohol intoxication.  No mental illness was reported.  It is concerning that given that Dr. Abrams-Silva was asked to address questions regarding that night, she did not review the medical or legal records associated with that night.

. . . .

Dr. Abrams-Silva did not properly administer or score the Health and Safety section of the ILS, so the score is not valid and cannot be interpreted to reflect Mr. Cleveland's real abilities in this regard.

. . . .

A comprehensive mental health assessment measure was not administered by Dr. Abrams-Silva, to evaluate potential overlap of symptomatology and rule-out of non-PTSD mental health conditions, even general anxiety, for which there is great overlap with PTSD.

. . . .

In response to specific questions provided to her, Dr. Abrams-Silva opined that on the night of his arrest, Mr. Cleveland believed that he was in "imminent danger of death or great bodily harm."  She again suggested that he was suffering a flashback in addition to cognitive impact from an acute head injury and intoxication, although there is no evidence he had a flashback, and a head injury does not equal brain injury.

. . . .

- 38 -

The only true condition at that time, however, was active intoxication. [Dr. Abram-silva] then stated that he demonstrated all those difficulties during her assessment when he was not having a response to an acute head injury, was not intoxicated, and was not having a flashback. She opined that based on such, he would be unable to control his responses, even though she did not thoroughly document asking him questions related to his thought processes at the time, or how he had shown her he could not control his responses. She in fact had described him as redirectable when he went off topic during her evaluation, and not exhibiting any inappropriate behaviors. Most importantly, her assessment included incorrect administer and scoring on at least one measure. This opinion is thus not supported by her own evaluation.

. . . .

In response to specific questions provided to her, Dr. Abrams-Silva opined that on the night of his arrest, Mr. Cleveland believed that he was in "imminent danger of death or great bodily harm." She again suggested that he was suffering a flashback in addition to cognitive impact from an acute head injury and intoxication, although there is no evidence he had a flashback, and a head injury does not equal brain injury.

. . . .

There is no evidence that Mr. Cleveland was suffering from any significant mental health condition on or around March 11, 2017, including posttraumatic stress disorder (PTSD). As he well explained, and is supported by collateral sources and documents, his family and that of the Willetos were in a feud, and assaulting each other or damaging each other's property in a back and forth, escalating manner in early March 2017. As Mr. Cleveland made clear, he was not suffering from a flashback on March 11, 2017, and has never suffered a flashback. Although Mr. Cleveland described having experienced traumas throughout his life, his actions on the date of March 11, 2017 were not trauma induced.

. . . .

In Dr. Abrams-Silva report, it is repeatedly noted that Mr. Cleveland was intoxicated for the days leading up to the events, and his account had been "disjointed" and "inaccurate." However, she disregards the importance of this, and instead chose to focus on PTSD, without a documented comprehensive inquiry as to his real symptoms at the time, and the events leading up to his actions. Additionally, it is highly concerning that in a forensic evaluation, she did not review any legal records before making legal opinions, and did not conduct a thorough history in all areas of his life, which are critical for neuropsychological evaluations within a criminal setting. She said he "likely" was having a flashback at the time,

concussion on the night he shot Largo, the issue is then whether he was so inebriated that he did not know he was shooting at an officer who was performing an official duty.[9] See United States v. Rivera-Alonzo, 584 F.3d at 836 ("The key factors are knowledge of the victim's official status and assaultive conduct motivated by that knowledge.").

Cleveland does not dispute that Largo was performing an official duty -- here, Largo was performing a valid stop. See Objections at 1-10; United States v. Akendeu, No. CR 18-0223 JB, 2019 WL 1002362, at *2 (D.N.M. Mar. 1, 2019)(Browning, J.)("United States Courts of Appeals have upheld enhancements under § 3A1.2 when the defendant knew that the victim was a government officer or employee, and the motivation for the action arose from the tasks that the

---

but he never reported this as the reason for him shooting.

. . . .

    In summary, evidence does not support that Kirby Cleveland was suffering from any cognitive or mental impairment, disease, or reduced capacity at the time of the events on March 11, 2017, either in general or causally related to his actions. The feud his family was in, and his voluntary inebriation, are what led to him possibly misperceiving the situation, and him shooting. Why he claims he would be shooting at the ground when, as Nathaniel stated, they would have shot into the air to scare off others, is not clear. Mr. Cleveland's drinking problem has been related to his previous criminal issues. Although particularly physically aggressive while drinking, there are instances of Mr. Cleveland being in many fights when not drinking.

Dr. Askenazi Report at 24-39 (no citations for quotations).

    [9]The USPO argues that "it is reasonable to believe" that K. Cleveland knew that he was shooting at a police officer: Largo approached E. Cleveland and K. Cleveland in a marked white police vehicle, turned on his lights, parked in front of them, and was wearing his uniform. Second PSR ¶¶ 10-33, at 4-8. The Court agrees that a reasonable person would have known that he was dealing with a police officer in such a situation; what a reasonable person believes, however, is not the question, the question is whether K. Cleveland subjectively knew he was shooting at an officer. See U.S.S.G. § 3A1.2 (applying the enhancement if the defendant was motivated by the conduct); United States v. Solorzano, 832 F. App'x ay 282; United States v. Rivera-Alonzo, 584 F.3d at 836.

government officer performed because of his or her status as a government officer.").  Instead, K. Cleveland argues that he was not in a normal state of mind and that he did not know he was shooting at an officer: (i) K. Cleveland was extremely intoxicated; (ii) he was in an agitated state, because he was worried that his attackers would come after him; (iii) his attackers had driven a white van and Largo was driving a white vehicle; (iv) he was still healing from recent wounds from those attackers; (v) the shooting occurred at night in an unlit area; (vi) he could not see the Largo's vehicle when he pulled up; (vii) K. Cleveland did not know that Todachine had called the police that evening;[10] (viii) he told Todachine within ten minutes after the shooting that he thought had mistakenly shot a police officer, believing he was dealing with his attackers; (ix) he has maintained that he did not know he was shooting a police officer; and (x) both K. Cleveland's and the United States' experts agree that K. Cleveland's intoxication combined with the anxiety of being attacked again by men in a white van could have led to his mistaken belief that Largo was not a police officer, but his attackers.  See Objection at 1-10; Second PSR ¶¶ 11-33, at 4-8 (admitting these facts); Dr. Askenazi Report at 38-39; Dr. Abrams Silva Report at 6-8.  K.

Although K. Cleveland's ten points establish that there is a possibility that he was so drunk and so worried about his attackers that he mistook Largo to be one of his assailants, the Court

---

[10]The USPO argues that K. Cleveland should have been aware that he had an active warrant for his arrest, because he was an absconder from supervision, suggesting that K. Cleveland should therefore have known Largo was a police officer.  See Second PSR ¶¶ 25-26, at 7.  As an absconder from supervision with a warrant out for his arrest, K. Cleveland knew he would likely have to deal with the police; the Court concludes, however, that K. Cleveland had no reason to suspect that he would be dealing with police that evening based on his status as an absconder, because it was late at night and there was no other indication that the police were coming to arrest him for absconding. In addition, although K. Cleveland had asked Todachine to call the police earlier that evening, because he was worried the attackers might show up, Todachine did not call the police when he asked her to, and he did not know that Todachine later did call the police when he became increasingly intoxicated and disruptive.  See Second PSR ¶ 25, at 7 ("Unbeknownst to Kirby," Todachine "contacted law enforcement due to Kirby's erratic behavior.").

concludes that the United States has met its burden to show by the preponderance of the evidence that K. Cleveland knew he was shooting at officer, because: (i) Largo approached in a marked police vehicle with his emergency lights on before stopping K. Cleveland and his uncle; (ii) Largo was in uniform; and (iii) K. Cleveland had two opportunities to see the police vehicle with its flashing lights, first when the officer stopped him and second when he turned around to shoot at the officer. Cf. United States v. Solorzano, 832 F. App'x at 282 (concluding that the defendant "was not motivated by" the officer's "official status," because "[h]e did not know" that the unmarked vehicles and unmarked officers "were federal officers when he shot at them"). For the Court to conclude that K. Cleveland did not know he was shooting at an officer, the Court would have to find that K. Cleveland did not see or somehow mistook a marked police vehicle with bright, flashing lights,[11] that approached and stopped him and his uncle, and pulled up right in front of them. K. Cleveland contends that, although Largo stopped them in a marked police vehicle and pulled up in front of them, Largo was parked closer to E. Cleveland than to himself; in other words, it was harder to see the vehicle because K. Cleveland was sitting in the passenger seat. See Objections at 2, 6-7. K. Cleveland does not, however, suggest that K. Cleveland's view was obstructed in any way, and although sitting in the passenger seat might change the angle at which

_____

[11]The record does not reflect when Largo turned on his lights; the Court concludes, however, that it was as Largo was approaching K. Cleveland and his uncle, because Largo would have turned them on to initiate the stop and K. Cleveland does not point to any portion of the record to suggest otherwise. Even if Largo did not turn on his lights until both vehicles had stopped, the Court's analysis would not substantively change, because K. Cleveland would still have had two opportunities to see the lights -- when both vehicles stopped and when he turned around to shoot at Largo. The only scenario that the Court can conceive of where K. Cleveland did not see the lights the first time is if K. Cleveland jumped out of his vehicle before Largo turned on his lights, but K. Cleveland does not argue this happened and nothing in the record suggests that this occurred, and such a conclusion would be mere speculation. And even if this occurred, K. Cleveland still had a second opportunity to see the lights and a uniformed Largo when he turned around to shoot.

K. Cleveland observed Largo's vehicle approaching, the Court concludes that sitting in the passenger seat does not make it harder to accurately perceive a police vehicle with lights approaching head on. See Objections at 6-7. Further, Largo stopped his vehicle only a short distance in front of K. Cleveland and his uncle, see Findings of Fact ¶ 21 (showing photographs of the two vehicles parked head on, a short distance away from each other), supra, and the Court is hard pressed to imagine a scenario where K. Cleveland mistook a clearly marked police vehicle with lights for his attackers. Even if K. Cleveland somehow did not see or recognize the police vehicle with flashing lights at first, K. Cleveland had a second opportunity to see not only the vehicle with flashing lights but also Largo in uniform, when he turned around to shoot at Largo. K. Cleveland shot at Largo a distance of 232 feet -- roughly two-thirds of a football field -- from the vehicles. See PSR ¶ 19, at 6.[12] To shoot at Largo, K. Cleveland was facing back the way he came: facing the police vehicle and Largo. Although it was dark and unlit, K. Cleveland would have had a clear view of the vehicle with its flashing lights.

Furthermore, even in K. Cleveland's version of events, he admits that he recognized that he shot an officer within minutes of Largo arriving on scene, meaning that K. Cleveland was not so drunk that he could not comprehend what had happened, go tell Todachine, return to the scene,

---

[12]K. Cleveland objects to the USPO characterization that K. Cleveland "waited nearby" for Largo to approach after K. Cleveland exited his vehicle. See Second PSR ¶ 26, at 7. The facts do not show by the preponderance of the evidence that K. Cleveland waited nearby: although it undisputed that K. Cleveland was only 232 feet away from the vehicles, the precise timing of when K. Cleveland exited his vehicle, and when Largo began to pursue K. Cleveland is unclear, and Todachine suggests that the shooting occurred within two minutes of Largo arriving on scene. See Second PSR ¶¶ 19, at 6; Objections at 6. Accordingly, although it is possible that K. Cleveland waited for Largo after initially fleeing the scene, the record is not sufficiently clear for the Court to conclude, by the preponderance of the evidence, that K. Cleveland waited for Largo, or that this fact shows that K. Cleveland knew he was shooting at a police officer because it was dark.

and then hide out till morning.  See Objections at 5; PSR ¶¶ 22-23, at 6-7 ("Approximately 10 minutes [after the shooting], Kirby knocked on the window, then went to the front door and said, 'I shot the cop,' 'go help the cop.'").

In concluding that K. Cleveland knew he was shooting at an officer who was initiating a stop, the Court recognizes that K. Cleveland's anxiety and fear of confronting his attackers and his pain from his lingering and untreated injuries led him to panic -- the Court only concludes that K. Cleveland knew he was shooting at an officer and that the officer was performing an official task, such as the stop here.  See United States v. Akendeu, 2019 WL 1002362, at *2 ("United States Courts of Appeals have upheld enhancements under § 3A1.2 when the defendant knew that the victim was a government officer or employee, and the motivation for the action arose from the tasks that the government officer performed because of his or her status as a government officer.").  Accordingly, the Court concludes that K. Cleveland was "motivated" by Largo's status as on officer.  U.S.S.G. § 3A1.2(a).  See United States v. Rivera-Alonzo, 584 F.3d at 836 ("The key factors are knowledge of the victim's official status and assaultive conduct motivated by that knowledge.").  The Court therefore overrules the Objection.

Last, the Court concludes that video evidence shows that K. Cleveland was not involved in a physical attack on another inmate on May 2, 2019, which the PSR alleges in paragraph 71. See PSR ¶ 71, at 15; Notice of Lodging Supplemental Exhibits at 1 (Doc. 200)(noting that K. Cleveland filed a "Video of Pod Activities at Sandoval County Detention Center on May 2, 2019" with the Court).  The Court has reviewed carefully the video evidence, and although at times it is difficult to see where every person is moving, because people move off screen, the video shows K. Cleveland never approach the cell where the attack happened.[13]  The USPO does not dispute

_____

[13]The Court's review of the video reflects the following sequence of events:

K. Cleveland's version, it only states that "it is difficult to determine if the individual depicted as the defendant is in fact him." Second Addendum to the Presentence Report, filed June 15, 2021 (Doc. 201)("Second Add. PSR"). The USPO states that a criminal complaint filed against K. Cleveland concerning the assault has been dismissed "Nolle Prosequi without prejudice in the above-captioned and numbered cause and as grounds states this matter is being reviewed and considered for Grand Jury." Second Add. PSR at 1. The USPO also states that "[a]dditional information concludes the defendant did not receive a disciplinary sanction for his involvement. As no sanction was imposed, it is believed his involvement was not significant." Second Add. PSR at 1. After reviewing the video, the Court concludes that K. Cleveland was not involved.

---

At 8:22:50 p.m., three men enter the alleged victim's cell, which is the second cell on the right hand, upstairs side. One is a large, easily identifiable man, one is wearing a do-rag, and one is wearing a white shirt over grey pants. At this time K. Cleveland is sitting in the center frame of the camera alone and then moves to a table where several inmates are playing cards.

At 08:23:21 p.m., while the three men are in the alleged victim's room, there are two other inmates standing outside watching something within. The door appears wedged open during this time. At 8:23:35 p.m., the three men leave. The larger inmate hangs around outside the alleged victim's door, the other two men go to the upstairs shower room. The larger man reenter the cell around 08:24 p.m. very briefly. K. Cleveland is still at the card table. The larger inmate goes and talks to K. Cleveland.

At 8:27:45 p.m. two men with full or partial orange jumpsuits enter the victim's room and leave about thirty-seconds later. At 8:31:34 p.m. one of them men reenters briefly, then leaves. This man in the full orange jumpsuit joins the larger inmate in his cell. At 8:33 p.m. K. Cleveland joins the larger inmate and the inmate in full orange jumpsuit that was in the victim's cell in the larger inmate's cell. At 8:34:20 p.m. a bald inmate with long white sleeves also enters. They leave together ten seconds later and everyone goes into the table area.

At 8:42 p.m. a short inmate in white short sleeves over orange pants enters and leaves very quickly. At 08:47 p.m. an inmate walks past and appears to knock the victim's door shut. At 8:52:50 p.m. a guard walks past the victim's room and very briefly looks in cell's window.

At 08:55:25 p.m., K. Cleveland goes upstairs and to the left and is let into one of the cells by a guard. A shirtless inmate motions and the white sleeved bald inmate, they stand outside the door. At 08:56 there is a dark shape on the victim's cell window.

At 8:58:22 p.m. the bald headed inmate in white sleeves enters the alleged victim's cell and exits at 8:58:37 p.m.. The victim follows with his belongings. Around 9:00:00, several guards ender and all the inmates start to enter their rooms. By 9:01:00 p.m. all the inmates are in their rooms and only guards remain in the main area.

**IT IS ORDERED** that the Objection in Defendant Kirby K. Cleveland's Objections to the

Amended Presentence Report [DKT. 178-1], filed July 28, 2020 (Doc. 181)(brackets in the original

title), is overruled.



_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred J. Federici
  Acting United States Attorney
Jennifer M. Rozzoni
Jeremy Pena
Joseph Michael Spindle
Niki Tapia-Brito
Novaline Wilson
Letitia Carroll Simms
Michael D. Murphy
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Theresa M. Duncan
Duncan Earnest L.L.C.
Albuquerque, New Mexico

-- and --

Donald Kochersberger
Business Law Southwest, L.L.C.
Albuquerque, New Mexico

    *Attorneys for the Defendant*